**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**COLUMBIA DIVISION**

| | | |
|---|---|---|
| **STARLINK LOGISTICS INC.,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.:** _____ |
| | ) | |
| **ACC, LLC,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **T & K CONSTRUCTION, LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>COMPLAINT</u>

Plaintiff StarLink Logistics, Inc. ("SLLI"), by and through its undersigned counsel, hereby alleges as follows:

### NATURE OF THE ACTION

1.      SLLI brings this citizen's suit against Defendant ACC, LLC ("ACC") and T & K Construction, LLC ("T&K") pursuant to Section 505(a)(1) of the federal Clean Water Act ("CWA" or "the Act"), as amended, 33 U.S.C. § 1365(a)(1).

### JURSIDICTION AND VENUE

2.      This Court has subject matter jurisdiction over the claims set forth in this Complaint pursuant to the citizen suit provisions of Section 505(a) of the CWA, 33 U.S.C. § 1365(a), and federal question jurisdiction pursuant to 28 U.S.C. § 1331.

3.      Plaintiff has complied with Section 505(b)(1)(A) of the CWA, 33 U.S.C. § 1365(b)(1)(A), which requires pre-suit notice.

Case 1:18-cv-00029   Document 1   Filed 04/09/18   Page 1 of 31 PageID #: 1

4. On October 25, 2017, Plaintiff mailed a notice of intent to file this action under the CWA to the named Defendants, the Administrator of the U.S. Environmental Protection Agency ("USEPA"), the Regional Administrator of USEPA Region 4, and the Commissioner of the Tennessee Department of Environment and Conservation ("TDEC"). A copy of the notice letter is attached as Exhibit A.

5. More than sixty days have passed since SLLI sent the notice letter.

6. The violations identified in the notice letter and in this complaint are continuing at this time and will continue in the future absent a court order for corrective action.

7. Neither USEPA nor TDEC has commenced, nor are they diligently prosecuting, a civil or criminal action in a court of the United States to redress the violations of the CWA by Defendants that were identified in the notice letter.

8. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and 33 U.S.C. § 1365 (c)(1). The CWA violations alleged here have occurred and are occurring in the Middle District of Tennessee.

## PARTIES

9. Plaintiff SLLI is a Delaware corporation headquartered in Bridgewater, New Jersey.

10. SLLI owns an approximately 1485-acre tract of land located at 786 Arrow Lake Road, in Maury County near the City of Mt. Pleasant, Tennessee 38474.

11. ACC, f/k/a Associated Commodities Corporation, is a Tennessee corporation whose corporate address is 400 Arrow Mines Road, Maury County, Tennessee 38474.

12. ACC owns property located immediately east of SLLI's property.

2

13.     Arrow Lake Road is the property line between SLLI's property and ACC's property.

14.     ACC's property includes an approximately 14-acre area of a former industrial landfill (hereinafter "the Landfill" or "ACC's Landfill").

15.     ACC's property also includes a "Waste Relocation Area" where industrial waste that had been buried in the Landfill was relocated between 2012 and 2016.

16.     Defendant ACC is a "person" within the meaning of 33 U.S.C. §§ 1362(5) and 1365(a)(1).

17.     Defendant T&K is an Alabama corporation whose corporate address is 235 County Road 1242, Vinemont, Alabama 35179.

18.     T&K has been contracted by ACC to conduct work on the Landfill and the Waste Relocation Area.

19.     Defendant T&K is a "person" within the meaning of 33 U.S.C. §§ 1362(5) and 1365(a)(1).

## STATUTORY BACKGROUND

20.     Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the discharge of pollutants from a point source into waters of the United States unless the discharge complies with various enumerated sections of the CWA.

21.     Among other things, Section 301(a) prohibits such discharges not authorized by, or in violation of the terms of, a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

3

22.     Each violation of an NPDES permit—and each discharge of a pollutant that is not authorized by such permit—is a separate violation of the CWA. 33 U.S.C. §§ 1311(a); 1342(a); 1365(f)(6).

23.     The CWA defines a "point source" as "any discernible, confined, and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, [or] container . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

24.     There are three pipes that run under Arrow Lake Road to convey surface water from ACC's property onto SLLI's property and into Sugar Creek and Arrow Lake in ditches and channels.

25.     The three pipes that convey surface water under Arrow Lake Road are point sources.

26.     Courts have consistently held stormwater runoff from landfill sediment basins as point sources regulated under the CWA. *See Residents Against Industrial Landfill Expansion (R.A.I.L.E.) v. Diversified Sys., Inc.,* 804 F. Supp. 1036, 1038 (E.D. Tenn. 1992) (sediment basins at the foot of an industrial landfill "are clearly point sources under the [Clean Water] Act"); *Dague v. City of Burlington,* 935 F.2d 1343 (2d Cir.1991) (culvert that carried seeps of leachate from a landfill was a point source), *cert. denied on other grounds,* 502 U.S. 1071, 112 S.Ct. 964, 117 L.Ed.2d 130 (1992).

27.     Sugar Creek, Arrow Lake, and the unnamed tributaries of Sugar Creek on SLLI's property are waters of the United States.

28.    The State of Tennessee has been delegated the authority to implement the permitting programs of the CWA by the USEPA, including the NPDES permit program, pursuant to 33 U.S.C. § 1342(b).

29.    TDEC is the water pollution control agency for purposes of the NPDES permit program under the CWA and has drafted regulations pursuant to that authority implementing the Act's permitting programs within the State of Tennessee. *See* Tenn. Code Ann. § 69-3-105(h)(1).

30.    A violation of an NPDES permit issued by TDEC is a violation of the Tennessee Water Quality Control Act of 1977 ("TWQCA"), Tenn. Code Ann. §§ 69-3-101, *et seq.*, TDEC rules, including Chapters 400-40-3 and 400-40-05, and the CWA.

31.    A citizen suit, pursuant to 33 U.S.C. § 1365(a)(1), may be brought for violations of the terms and conditions of NPDES permits. 33 U.S.C. § 1365(f).

## RELEVANT FACTS

*a) The Properties in Question*

23.    The approximate center of ACC's Landfill is located at Latitude 35º29'31"N, Longitude 87º10'28"W near the City of Mt. Pleasant, in Maury County, Tennessee.

24.    The ACC Landfill received industrial waste from 1981 to 1993.

25.    ACC used the Landfill for the disposal of aluminum salt cake, slag, bag house dusts, and other related waste byproduct materials from a secondary aluminum smelting plant operated by Smelter Service Corporation, located at 400 Arrow Mines Road, Maury County, Tennessee 38474.

26.    The Landfill was operated pursuant to a "Registration Authorizing Solid Waste Disposal Activities in Tennessee" issued on July 1, 1981 by the Tennessee Department of Public Health, the predecessor agency to the TDEC.

5

27.     SLLI owns a 1,485-acre tract of land located directly adjacent to, and downstream from, ACC's property.

28.     SLLI's property includes several miles of Sugar Creek, including Arrow Lake, and numerous unnamed tributaries of Sugar Creek. An aerial photograph taken on February 26, 2018 showing the positioning of the Landfill, Waste Relocation Area, SLLI's property, Sugar Creek, and Arrow Lake is attached as Exhibit B.

### b) Sugar Creek

29.     Sugar Creek flows through SLLI's property, and eventually flows into the Cumberland River.

30.     Sugar Creek was dammed on the SLLI property in the 1920s to form an approximately 60-acre reservoir known as Arrow Lake.

31.     Arrow Lake has historically been used as a fishing and recreation lake by the residents of Tennessee.

32.     Arrow Lake remained in use as a public recreational fishing lake until 2007.

33.     At that time SLLI closed the lake to public fishing in part due to pollution coming into the lake from the ACC Landfill.

34.     SLLI has publicly stated its intention to environmentally remediate Arrow Lake and reopen it to the public for recreation.

35.     Acts of the Defendants resulting in pollution from the ACC Landfill have prevented SLLI from realizing this objective.

36.     During rain events, sediment-laden stormwater leaves ACC's property, including the Landfill, the Waste Relocation Area and other areas of the property where soil has been

6

disturbed in connection with construction activities associated with the Landfill and Waste Relocation Area.

37.     This sediment-laden stormwater runoff is then directed through at least three steel culvert pipes that pass under Arrow Lake Road and directly onto SLLI's property.

38.     These sediment-laden stormwater discharges from ACC's property meander across SLLI's property in unnamed tributaries of Sugar Creek, into Sugar Creek, and into Arrow Lake. *See* Exhibit A.

39.     Section 303(d) of the CWA, 33 U.S.C. § 1313(d), requires TDEC to provide USEPA a list of streams, rivers and other water bodies that are impaired or threatened by pollution on a biennial basis.

40.     USEPA reviews and approves TDEC's 303(d) list.

41.     Sugar Creek, Arrow Lake and the primary unnamed tributary that runs from the ACC Landfill to Sugar Creek are on TDEC's USEPA-approved Final Year 2016 303(d) and Draft 2018 303(d) List of Impaired and Threatened Waters due to numerous issues caused by the ACC Landfill.

42.     Sugar Creek has been listed on the USEPA approved 303(d) List of Impaired and Threatened Waters for many years due to sediment runoff into the creek.

43.     Due to sediment problems, USEPA approved a TDEC-prepared Total Maximum Daily Load ("TMDL") for Siltation and Habitat Alteration in the Lower Duck River Watershed (HUC 06040003) ("Lower Duck River TMDL") in 2005, which includes Sugar Creek, Arrow Lake and the unnamed tributary of Sugar Creek.

*c) ACC's Landfill*

44. ACC has been engaged in episodic construction activities at the ACC Landfill since 2011 and at the Waste Relocation Area since 2012.

45. T&K has been the contractor (also referred to in the NPDES permit as a "secondary permittee") responsible for at least some of the construction work conducted on the ACC Landfill and Waste Relocation Area from 2012 to the present.

46. From 2012 to 2016, ACC and its contractors relocated industrial waste from the original Landfill to the new Waste Relocation Area on its property pursuant to an Amended and Restated Consent Order between ACC and TDEC.

47. Substantial earthwork in both the Landfill and the new Waste Relocation Area and in other portions of ACC's property was completed around November of 2016 and no significant earth disturbing activity took place at the ACC Landfill in 2017.

48. Throughout this period and at present, significant amounts of sediment and other pollutants associated with the Landfill have been eroding from the construction areas on ACC's property and leaving the property in stormwater discharges have that flow onto SLLI's property and into Sugar Creek, the unnamed tributary and Arrow Lake. *See* Exhibit A.

### d) *ACC Landfill NPDES Permit*

49. On February 17, 2011, TDEC issued a Notice of Coverage ("NOC") for discharges of stormwater associated with construction activities to be performed at the ACC Landfill. *See* Exhibit 1 of Exhibit A.

50. The NOC authorized the discharge of stormwater from the ACC Landfill in compliance with Tennessee's General NPDES Permit for Stormwater Associated with Construction Activity (the "Construction General Permit" of "CGP").

8

51.     This NOC has been amended several times by TDEC at the request of ACC to include coverage for contractors, including T&K.

52.     TDEC assigned NPDES Construction General Permit ("CGP") Tracking Number TNR181267 to the ACC Landfill.

53.     ACC was authorized to discharge stormwater pursuant to the CGP from February 17, 2011 until TDEC approves a notice of termination ("NOT") that certifies that all post-construction requirements have been completed at the ACC Landfill.

54.     At this time, a NOT has not been submitted or approved, and therefore the CGP remains in effect at the ACC Landfill.

55.     Pursuant to the requirements of the CGP, ACC prepared a Construction Stormwater Pollution Prevention Plan for the Phase 1 Corrective Action Construction at the ACC Landfill (the "SWPPP").

56.     The most recent version of the SWPPP available from TDEC's files as of September 8, 2017, is dated July 31, 2012, and was prepared by TriAD Environmental Consultants, Inc.  *See* Exhibit 3 of Exhibit A.

57.     The original CGP that covered the ACC Landfill was issued by TDEC on May 23, 2011 and expired on May 23, 2016 (hereinafter the "2011 CGP").

58.     A copy of the 2011 CGP was included as Appendix 4 to the SWPPP.

59.     TDEC issued a new CGP on September 30, 2016 that now applies to the ACC landfill (hereinafter the "2016 CGP").

*e)  Sediment Basins/Ponds*

60.     A critical element to managing stormwater runoff from construction sites are sediment basins and ponds.  These engineered structures are designed to pool muddy stormwater

9

on the construction site during storm events so that sediment settles out of the water in these ponds and basins on the construction site and clean water is released slowly over time, thus preventing pollution of downstream waterbodies with sediment.

61.     The regulations of the Tennessee Division of Solid Waste Management applicable to management of stormwater from landfills, T.C.A. § 0400-11-01-.04(2)(i), provide that landfill operators must "design, construct, operate and maintain a run-off management system to collect and control at least the peak flow volume resulting from a 24-hour, 25-year storm."

62.     Furthermore, these regulations require that "Holding facilities (e.g., sediment basins) associated with run-on and run-off control systems must be designed to detain at least the water volume resulting from a 24-hour, 25-year storm and to divert through emergency spillways at least the peak flow resulting from a 24-hour, 100-year storm."

63.     Based on visual observations of the stormwater exiting ACC's property documented in photographs, laboratory analysis of water samples, and precipitation data, ACC's stormwater management practices are not effective for controlling a small 24-hour, 1-year storm event (a 24-hour long storm event that occurs on average once every year), much less a much larger 24-hour, 25-year storm event (a 24-hour long storm event that occurs on average every 25 years). *See* Exhibit A.

64.     According to the National Weather Service ("NWS"), the 24-hour, 25-year design storm precipitation is 6.36 inches at the ACC Landfill.

65.     The rainfall over the 24-hours of August 31, 2017 was 3.28 inches.

66.     During the storm in the afternoon of August 31, 2017, SLLI collected two water samples, one from Sugar Creek just upstream of SLLI's property and one from the primary pipe where ACC's water discharges onto SLLI's property.

10

67. Total suspended solids, a measurement of sediment in water, in the sample from Sugar Creek was 3 mg/l while it was almost twelve times higher, at 35 mg/l in the sample from the ACC discharge.

68. On the morning of September 1, 2017, SLLI representatives took ground level photographs documenting the sediment-laden discharges of stormwater from the ACC Landfill property onto SLLI's property and into Sugar Creek. *See* Exhibit 7 of Exhibit A.

69. The erosion prevention and sediment control ("EPSC") measures, if any, that ACC and/or T&K have designed and implemented do not retain a 24-hour 25-year storm event as required by applicable regulations, have not prevented discharge of sediment in the past and do not do so today. *See* Exhibit A.

70. ACC and T&K have failed to properly maintain the sediment control mechanisms. A TDEC inspection report pursuant to the CGP dated November 19, 2014 states:

> Small pond above larger sediment pond appears to be filled to capacity allowing some sediment to escape over the rip rap spillway. Pond needs to be cleaned of sediment to restore capacity. Filter ring in small drainage area below pond needs to be built back up to original height to prevent sediment from escaping further down drain. Spoke with Mr. James Manley, certified inspector for site, and he intends to address these issues.

71. Based on information and belief, including aerial photographs of the ACC Landfill and Waste Relocation Area taken each month from August 2012 to present, these issues identified by TDEC were never addressed by ACC or T&K. *See* Exhibit 4 of Exhibit A.

72. ACC and T&K meet the definition of "primary permittee," "secondary permittee" and/or "operator" under Section 2 of the 2011 and 2016 CGPs and are hereinafter referred to as the "permittees."

11

73.     Under Section 2.1 of the CGPs, the permittees can be held "jointly and severally responsible for complying with the permit."

74.     When calculating the maximum penalty for which Defendants are liable, each day of violation of each permit condition constitutes a separate violation of Section 301(a) of the CWA, pursuant to Section 309(d), 33 U.S.C. § 1319(d).

## CLAIMS

### Claim 1: Violation of § 1.3(d) of the 2011 and 2016 CGP

75.     Paragraphs 1 through 74 of this Complaint are hereby realleged and incorporated by reference.

76.     The permittees are in violation of Section 1.3(d) of the 2011 and 2016 CGPs relating to discharges threatening water quality because the discharges from ACC property have and will continue to cause or have the reasonable potential to cause or contribute to violations of water quality standards.

77.     Sugar Creek, including its unnamed tributaries and Arrow Lake, is already listed as impaired for siltation and a TMDL has been issued by TDEC and approved by USEPA to prevent the very type of sediment pollution being created by discharges from ACC's property.

### Claim 2: Violation of § 1.3(e) of the 2011 and 2016 CGP

78.     Paragraphs 1 through 77 of this Complaint are hereby realleged and incorporated by reference.

79.     The permittees are in violation of Section 1.3(e) of the 2011 and 2016 CGPs relating to discharges into waters with unavailable parameters (*i.e.,* impaired streams).

80.     The discharges of sediment from ACC's property are causing measurable degradation of water quality in Sugar Creek as evidenced by the fact that Sugar Creek is listed on

12

the TDEC 303(d) List and a TMDL for siltation and habitat alteration was issued for this watershed in 2005.

## Claim 3: Violation of § 1.3(k) of the 2011 and 2016 CGP

81.     Paragraphs 1 through 80 of this Complaint are hereby realleged and incorporated by reference.

82.     The permittees are in violation of Section 1.3(k) of the 2011 and 2016 CGPs relating to discharges into waters with an approved TMDL.

83.     The SWPPP applicable to the construction activities on the ACC Landfill and Waste Relocation Area does not incorporate measures or controls consistent with the assumptions and requirements of the TMDL applicable to Sugar Creek.

## Claim 4: Violation of § 2.3 of the 2011 and 2016 CGP

84.     Paragraphs 1 through 83 of this Complaint are hereby realleged and incorporated by reference.

85.     The permittees are in violation of Section 2.3 of the 2011 and 2016 CGPs related to their SWPPP and erosion control practices.

86.     Defendants have failed to ensure the project specifications that they have developed meet the minimum requirements of the SWPPP as evidenced by the fact that the measures the permittees have taken at the ACC Landfill and Waste Relocation Area cannot even effectively control and manage stormwater discharges from a 1-year, 24-hour storm event.

87.     Defendants have failed to ensure that all facilities necessary for the prevention of erosion or control of sediment are maintained and effective as evidenced by aerial photos showing sediment accumulated in the sediment pond at the base of the Waste Relocation Area and the sediment being discharged from the ACC property during storm events.

13

88.     Defendants have failed ensure that all site operators are complying with the SWPPP.

89.     Defendants have failed to ensure that measures in the SWPPP are adequate to prevent erosion and control any sediment that may result from their earth disturbing activity.

90.     Defendants have failed to effectively implement and maintain best management practices ("BMPs") and other erosion controls required by the SWPPP.

91.     As an example of the permittees' failure to implement the SWPPP, one of the engineer's stamped drawings in the July 31, 2012 SWPPP submitted to TDEC has a note that "All landfill surfaces shall be covered with a minimum 12-inch soil layer upon completion of Phase 1 excavation activities.  All other disturbed areas with the exception of the road surface shall also be vegetated."

92.     The SWPPP states in Section 4.0 that "stabilization methods will be initiated as soon as practicable in portions of the Site where construction activities have temporarily or permanently ceased, but in no case more than 15 days after the construction activity in that portion of the Site has temporarily or permanently ceased."

93.     The SWPPP also states that "permanent stabilization with perennial vegetation, as specified in the Construction Specifications, will replace any temporary measures as soon as practicable."

94.     As recent as 2017, cattle were grazing on what little new grass had germinated on the Waste Relocation Area.

95.     All major earthwork on the ACC Landfill and Waste Relocation Area ended in 2016, yet photographs from as recent as March 26, 2018, show vast areas of the ACC property

14

possess no vegetation whatsoever and the cover on the Waste Relocation Area has barren soil in several areas.

## Claim 5: Violation of § 3.1 of the 2011 and 2016 CGP

96.     Paragraphs 1 through 95 of this Complaint are hereby realleged and incorporated by reference.

97.     The permittees are in violation of Section 3.1 of the 2011 and 2016 CGPs.  The Defendants have not implemented the SWPPP as written from the commencement of construction activity to final stabilization.

98. As one example, Section 5.0 of the July 31, 2012 SWPPP states:

> Erosion and sediment control measures identified in the plan will be observed to ensure that they are operating correctly.  Outfall points will be inspected to ascertain whether erosion control measures are effective in preventing significant impacts to receiving waters. . .. In the event that sediment migrates offsite, the accumulation will be removed as soon as possible, before the next rain event, if possible.  The local Water Pollution office will be contacted to determine the appropriate remedial activities for sediment removal from stream.

99.     The permittees have never removed sediment from streams on SLLI's property, never contacted SLLI about doing so, and, based on a review of TDEC files, never contacted TDEC about doing so either.

100.    Due to the complete failure of the permittees' EPSC measures, much of the sediment that has discharged from their property over the past six years, and continues to discharge today, is now settled in Arrow Lake.

101.    Section 3.1 of the 2011 and 2016 CGP also requires "at a minimum" that the SWPPP be consistent with the requirements and recommendations of the current edition of the Tennessee Erosion Prevention and Sediment Control Handbook (the "Handbook").

15

102. Section 5.2.6 of the Handbook states:

> The CGP contains additional design related requirements for construction sites that discharge into streams that are either designated by TDEC as Exceptional Tennessee Waters or as impaired due to siltation (sediment). Erosion prevention and sediment control measures must be designed to control runoff generated by the 5-yr, 24-hr storm event. Also, sediment basins (or equivalent measures) are required for outfalls that have a total drainage area of 5 acres or more. The basin must be designed to provide treatment for the volume of runoff from a 5-yr, 24-hr storm event from each acre drained.

103. The design and/or the measures taken by the permittees have failed to provide adequate treatment for 1-year, 24-hour storm events. These storm conditions have existed during *numerous* storm events dating back to when the NOC was first issued and will continue until the underlying issues are corrected.

## Claim 6: Violation of § 3.4.1(b) of the 2011 and 2016 CGP

104. Paragraphs 1through 103 of this Complaint are hereby realleged and incorporated by reference.

105. The permittees are in violation of Section 3.4.1(b) of the 2011 and 2016 CGPs.

106. Visual inspections by the permittees during small storm events demonstrate that the SWPPP is ineffective in eliminating or significantly reducing pollutants and is otherwise not meeting the general objective of controlling pollutants in stormwater associated with construction activities.

107. As such, the SWPPP needed to be modified to fix these deficiencies, but it either has not been modified, or the modifications have been ineffective.

## Claim 7: Violation of § 3.5.1(i) of the 2011 and § 3.5.1(j) of the 2016 CGP

108. Paragraphs 1through 107 of this Complaint are hereby realleged and incorporated by reference.

109. The permittees are in violation of Section 3.5.1(i) of the 2011 CGP and Section 3.5.1(j) of the 2016 CGP related to Aquatic Resources Alteration Permit ("ARAP") and CWA 401 Certification.

110. The SWPPP fails to identify streams and wetlands adjacent to the project on SLLI's property, the anticipated alteration of these waters and the permit number of the tracking number of the ARAP or CWA Section 401 Certification issued for the alteration.

111. Numerous ground level and aerial photographs as well as laboratory samples of the streams, wetlands and Arrow Lake on SLLI's property document that actual alteration of these water resources has occurred as a result of the permittees' activities.

112. The permittees never applied for nor obtained an ARAP or CWA 401 Certification for these downstream alterations.

## Claim 8: Violation of § 3.5.3.1(a) of the 2011 and 2016 CGP

113. Paragraphs 1 through 112 of this Complaint are hereby realleged and incorporated by reference.

114. The permittees are in violation of Section 3.5.3.1(a) of the 2011 and 2016 CGPs

115. Construction phase erosion prevention controls are not designed to eliminate (or minimize if complete elimination is not possible) the dislodging and suspension of soil in water.

116. In addition, the sediment controls are not designed to retain mobilized sediment on site to the maximum extent practicable.

## Claim 9: Violation of § 3.5.3.1(b) of the 2011 and 2016 CGP

117. Paragraphs 1 through 116 of this Complaint are hereby realleged and incorporated by reference.

17

118. The permittees are in violation of Section 3.5.3.1(b) of the 2011 and 2016 CGPs because the selected Best Management Practices ("BMPs") have failed to slow runoff so that rill and gully formation is prevented.

119. Aerial photographs from the ACC Landfill since the NOC was issued to the present day show *significant* rills and gullies across the site.

120. When steep slopes or fine particle soils are present the CGP states that additional physical or chemical treatment may be required.

121. The ACC Landfill site has steep slopes and fine-grained soil yet the permittees have never implemented additional physical or chemical treatment to control sediment discharges.

### Claim 10: Violation of § 3.5.3.1(e) of the 2011 and 2016 CGP

122. Paragraphs 1 through 121 of this Complaint are hereby realleged and incorporated by reference.

123. The permittees are in violation of Section 3.5.3.1(e) of the 2011 and 2016 CGPs related to accumulated sediment.

124. Accumulated sediment has not been removed from sediment traps, sediment basins and other sediment controls when design capacity has been reduced by 50%.

125. The east sediment trap upstream of the sediment basin servicing the Waste Relocation Area were identified as "filled to capacity" by a TDEC inspector in November 2014, but the sediment has not been removed.

### Claim 11: Violation of § 3.5.3.1(j) of the 2011 and 2016 CGP

126. Paragraphs 1 through 125 of this Complaint are hereby realleged and incorporated by reference.

18

127.     The permittees are in violation of Section 3.5.3.1(j) of the 2011 and 2016 CGPs related vegetation cover.

128.     Construction has not been sequenced to minimize the exposure time of graded or denuded areas.

129.     Large areas of the ACC property have been left with no vegetation for extensive lengths of time and remain unvegetated today. The lack of vegetation is well documented by SLLI's aerial photographs.

### Claim 12: Violation of § 3.5.3.1(l) of the 2011 and 2016 CGP

130.     Paragraphs 1 through 129 of this Complaint are hereby realleged and incorporated by reference.

131.     The permittees are in violation of Section 3.5.3.1(l) of the 2011 and 2016 CGPs because EPSC measures have not been constructed and maintained and the permittees have not submitted a notice of termination to TDEC indicating that construction is complete.

### Claim 13: Violation of § 3.5.3.2 of the 2011 and 2016 CGP

132.     Paragraphs 1 through 131 of this Complaint are hereby realleged and incorporated by reference.

133.     The permittees are in violation of Section 3.5.3.2 of the 2011 and 2016 CGPs because temporary and permanent stabilization activities have not been effectively implemented within 14 days after construction activities in areas of the project cease temporarily or permanently, nor within seven days on steep slopes.

### Claim 14: Violation of § 3.5.3.3 of the 2011 and 2016 CGP

134.     Paragraphs 1 through 133 of this Complaint are hereby realleged and incorporated by reference.

19

135.     The permittees are in violation of Section 3.5.3.3 of the 2011 and 2016 CGP.

136.     The EPSC measures are not designed to minimize erosion and maximize sediment removal resulting from a 2-year, 24-hour storm at a minimum, either from total rainfall or the equivalent intensity.

137.     In addition, the SWPPP indicates that Outfall O-2 has a drainage area of 20.8 acres.  Section 3.5.3.3 of the 2011 and 2016 CGP requires that any outfall with a drainage area greater than 10 acres must have a minimum sediment basin volume that will provide treatment for a calculated volume of runoff from a 2-year, 24-hour storm until final stabilization of the site.

138.     All calculations of drainage areas, runoff coefficients and basin volumes are required to be included in the SWPPP, but the July 31, 2012 SWPPP contains no such calculations.

139.     The CGP requires that the discharge structure from the sediment basin be designed to retain sediment during lower flows (i.e., storms that are less than the 2-year, 24-hour storm event), yet the sediment basins from the ACC Landfill cannot even contain a 1-year, 24-hour storm event.

140.     This section of the CGP requires that discharged water not "cause an objectionable color contrast with the receiving stream." Yet, numerous rain events have created a stark contrast in color of the flow from ACC into Sugar Creek.

141.     That discoloration has occurred regularly for many years and still occurs regularly today.

### Claim 15: Violation of § 3.5.8.2 of the 2011 and 2016 CGP

142.     Paragraphs 1through 141 of this Complaint are hereby realleged and incorporated by reference.

20

143. The permittees are in violation of Section 3.5.8.2 of the 2011 and 2016 CGPs.

144. This section of the CGP requires regular inspections of all EPSC measures to ensure they are operating properly and of outfall points to determine whether the EPSC measures "are effectively preventing impacts to receiving waters."

145. Based on results of the inspections, any inadequate control measures or control measures in disrepair must be replaced, modified or repaired *before* the next rain event, but in no case more than seven days later.

146. Based on the inspections, the SWPPP must be revised as appropriate to address deficiencies within 14 days of the inspection.

147. It is unclear whether the SWPPP has ever been amended based on any inspections and even if it had, obviously the inspection regimen adopted by the permittees remains ineffective at complying with the CGP.

### Claim 16: Violation of § 3.5.10 of the 2011 and 2016 CGP

148. Paragraphs 1 through 147 of this Complaint are hereby realleged and incorporated by reference.

149. The permittees are in violation of Section 3.5.10 of the 2011 and 2016 CGPs, which requires the SWPPP to include documentation supporting a determination of permit eligibility regarding discharges to waters with an approved TMDL.

150. The SWPPP does not include any discussion of the fact that the discharge from the ACC Landfill is to a 303(d)-listed water that has a USEPA-approved TMDL for siltation and habitat alteration.

151. The SWPPP does not mention that the TMDL requires that EPSC measures *must* be designed to function properly in a 2-year, 24-hour storm event.

21

## Claim 17: Violation of § 4.1.1 of the 2011 and 2016 CGP

152.   Paragraphs 1 through 151 of this Complaint are hereby realleged and incorporated by reference.

153.   The permittees are in violation of Section 4.1.1 of the 2011 and 2016 CGPs.

154.   This section of the CGP requires that the EPSCs be designed, installed and maintained to:

> (1) control stormwater volume and velocity to minimize soil erosion, (2) minimize the amount of soil exposed during construction activities, and (3) minimize sediment discharges from the site considering amount, frequency, intensity and duration of precipitation, soil characteristics and the range of soil particle sizes.

155.   The exhibits attached hereto and information set forth above prove that these requirements are not being met.

## Claim 18: Violation of § 4.1.3 of the 2011 and 2016 CGP

156.   Paragraphs 1 through 155 of this Complaint are hereby realleged and incorporated by reference.

157.   The permittees are in violation of Section 4.1.3 of the 2011 and 2016 CGPs.

158.   This section of the CGP requires stabilization of disturbed areas whenever earth disturbing activities have temporarily or permanently ceased and will not resume for more than 14 days on any portion of the site.

159.   Large areas of the ACC property have not been stabilized with vegetation and earth disturbing activities have ceased for more than 14 days.

## Claim 19: Violation of § 5.3.1 and § 5.3.2 of the 2011 and 2016 CGP

160.   Paragraphs 1 through 159 of this Complaint are hereby realleged and incorporated by reference.

22

161. The permittees are in violation of Sections 5.3.1 and 5.3.2 of the 2011 and 2016 CGPs. These sections of the CGP prohibit discharges that would cause or contribute to a violation of state water quality standards.

162. The designated uses of Sugar Creek, which includes Arrow Lake, are domestic water supply, industrial water supply, fish and aquatic life, recreation, livestock watering and wildlife, and irrigation. *See* TDEC Rule 0400-40-04-.05.

163. Due to the fish and aquatic life designated use of Sugar Creek, Rule 0400-40-03-.03(3)(c) states "there shall be no distinctly visible solids, scum . . . bottom deposits or sludge banks of such size or character that may be detrimental to fish and aquatic life."

164. Rule 0400-40-03-.03(3)(d) states: "there shall be no turbidity, total suspended solids, or color in such amounts or of such character that will materially affect fish and aquatic life. In wadeable streams, suspended solid levels over time should not be substantially different than conditions found in reference streams."

165. Additionally, Rule 0400-40-03-.03(3)(m) states "waters shall not be modified through the addition of pollutants or through physical alteration to the extent that the diversity and/or productivity of aquatic biota within the receiving waters are substantially decreased or, in the case of wadeable streams, substantially different from conditions in reference streams in the same ecoregion."

166. Because of the recreation designated use of Sugar Creek TDEC Rule 0400-40-03-.03(4)(c) states "there shall be no distinctly visible solids, scum . . . bottom deposits or sludge banks of such size or character that may be detrimental to recreation."

167. And Rule 0400-40-03-.03(4)(d) states "there shall be no total suspended solids, turbidity or color in such amounts or character that will result in any objectionable appearance to the water, considering the nature and location of the water."

168. Each of the above water quality criteria are being violated in Sugar Creek, Arrow Lake and the tributaries thereto because of the discharges of sediment-laden stormwater associated with construction activities from the ACC Landfill and Waste Relocation Area.

169. There is substantial sediment in Arrow Lake and on the bottom of the stream channels on SLLI's property due to the permittees' sediment-laden discharges.

170. The turbidity in the discharge from the ACC Landfill is noticeably worse than in Sugar Creek during storm events and violates the express term of the CGP that the stormwater discharge must not create an objectionable color contrast in the receiving stream.

171. When there is significant rainfall, Arrow Lake turns muddy as a direct result of the discharges because it is effectively being used as a sediment basin by the permittees.

172. Additionally, Section 5.3.2(d) of the CGP requires that the discharge not result in conditions that are detrimental to humans, livestock, wildlife, plant life or fish and aquatic life in the receiving stream.

173. There is substantial sediment from the ACC Landfill in Arrow Lake that is causing an engulfment hazard to humans, livestock and wildlife that may enter the lake, and the sediment has smothered nearly all plant life and eliminated structure in the bottom of the lake that serves as fish habitat.

24

## Claim 20: Violation of § 5.4.1 of the 2011 and 2016 CGP

174.     Paragraphs 1 through 173 of this Complaint are hereby realleged and incorporated by reference.

175.     The permittees are in violation of Section 5.4.1 of the 2011 and 2016 CGPs.  This section of the CGP prohibits any discharge that would cause measurable degradation or additional loadings to impaired waters.

176.     The CGP defines "measurable degradation" as "changes in parameters of waters that are of significant magnitude to be detected by the best available instrumentation or laboratory analyses."

177.     Stream sampling during a storm event on March 1, 2017 showed the Total Suspended Solids level in the ACC discharge was 590 mg/l, which was 2.33 times the level measured in Sugar Creek upstream of the discharge.

178.     Stream sampling on August 31, 2017, showed the Total Suspended Solids level in the ACC discharge was 35 mg/l, which was 11.66 times the level measured in Sugar Creek upstream of the discharge.

179.     The permittees are causing measurable and visible degradation of Sugar Creek and Arrow Lake.

180.     Because the permittees discharge to impaired waters, they are obligated under Section 5.4.1(a) of the CGP to certify in the SWPPP that the EPSC measures are designed to control the runoff generated by a 5-year, 24-hour storm event at a minimum.

181.     Section 5.4.1(f) of the 2011 CGP and 5.4.1(g) of the 2016 CGP require that any outfall in a drainage area exceeding 5 acres must have a sediment basin capable of treating the calculated volume of a 5-year, 24-hour storm.

25

182.   Section 5.4.1(h) of the 2016 CGP requires a sediment trap capable of treating the volume of the 5-year, 24-hour storm be used for all outfalls in a drainage area of 3.5 to 4.9 acres.

183.   According to the July 21, 2012 SWPPP, Outfall OU-1 is in a drainage area of 20.8 acres and Outfall OU-2 is in a drainage area of 4.0 acres, yet neither area has sediment basins or traps capable of treating the 5-year, 24-hour storm event.

184.   The 2012 SWPPP states that "in accordance with the Tennessee Division of Solid Waste Management regulations, the Phase I impoundment has been designed to reduce runoff below predevelopment conditions and provide sediment discharge control for a 25-year, 24-hour storm event."

185.   In a letter to TDEC dated May 14, 2015, Nancy Sullivan, a professional engineer with TriAD Environmental Consultants, who stamped the 2012 SWPPP, reiterated to TDEC "As was in place for previous phases, the site has a sediment pond in place below the waste relocation area designed to accommodate the storm run-off for the 25-year, 24-hour storm event."

186.   Visual observations, precipitation data and laboratory analysis of water samples document that the permittees do not meet any of the above requirements because they fail to control sediment discharges from a much smaller 1-year, 24-hour storm event.

## Claim 21: Violation of § 7.1 of the 2011 and 2016 CGP

187.   Paragraphs 1 through 186 of this Complaint are hereby realleged and incorporated by reference.

188.   The permittees are in violation of Section 7.1 of the 2011 and 2016 CGPs which imposes a duty to comply with all conditions of the CGP.

26

## Claim 22: Violation of § 7.1.3 of the 2011 and 2016 CGP

189.    Paragraphs 1 through 188 of this Complaint are hereby realleged and incorporated by reference.

190.    The permittees are in violation of Section 7.1 of the 2011 and 2016 CGPs, which requires that the permittees conduct stormwater discharge activities "in a manner such that public or private nuisances or health hazards will not be created."

191.    The permittees' discharges of sediment are creating public and private nuisances and health hazards on SLLI's property.

## Claim 23: Violation of § 7.4 of the 2011 and 2016 CGP

192.    Paragraphs 1 through 191 of this Complaint are hereby realleged and incorporated by reference.

193.    The permittees are in violation of Section 7.4 of the 2011 and 2016 CGPs which impose a duty to take reasonable steps to minimize or prevent any discharge in violation of the CGP that has a reasonable likelihood of adversely affecting human health or the environment.

194.    The permittees have not taken reasonable steps that are taken on countless other construction sites to minimize or prevent discharges that have caused significant damage to SLLI's property and waters of the United States.

## Claim 24: Violation of § 7.10 of the 2011 and 2016 CGP

195.    Paragraphs 1 through 194 of this Complaint are hereby realleged and incorporated by reference.

196.    The acts and omissions of the permittees are in direct contradiction of Section 7.10 of the 2011 and 2016 CGPs which make clear that the CGP does not convey any property

27

rights to the permittees, does not authorize injury to private property or trespassing or discharges of stormwater across private property.

197.     The permittees have failed to provide adequately designed, installed and maintained EPSC measures and have instead used SLLI's private property, particularly Arrow Lake, as their own private sediment control basin for the construction project.

## Claim 25: Violation of § 7.14 of the 2011 and 2016 CGP

198.     Paragraphs 1 through 197 of this Complaint are hereby realleged and incorporated by reference.

199.     The permittees are in violation of Section 7.14 of the 2011 and 2016 CGPs, which require the permittees to properly operate and maintain all facilities and systems of treatment and control and related equipment that are installed or used by the permittees to achieve compliance with the CGP and the SWPPP.

## Claim 26: Nuisance

200.     Paragraphs 1 through 199 of this Complaint are hereby realleged and incorporated by reference.

201.     The acts and omissions of ACC and T&K with respect to discharges of sediment from ACC's property onto SLLI's property represent an unreasonable, unwarranted, and unlawful use of property that has created substantial annoyance, inconvenience, and discomfort to SLLI.

202.     These acts and omissions of ACC and T&K have materially harmed and interfered with the rights of SLLI to full use and enjoyment of its property, including the unnamed tributary to Sugar Creek, Sugar Creek and Arrow Lake.

203. The Defendants' acts and omissions constitute an actionable nuisance and are creating actionable nuisance conditions on SLLI's property.

204. The nuisance conditions caused by Defendants can be remedied at reasonable expense.

205. Defendants are subject to injunctive relief sufficient to remove the nuisance conditions from SLLI's property and to restore Arrow Lake.

206. SLLI is also entitled to an award of damages for the decrease in value of SLLI's property while the nuisance conditions exist.

## Claim 27: Negligence

207. Paragraphs 1 through 206 of this Complaint are hereby realleged and incorporated by reference.

208. ACC and T&K owed a duty to SLLI to carry out construction activities on ACC's property in a careful manner that would avoid, or at least minimize to the extent reasonably possible, the discharge of pollutants and sediment-laden runoff from ACC's property onto SLLI's property.

209. ACC and T&K breached this duty when they failed to exercise reasonable care while performing these activities, the direct and proximate cause in fact of which is the partial destruction of, and continuing damage to, SLLI's property, including, but not limited to, the unnamed tributary to Sugar Creek, to Sugar Creek to Arrow Lake, and to surrounding vegetation, and also continuing damage to the past, present and future value of SLLI's property.

210. SLLI is entitled to injunctive relief and to an award from ACC and T&K for the damages caused by these negligent acts and omissions.

29

## PRAYER FOR RELIEF

WHEREFORE, based upon the allegations contained in the foregoing paragraphs, Plaintiff respectfully requests the Court grant the following relief:

a.  Enter a declaratory judgment that Defendants have violated, and are in violation of, the CGP, the TWQCA and the CWA;

b.  Order Defendants to immediately comply with all terms and conditions of coverage under the CGP, the TWQCA and the CWA;

c.  Order Defendants to apply for, obtain and comply with an individual NPDES permit from TDEC for discharges of stormwater associated with construction activities from the ACC property;

d.  Order Defendants to immediately take such steps as are necessary and proper to remedy the harm caused by their violations of the CGP, the TWQCA and the CWA;

e.  Order Defendants to pay civil penalties of up to fifty-three thousand four hundred eighty-four dollars ($53,484) per violation of the CWA per day pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d) and 1365, and 83 Fed. Reg. 1190(Jan. 10, 2018);

f.  Order the Defendants to abate the nuisance and award Plaintiff damages for the harm caused by the Defendants' nuisance;

g.  Award Plaintiff damages for the harm caused by the Defendants' negligence;

h.  Award Plaintiff its costs of litigation, including reasonable attorney and expert witness fees, as authorized by Section 505(d) of the CWA, 33 U.S.C. § 1365(d); and

i.  Grant such other and further relief as the Court deems just and proper.

30

Respectfully submitted,

s/ Lynda M. Hill
Lynda M. Hill (BPR #019427)
Frost Brown Todd LLC
150 3rd Avenue South, Suite 1900
Nashville, Tennessee 37201
615.251.5550 Phone
615.251.5551 Fax
lhill@fbtlaw.com

Christopher S. Habel (*Pro Hac Vice pending*)
Frost Brown Todd LLC
3300 Great American Tower, 301 E. Fourth St.
Cincinnati, Ohio 45202
513.651.6800 Phone
513.651.6981 Fax
chabel@fbtlaw.com

*Attorneys for Plaintiff StarLink Logistics Inc.*

0109541.0583837  4851-9351-3824v2