# EXHIBIT A



**Christopher S. Habel**
Member-in-Charge Cincinnati
513.651.6993 (t)
513.651.6981 (f)
chabel@fbtlaw.com

October 25, 2017

**CERTIFIED MAIL - RETURN RECEIPT REQUESTED**

Mr. Tom Grosko
ACC, LLC
400 Arrow Mines Road
Mt. Pleasant, TN 38474-1605

Mr. Dalton Mounger
Statutory Agent
ACC, LLC
PO Box 432
Mt. Pleasant, TN 38474-0432

Mr. Timothy Tucker
Registered Agent
T&K Construction, L.L.C.
235 County Road 1242
Vinemont, AL 35179

Mr. Robert Martineau, Commissioner
Tennessee Dep't. of Environment &
Conservation
312 Rosa L. Parks Ave.
Tennessee Tower - 2nd Floor
Nashville, TN 37243

Ms. V. Anne Heard, Regional Administrator
U.S. Environmental Protection Agency
Region 4
61 Forsyth Street, S.W.
Mail Code: 9T25
Atlanta, GA 30303-8960

Mr. Scott Pruitt, Administrator
U.S. Environmental Protection Agency
USEPA Headquarters
William Jefferson Clinton Building
1200 Pennsylvania Avenue, N. W.
Mail Code: 1101A
Washington, DC 20460

Re:    **Notice of Intent to Commence Civil Action for Past and Ongoing Violations
of the Federal Clean Water Act Arising from Stormwater Discharges into
Sugar Creek and Arrow Lake, Maury County, Mt. Pleasant, Tennessee**

To All Concerned:

On behalf of our client, StarLink Logistics, Inc., 55 Corporate Drive, Bridgewater, NJ 08807 ("SLLI"), we hereby serve notice of SLLI's intent to file a federal lawsuit in the U.S. District Court for the Middle District of Tennessee pursuant to Section 505(a)(1) of the federal Clean Water Act ("CWA"), 33 U.S.C. § 1365(a)(1) against ACC, LLC ("ACC"), T&K Construction, L.L.C. ("T&K") and potentially other parties to address past, present and ongoing violations of the stormwater permit issued by the Tennessee Department of Environment and Conservation ("TDEC") for construction activities on ACC's closed landfill. These violations arise from the continued discharge of sediment and other pollutants in stormwater runoff from ACC's closed landfill, located on Arrow Mines Road near the City of Mt. Pleasant in Maury

3300 Great American Tower | 301 East Fourth Street | Cincinnati, OH 45202-4182 | 513.651.6800 | **frostbrowntodd.com**
Offices in Indiana, Kentucky, Ohio, Pennsylvania, Tennessee, Texas, Virginia and West Virginia

Case 1:18-cv-00029    Document 1-1    Filed 04/09/18    Page 2 of 153 PageID #: 33

County, Tennessee. These discharges enter Sugar Creek, its unnamed tributaries and Arrow Lake, all of which are located on property owned by SLLI.

## BACKGROUND FOR THE VIOLATIONS

ACC f/k/a Associated Commodities Corporation, is the owner and operator of a closed industrial waste landfill known as the ACC Landfill located on Arrow Mines Road, near the City of Mt. Pleasant in Maury County, Tennessee. The approximate center of this landfill is located at 35°29'31"N, 87°10'28"W. The landfill received industrial waste from 1981 to 1993. The wastes were from local secondary aluminum smelting operations and included aluminum salt cake and slag, aluminum baghouse dust, and other related waste byproduct materials. The landfill was operated pursuant to a "Registration Authorizing Solid Waste Disposal Activities in Tennessee" issued on July 1, 1981 by the Tennessee Department of Public Health, the predecessor agency to the TDEC.

Stormwater from the ACC Landfill discharges from at least three steel culverts that pass under Arrow Mines Road directly onto SLLI's 1,485-acre tract of land that is located adjacent to ACC's land. These discharges meander across SLLI's property in unnamed tributaries that lead into Sugar Creek. Several miles of Sugar Creek cross SLLI's property, with the ACC Landfill discharges entering Sugar Creek near where it enters SLLI's property (*i.e.,* very near the upstream end of SLLI's property). Sugar Creek was dammed in the 1920s to form an approximately 60-acre reservoir known as Arrow Lake that is also on SLLI's property just downstream of the ACC Landfill. All off-site stormwater discharges from the ACC landfill go into Sugar Creek and pass through Arrow Lake.

Sugar Creek is on TDEC's Proposed Final Year 2016 303(d) List of impaired waters due to many issues relating to the ACC Landfill including loss of biological integrity due to siltation. Sugar Creek has been listed on the U.S. EPA approved 303(d) List of impaired waters for many years. In fact, U.S. EPA approved a TDEC-prepared Total Maximum Daily Load ("TMDL") for Siltation and Habitat Alteration in the Lower Duck River Watershed (HUC 06040003) in 2005, which includes Sugar Creek. Section 8.1.4 of the TMDL states:

> The [Waste Load Allocations] WLAs provided to existing and future NPDES-regulated construction activities disturbing one acre or more will be implemented through Best Management Practices (BMPs) as specified in NPDES Permit No. TNR10-0000, General NPDES Permit for Storm Water Discharges Associated with Construction Activity. It is not technically feasible to incorporate numeric sediment limits into permits for these activities at this time. WLAs should not be construed as numeric permit limits. This permit requires (ref.: Appendix E):
>
> • Development and implementation of a site-specific Storm Water Pollution Prevention Plan (SWPPP) that addresses erosion and sediment control.
> • Good engineering and best management practices in the design, installation, and maintenance of erosion and sediment controls.
> • Erosion and sediment controls must be designed to function properly in a two-year, 24-hour storm event.

3300 Great American Tower | 301 East Fourth Street | Cincinnati, OH 45202-4182 | 513.651.6800 | frostbrowntodd.com
Offices in Indiana, Kentucky, Ohio, Pennsylvania, Tennessee, Texas, Virginia and West Virginia

Case 1:18-cv-00029   Document 1-1   Filed 04/09/18   Page 3 of 153 PageID #: 34

In addition, a number of special requirements in the permit apply to discharges entering waterbodies that have been identified on the 303(d) list as being impaired due to siltation. These additional requirements include:

• More frequent (weekly) inspections of erosion and sediment controls.
• Inspections and the condition of erosion and sediment controls must be reported to the Division of Water Pollution Control (DWPC).
• The SWPPP must be submitted to the DWPC prior to disturbing soil at the construction site.
• In order to assure that the WLA is achieved, the application of BMPs that go beyond the typical minimum elements generally undertaken to comply with the General Permit may be necessary.

Strict compliance with the provisions of the General NPDES Permit for Storm Water Discharges Associated With Construction Activity can reasonably be expected to achieve reduced sediment loads to streams. The primary challenge for the reduction of sediment loading from construction sites to meet TMDL WLAs is in the effective compliance monitoring of all requirements specified in the permit and timely enforcement against construction sites not found to be following the permit.

On February 17, 2011, TDEC issued a Notice of Coverage ("NOC") for stormwater associated with construction activities to be performed at the ACC Landfill. The NOC authorized the discharge of stormwater from the ACC Landfill in compliance with Tennessee's General NPDES Permit for Stormwater Associated with Construction Activity (the "Construction General Permit" of "CGP"). This NOC has been amended several times by TDEC at the request of ACC to include coverage for contractors, including T&K Construction, LLC. A copy of the most recent NOC that SLLI obtained from TDEC's files is enclosed as Exhibit 1. A copy of a Notice of Intent ("NOI") signed by representatives of Associated Commodities Corporation and T&K Construction LLC on July 31, 2012 and August 14, 2012 respectively is also enclosed as Exhibit 2. TDEC assigned NPDES Construction General Permit Tracking Number TNR181267 to the ACC Landfill. Associated Commodities Corporation was authorized to discharge stormwater pursuant to the CGP from February 17, 2011 until TDEC approves a notice of termination ("NOT") that certifies that all post-construction requirements have been completed at the ACC Landfill. SLLI's review of TDEC's files confirms that a NOT has not been submitted or approved as of September 8, 2017 and therefore the CGP remains in effect at the ACC Landfill.

Pursuant to the requirements of the CGP, Associated Commodities Corporation prepared a Construction Stormwater Pollution Prevention Plan for the Phase 1 Corrective Action Construction at the ACC Landfill (the "SWPPP"). This is the most recent version of the SWPPP available from TDEC's files as of September 8, 2017. The SWPPP is dated July 31, 2012 and was prepared by TriAD Environmental Consultants, Inc and is stamped by Nancy B.

3300 Great American Tower | 301 East Fourth Street | Cincinnati, OH 45202-4182 | 513.651.6800 | **frostbrowntodd.com**
Offices in Indiana, Kentucky, Ohio, Pennsylvania, Tennessee, Texas, Virginia and West Virginia
Case 1:18-cv-00029    Document 1-1    Filed 04/09/18    Page 4 of 153 PageID #: 35

Sullivan, Tennessee Registered Engineer No. 20401. A copy of this SWPPP obtained from TDEC's files is enclosed as Exhibit 3.

The original CGP that covered the ACC Landfill was issued on May 23, 2011 and expired on May 23, 2016 (hereinafter the "2011 CGP"). A copy of the 2011 CGP was included as Appendix 4 to the SWPPP. TDEC issued a new CGP on September 30, 2016 that now covers these discharges (hereinafter the "2016 CGP").

The regulations of the Tennessee Division of Solid Waste Management applicable to management of stormwater from landfills at T.C.A. § 0400-11-01-.04(2)(i) provide that landfill operators must "design, construct, operate and maintain a run-off management system to collect and control at least the peak flow volume resulting from a 24-hour, 25-year storm." Furthermore, these regulations require that "Holding facilities (e.g., sediment basins) associated with run-on and run-off control systems must be designed to detain at least the water volume resulting from a 24-hour, 25-year storm and to divert through emergency spillways at least the peak flow resulting from a 24-hour, 100-year storm."

Associated Commodities Corporation and/or ACC has been engaged in episodic construction activities at the ACC Landfill since 2011. Based on review of the TDEC files, T&K has been the contractor (also referred to in the CGP as a "secondary permittee") responsible for the construction work from 2012 to the present. From 2012 to 2016, ACC and its contractors relocated industrial waste from the original closed landfill cell to a new "Waste Relocation Area" on its property pursuant to an Amended and Restated Consent Order between ACC and TDEC. Based on visual observations, substantial earthwork in both the former landfill and the new Waste Relocation Area was completed by November of 2016 and no significant earth disturbing activity has taken place at the ACC Landfill in 2017. Throughout this period, SLLI has observed and documented through laboratory samples, ground level and aerial photographs the flow of significant amounts of sediment and other pollutants associated with leachate from the landfill in stormwater discharges onto SLLI's property and into Sugar Creek and Arrow Lake. A small sampling of this evidence is discussed below and enclosed.

On several occasions between 2012 and 2016, SLLI has reported its observations of the discharges of stormwater from the ACC Landfill to TDEC. As of September 8, 2017, TDEC files include only one inspection report pursuant to the CGP dated November 19, 2014. The inspection report states:

> Small pond above larger sediment pond appears to be filled to capacity allowing some sediment to escape over the rip rap spillway. Pond needs to be cleaned of sediment to restore capacity. Filter ring in small drainage area below pond needs to be built back up to original height to prevent sediment from escaping further down drain. Spoke with Mr. James Manley, certified inspector for site, and he intends to address these issues.

The TDEC files are silent as to whether there was ever a reinspection to confirm that the items noted in the inspection were addressed. SLLI hired an aerial photographer to take photographs from an aircraft of the work being conducted on its property as well as the work on

3300 Great American Tower | 301 East Fourth Street | Cincinnati, OH 45202-4182 | 513.651.6800 | **frostbrowntodd.com**
Offices in Indiana, Kentucky, Ohio, Pennsylvania, Tennessee, Texas, Virginia and West Virginia

Case 1:18-cv-00029   Document 1-1   Filed 04/09/18   Page 5 of 153 PageID #: 36

the ACC Landfill. Photos have been taken one day each month since August 2012, the most recent photographs having been taken on September 25, 2017. In the aerial photographs from September 22, 2014 (two months before the TDEC inspection) through February 25, 2015 (three months after the TDEC inspection, there is a pond on the east side of the larger sediment pond on ACC's Waste Relocation Area that is visibly filled with sediment. It appears filled with sediment in the photo taken on August 25, 2017. It does not appear the sediment was ever removed from this small pond. The referenced aerial photographs are enclosed as Exhibit 4.

ACC's stormwater management practices are not effective for even a 1-year, 24-hour storm event as evidenced by the photographs and information relating to a recent storm event. From August 30, 2017 through September 1, 2017, the remains of Hurricane Harvey moved through the area of the ACC Landfill. Official precipitation data for that three-day storm event (the "Harvey Storm") is available from the Tennessee Valley Authority's MPLT1 Mt. Pleasant weather monitoring station and is also enclosed as Exhibit 5. This weather station is located about 3.5 miles from the ACC Landfill. The recorded precipitation was 0.13 inches on August 30, 3.28 inches on August 31 and 0.58 inches on September 1 for a total storm event rainfall over three days of 3.99 inches. Unofficial precipitation data SLLI collected at its digital weather station on its property located about 1.5 miles from the ACC Landfill was similar: 0.19 inches on August 30, 2.89 inches on August 31 and 0.42 inches on September 1 for a total of 3.50 inches.

The National Weather Service ("NWS") maintains a website of design storm data at http://hdsc.nws.noaa.gov/hdsc/pfds/orb/tn_pfds.html. From this website, the official rainfall intensity for a 5-year 24-hour storm at the ACC Landfill is 4.76 inches of rainfall. Comparing the Harvey Storm data from the TVA weather station, the rainfall over the 24-hours of August 31, 2017 was only 3.28 inches, or just 69% of the 5-year 24-hour storm according to the NWS. The total rainfall for the entire three-day Harvey Storm event was only 3.99 inches which is 84% of the 5-year, 24-hour design storm. And according to the NWS, the 25-year, 24-hour design storm precipitation is 6.36 inches at the ACC Landfill, nearly double the actual precipitation that fell on August 31, 2017. The NWS data (copy enclosed as Exhibit 6) shows that the heaviest day of rain from the Harvey Storm at 3.28 inches, was almost exactly equal to the 1-year, 24-hour storm of 3.27 inches.

On the morning of September 1, 2017, the Harvey Storm was still occurring. SLLI representatives took ground level photographs of the discharges of stormwater from the ACC Landfill property onto SLLI's property and into Sugar Creek. These photographs are enclosed as Exhibit 7 and show excessive amounts of sediment in the storm water. These discharges look the same as many other discharges that have occurred during storm events since 2011.

SLLI has also documented many storm events since 2011 with ground level and aerial photographs and in many cases laboratory data. For example, earlier this year on March 1, 2017, SLLI measured 590 mg/l Total Suspended Solids and 3.5 ml/l Total Settlable Solids in the discharge from the ACC property as compared to 253 mg/l Total Suspended Solids and 0.8 ml/l Total Settlable Solids in Sugar Creek at the same time just upstream of SLLI's property. On that day, the TVA Mt. Pleasant weather station recorded only 1.61 inches of rain.

Case 1:18-cv-00029   Document 1-1   Filed 04/09/18   Page 6 of 153 PageID #: 37

SLLI collected samples from Sugar Creek just upstream of the SLLI's property and of the ACC discharge on August 31, 2017 at 2:30 pm a few hours after the Harvey Storm had started (SLLI's on-site weather station had only measured 0.27 inches of precipitation between midnight and 2:30 pm on August 31). The laboratory reported total suspended solids were 3 mg/l in Sugar Creek and nearly twelve times higher at 35 mg/l in the ACC discharge even though there had only been about a quarter inch of precipitation.

On the morning of September 1, 2017 after the heaviest rain from the Harvey Storm had ended, SLLI's representative collected three samples of water in clear glass jars. One sample came from Sugar Creek just before it enters SLLI's property, one from the unnamed tributary from the ACC Landfill that enters Sugar Creek and one from Sugar Creek at the outfall from Arrow Lake. Photographs of the clear glass sample jars are enclosed as Exhibit 8 (note that the date of collection on the jars was incorrectly marked as September 2, 2017, however the author of this letter was provided the enclosed photograph on September 1, 2017). Based on the photographs and laboratory data, the erosion prevention and sediment control ("EPSC") measures, if any, that ACC and/or T&K have implemented at the ACC Landfill have not worked in the past and do not work to this day.

## VIOLATIONS GIVING RISE TO LIABILITY

Associated Commodities Corporation, ACC, LLC, T&K Construction, LLC and perhaps other parties meet the definition of "primary permittee," "secondary permittee" and/or "operator" under Section 2 of the 2011 and 2016 CGPs and are hereinafter referred to as the "permittees." Under Section 2.1 of the CGPs, the permittees can be held "jointly and severally responsible for complying with the permit."

The permittees are in violation of §1.3(d) of the 2011 and 2016 CGPs relating to discharges threatening water quality because the discharges from the ACC Landfill have and will continue to cause or have the reasonable potential to cause or contribute to violations of water quality standards. Sugar Creek is already listed as impaired for siltation and a TMDL has been issued by TDEC and approved by U.S. EPA to prevent the very type of sediment pollution being created by discharges from the ACC Landfill.

The permittees are in violation of Section 1.3(e) of the 2011 and 2016 CGPs relating to discharges into waters with unavailable parameters (*i.e.,* impaired streams) because the discharges of sediment from the ACC landfill are causing measurable degradation of water quality in Sugar Creek as evidenced by the fact that Sugar Creek is listed on the TDEC 303(d) List and a TMDL for siltation and habitat alteration was issued for this watershed in 2005.

The permittees are in violation of Section 1.3(k) of the 2011 and 2016 CGPs relating to discharges into waters with an approved TMDL because the SWPPP for the ACC Landfill does not incorporate measures or controls consistent with the assumptions and requirements of the TMDL applicable to Sugar Creek.

The permittees are in violation of Section 2.3 of the 2011 and 2016 CGPs because they have failed to: (1) ensure the project specifications that they have developed meet the minimum

3300 Great American Tower | 301 East Fourth Street | Cincinnati, OH 45202-4182 | 513.651.6800 | **frostbrowntodd.com**
Offices in Indiana, Kentucky, Ohio, Pennsylvania, Tennessee, Texas, Virginia and West Virginia
Case 1:18-cv-00029   Document 1-1   Filed 04/09/18   Page 7 of 153 PageID #: 38

requirements of the SWPPP as evidenced by the fact that the ACC Landfill cannot effectively manage stormwater from a 1-year, 24-hour storm event in the case of the Harvey Storm, (2) ensure that all facilities necessary for the prevention of erosion or control of sediment are maintained and effective as evidenced by the aerial photos showing sediment accumulated in the sediment pond at the base of the Waste Relocation Area and the sediment being discharged from the ACC landfill during the Harvey Storm, (3) ensure that all site operators are complying with the SWPPP, (4) ensure that measures in the SWPPP are adequate to prevent erosion and control any sediment that may result from their earth disturbing activity, and (5) effectively implement and maintain best management practices (BMPs) and other erosion controls required by the SWPPP.

As an example of the permittees' failure to implement the SWPPP, one of the engineer's stamped drawings in the July 31, 2012 SWPPP submitted to TDEC has a note that "All landfill surfaces shall be covered with a minimum 12-inch soil layer upon completion of Phase 1 excavation activities. All other disturbed areas with the exception of the road surface shall also be vegetated." The SWPPP states in Section 4.0 that "stabilization methods will be initiated as soon as practicable in portions of the Site where construction activities have temporarily or permanently ceased, but in no case more than 15 days after the construction activity in that portion of the Site has temporarily or permanently ceased." The SWPPP also states that "permanent stabilization with perennial vegetation, as specified in the Construction Specifications, will replace any temporary measures as soon as practicable." All major earthwork on the ACC Landfill ended nearly a year ago yet the photographs enclosed as Exhibit 9 from August 25, 2017, show vast areas of the ACC property have no vegetation whatsoever and the grass cover on the completed Waste Relocation Area is limited. In fact, aerial photos enclosed as Exhibit 10 from earlier this year show a herd of cattle grazing on what little new grass had germinated on the Waste Relocation Area.

The permittees are in violation of Section 3.1 of the 2011 and 2016 CGPs. These parties have not implemented the SWPPP as written from the commencement of construction activity to final stabilization. As one example, Section 5.0 of the July 31, 2012 SWPPP states:

> Erosion and sediment control measures identified in the plan will be observed to ensure that they are operating correctly. Outfall points will be inspected to ascertain whether erosion control measures are effective in preventing significant impacts to receiving waters. . . . In the event that sediment migrates offsite, the accumulation will be removed as soon as possible, before the next rain event, if possible. The local Water Pollution office will be contacted to determine the appropriate remedial activities for sediment removal from stream.

The permittees have never removed sediment from streams on SLLI's property, never contacted SLLI about doing so, and, based on a review of TDEC files, never contacted TDEC about doing so either. Due to the complete failure of the permittees' EPSC measures, much of the sediment that has discharged from their property over the past six years, and continues to discharge today, is now settled in Arrow Lake.

3300 Great American Tower | 301 East Fourth Street | Cincinnati, OH 45202-4182 | 513.651.6800 | **frostbrowntodd.com**
Offices in Indiana, Kentucky, Ohio, Pennsylvania, Tennessee, Texas, Virginia and West Virginia
Case 1:18-cv-00029    Document 1-1    Filed 04/09/18    Page 8 of 153 PageID #: 39

Section 3.1 of the 2011 and 2016 CGP also requires "at a minimum" that the SWPPP be consistent with the requirements and recommendations of the current edition of the Tennessee Erosion Prevention and Sediment Control Handbook (the "Handbook"). Section 5.2.6 of the Handbook states:

> The CGP contains additional design related requirements for construction sites that discharge into streams that are either designated by TDEC as Exceptional Tennessee Waters or as impaired due to siltation (sediment). Erosion prevention and sediment control measures must be designed to control runoff generated by the 5-yr, 24-hr storm event. Also, sediment basins (or equivalent measures) are required for outfalls that have a total drainage area of 5 acres or more. The basin must be designed to provide treatment for the volume of runoff from a 5-yr, 24-hr storm event from each acre drained.

The design and/or the measures taken by the permittees have failed to provide adequate treatment for the Harvey Storm, which was a 1-year, 24-hour storm event. Similar conditions have existed during *numerous* storm events prior to the Harvey Storm dating back to when the NOC was first issued.

The permittees are in violation of Section 3.4.1(b) of the 2011 and 2016 CGPs because simple visual inspections by the permittees during small storm events demonstrate that the SWPPP is ineffective in eliminating or significantly reducing pollutants and is otherwise not meeting the general objective of controlling pollutants in stormwater associated with construction activities. As such, the SWPPP needed to be modified to fix these deficiencies but it apparently has not been modified, or the modifications have been ineffective.

The permittees are in violation of Section 3.5.1(i) of the 2011 CGP and Section 3.5.1(j) of the 2016 CGP because the SWPPP fails to identify streams and wetlands adjacent to the project on SLLI's property, the anticipated alteration of these waters and the permit number of the tracking number of the Aquatic Resources Alteration Permit (ARAP or Section 401 Certification issued for the alteration. Numerous ground level and aerial photographs as well as laboratory samples of the streams, wetlands and Arrow Lake on SLLI's property document the actual alteration of these water resources has occurred. The permittees never applied for nor obtained an ARAP or 401 Certification for these downstream alterations.

The permittees are in violation of Section 3.5.3.1(a) of the 2011 and 2016 CGPs because construction phase erosion prevention controls are not designed to eliminate (or minimize if complete elimination is not possible) the dislodging and suspension of soil in water. In addition, the sediment controls are not designed to retain mobilized sediment on site to the maximum extent practicable. Evidence of these continuing violations are provided in the enclosed Exhibit 11 photographs of the outfalls from the ACC Landfill during recent and past storm events.

The permittees are in violation of Section 3.5.3.1(b) of the 2011 and 2016 CGPs because the selected BMPs have failed to slow runoff so that rill and gully formation is prevented. Aerial photographs from the ACC Landfill since the NOC was issued to the present day show *significant* rills and gullies across the site. When steep slopes or fine particle soils are present the

CGP states that additional physical or chemical treatment may be required. The ACC Landfill site has steep slopes and fine-grained soil yet the permittees have never implemented additional physical or chemical treatment to control sediment discharges.

The permittees are in violation of Section 3.5.3.1(e) of the 2011 and 2016 CGPs because accumulated sediment has not been removed from sediment traps, sediment basins and other sediment controls when design capacity has been reduced by 50%. The east sediment trap upstream of the sediment basin servicing the Waste Relocation Area was identified as "filled to capacity" by a TDEC inspector in November 2014, but the sediment never removed.

The permittees are in violation of Section 3.5.3.1(j) of the 2011 and 2016 CGPs because construction has not been sequenced to minimize the exposure time of graded or denuded areas. The reality is that much of the ACC Landfill has had no vegetation for the past five years and this is well documented in SLLI's aerial photographs including the photographs taken on August 25, 2017. The permittees would begin construction activities on the project in mid to late summer each year and work until late fall or early winter at which time traditional vegetative stabilization efforts were ineffective because grass would not germinate due to winter weather. The site sat largely denuded through most of the wet spring weather and about the time any vegetation had been re-established in May or June, the next construction phase would begin and the permittees would strip off much of that vegetation. This construction sequence has been repeated each year leaving large portions of the site denuded for the entire time the permittees have been subject to the CGP.

The permittees are in violation of Section 3.5.3.1(l) of the 2011 and 2016 CGPs because EPSC measures have not been constructed and maintained throughout the construction period.

The permittees are in violation of Section 3.5.3.2 of the 2011 and 2016 CGPs because temporary and permanent stabilization activities have not been implemented within 14 days after construction activities in areas of the project cease temporarily or permanently, nor within seven days on steep slopes.

The permittees are in violation of Section 3.5.3.3 of the 2011 and 2016 CGP because the EPSC measures are not designed to minimize erosion and maximize sediment removal resulting from a 2-year, 24-hour storm at a minimum, either from total rainfall or the equivalent intensity. In addition, the SWPPP indicates that Outfall O-2 has a drainage area of 20.8 acres. Section 3.5.3.3 of the 2011 and 2016 CGP require that any outfall with a drainage area greater than 10 acres must have a minimum sediment basin volume that will provide treatment for a calculated volume of runoff from a 2-year, 24-hour storm until final stabilization of the site. All calculations of drainage areas, runoff coefficients and basin volumes are required to be included in the SWPPP, but the July 31, 2012 SWPPP in the TDEC files contains no such calculations. The CGP requires that the discharge structure from the sediment basin be designed to retain sediment during lower flows (i.e., storms that are less than the 2-year, 24-hour storm event) yet the sediment basins from the ACC Landfill cannot even contain a 1-year, 24-hour storm event as evidenced in the Harvey Storm. This section of the CGP requires that discharged water not "cause an objectionable color contrast with the receiving stream." The enclosed photos show the

3300 Great American Tower | 301 East Fourth Street | Cincinnati, OH 45202-4182 | 513.651.6800 | **frostbrowntodd.com**
Offices in Indiana, Kentucky, Ohio, Pennsylvania, Tennessee, Texas, Virginia and West Virginia

Case 1:18-cv-00029    Document 1-1    Filed 04/09/18    Page 10 of 153 PageID #: 41

stark contrast in color of the flow from ACC into Sugar Creek during the Harvey Storm and it has been this way for years and continues today.

The permittees are in violation of Section 3.5.8.2 of the 2011 and 2016 CGPs. This section of the CGP requires regular inspections of all EPSC measures to ensure they are operating properly and of outfall points to determine whether the EPSC measures "are effectively preventing impacts to receiving waters." Based on results of the inspections, any inadequate control measures or control measures in disrepair must be replaced, modified or repaired *before* the next rain event but in no case more than seven days later. Based on the inspections, the SWPPP must be revised as appropriate to address deficiencies within 14 days of the inspection. It is unclear whether the SWPPP has ever been amended based on any inspections and even if it had, obviously the inspection regimen adopted by the permittees is ineffective at complying with the CGP.

The permittees are in violation of Section 3.5.10 of the 2011 and 2016 CGPs which requires the SWPPP to include documentation supporting a determination of permit eligibility regarding discharges to waters with an approved TMDL. The SWPPP does not include any discussion of the fact that the discharge from the ACC Landfill is to a 303(d)-listed water that has a U.S. EPA-approved TMDL for siltation and habitat alteration. Nor does the SWPPP mention that the TMDL requires that EPSC measures *must* be designed to function properly in a 2-year, 24-hour storm event.

The permittees are in violation of Section 4.1.1 of the 2011 and 2016 CGPs. This section of the CGP requires that the EPSCs be designed, installed and maintained to: (1) control stormwater volume and velocity to minimize soil erosion, (2) minimize the amount of soil exposed during construction activities, and (3) minimize sediment discharges from the site considering amount, frequency, intensity and duration of precipitation, soil characteristics and the range of soil particle sizes. The enclosed documents and information prove that none of these requirements are being met.

The permittees are in violation of Section 4.1.3 of the 2011 and 2016 CGPs. This section of the CGP requires stabilization of disturbed areas whenever earth disturbing activities have temporarily or permanently ceased and will not resume for more than 14 days on any portion of the site. In areas where arid or semi-arid conditions prevent vegetative stabilization measures, alternative stabilization methods are required.

The permittees are in violated of Sections 5.3.1 and 5.3.2 of the 2011 and 2016 CGPs. These sections of the CGP prohibits discharges that would cause or contribute to a violation of state water quality standards. The designated uses of Sugar Creek, which includes Arrow Lake, are domestic water supply, industrial water supply, fish and aquatic life, recreation, livestock watering and wildlife, and irrigation. *See* Rule 0400-40-04-.05. Due to the fish and aquatic life designated use of Sugar Creek:

(1) "there shall be no distinctly visible solids, scum . . . bottom deposits or sludge banks of such size or character that may be detrimental to fish and aquatic life." 0400-40-03-.03(3)(c).

3300 Great American Tower | 301 East Fourth Street | Cincinnati, OH 45202-4182 | 513.651.6800 | **frostbrowntodd.com**
Offices in Indiana, Kentucky, Ohio, Pennsylvania, Tennessee, Texas, Virginia and West Virginia

Case 1:18-cv-00029 Document 1-1 Filed 04/09/18 Page 11 of 153 PageID #: 42

(2) "there shall be no turbidity, total suspended solids, or color in such amounts or of such character that will materially affect fish and aquatic life. In wadeable streams, suspended solid levels over time should not be substantially different than conditions found in reference streams." Rule 0400-40-03-.03(3)(d).

(3) "waters shall not be modified through the addition of pollutants or through physical alteration to the extent that the diversity and/or productivity of aquatic biota within the receiving waters are substantially decreased or, in the case of wadeable streams, substantially different from conditions in reference streams in the same ecoregion." Rule 0400-40-03-.03(3)(m).

Because of the recreation designated use of Sugar Creek:

(1) "there shall be no distinctly visible solids, scum . . . bottom deposits or sludge banks of such size or character that may be detrimental to recreation." Rule 0400-40-03-.03(4)(c).

(2) "there shall be no total suspended solids, turbidity or color in such amounts or character that will result in any objectionable appearance to the water, considering the nature and location of the water." Rule 0400-40-03-.03(4)(d),

Each of the above water quality criteria are being violated in Sugar Creek, Arrow Lake and the tributaries thereto because of the discharges of stormwater associated with construction activities from the ACC Landfill. There is substantial sediment in Arrow Lake and on the bottom of the stream channels due to the permittees' discharges. The turbidity in the discharge from the ACC Landfill is noticeably worse than in Sugar Creek during storm events and violates the express term of the CGP that the stormwater discharge must not create an objectionable color contrast in the receiving stream. When there is significant rainfall, Arrow Lake turns muddy as a direct result of the discharges because it is effectively being used as a sediment basin by the permittees. Additionally, Section 5.3.2(d) of the CGP requires that the discharge not result in conditions that are detrimental to humans, livestock, wildlife, plant life or fish and aquatic life in the receiving stream. There is substantial sediment from the ACC Landfill in Arrow Lake that is causing an engulfment hazard to humans and livestock who may enter the lake. The sediment has smothered nearly all plant life and eliminated structure in the bottom of the lake that serves as fish habitat.

The permittees are in violation of Section 5.4.1 of the 2011 and 2016 CGPs. This section of the CGP prohibits any discharge that would cause measurable degradation or additional loadings to impaired waters. The CGP defines "measurable degradation" as "changes in parameters of waters that are of significant magnitude to be detected by the best available instrumentation or laboratory analyses." As noted above, stream sampling during a storm event on March 1, 2017 showed the Total Suspended Solids level in the ACC discharge was 590 mg/l, which was 2.33 times the level measured in Sugar Creek upstream of the discharge. Stream sampling on August 31, 2017, after the beginning of the Harvey Storm, showed the Total Suspended Solids level in the ACC discharge was 35 mg/l, which was 11.66 times the level

3300 Great American Tower | 301 East Fourth Street | Cincinnati, OH 45202-4182 | 513.651.6800 | **frostbrowntodd.com**
Offices in Indiana, Kentucky, Ohio, Pennsylvania, Tennessee, Texas, Virginia and West Virginia
Case 1:18-cv-00029 Document 1-1 Filed 04/09/18 Page 12 of 153 PageID #: 43

measured in Sugar Creek upstream of the discharge. The permittees are causing measurable and visible degradation of Sugar Creek and Arrow Lake.

Because the permittees discharge to impaired waters, they are obligated under Section 5.4.1(a) of the CGP to certify in the SWPPP that the EPSC measures are designed to control the runoff generated by a 5-year, 24-hour storm event at a minimum. As evidenced from the Harvey Storm, the EPSCs do not control a 1-year, 24-hour storm event. Section 5.4.1(f) of the 2011 CGP and 5.4.1(g) of the 2016 CGP require that any outfall in a drainage area exceeding 5 acres must have a sediment basin capable of treating the calculated volume of a 5-year, 24-hour storm. Section 5.4.1(h) of the 2016 CGP requires a sediment trap capable of treating the volume of the 5-year, 24-hour storm be used for all outfalls in a drainage area of 3.5 to 4.9 acres. According to the July 21, 2012 SWPPP, Outfall OU-1 is in a drainage area of 20.8 acres and Outfall OU-2 is in a drainage area of 4.0 acres, yet neither area has sediment basins or traps capable of treating the 5-year, 24-hour storm event.

The 2012 SWPPP states that "in accordance with the Tennessee Division of Solid Waste Management regulations, the Phase I impoundment has been designed to reduce runoff below predevelopment conditions and provide sediment discharge control for a 25-year, 24-hour storm event." In a letter to TDEC dated May 14, 2015, Nancy Sullivan, a professional engineer with TriAD Environmental Consultants, who stamped the 2012 SWPPP, reiterated to TDEC "As was in place for previous phases, the site has a sediment pond in place below the waste relocation area designed to accommodate the storm run-off for the 25-year, 24-hour storm event." In contrast to these statements, downstream photographs taken by SLLI demonstrate what happened during the Harvey Storm, which was *only* a 1-year, 24-hour storm event that took place after the waste relocation area was to have been permanently stabilized.

The permittees are in violation of Section 7.1 of the 2011 and 2016 CGPs which imposes a duty to comply with all conditions of the CGP. As noted in Section 7.1.2 of the CGP, the violations set forth in this notice subject the permittees to a civil penalty of up to $10,000 per day for each day of these ongoing violations. As set forth in Section 7.1.3 of the 2011 and 2016 CGPs, the permittees are also liable for damages sustained by the State of Tennessee including, but not limited to, fish kills and losses of aquatic life and/or wildlife, because of the discharge. In addition, that section of the CGP is also being violated because it requires that the permittees conduct stormwater discharge activities "in a manner such that public or private nuisances or health hazards will not be created."

The permittees are in violation of Section 7.4 of the 2011 and 2016 CGPs which impose a duty to take reasonable steps to minimize or prevent any discharge in violation of the CGP that has a reasonable likelihood of adversely affecting human health or the environment.

The acts and omissions of the permittees are in direct contradiction of Section 7.10 of the 2011 and 2016 CGPs which make clear that the CGP does not convey any property rights to the permittees, does not authorize injury to private property or trespassing or discharges of stormwater across private property. The permittees have failed to provide adequately designed, installed and maintained EPSC measures and have instead used SLLI's private property, particularly Arrow Lake, as their own private sediment control basin for the construction project.

3300 Great American Tower | 301 East Fourth Street | Cincinnati, OH 45202-4182 | 513.651.6800 | **frostbrowntodd.com**
Offices in Indiana, Kentucky, Ohio, Pennsylvania, Tennessee, Texas, Virginia and West Virginia
Case 1:18-cv-00029    Document 1-1    Filed 04/09/18    Page 13 of 153 PageID #: 44

The permittees are in violation of Section 7.14 of the 2011 and 2016 CGPs, which require the permittees to properly operate and maintain all facilities and systems of treatment and control and related equipment that are installed or used by the permittees to achieve compliance with the CGP and the SWPPP.

**RELIEF REQUESTED**

SLLI seeks equitable and injunctive relief to require the permittees to comply with the terms of the CGP. In addition, pursuant to Section 7.12.1 of the 2016 CGP, SLLI hereby expressly requests that the Director of the TDEC Division of Water Resources, Ms. Tisha Benton, require the permittees to obtain an individual NPDES permit for the continued discharges of stormwater associated with construction activities from the ACC Landfill. The written basis for requiring such an individual permit is set forth in this letter and the enclosures. The permittees have demonstrated an inability to comply with the requirements of the CGP and as a direct result have further degraded a 303(d)-listed impaired water.

The violations of the CGP set forth herein constitute violates of the Tennessee Water Quality Control Act, T.C.A. 69-3-101 et seq., and the federal Clean Water Act, 33 U.S.C. 1251, et. seq. The permittees are subject to civil penalties and injunctive relief to address and eliminate the violations under Section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1), and payment of SLLI's costs of litigation under Section 505(d) of the CWA, 33 U.S.C. § 1365(a)(1). The allegations set forth herein demonstration that ACC remains in violation of the landfill closure requirements to control and treat runoff from a 25-year, 24-hour storm.

SLLI has implored representatives of the ACC Landfill to eliminate their discharges for years. SLLI has tried every conceivable approach to get this polluter to comply with basic environmental requirements and to stop damaging SLLI's property and waters of the State of Tennessee. Nothing has worked. To avoid the commencement of additional litigation, ACC and T&K must take steps immediately to eliminate these violations and demonstrate ACC's ability to consistently comply with its federal and state Clean Water Act obligations. Please contact the undersigned if ACC or T&K wishes to discuss a resolution that avoids litigation.

The address and telephone number of the representative for SLLI providing this notice is:

Michael Bogdan
President
StarLink Logistics, Inc.
55 Corporate Drive
Bridgewater, NJ 08807
908-981-5271

3300 Great American Tower | 301 East Fourth Street | Cincinnati, OH 45202-4182 | 513.651.6800 | **frostbrowntodd.com**
Offices in Indiana, Kentucky, Ohio, Pennsylvania, Tennessee, Texas, Virginia and West Virginia

Case 1:18-cv-00029   Document 1-1   Filed 04/09/18   Page 14 of 153 PageID #: 45

Tom Grosko, *et al.*
October 25, 2017
Page 14

Sincerely,

Christopher S. Habel

Enclosures

cc:    Michelle Sullivan, Esq. (w/encl.) via email
       Mike Bogdan (w/encl.) via email
       Elizabeth P. McCarter, Esq. (w/encl.) via email
       Sharon O. Jacobs, Esq. (w/encl.) via email

0109541.0583837   4816-7002-7088v1

3300 Great American Tower | 301 East Fourth Street | Cincinnati, OH 45202-4182 | 513.651.6800 | **frostbrowntodd.com**
Offices in Indiana, Kentucky, Ohio, Pennsylvania, Tennessee, Texas, Virginia and West Virginia
Case 1:18-cv-00029    Document 1-1    Filed 04/09/18    Page 15 of 153 PageID #: 46

# EXHIBIT 1

## NOTICE OF COVERAGE



# STATE OF TENNESSEE
# NPDES PERMIT

### Tracking Number  TNR181267

## NOTICE OF COVERAGE UNDER THE GENERAL NPDES PERMIT FOR STORMWATER DISCHARGES ASSOCIATED WITH CONSTRUCTION ACTIVITY (CGP)

Tennessee Department of Environment and Conservation
Division of Water Resources
401 Church Street, 6th Floor, L&C Annex
Nashville, Tennessee 37243

Under authority of the Tennessee Water Quality Control Act of 1977 (T.C.A. 69-3-101 et seq.) and the delegation of authority from the United States Environmental Protection Agency under the Federal Water Pollution Control Act, as amended by the Clean Water Act of 1977 (33 U.S.C. 1251, et seq.):

Name of the Construction Project: **Associated Commodities Corporation Landfill (17 acres)**

Master Tracking Number at the Site: **TNR181267**
Permittee Name: **Associated Commodities Corporation**
Contractor(s): **MHM Metals Corporation**
**Hagan Inc.**
**T & K Construction LLC**

is authorized to discharge: storm water associated with construction activity

from site located at: **Arrow Lake Road, Maury County**

to receiving waters named: **Unnamed tributary to Sugar Creek**

in accordance with effluent limitations, monitoring requirements and other conditions set forth herein.

Likely presence of threatened or endangered species in one mile radius: **NO**
Likely presence of threatened or endangered species downstream: **NO**

Additional pollution prevention requirements apply for discharges into waters which TDEC identifies as:
a) impaired: **YES**          b) discharging into Exceptional Tennessee Waters: **NO**

Your coverage under the CGP shall become effective on **February 17, 2011**, and shall be terminated upon receipt of <u>Notice of Termination</u>.

for Sandra K. Dudley, Ph.D., P.E.
Director

# **EXHIBIT 2**

# NOTICE OF INTENT



TENNESSEE DEPARTMENT OF ENVIRONMENTAL CONSERVATION **RECEIVED**
Division of Water Pollution Control
6th Floor Annex, L&C Tower, 401 Church Street, Nashville, Tennessee 37243
1-888-891-8332 (TDEC)

AUG 15 2012

**Notice of Intent (NOI) for General NPDES Permit for Stormwater Discharges from Construction Activities (TNR100000)** ENVIRONMENTAL FIELD OFFICE COLUMBIA

| Site or Project Name: | ACC Landfill Phase 1 Corrective Action Construction | | | NPDES Tracking Number: TNR | 181267 |
|---|---|---|---|---|---|
| Street Address or Location: | Arrow Lake Road; Mt. Pleasant, Tennessee | | | Start date: | 8/15/12 |
| | | | | Estimated end date: | 8/15/17 |
| Site Description: | 14-acre, closed industrial landfill in Maury County, Tennessee | | | Latitude (dd.dddd): | 35.4921 |
| | | | | Longitude (dd.dddd): | 87.1734 |
| County(ies): | Maury | MS4 Jurisdiction: | NA | Acres Disturbed: | 17 |
| | | | | Total Acres: | 732 |

Does a topographic map show dotted or solid blue lines ☒ and/or wetlands ☒ on or adjacent to the construction site?
If wetlands are located on-site and may be impacted, attach wetlands delineation report.
If an **Aquatic Resource Alteration Permit** has been obtained for this site, what is the permit number?   ARAP permit No.:

| Receiving waters: | Arrow Lake/Sugar Creek | | |
|---|---|---|---|
| Attach the SWPPP with the NOI | ☒ SWPPP Attached | Attach a site location map | ☒ Map Attached |

**Name of Site Owner or Developer (Site-Wide Permittee):** (person, company, or legal entity that has operational or design control over construction plans and specifications):
Associated Commodities Corporation

| Site Owner or Developer Contact Name: (individual responsible for site): Tom Grosko | Title or Position: (the party who signs the certification below): President | | |
|---|---|---|---|
| Mailing Address: P.O. Box 432 | City: Mt. Pleasant | State: TN | Zip: 38474 |
| Phone: ( 931 ) 379-7765 | Fax: ( 931 ) 379-7768 | E-mail: tgrosko@smelterservice.com | |
| Optional Contact: | Title or Position: | | |
| Mailing Address: | City: | State: | Zip: |
| Phone: ( ) | Fax: ( ) | E-mail: | |

**Owner or Developer Certification** (must be signed by president, vice-president or equivalent, or ranking elected official) (Primary Permittee)

I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

| Owner or Developer Name: (print or type) TOM GROSKO | Signature: | Date: 7-31-12 |
|---|---|---|

**Contractor(s) Certification** (must be signed by president, vice-president or equivalent, or ranking elected official) (Secondary Permittee)

I certify under penalty of law that I have reviewed this document, any attachments, and the SWPPP referenced above. Based on my inquiry of the construction site owner/developer identified above and/or my inquiry of the person directly responsible for assembling this NOI and SWPPP, I believe the information submitted is accurate. I am aware that this NOI, if approved, makes the above-described construction activity subject to NPDES permit number TNR100000, and that certain of my activities on-site are thereby regulated. I am aware that there are significant penalties, including the possibility of fine and imprisonment for knowing violations, and for failure to comply with these permit requirements.

| Primary contractor name and address: (print or type) 235 County Road 1242 T&K CONSTRUCTION, LLC    Vinemont, AL 35179 | Signature: | Date: 8/14/2012 |
|---|---|---|
| Other contractor name and address: (print or type) | Signature: | Date: |
| Other contractor name and address: (print or type) | Signature: | Date: |

| **OFFICIAL STATE USE ONLY** | | | | |
|---|---|---|---|---|
| Received Date: | Reviewer: | Field Office: | Permit Number TNR | Exceptional TN Water: |
| Fee(s): | T & E Aquatic Flora and Fauna: | | Impaired Receiving Stream: | Notice of Coverage Date: |

# EXHIBIT 3

## JULY 31, 2012 SWPPP

### (excluding oversized drawings)

# CONSTRUCTION
# STORM WATER POLLUTION PREVENTION PLAN

# PHASE 1 CORRECTIVE ACTION CONSTRUCTION
# ACC LANDFILL
# MAURY COUNTY, TENNESSEE
### (TN PERMIT NO. IDL 60-102-0032)

### TriAD Project No. 97-SSI07-01

### Prepared for:

## ASSOCIATED COMMODITIES CORPORATION
### P.O. Box 432
### Mt. Pleasant, Tennessee 38474

### Prepared by:



**TriAD**

**TriAD Environmental Consultants, Inc.**
Suite 200
207 Donelson Pike
Nashville, TN 37214
615-889-6888

### July 31, 2012

Case 1:18-cv-00029   Document 1-1   Filed 04/09/18   Page 21 of 153 PageID #: 52

# Table of Contents

**Page**

CERTIFICATION.................................................................................i

CONTRACTOR CERTIFICATION .....................................................ii

1.0 INTRODUCTION ...................................................................1

2.0 FACILITY DESCRIPTION ......................................................1

    2.1 Proposed Construction Activities ....................................1

    2.2 Site Drainage ................................................................3

3.0 STORM WATER RUNOFF CONTROLS...................................4

4.0 SITE STABILIZATION ...........................................................6

5.0 INSPECTIONS.......................................................................7

6.0 SPILLS.................................................................................8

7.0 RECORD KEEPING ..............................................................9

8.0 FUTURE STORM WATER MANAGEMENT ............................10

## Table

Table 1          Outfall Drainage Areas ..........................................................5

## Appendices

Appendix 1       Drawings
Appendix 2       Inspection Forms
Appendix 3       SWPPP Revisions/Amendments
Appendix 4       Construction Permit
Appendix 5       NOI/NOT

## CERTIFICATION

I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gathered and evaluated the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

_____
Signature

_____7-31-12_____
Date

## CONTRACTOR CERTIFICATION

I certify under penalty of law that I have reviewed this document, any attachments, and the SWPPP referenced above. Based on my inquiry of the construction site owner/developer identified above and/or my inquiry of the person directly responsible for assembling this Notice of Intent, I believe the information submitted is accurate. I am aware that this NOI, if approved, makes the above-described construction activity subject to NPDES permit number TNR 100000, and that certain of my activities onsite are thereby regulated. I am aware there are significant penalties, including the possibility of fine and imprisonment for knowing violations, for failure to comply with these permit requirements.

_____

Signature

_____

Date

## 1.0   INTRODUCTION

This Storm Water Pollution Prevention Plan (SWPPP) for the Associated Commodities Corporation (ACC) Landfill has been developed by TriAD Environmental Consultants, Inc., (TriAD) for Associated Commodities Corporation to fulfill the requirements of Tennessee NPDES Permit No. TNR10000 - Storm Water Discharges Associated with Construction Activity (Appendix 4). This SWPPP provides a description of the proposed pollution prevention plan procedures which will be used during Phase 1 Corrective Action Construction. A copy of this SWPPP will remain onsite during construction and be used by appropriate ACC and Construction Contractor employees and management.

For the purposes of this plan, ACC is the Site Operator and is responsible for preparing and updating this SWPPP. The Construction Contractor identified on the NOI (and their designated subcontractors) will be responsible for site construction activities. The Construction Contractor will be responsible for implementing the SWPPP, conducting inspections, maintaining sediment control measures, and ensuring that all personnel and subcontractors are familiar with and comply with the plan elements.

## 2.0   FACILITY DESCRIPTION

The ACC Landfill is an industrial, non-hazardous, solid waste landfill that has been closed since 1993 and is located on Arrow Lake Road in Maury County, Tennessee. The total Site area is approximately 732 acres and includes the approximately 14 acres of former landfill. Drawings of the Site are provided in Appendix 1.

### 2.1   Proposed Construction Activities

The construction activities proposed are the excavation and relocation of landfilled waste from the existing ACC landfill to a newly constructed onsite Waste Relocation Area. Areas disturbed due to Phase 1 Corrective Action Construction will encompass approximately 17 acres. Two outfall locations have been identified downgradient of the proposed construction activities and will be monitored in accordance with the storm water inspection requirements specified herein.

Sequential activities which will be conducted during Phase 1 Corrective Action Construction include the following:

a.    Prior to clearing and grubbing, silt fence and the check dams identified on the Sediment and Erosion Control Plan will be constructed.  Additional silt fencing may be required downgradient of any temporary haul roads and/or soil stockpile locations.

b.    Subsequent to construction of the sediment and erosion control devices, the Contractor will construct the western haul road and the temporary haul road into the Waste Excavation Area.   The remaining portions of the temporary haul road will be constructed progressively during Phase 1 excavation.

c.    Upon completion of temporary haul road construction, excavation within the Waste Relocation Area will be initiated.  Excavated soil will be used to construct the northern diversion berm, Phase 1 impoundment berm, and the Waste Relocation Area diversion berm/soil stockpile.  During Waste Relocation Area excavation, the excavation area will be utilized to capture storm water that falls within the construction area.  Water will be discharged from the excavation via pumping.  Water will be pumped from the top of the accumulated water surface, and a filter bag will be utilized at the pump discharge to provide additional water filtration.   If necessary to facilitate construction activities, water may be discharged through the proposed leachate collection trench and directed to the upper wetland pond or surface water impoundment for retention and sediment settling prior to discharge from the Site.

d.    Prior to construction of the surface water impoundment berm, the 12" HDPE drainage pipes between the upper and lower pond will be capped and the breach between the two ponds repaired.  Drainage from the upper pond will be diverted around the lower pond to the Road Crossing through a constructed breach in the upper pond at the location identified on the Drawings.

e. Prior to cap removal and waste excavation activities, temporary Ditch 1 and the associated check dams are to be constructed. The Phase 1 impoundment will serve as the sediment basin for all Phase 1 excavation activities; however, check dams within the excavation and the Ditch 1 will be used to control the migration of sediment from the excavation area. Soils removed during cap excavation will be stockpiled upgradient of the Phase 1 excavation to prevent storm water run on and divert water away from the Phase 1 impoundment.

f. Subsequent to the completion of Phase 1 Corrective Action Construction, all excavated landfill surfaces will be covered with a minimum 12-inch soil layer and revegetated. All disturbed areas outside of the original landfill and Waste Relocation Area with the exception of the road surface will also be revegetated.

## 2.2    Site Drainage

The Landfill is located in a small valley east of Arrow Mines Road that drains westward into Arrow Lake into Arrow Lake, an impoundment of Sugar Creek (303-d listed). The valley in which the Landfill is located joins an adjacent valley to the south at a point near the Landfill's downgradient end or toe. Springs at the juncture of these valleys flow into a series of constructed ponds. The ponds were originally constructed as a salt water marsh/wetland in an attempt to mitigate the release of chlorides from the site; however, no wetland vegetation is currently present. The ponds are located in the vicinity of the original sediment basin serving the landfill during its operation. Discharges from these ponds flow into to an unnamed tributary to Sugar Creek, approximately 1,100 feet west of the Landfill. This stream flows west into a culvert under Arrow Mines Road and into the southern (upstream) end of Arrow Lake.

Surface soils to be disturbed at the have been classified as silty clays. These soils typically have a low to moderate permeability and a low to moderate erosion potential.

Subsequent to the completion of construction activities, storm water which falls within the project areas will flow across moderately steep revegetated slopes. The estimated

runoff coefficient of the completed construction areas is 0.30. With the exception of the storm water that is pumped from the Waste Relocation Area or flows over the Phase 1 impoundment spillway, there will be no other concentrated discharge. No significant increase in runoff from the property is anticipated from this construction. In accordance with the Tennessee Division of Solid Waste Management regulations, the Phase 1 impoundment has been designed to reduce runoff below pre-development conditions and provide sediment discharge control for a 25-year, 24-hour storm event.

## 3.0    STORM WATER RUNOFF CONTROLS

Erosion prevention and sediment controls which may be utilized by the Contractor during construction include the following:

- Silt Fences - Silt fences will be utilized downgradient of disturbed and soil stockpile areas, as necessary, to prevent the potential for transport of material outside of the disturbed areas.

- Rock Outlet Protection - Rip-rap will be utilized at the outlet end of the principle spillway and culvert to reduce the depth, velocity, and energy of water, thereby minimizing the potential for downstream erosion.

- Check dams - Check will be utilized to reduce the velocity of channelized water, thereby reducing the potential for channel erosion. Check dams will be constructed of stone.

- Drainage Swales - Drainage swales may be utilized to manage storm water runon/runoff at the facility by either diverting potentially sediment-laden waters into onsite sediment ponds or diverting non-impacted waters around sediment ponds.

- Vegetation - Vegetation will be utilized at the facility to provide flow attenuation,

allow infiltration/evapotranspiration of storm water, and reduce the potential for erosion.

The Contractor will be responsible for providing and maintaining the design capacity for all erosion prevention and sediment control measures which are necessary during construction. Sediment will be removed from sediment control devices when approximately 50 percent of the sediment storage capacity is achieved. Drainage areas associated with these outfalls are provided in Table 1.

| Table 1 Outfall Drainage Areas | | |
|---|---|---|
| Outfall No. | Drainage Area (ac.) | Note |
| O-1 | 4.0 | Outfall 1 is located adjacent to the Waste Relocation Area at the discharge of excavation pumping/dewatering. |
| O-2 | 20.8 | Outfall 2 is located at the emergency spillway of the proposed surface water impoundment. |

Additional erosion and sediment control practices which will be implemented by the Contractor include the following:

a. Litter, construction debris, and construction chemicals exposed to storm water will be picked up prior to anticipated storm events or otherwise prevented from becoming a pollutant source.

b. Pre-construction vegetative ground cover will not be destroyed, removed, or disturbed more than 10 calendar days prior to grading or earth moving unless the area is seeded and/or mulched or other temporary cover is installed.

c. Clearing and grubbing must be held to the minimum necessary for grading and equipment operations.

d. Construction must be sequenced to minimize the exposure time of graded or denuded areas.

e. Erosion and sediment control measures must be in place and functional before earth moving operations begin, and must be constructed and maintained throughout the construction period.

f. Off-site vehicle tracking of sediments and the generation of dust must be minimized.

## 4.0 SITE STABILIZATION

Site stabilization practices will include temporary seeding (if necessary), permanent seeding, and mulching. Stabilization measures will be required on exposed soil areas only. Stabilization measures will be initiated as soon as practicable in portions of the Site where construction activities have temporarily or permanently ceased, but in no case more than 15 days after the construction activity in that portion of the Site has temporarily or permanently ceased except in the following two situations:

a. Where the initiation of stabilization measures by the seventh day is precluded by snow cover or frozen ground conditions.

b. Construction activity on a portion of the Site is temporarily ceased, and earth disturbing activities will be resumed within 15 days.

Temporary or permanent soil stabilization will be accomplished within 15 days after final grading or other earth work. Permanent stabilization with perennial vegetation, as specified in the Construction Specifications, will replace any temporary measures as soon as practicable. Final stabilization, seed mixes and application rates, for construction areas will be determined at the time of application. Permanent cover seeding mixtures and times of application, as defined in the Tennessee Erosion & Sediment Control Handbook, dated March 2009, are as follows:

a. February 1 to July 1: A seed mixture of 80% Kentucky 31 Fescue, 15% Koren Lespedeza, and 5% English Rye.

b. June 1 to August 15: A seed mixture of 55% Kentucky 31 Fescue, 20% English Rye, 15% Korean Lespedeza, and 10% German Millet.

c. April 15 to August 15: A seed mixture of 70% Bermuda Grass (hulled) and 30% Annual Lespedeza.

d. August 1 to December 1: A seed mixture of 70% Kentucky 31 Fescue, 20% English Rye, and 10% White Clover.

e. February 1 to December 1: A seed mixture of 70% Kentucky 31 Fescue, 25% Crown Vetch, and 5% English Rye.

Final Site stabilization for disturbed areas of construction including pipe trenches will be revegetated at a rate of 120 pounds per acre of the appropriate grass seed mixture. Straw mulch will be uniformly spread after seeding at a rate of 2 tons per acre.

## 5.0    INSPECTIONS

Inspections will be conducted at the Site at least twice every seven calendar days. Each inspection shall be conducted at least 72 hours apart. When the site, or portion of the site, is temporarily stabilized or runoff is unlikely due to winter conditions, such as snow or ice cover, inspections are to be conducted once a month until thawing begins or construction resumes. The inspections will be conducted by qualified ACC personnel, or their designated representative. The inspector must have successfully completed the Tennessee Water Resources Group, "Fundamentals of Erosion Prevention and Sediment Control" course or an equivalent course. A copy of the record of inspector(s) certification should be maintained in Appendix 2 of the SWPPP. This person will visually inspect the following:

a. Disturbed areas of the construction site that have not been finally stabilized

b. Areas used for storage of materials that are exposed to precipitation

c. Structural control measures

d.     Locations where vehicles enter or exit the Site

e.     Outfall points

Disturbed areas and areas used for storage of materials that are exposed to precipitation will be inspected for evidence of, or the potential for, pollutants entering the drainage system. Erosion and sediment control measures identified in the plan will be observed to ensure that they are operating correctly. Outfall points will be inspected to ascertain whether erosion control measures are effective in preventing significant impacts to receiving waters. Where discharge locations are inaccessible, nearby downstream locations will be inspected if possible. In the event that sediment migrates offsite, the accumulation will be removed as soon as possible, before the next rain event, if possible. The local Water Pollution office will be contacted to determine the appropriate remedial activities for sediment removal from stream. Locations where vehicles enter or exit the Site will be inspected for evidence of offsite sediment tracking.

During this inspection, a reporting form (provided in Appendix 2) will be completed. If deficiencies with the storm water measures are identified, any inadequate control measures will be replaced, modified, or repaired as necessary, before the next rain event of possible, but in no case more than seven days after the need is identified. In addition, if necessary, the SWPPP will be modified to incorporate any new or revised procedures. Revisions will be incorporated into the SWPPP within 14 days of the inspection.

## 6.0   SPILLS

In the event of a significant spill or leak, the permittee is required to notify the National Response Center (NRC) (800-424-8802) and the Tennessee Emergency Management Agency (emergencies: 800-262-3300; non-emergencies: 800-262-3400) as soon as he or she has knowledge of the discharge.

A letter describing the release, the material and amount spilled, date of spill, and cause of the spill will be submitted to the TDWPC within 14 calendar days of knowledge of the

Case 1:18-cv-00029   Document 1-1    Filed 04/09/18    Page 32 of 153 PageID #: 63

event. This letter and a description of mitigation actions taken and proposed modifications to the SWPPP to prevent future occurrences will be submitted to the following address:

> Columbia Environmental Field Office
> 1421 Hampshire Pike
> Columbia, Tennessee 38401

The SWPPP must be modified within 14 calendar days of knowledge of the release to provide a description of the release, the circumstances leading to the release, and the date of the release. In addition, the plan must be reviewed to identify measures to prevent the recurrence of such releases and to respond to such releases, and the plan must be modified where appropriate.

## 7.0   RECORD KEEPING

The following records shall be maintained onsite:

1. The dates when major grading activities occur
2. The dates when construction activities temporarily or permanently cease on a portion of the site
3. The dates when stabilization measures are initiated
4. Inspection records
5. Documentation that necessary repairs/inspection recommendations were implemented.
6. Rainfall records

A rain gauge shall be maintained onsite for the purpose of recording daily rainfall amounts. Completed inspection forms, rainfall logs, and construction record dates shall be maintained in Appendix 2. Documentation that necessary repairs/inspection recommendations were implemented should be included on subsequent inspection records.

## 8.0    FUTURE STORM WATER MANAGEMENT

A Notice of Termination (NOT) for this Construction General NPDES Permit is provided in Appendix 5. The NOT will be completed and transmitted to the Columbia Environmental Field Office upon the completion of Site stabilization activities for construction activities.

# APPENDIX 1

# DRAWINGS

# APPENDIX 2

# INSPECTION FORMS



TENNESSEE DEPARTMENT OF ENVIRONMENT AND CONSERVATION (TDEC)
Division of Water Pollution Control (WPC)
6th Floor Annex, L&C Tower, 401 Church Street, Nashville, Tennessee 37243
1-888-891-8332 (TDEC)
General NPDES Permit for Stormwater Discharges from Construction Activities (CGP)

## Construction Stormwater Inspection Certification (Twice-Weekly Inspections)

| Site or Project Name: | | | NPDES Tracking Number: TNR |
|---|---|---|---|
| Primary Permittee Name: | | | Date of Inspection: |
| Current approximate disturbed acreage: | | Has rainfall been checked/documented daily? ☐Yes ☐ No | Name of Inspector: |
| Current weather conditions: | | | Inspector's TNEPSC Certification Number: |

**Please check the box if the following items are on-site:**

☐ Notice of Coverage (NOC)   ☐ Stormwater Pollution Prevention Plan (SWPPP)   ☐ Twice-weekly inspection documentation

☐ Site contact information   ☐ Rain Gage   ☐ Off-site Reference Rain Gage Location: _____

**Best Management Practices (BMPs)**

| | Are the Erosion Prevention and Sediment Controls (EPSCs) functioning correctly: If "No", describe below in Comment Section | | |
|---|---|---|---|
| 1. | Are all applicable EPSCs installed and maintained per the SWPPP? | ☐Yes | ☐No |
| 2. | Are EPSCs functioning correctly at all disturbed areas/material storage areas per section 4.1.5? | ☐Yes | ☐No |
| 3. | Are EPSCs functioning correctly at outfall/discharge points such that there is no objectionable color contrast in the receiving stream, and no other water quality impacts per section 5.3.2? | ☐Yes | ☐No |
| 4. | Are EPSCs functioning correctly at ingress/egress points such that there is no evidence of track out? | ☐Yes | ☐No |
| 5. | If applicable, have discharges from dewatering activities been managed by appropriate controls per section 4.1.4? If "No", describe below the measures to be implemented to address deficiencies. | ☐Yes | ☐No |
| 6. | If construction activity at any location on-site has temporarily/permanently ceased, was the area stabilized within 14 days per section 3.5.3.2? If "No", describe below each location and measures taken to stabilize the area(s). | ☐Yes | ☐No |
| 7. | Have pollution prevention measures been installed, implemented, and maintained to minimize the discharge of pollutants from equipment and vehicle washing, wheel wash water, and other wash waters per section 4.1.5? If "No", describe below the measures to be implemented to address deficiencies. | ☐Yes | ☐No |
| 8. | If a concrete washout facility is located on site, is it clearly identified on the project and maintained? If "No", describe below the measures to be implemented to address deficiencies. ☐ N/A | ☐Yes | ☐No |
| 9. | Have all previous deficiencies been addressed? If not, describe the remaining deficiencies in the Comments section. ☐ Check if deficiencies/corrective measures have been reported on a previous form. | ☐Yes | ☐No |

**Comment Section.** If the answer is "No" for any of the above, please describe the problem and corrective actions to be taken. Otherwise, describe any pertinent observations:

**Certification and Signature** (must be signed by the certified inspector and the permittee per Sections 3.5.8.2 (g) and 7.7.2 of the CGP)

I certify under penalty of law that this report and all attachments are, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

| Inspector Name and Title: | Signature: | Date: |
|---|---|---|
| Permittee Name and Title: | Signature: | Date: |

# CONSTRUCTION LOG

| Date Initiated | Description of Construction Activity | Date Completed |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

# RAINFALL LOG

| Date | Rainfall Amt.(in.) | Date | Rainfall Amt.(in.) | Date | Rainfall Amt.(in.) | Date | Rainfall Amt.(in.) |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

# APPENDIX 3

# SWPPP REVISIONS/AMENDMENTS

# PLAN AMENDMENTS

Plan amendments should be incorporated into the plan as they occur and documented below.

| Description of Revision | Date | Approval Signature |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**APPENDIX 4**

**CONSTRUCTION PERMIT**



# STATE OF TENNESSEE

# NPDES PERMIT

## GENERAL NPDES PERMIT
## FOR DISCHARGES OF STORMWATER
## ASSOCIATED WITH CONSTRUCTION ACTIVITIES

### PERMIT NO. TNR100000

Under authority of the Tennessee Water Quality Control Act of 1977 (T.C.A. 69-3-101 et seq.) and the authorization by the United States Environmental Protection Agency under the Federal Water Pollution Control Act, as amended by the Clean Water Act of 1977 (33 U.S.C. 1251, et seq.) and the Water Quality Act of 1987, P.L. 100-4, including special requirements as provided in part 5.4 (Discharges into Impaired or Exceptional Tennessee Waters) of this general permit, operators of point source discharges of stormwater associated with construction activities into waters of the State of Tennessee, are authorized to discharge stormwater associated with construction activities in accordance with the following permit monitoring and reporting requirements, effluent limitations, and other provisions as set forth in parts 1 through 10 herein, from the subject outfalls to waters of the State of Tennessee.

This permit is issued on: **May 23, 2011**

This permit is effective on: **May 24, 2011**

This permit expires on: **May 23, 2016**

for Paul E. Davis, P.E., Director
Division of Water Pollution Control

CN-0759

RDAs 2352 and 2366

# Tennessee General Permit No. TNR100000
## Stormwater Discharges Associated with Construction Activities

---

### Table of Contents

---

**1. COVERAGE UNDER THIS GENERAL PERMIT** ....................................................1

**1.1. Permit Area** ...................................................................................................1

**1.2. Discharges Covered by this Permit** ......................................................................1
1.2.1. Stormwater discharges associated with construction activities .......................................1
1.2.2. Stormwater discharges associated with construction support activities...............................1
1.2.3. Non-stormwater discharges authorized by this permit ..................................................2
1.2.4. Other NPDES-permitted discharges ..................................................................2

**1.3. Limitations on Coverage** ...................................................................................2

**1.4. Obtaining Permit Coverage** ...............................................................................4
1.4.1. Notice of Intent (NOI) ...........................................................................4
1.4.2. Stormwater Pollution Prevention Plan (SWPPP) ....................................................5
1.4.3. Permit application fees ...........................................................................5
1.4.4. Submittal of a copy of the NOC and NOT to the local MS4.........................................6
1.4.5. Permit Coverage through Qualifying Local Program ................................................6

**1.5. Effective Date of Coverage** ...............................................................................6
1.5.1. Notice of Coverage (NOC) .......................................................................6
1.5.2. Permit tracking numbers .........................................................................7

**2. NOTICE OF INTENT (NOI) REQUIREMENTS** ......................................................7

**2.1. Who Must Submit an NOI?** ..............................................................................7

**2.2. Typical Construction Site Operators** ...................................................................8
2.2.1. Owner/Developer.................................................................................8
2.2.2. Commercial builders..............................................................................8
2.2.3. Contractors.......................................................................................8

**2.3. Responsibilities of Operators** ............................................................................8
2.3.1. Permittee(s) with design control (owner/developer) ...............................................9
2.3.2. Permittee(s) with day-to-day operational control (contractor – secondary
permittee).........................................................................................9

**2.4. NOI Submittal** ..............................................................................................10
2.4.1. Existing site ......................................................................................10
2.4.2. Application for new permit coverage .............................................................10
2.4.3. New operator .....................................................................................10
2.4.4. Late NOIs.........................................................................................11

**2.5. Who Must Sign the NOI?** .................................................................................11

**2.6. NOI Form** ...................................................................................................11

Case 1:18-cv-00029    Document 1-1    Filed 04/09/18    Page 44 of 153 PageID #: 75

2.6.1.     Contents of the NOI form ................................................................................11
2.6.2.     Construction site map ...................................................................................11
2.6.3.     Application completeness ..............................................................................12

**2.7.     Where to Submit the NOI, SWPPP and Permitting Fee? .....................12**

**2.8.     List of the TDEC Environmental Field Offices (EFOs) and
           Corresponding Counties .................................................................12**

**3.        STORMWATER POLLUTION PREVENTION PLAN (SWPPP)
           REQUIREMENTS ................................................................13**

**3.1.     The General Purpose of the SWPPP .........................................13**
3.1.1.     Registered engineer or landscape architect requirement .......................13
3.1.2.     Site Assessment ............................................................................................14

**3.2.     SWPPP Preparation and Compliance .......................................15**
3.2.1.     Existing site ....................................................................................................15
3.2.2.     New site ..........................................................................................................15

**3.3.     Signature Requirements, Plan Review and Making Plans Available ............15**
3.3.1.     Signature Requirements for a SWPPP .........................................................15
3.3.2.     SWPPP Review .............................................................................................15
3.3.3.     Making plans available ..................................................................................15

**3.4.     Keeping Plans Current ................................................................15**
3.4.1.     SWPPP modifications ...................................................................................15

**3.5.     Components of the SWPPP ........................................................16**
3.5.1.     Site description ..............................................................................................16
3.5.2.     Description of stormwater runoff controls ..................................................17
3.5.3.     Erosion prevention and sediment controls ..................................................18
3.5.4.     Stormwater management ..............................................................................22
3.5.5.     Other items needing control ........................................................................23
3.5.6.     Approved local government sediment and erosion control requirements ....23
3.5.7.     Maintenance .................................................................................................23
3.5.8.     Inspections ....................................................................................................23
3.5.9.     Pollution prevention measures for non-stormwater discharges ...............25
3.5.10.    Documentation of permit eligibility related to Total Maximum Daily Loads
           (TMDL) .........................................................................................................25

**4.        CONSTRUCTION AND DEVELOPMENT EFFLUENT GUIDELINES ..............25**

**4.1.     Non-Numeric Effluent Limitations ...........................................25**
4.1.1.     Erosion Prevention and Sediment Controls ................................................25
4.1.2.     Buffer zone requirements .............................................................................26
4.1.3.     Soil stabilization ...........................................................................................27
4.1.4.     Dewatering ....................................................................................................27
4.1.5.     Pollution prevention measures ....................................................................28
4.1.6.     Prohibited discharges ...................................................................................28
4.1.7.     Surface outlets ..............................................................................................28

| 5. | SPECIAL CONDITIONS, MANAGEMENT PRACTICES, AND OTHER NON-NUMERIC LIMITATIONS | 28 |
|---|---|---|
| 5.1. | Releases in Excess of Reportable Quantities | 28 |
| 5.2. | Spills | 29 |
| 5.3. | Discharge Compliance with State Water Quality Standards | 29 |
| 5.3.1. | Violation of Water Quality Standards | 29 |
| 5.3.2. | Discharge quality | 29 |
| 5.4. | Discharges into Impaired or Exceptional Tennessee Waters | 30 |
| 5.4.1. | Additional SWPPP/BMP Requirements for discharges into impaired or exceptional TN Waters | 30 |
| 5.4.2. | Buffer zone requirements for discharges into impaired or exceptional TN waters | 31 |
| 5.4.3. | Pre-Approved sites | 32 |
| 6. | RETENTION, ACCESSIBILITY AND SUBMISSION OF RECORDS | 32 |
| 6.1. | Documents | 32 |
| 6.2. | Accessibility and Retention of Records | 32 |
| 6.2.1. | Posting information at the construction site | 33 |
| 6.3. | Electronic Submission of NOIs, NOTs and Reports | 33 |
| 7. | STANDARD PERMIT CONDITIONS | 33 |
| 7.1. | Duty to Comply | 33 |
| 7.1.1. | Permittee's duty to comply | 33 |
| 7.1.2. | Penalties for violations of permit conditions | 34 |
| 7.1.3. | Civil and criminal liability | 34 |
| 7.1.4. | Liability under state law | 34 |
| 7.2. | Continuation of the Expired General Permit | 34 |
| 7.3. | Need to Halt or Reduce Activity Not a Defense | 35 |
| 7.4. | Duty to Mitigate | 35 |
| 7.5. | Duty to Provide Information | 35 |
| 7.6. | Other Information | 35 |
| 7.7. | Signatory Requirements | 35 |
| 7.7.1. | Signatory requirements for a Notice of Intent (NOI) | 36 |
| 7.7.2. | Signatory requirements for reports and other items | 36 |
| 7.7.3. | Duly authorized representative | 37 |
| 7.7.4. | Changes to authorization | 37 |
| 7.7.5. | Signatory requirements for primary permittees | 37 |
| 7.7.6. | Signatory requirements for secondary permittees | 37 |
| 7.8. | Penalties for Falsification of Reports | 38 |
| 7.9. | Oil and Hazardous Substance Liability | 38 |

| 7.10. | Property Rights | 38 |
|---|---|---|
| 7.11. | Severability | 38 |
| 7.12. | **Requiring an Individual Permit** | **38** |
| 7.12.1. | Director can require a site to obtain an individual permit | 38 |
| 7.12.2. | Permittee may request individual permit instead of coverage under this general permit | 39 |
| 7.12.3. | Individual permit terminates general permit | 39 |
| 7.13. | **Other, Non-Stormwater, Program Requirements** | **39** |
| 7.14. | **Proper Operation and Maintenance** | **40** |
| 7.15. | **Inspection and Entry** | **40** |
| 7.16. | **Permit Actions** | **40** |
| 8. | **REQUIREMENTS FOR TERMINATION OF COVERAGE** | **40** |
| 8.1. | **Termination of Developer and Builder Coverage** | **40** |
| 8.1.1. | Termination process for primary permittees | 40 |
| 8.1.2. | NOT review | 41 |
| 8.2. | **Termination of Builder and Contractor Coverage** | **42** |
| 8.2.1. | Termination process for secondary permittees | 42 |
| 8.3. | **NOT certification** | **42** |
| 8.4. | **Where to Submit a Notice of Termination (NOT)?** | **42** |
| 9. | **AQUATIC RESOURCE ALTERATION PERMITS (ARAP)** | **42** |
| 10. | **DEFINITIONS** | **43** |
| 11. | **LIST OF ACRONYMS** | **50** |
| | **APPENDIX A – Notice of Intent (NOI) Form** | |
| | **APPENDIX B – Notice of Termination (NOT) Form** | |
| | **APPENDIX C – Inspection Report Form** | |
| | **APPENDIX D – Stormwater Monitoring Report Form** | |

Case 1:18-cv-00029    Document 1-1    Filed 04/09/18    Page 47 of 153 PageID #: 78

# 1. COVERAGE UNDER THIS GENERAL PERMIT

## 1.1. Permit Area

This construction general permit (CGP) covers all areas of the State of Tennessee.

## 1.2. Discharges Covered by this Permit

### 1.2.1. Stormwater discharges associated with construction activities

This permit authorizes point source discharges of stormwater from construction activities including clearing, grading, filling and excavating (including borrow pits and stockpile/material storage areas containing erodible material), or other similar construction activities that result in the disturbance of one acre or more of total land area. Projects or developments of less than one acre of land disturbance are required to obtain authorization under this permit if the construction activities at the site are part of a larger common plan of development or sale that comprise at least one acre of land disturbance. One or more site operators must maintain coverage under this permit for all portions of a site that have not been finally stabilized.

Projects or developments of less than one acre of total land disturbance may also be required to obtain authorization under this permit if:

a) the director has determined that the stormwater discharge from a site is causing, contributing to, or is likely to contribute to a violation of a state water quality standard;

b) the director has determined that the stormwater discharge is, or is likely to be a significant contributor of pollutants to waters of the state, or

c) changes in state or federal rules require sites of less than one acre that are not part of a larger common plan of development or sale to obtain a stormwater permit.

Note: Any discharge of stormwater or other fluid to an improved sinkhole or other injection well, as defined, must be authorized by permit or rule as a Class V underground injection well under the provisions of TDEC Rules, Chapter 1200-4-6.

### 1.2.2. Stormwater discharges associated with construction support activities

This permit also authorizes stormwater discharges from support activities associated with a permitted construction site (e.g., concrete or asphalt batch plants, equipment staging yards, material storage areas, excavated material disposal areas, borrow areas) provided all of the following are met:

a) the support activity is primarily related to a construction site that is covered under this general permit;

b) the operator of the support activity is the same as the operator of the construction site;

c) the support activity is not a commercial operation serving multiple unrelated construction projects by different operators;

d) the support activity does not operate beyond the completion of the construction activity of the last construction project it supports; and

Case 1:18-cv-00029    Document 1-1    Filed 04/09/18    Page 48 of 153 PageID #: 79

e) support activities are identified in the Notice of Intent (NOI) and the Stormwater Pollution Prevention Plan (SWPPP). The appropriate erosion prevention and sediment controls and measures applicable to the support activity shall be described in a comprehensive SWPPP covering the discharges from the support activity areas.

TDOT projects shall be addressed in the <u>Waste and Borrow Manual</u> per the <u>Statewide Stormwater Management Plan (SSWMP)</u>. Stormwater discharges associated with support activities that have been issued a separate individual permit or an alternative general permit are not authorized by this general permit. This permit does not authorize any process wastewater discharges from support activities. Process wastewater discharges from support activities must be authorized by an individual permit or other appropriate general permit.

1.2.3. <u>Non-stormwater discharges authorized by this permit</u>

The following non-stormwater discharges from active construction sites are authorized by this permit provided the non-stormwater component of the discharge is in compliance with section 3.5.9 below (*Pollution prevention measures for non-stormwater discharges*):

a) dewatering of work areas of collected stormwater and ground water (filtering or chemical treatment may be necessary prior to discharge);
b) waters used to wash vehicles (of dust and soil, not process materials such as oils, asphalt or concrete) where detergents are not used and detention and/or filtering is provided before the water leaves site;
c) water used to control dust in accordance with section 3.5.5 below;
d) potable water sources including waterline flushings from which chlorine has been removed to the maximum extent practicable;
e) routine external building washdown that does not use detergents or other chemicals;
f) uncontaminated groundwater or spring water; and
g) foundation or footing drains where flows are not contaminated with pollutants (process materials such as solvents, heavy metals, etc.).

All non-stormwater discharges authorized by this permit must be free of sediment or other solids and must not cause erosion of soil or the stream bank, or result in sediment impacts to the receiving stream.

1.2.4. <u>Other NPDES-permitted discharges</u>

Discharges of stormwater or wastewater authorized by and in compliance with a different NPDES permit (other than this permit) may be mixed with discharges authorized by this permit.

**1.3. Limitations on Coverage**

Except for discharges from support activities, as described in section 1.2.2 above and certain non-stormwater discharges listed in section 1.2.3 above, all discharges covered by this permit shall be composed entirely of stormwater. This permit does <u>not</u> authorize the following discharges:

a) <u>Post-Construction Discharges (Permanent Stormwater Management)</u> - Stormwater discharges associated with construction activity that originate from the construction site

Case 1:18-cv-00029   Document 1-1   Filed 04/09/18   Page 49 of 153 PageID #: 80

after construction activities have been completed, the site has undergone final stabilization, and the coverage under this permit has been terminated.

b) <u>Discharges Mixed with Non-Stormwater</u> - Discharges that are mixed with sources of non-stormwater, other than discharges which are identified in section 1.2.4 above (*Other NPDES-permitted discharges*) and in compliance with section 3.5.9 below (*Pollution prevention measures for non-stormwater discharges*) of this permit.

c) <u>Discharges Covered by Another Permit</u> - Stormwater discharges associated with construction activity that have been issued an individual permit in accordance with subpart 7.12 below (*Requiring an Individual Permit*).

d) <u>Discharges Threatening Water Quality</u> - Stormwater discharges from construction sites, that the director determines will cause, have the reasonable potential to cause, or contribute to violations of water quality standards. Where such determination has been made, the discharger will be notified by the director in writing that an individual permit application is necessary as described in subpart 7.12 below (*Requiring an Individual Permit*). However, the division may authorize coverage under this permit after appropriate controls and implementation procedures have been included in the SWPPP that are designed to bring the discharge into compliance with water quality standards.

e) <u>Discharges into Impaired Streams</u> – This permit does not authorize discharges that would add loadings of a pollutant that is identified as causing or contributing to the impairment of a water body on the list of impaired waters. Impaired waters means any segment of surface waters that has been identified by the division as failing to support its designated classified uses. Compliance with the additional requirements set forth in sub-part 5.4 is not considered as contributing to loadings to impaired waters or degradation unless the division determines upon review of the SWPPP that there is a reason to limit coverage as set forth in paragraph d) above and the SWPPP cannot be modified to bring the site into compliance.

f) <u>Discharges into Outstanding National Resource Waters</u> - The director shall not grant coverage under this permit for discharges into waters that are designated by the Water Quality Control Board as Outstanding National Resource Waters (ONRWs). Designation of ONRWs are made according to TDEC Rules, Chapter 1200-4-3-.06.

g) <u>Discharges into Exceptional Quality Waters</u> - The director shall not grant coverage under this permit for potential discharges of pollutants which would cause degradation to waters designated by TDEC as exceptional quality waters (see sub-part 5.4 (Discharges into Impaired or Exceptional Tennessee Waters for additional permit requirements). Compliance with the additional requirements set forth in sub-part 5.4 is not considered as contributing to loadings to exceptional quality waters or degradation unless the division determines upon review of the SWPPP that there is a reason to limit coverage as set forth in paragraph d) above and the SWPPP cannot be modified to bring the site into compliance. Identification of exceptional quality waters is made according to TDEC Rules, Chapter 1200-4-3-.06.

h) <u>Discharges Not Protective of Federal or State listed Threatened and Endangered Species, Species Deemed in Need of Management or Special Concern Species</u> - Stormwater discharges and stormwater discharge-related activities that are not protective of legally protected listed or proposed threatened or endangered aquatic fauna or flora (or species proposed for such protection) in the receiving stream(s); or discharges or activities that would result in a "take" of a state or federal listed endangered or threatened aquatic or wildlife species deemed in need of management or special concern species, or such species' habitat. If the division finds that stormwater discharges or stormwater related activities are likely to result in any of the above effects, the director will deny the

Case 1:18-cv-00029    Document 1-1    Filed 04/09/18    Page 50 of 153 PageID #: 81

coverage under this general permit unless and until project plans are changed to adequately protect the species.

i)  Discharges from a New or Proposed Mining Operation - This permit does not cover discharges from a new or proposed mining operation.

j)  Discharges Negatively Affecting a Property on the National Historic Register - Stormwater discharges that would negatively affect a property that is listed or is eligible for listing in the National Historic Register maintained by the Secretary of Interior.

k)  Discharging into Receiving Waters With an Approved Total Maximum Daily Load Analysis - Discharges of pollutants of concern to waters for which there is an EPA-approved total maximum daily load (TMDL) for the same pollutant are not covered by this permit unless measures or controls that are consistent with the assumptions and requirements of such TMDL are incorporated into the SWPPP. If a specific wasteload allocation has been established that would apply to the discharge, that allocation must be incorporated into the SWPPP and steps necessary to meet that allocation must be implemented. In a situation where an EPA-approved or established TMDL has specified a general wasteload allocation applicable to construction stormwater discharges, but no specific requirements for construction sites have been identified, the permittee should consult with the division to confirm that adherence to a SWPPP that meets the requirements of this permit will be consistent with the approved TMDL. Where an EPA-approved or established TMDL has not specified a wasteload allocation applicable to construction stormwater discharges, but has not specifically excluded these discharges, adherence to a SWPPP that meets the requirements of the CGP will generally be assumed to be consistent with the approved TMDL. If the EPA-approved or established TMDL specifically precludes construction stormwater discharges, the operator is not eligible for coverage under the CGP.

## 1.4. Obtaining Permit Coverage

Submitting a complete NOI, a SWPPP and an appropriate permitting application fee are required to obtain coverage under this general permit. Requesting coverage under this permit means that an applicant has obtained and examined a copy of this permit, and thereby acknowledges applicant's claim of ability to comply with permit terms and conditions. Upon completing NOI review, the division will:

a)  issue a notice of coverage (NOC) to the operator identified as a primary permittee on the NOI form (see subpart 1.5 below - *Effective Date of Coverage*); or

b)  notify the applicant of needed changes to their NOI submittal (see section 2.6.3 below - *Application completeness*); or

c)  deny coverage under this general permit (see subpart 7.12 below - *Requiring an Individual Permit*).

### 1.4.1. Notice of Intent (NOI)

Operators wishing to obtain coverage under this permit must submit a completed NOI in accordance with requirements of part 2 below, using the NOI form provided in Appendix A of this permit (or a copy thereof). The division will review NOIs for completeness and accuracy and, when deemed necessary, investigate the proposed project for potential impacts to the waters of the state.

Case 1:18-cv-00029   Document 1-1   Filed 04/09/18   Page 51 of 153 PageID #: 82

1.4.2.   Stormwater Pollution Prevention Plan (SWPPP)

Operators wishing to obtain coverage under this permit must develop and submit a site-specific SWPPP with the NOI. The initial, comprehensive SWPPP, developed and submitted by the site-wide permittee (typically owner/developer who applied for coverage at project commencement[1]), should address all construction-related activities from the date construction commences to the date of termination of permit coverage, to the maximum extent practicable. The SWPPP must be developed, implemented and updated according to the requirements in part 3 below (*SWPPP Requirements*) and subpart 2.3 below (*Responsibilities of Operators*). The SWPPP must be implemented prior to commencement of construction activities.

If the initial, comprehensive SWPPP does not address all activities until final stabilization of the site, an updated SWPPP or addendums to the plan addressing all aspects of current site disturbance must be prepared. An active, updated SWPPP must be in place for all disturbed portions of a site until each portion has been completed and finally stabilized.

Preparation and implementation of the comprehensive SWPPP may be a cooperative effort with all operators at a site. New operators with design and operational control of their portion of the construction site are expected to adopt, modify, update and implement a comprehensive SWPPP. Primary permittees at the site may develop a SWPPP addressing only their portion of the project, as long as the proposed Best Management Practices (BMPs) are compatible with the comprehensive SWPPP and complying with conditions of this general permit.

1.4.3.   Permit application fees

The permit application fee should accompany the site-wide permittee's NOI form. The fee is based on the total acreage planned to be disturbed by an entire construction project for which the site-wide permittee is requesting coverage, including any associated construction support activities (see section 1.2.2 above). *The disturbed area* means the total area presented as part of the development (and/or of a larger common plan of development) subject to being cleared, graded, or excavated during the life of the development. The area cannot be limited to only the portion of the total area that the site-wide owner/developer initially disturbs through the process of various land clearing activities and/or in the construction of roadways, sewers and water utilities, stormwater drainage structures, etc., to make the property marketable. The site-wide owner/developer may present documentation of common areas in the project that will not be subject to disturbance at anytime during the life of the project and have these areas excluded from the fee calculation.

The application fees shall be as specified in the TDEC Rules, Chapter 1200-4-11. The application will be deemed incomplete until the appropriate application fee is paid in full. Checks for the appropriate fee should be made payable to "Treasurer, State of Tennessee." There is no additional fee for subsequent owner/operator to obtain permit coverage (see section 2.4.3 below - *New operator*), as long as the site-wide primary permittee has active permit coverage at the time of receipt of the subsequent operator's application, because the site-wide primary permittee paid the appropriate fee for the entire area of site disturbance. If a project was previously permitted, but permit coverage was terminated (see section 8.1.1 below - Termination process for primary permittees), and subsequent site disturbance or re-development occurs, the new operator must obtain coverage and pay the appropriate fee for the disturbed acreage.

---

[1] See sub-part 2.1 on page 7 for a definition of an site-wide permittee.

Case 1:18-cv-00029    Document 1-1    Filed 04/09/18    Page 52 of 153 PageID #: 83

#### 1.4.4. Submittal of a copy of the NOC and NOT to the local MS4

Permittees who discharge stormwater through an NPDES-permitted municipal separate storm sewer system (MS4) who are not exempted in section 1.4.5 below (*Permit Coverage through Qualifying Local Program*) must submit a courtesy copy of the notice of coverage (NOC), and at project completion, a copy of the signed notice of termination (NOT) to the MS4 upon their request. Permitting status of all permittees covered (or previously covered) under this general permit as well as the most current list of all MS4 permits is available at the division's DataViewer web site[2].

#### 1.4.5. Permit Coverage through Qualifying Local Program

Coverage equivalent to coverage under this general permit may be obtained from a qualifying local erosion prevention and sediment control Municipal Separate Storm Sewer System (MS4) program. A qualifying local program (QLP) is a municipal stormwater program for stormwater discharges associated with construction activity that has been formally approved by the division. More information about Tennessee's QLP program and MS4 participants can be found at: http://tn.gov/environment/wpc/stormh2o/qlp.shtml.

If a construction site is within the jurisdiction of and has obtained a notice of coverage from a QLP, the operator of the construction activity is authorized to discharge stormwater associated with construction activity under this general permit without the submittal of an NOI to the division. The permittee is also not required to submit a SWPPP, a notice of termination or a permit fee to the division. At the time of issuance of this permit, there were no qualifying local erosion prevention and sediment control MS4 programs in Tennessee. Permitting of stormwater runoff from construction sites from federal or state agencies (including, but not limited to the Tennessee Department of Transportation (TDOT) and Tennessee Valley Authority (TVA)) and the local MS4 program itself will remain solely under the authority of TDEC.

The division may require any owner/developer or operator located within the jurisdiction of a QLP to obtain permit coverage directly from the division. The operator shall be notified in writing by the division that coverage by the QLP is no longer applicable, and how to obtain coverage under this permit.

### 1.5. Effective Date of Coverage

#### 1.5.1. Notice of Coverage (NOC)

The NOC is a notice from the division to the primary permittee, which informs the primary permittee that the NOI, the SWPPP and the appropriate fee were received and accepted, and stormwater discharges from a specified area of a construction activity have been approved under this general permit. The permittee is authorized to discharge stormwater associated with construction activity as of the effective date listed on the NOC.

Assigning a permit tracking number by the division to a proposed discharge from a construction site does not confirm or imply an authorization to discharge under this permit. Correspondence

---

[2] http://www.tn.gov/environment/wpc/dataviewer/

with the permittee is maintained through the Site Owner or Developer listed in the NOI, not the optional contact or the secondary permittee.

If any Aquatic Resource Alteration Permits (ARAP) are required for a site in areas proposed for active construction, the NOC will not be issued until ARAP application(s) are submitted and deemed by TDEC to be complete. The treatment and disposal of wastewater (including, but not limited to sanitary wastewater) generated during and after the construction must be also addressed. The issuance of the NOC may be delayed until adequate wastewater treatment and accompanying permits are issued.

1.5.2. Permit tracking numbers

Construction sites covered under this permit will be assigned permit tracking numbers in the sequence TNR100001, TNR100002, etc. An operator presently permitted under a previous construction general permit shall be granted coverage under this new general permit. Permit tracking numbers assigned under a previous construction general permit will be retained (see section 2.4.1 below). An operator receiving new permit coverage will be assigned a new permit tracking number (see section 2.4.2 below).

## 2. NOTICE OF INTENT (NOI) REQUIREMENTS

## 2.1. Who Must Submit an NOI?

All site operators must submit an NOI form. "Operator" for the purpose of this permit and in the context of stormwater associated with construction activity means any person associated with a construction project who meets either or both of the following two criteria:

a) The person has operational or design control over construction plans and specifications, including the ability to make modifications to those plans and specifications. This person is typically the owner or developer of the project or a portion of the project (e.g. subsequent builder), or the person that is the current land owner of the construction site. This person is considered the primary permittee; or

b) The person has day-to-day operational control of those activities at a project which are necessary to ensure compliance with a SWPPP for the site or other permit conditions. This person is typically a contractor or a commercial builder who is hired by the primary permittee, and is considered a secondary permittee.

The site-wide permittee is the first primary permittee to apply for coverage at the site. There may be other primary permittees for a project, but there is only one site-wide permittee. Where there are multiple operators associated with the same project, all operators are required to obtain permit coverage. Once covered by a permit, all such operators are to be considered as co-permittees if their involvement in the construction activities affects the same project site, and are held jointly and severally responsible for complying with the permit.

Case 1:18-cv-00029    Document 1-1    Filed 04/09/18    Page 54 of 153 PageID #: 85

## 2.2. Typical Construction Site Operators

### 2.2.1. Owner/Developer

An owner or developer(s) of a project is a primary permittee. This person has operational or design control over construction plans and specifications, including the ability to make modifications to those plans and specifications. This person may include, but is not limited to a developer, landowner, realtor, commercial builder, homebuilder, etc. An owner or developer's responsibility to comply with requirements of this permit extends until permit coverage is terminated in accordance with requirements of part 8 below.

### 2.2.2. Commercial builders

A commercial builder can be a primary or secondary permittee at a construction site.

A commercial builder who purchases one or more lots from an owner/developer (site-wide permittee) for the purpose of constructing and selling a structure (e.g., residential house, non-residential structure, commercial building, industrial facility, etc.) and has design or operational control over construction plans and specifications is a primary permittee for that portion of the site. A commercial builder may also be hired by the end user (e.g., a lot owner who may not be a permittee). In either case the commercial builder is considered a new operator and must submit a new NOI following requirements in section 2.4.3 below.

The commercial builder may also be hired by the primary permittee or a lot owner to build a structure. In this case, the commercial builder signs the primary permittee's NOI and SWPPP as a contractor (see section 2.2.3 below) and is considered a secondary permittee.

### 2.2.3. Contractors

A contractor is considered a secondary permittee. This person has day-to-day operational control of those activities at a project which are necessary to ensure compliance with a SWPPP for the site or other permit conditions (e.g., contractor is authorized to direct workers at a site to carry out activities required by the SWPPP or comply with other permit conditions).

A contractor may be, but is not limited to a general contractor, grading contractor, erosion control contractor, sub-contractor responsible for any land disturbing activities and/or erosion prevention and sediment control (EPSC) implementation/maintenance, commercial builder hired by the owner/developer, etc. The contractor may need to include in their contract with the party that hired them specific details for the contractor's responsibilities concerning EPSC measures. This includes the ability of the contractor to make EPSC modifications. The contractor should sign the NOI and SWPPP associated with the construction project at which they will be an operator.

## 2.3. Responsibilities of Operators

A permittee may meet one or more of the operational control components in the definition of "operator" found in subpart 2.1 above. Either section 2.3.1 or 2.3.2 below, or both, will apply depending on the type of operational control exerted by an individual permittee.

Case 1:18-cv-00029    Document 1-1    Filed 04/09/18    Page 55 of 153 PageID #: 86

### 2.3.1. Permittee(s) with design control (owner/developer)

Permittee(s) with design control (i.e., operational control over construction plans and specifications) at the construction site, including the ability to make modifications to those plans and specifications (e.g., owner/developer) must:

a) Ensure the project specifications they develop meet the minimum requirements of part 3 below (stormwater pollution prevention plan – SWPPP) and all other applicable conditions;

b) Ensure that the SWPPP indicates the areas of the project where they have design control (including the ability to make modifications in specifications), and ensure all other permittees implementing and maintaining portions of the SWPPP impacted by any changes they make to the plan are notified of such modifications in a timely manner;

c) Ensure that all common facilities (i.e., sediment treatment basin and drainage structures) that are necessary for the prevention of erosion or control of sediment are maintained and effective until all construction is complete and all disturbed areas in the entire project are stabilized, unless permit coverage has been obtained and responsibility has been taken over by a new (replacement) owner/operator.

d) If parties with day-to-day operational control of the construction site have not been identified at the time the comprehensive SWPPP is initially developed, the permittee with design control shall be considered to be the responsible person until such time the supplemental NOI is submitted, identifying the new operator(s) (see section 2.4.3 below). These new operators (e.g., general contractor, utilities contractors, sub-contractors, erosion control contractors, hired commercial builders) are considered secondary permittees. The SWPPP must be updated to reflect the addition of new operators as needed to reflect operational or design control.

e) Ensure that all operators on the site have permit coverage, if required, and are complying with the SWPPP.

### 2.3.2. Permittee(s) with day-to-day operational control (contractor – secondary permittee)

Permittee(s) with day-to-day operational control of those activities at a project which are necessary to ensure compliance with the SWPPP for the site or other permit conditions (e.g., general contractor, utilities contractors, sub-contractors, erosion control contractors, hired commercial builders) must:

a) Ensure that the SWPPP for portions of the project where they are operators meets the minimum requirements of part 3 below (*SWPPP Requirements*) and identifies the parties responsible for implementation of control measures identified in the plan;

b) Ensure that the SWPPP indicates areas of the project where they have operational control over day-to-day activities;

c) Ensure that measures in the SWPPP are adequate to prevent erosion and control any sediment that may result from their earth disturbing activity;

d) Permittees with operational control over only a portion of a larger construction project are responsible for compliance with all applicable terms and conditions of this permit as it relates to their activities on their portion of the construction site. This includes, but is not limited to, implementation of Best Management Practices (BMPs) and other controls required by the SWPPP. Permittees shall ensure either directly or through coordination with other permittees, that their activities do not render another person's pollution control ineffective. All permittees must implement their portions of a comprehensive SWPPP.

Case 1:18-cv-00029    Document 1-1    Filed 04/09/18    Page 56 of 153 PageID #: 87

## 2.4. NOI Submittal

### 2.4.1. Existing site

An operator presently permitted under the 2005 construction general permit shall be granted coverage under this new general permit. There will be no additional fees associated with an extension of coverage for existing sites under the new permit. The division may, at its discretion, require permittees to confirm their intent to be covered under this new general permit following its effective date through submission of an updated NOI. Should the confirmation be required and is not received, coverage under the new general permit will be terminated. Should a site with terminated coverage be unstable or construction continues, a new NOI, SWPPP and an appropriate fee must be submitted.

### 2.4.2. Application for new permit coverage

Except as provided in section 2.4.3 below, operators must submit a complete NOI, SWPPP and an appropriate fee in accordance with the requirements described in subpart 1.4 above. The complete application should be submitted at least 30 days prior to commencement of construction activities. The permittee is authorized to discharge stormwater associated with construction activity as of the effective date listed on the NOC. The land disturbing activities shall not start until a NOC is prepared and written approval by the division staff is obtained according to subpart 1.5 above.

### 2.4.3. New operator

For stormwater discharges from construction sites or portions of the sites where the operator changes (new owner), or projects where an operator is added (new contractor) after the initial NOI and comprehensive SWPPP have been submitted, the supplemental (submitted by a new contractor) or additional (submitted by a new owner) NOI should be submitted as soon as practicable, and always before the new operator commences work at the site. The supplemental NOI must reference the project name and tracking number assigned to the primary permittee's NOI.

If the site under the control of the new owner is inactive and all areas disturbed are completely stabilized, the NOI may not need to be submitted immediately upon assuming operational control. However, the division should be notified if a new operator obtains operational control at a site, but commencement of construction under the direction of the operator at the site is going to be delayed.

If upon the sale or transfer of the site's ownership does not change the signatory requirements for the NOI (see section 7.7.1 below), but the site's owner or developer's company name has changed, a new, updated NOI should be submitted to the division within 30 days of the name change. If the new operator agrees to comply with an existing comprehensive SWPPP already implemented at the site, a copy of the supplemental or modified SWPPP does not have to be submitted with the NOI. There will be no additional fees associated with the sale or transfer of ownership for existing permitted sites.

If the transfer of ownership is due to foreclosure or a permittee filing for bankruptcy proceedings, the new owner (including but not limited to a lending institution) must obtain permit coverage if the property is inactive, but is not stabilized sufficiently. If the property is sufficiently stabilized permit coverage may not be necessary, unless and until construction activity at the site resumes.

## 2.4.4. Late NOIs

Dischargers are not prohibited from submitting late NOIs. When a late NOI is submitted, and if the division authorizes coverage under this permit, such authorization is only for future discharges; any prior, unpermitted, discharges or permit noncompliances are subject to penalties as described in section 7.1.2 below.

## 2.5. Who Must Sign the NOI?

All construction site operators as defined in subsection 2.2 above (*Typical Construction Site Operators*) must sign the NOI form. Signatory requirements for a NOI are described in section 7.7.1 below. All signatures must be original. An NOI that does not bear an original signature will be deemed incomplete. The division recommends that signatures be in blue ink.

## 2.6. NOI Form

### 2.6.1. Contents of the NOI form

NOI for construction projects shall be submitted on the form provided in Appendix A of this permit, or on a copy thereof. This form and its instructions set forth the required content of the NOI. The NOI form must be filled in completely. If sections of the NOI are left blank, a narrative explaining the omission must be provided as an attachment.

Owners, developers and all contractors that meet the definition of the operator in subsection 2.2 above (*Typical Construction Site Operators*) shall apply for permit coverage on the same NOI, insofar as possible. The NOI is designed for more than one contractor (secondary permittee). The division may accept separate NOI forms from different operators for the same construction site when warranted.

After permit coverage has been granted to the primary permittee, any subsequent NOI submittals must include the site's previously assigned permit tracking number and the project name. The comprehensive site-specific SWPPP shall be prepared in accordance with the requirements of part 3 below, and must be submitted with the NOI unless the NOI being submitted is to only add a contractor (secondary permittee) to an existing coverage.

### 2.6.2. Construction site map

An excerpt (8 ½" by 11" or 11" by 17") from the appropriate 7.5 minute United States Geological Survey (USGS) topographic map, with the proposed construction site centered, must be included with the NOI. The entire proposed construction area must be clearly identified (outlined) on this map. The total area to be disturbed (in acres) should be included on the map. The map should outline the boundaries of projects, developments and the construction site in relation to major roads, streams or other landmarks. All outfalls where runoff will leave the property should be identified. Stream(s) receiving the discharge, and storm sewer system(s)

conveying the discharge from all site outfalls should be clearly identified and marked on the map. The map should also list and indicate the location of EPSCs that will be used at the construction site. NOIs for linear projects must specify the location of each end of the construction area and all areas to be disturbed. Commercial builders that develop separate SWPPPs that cover only their portion of the project shall also submit a site or plat map that clearly indicates the lots which they purchased and for which they are applying for permit coverage and the location of EPSCs that will be used at each lot.

2.6.3.   Application completeness

Based on a review of the NOI or other available information, the division shall:

1. prepare a notice of coverage (NOC) for the construction site (see subpart 1.5 above); or
2. prepare a deficiency letter stating additional information must be provided before the NOC can be issued; or
3. deny coverage under this general permit and require the discharger to obtain coverage under an individual NPDES permit (see subpart 7.12 below).

## 2.7.  Where to Submit the NOI, SWPPP and Permitting Fee?

The applicant shall submit the NOI, SWPPP and permitting fee to the appropriate TDEC Environmental Field Office (EFO) for the county(ies) where the construction activity is located and where stormwater discharges enters waters of the state. If a site straddles a county line of counties that are in areas of different EFOs, the operators shall send NOIs to each EFO. The permitting fee should be submitted to the EFO that provides coverage for the majority of the proposed construction activity.

A list of counties and the corresponding EFOs is provided in subpart 2.8 below. The division's Nashville Central Office will serve as a processing office for NOIs submitted by federal or state agencies (including, but not limited to the Tennessee Department of Transportation (TDOT), Tennessee Valley Authority (TVA) and the local MS4 programs).

## 2.8.  List of the TDEC Environmental Field Offices (EFOs) and Corresponding Counties

| EFO Name | List of Counties |
|---|---|
| Chattanooga | Bledsoe, Bradley, Grundy, Hamilton, Marion, McMinn, Meigs, Polk, Rhea, Sequatchie |
| Columbia | Bedford, Coffee, Franklin, Giles, Hickman, Lawrence, Lewis, Lincoln, Marshall, Maury, Moore, Perry, Wayne |
| Cookeville | Cannon, Clay, Cumberland, De Kalb, Fentress, Jackson, Macon, Overton, Pickett, Putnam, Smith, Van Buren, Warren, White |
| Jackson | Benton, Carroll, Chester, Crockett, Decatur, Dyer, Gibson, Hardeman, Hardin, Haywood, Henderson, Henry, Lake, Lauderdale, Madison, McNairy, Obion, Weakley |
| Johnson City | Carter, Greene, Hancock, Hawkins, Johnson, Sullivan, Unicoi, Washington |
| Knoxville | Anderson, Blount, Campbell, Claiborne, Cocke, Grainger, Hamblen, Jefferson, Knox, Loudon, Monroe, Morgan, Roane, Scott, Sevier, Union |
| Memphis | Fayette, Shelby, Tipton |
| Nashville | Cheatham, Davidson, Dickson, Houston, Humphreys, Montgomery, Robertson, Rutherford, Stewart, Sumner, Trousdale, Williamson, Wilson |

TDEC may be reached by telephone at the toll-free number 1-888-891-8332 (TDEC). Local EFOs may be reached directly when calling this number from the construction site, using a land line.

## 3. STORMWATER POLLUTION PREVENTION PLAN (SWPPP) REQUIREMENTS

### 3.1. The General Purpose of the SWPPP

A comprehensive SWPPP must be prepared and submitted along with the NOI as required in section 1.4.2 above. The primary permittee must implement the SWPPP as written from commencement of construction activity until final stabilization is complete, or until the permittee does not have design or operational control of any portion of the construction site. Requirements for termination of site coverage are provided in part 8 below.

A site-specific SWPPP must be developed for each construction project or site covered by this permit. The design, inspection and maintenance of Best Management Practices (BMPs) described in SWPPP must be prepared in accordance with good engineering practices. At a minimum, BMPs shall be consistent with the requirements and recommendations contained in the current edition of the <u>Tennessee Erosion and Sediment Control Handbook</u> (the handbook). The handbook is designed to provide information to planners, developers, engineers, and contractors on the proper selection, installation, and maintenance of BMPs. This permit allows the use of innovative or alternative BMPs, whose performance has been documented to be equivalent or superior to conventional BMPs as certified by the SWPPP designer.

Once a definable area has been finally stabilized, the permittee may identify this area on the site-specific SWPPP. No further SWPPP or inspection requirements apply to that portion of the site (e.g., earth-disturbing activities around one of three buildings in a complex are done and the area is finally stabilized, one mile of a roadway or pipeline project is done and finally stabilized, etc).

For more effective coordination of BMPs a cooperative effort by the different operators at a site to prepare and participate in a comprehensive SWPPP is expected. Primary permittees at a site may develop separate SWPPPs that cover only their portion of the project. In instances where there is more than one SWPPP for a site, the permittees must ensure the stormwater discharge controls and other measures are compatible with one another and do not prevent another operator from complying with permit conditions. The comprehensive SWPPP developed and submitted by the primary permittee must assign responsibilities to subsequent (secondary) permittees and coordinate all BMPs at the construction site. Assignment and coordination can be done by name or by job title.

### 3.1.1. Registered engineer or landscape architect requirement

The narrative portion of the SWPPP may be prepared by an individual that has a working knowledge of erosion prevention and sediment controls, such as a Certified Professional in Erosion and Sediment Control (<u>CPESC</u>) or a person that successfully completed the "<u>Level II Design Principles for Erosion Prevention and Sediment Control for Construction Sites</u>" course. Plans and specifications for any building or structure, including the design of sediment basins or other sediment controls involving structural, hydraulic, hydrologic or other engineering calculations shall be prepared by a licensed professional engineer or landscape architect and

Case 1:18-cv-00029    Document 1-1    Filed 04/09/18    Page 60 of 153 PageID #: 91

stamped and certified in accordance with the <u>Tennessee Code Annotated</u>, Title 62, Chapter 2 (see part 10 below) and the rules of the <u>Tennessee Board of Architectural and Engineering Examiners</u>. Engineering design of sediment basins and other sediment controls must be included in SWPPPs for construction sites involving drainage to an outfall totaling 10 or more acres (see subsection 3.5.3.3 below) or 5 or more acres if draining to an impaired or exceptional quality waters (see subsection 5.4.1 below).

3.1.2.  <u>Site Assessment</u>

Quality assurance of erosion prevention and sediment controls shall be done by performing site assessment at a construction site. The site assessment shall be conducted at each outfall involving drainage totaling 10 or more acres (see subsection 3.5.3.3 below) or 5 or more acres if draining to an impaired or exceptional quality waters (see subsection 5.4.1 below), within a month of construction commencing at each portion of the site that drains the qualifying acreage of such portion of the site. The site assessment shall be performed by individuals with following qualifications:

- a licensed professional engineer or landscape architect;
- a Certified Professional in Erosion and Sediment Control (<u>CPESC</u>) or
- a person that successfully completed the "<u>Level II Design Principles for Erosion Prevention and Sediment Control for Construction Sites</u>" course.

As a minimum, site assessment should be performed to verify the installation, functionality and performance of the EPSC measures described in the SWPPP. The site assessment should be performed with the inspector (as defined in part 10 below – Definitions), and should include a review and update (if applicable) of the SWPPP. Modifications of plans and specifications for any building or structure, including the design of sediment basins or other sediment controls involving structural, hydraulic, hydrologic or other engineering calculations shall be prepared by a licensed professional engineer or landscape architect and stamped and certified in accordance with the <u>Tennessee Code Annotated</u>, Title 62, Chapter 2 (see part 10 below) and the rules of the <u>Tennessee Board of Architectural and Engineering Examiners</u>.

The site assessment findings shall be documented and the documentation kept with the SWPPP at the site. At a minimum, the documentation shall include information included in the inspection form provided in Appendix C of this permit. The documentation must contain the printed name and signature of the individual performing the site assessment and the following certification:

> *"I certify under penalty of law that this report and all attachments are, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."*

The site assessment can take the place of one of the twice weekly inspections requirement from subsection 3.5.8.2 below.

The division may require additional site assessment(s) to be performed if site inspection by division's personnel reveals site conditions that have potential of causing pollution to the waters of the state.

Case 1:18-cv-00029    Document 1-1    Filed 04/09/18    Page 61 of 153 PageID #: 92

### 3.2. SWPPP Preparation and Compliance

#### 3.2.1. Existing site

Operator(s) of an existing site presently permitted under the division's previous construction general permit shall maintain full compliance with the current SWPPP. The current SWPPP should be modified, if necessary, to meet requirements of this new general permit, and the SWPPP changes implemented no later than 12 months following the new permit effective date (May 24, 2011), excluding the buffer zone requirements as stated in section 4.1.2 below. The permittee shall make the updated SWPPP available for the division's review upon request.

#### 3.2.2. New site

For construction stormwater discharges not authorized under an NPDES permit as of the effective date of this permit, a SWPPP that meets the requirements of subpart 3.5 below of this permit shall be prepared and submitted along with the NOI and an appropriate fee for coverage under this permit.

### 3.3. Signature Requirements, Plan Review and Making Plans Available

#### 3.3.1. Signature Requirements for a SWPPP

The SWPPP shall be signed by the operator(s) in accordance with subpart 7.7 below, and if applicable, certified according to requirements in section 3.1.1 above. All signatures must be original. A SWPPP that does not bear an original signature will be deemed incomplete. The division recommends that signatures be in blue ink.

#### 3.3.2. SWPPP Review

The permittee shall make updated plans and inspection reports available upon request to the director, local agency approving erosion prevention and sediment control plan, grading plans, land disturbance plans, or stormwater management plans, or the operator of an MS4.

#### 3.3.3. Making plans available

A copy of the SWPPP shall be retained on-site at the location which generates the stormwater discharge in accordance with part 6 below of this permit. If the site is inactive or does not have an onsite location adequate to store the SWPPP, the location of the SWPPP, along with a contact phone number, shall be posted on-site. If the SWPPP is located offsite, reasonable local access to the plan, during normal working hours, must be provided.

### 3.4. Keeping Plans Current

#### 3.4.1. SWPPP modifications

The permittee must modify and update the SWPPP if any of the following are met:

    a) whenever there is a change in the scope of the project, which would be expected to have a significant effect on the discharge of pollutants to the waters of the state and which has

not otherwise been addressed in the SWPPP. If applicable, the SWPPP must be modified or updated whenever there is a change in chemical treatment methods, including the use of different treatment chemical, different dosage or application rate, or different area of application;

b) whenever inspections or investigations by site operators, local, state or federal officials indicate the SWPPP is proving ineffective in eliminating or significantly minimizing pollutants from sources identified under section 3.5.2 below of this permit, or is otherwise not achieving the general objectives of controlling pollutants in stormwater discharges associated with construction activity. Where local, state or federal officials determine that the SWPPP is ineffective in eliminating or significantly minimizing pollutant sources, a copy of any correspondence to that effect must be retained in the SWPPP;

c) to identify any new operator (typically contractor and/or subcontractor) as needed to reflect operational or design control that will implement a measure of the SWPPP (see subparts 2.1 and 2.2 above for further description of which operators must be identified); and

d) to include measures necessary to prevent a negative impact to legally protected state or federally listed fauna or flora (or species proposed for such protection — see subpart 1.3 above). Amendments to the SWPPP may be reviewed by the division, a local MS4, the EPA or an authorized regulatory agency; and

e) a TMDL is developed for the receiving waters for a pollutant of concern (siltation and/or habitat alteration).

## 3.5. Components of the SWPPP

The SWPPP shall include the following items, as described in sections 3.5.1 to 3.5.10 below: site description, description of stormwater runoff controls, erosion prevention and sediment controls, stormwater management, description of other items needing control, approved local government sediment and erosion control requirements, maintenance, inspections, pollution prevention measures for non-stormwater discharges, and documentation of permit eligibility related to Total Maximum Daily Loads (TMDL). The SWPPP must:

a) identify all potential sources of pollution which are likely to affect the quality of stormwater discharges from the construction site;

b) describe practices to be used to reduce pollutants in stormwater discharges from the construction site; and

c) assure compliance with the terms and conditions of this permit.

### 3.5.1. Site description

Each plan shall provide a description of pollutant sources and other information as indicated below:

a) a description of all construction activities at the site (not just grading and street construction);

b) the intended sequence of major activities which disturb soils for major portions of the site (e.g., grubbing, excavation, grading, utilities and infrastructure installation, etc.);

c) estimates of the total area of the site and the total area that is expected to be disturbed by excavation, grading, filling, or other construction activities;

d)  a description of the topography of the site including an estimation of the percent slope and the variation in percent slope found on the site; such estimation should be on a basis of a drainage area serving each outfall, rather than an entire project;

e)  any data describing the soil (data may be referenced or summarized) and how the soil type will dictate the needed control measures and how the soil may affect the expected quality of runoff from the site;

f)  an estimate of the runoff coefficient of the site after construction activities are completed and how the runoff will be handled to prevent erosion at the permanent outfall and receiving stream, as well as the estimate of the percentage of impervious area before and after construction;

g)  an erosion prevention and sediment control plan of the site with the proposed construction area clearly outlined. The plan should indicate the boundaries of the permitted area, drainage patterns and approximate slopes anticipated after major grading activities, areas of soil disturbance, an outline of areas which are not to be disturbed, the location of major structural and nonstructural controls identified in the SWPPP, the location of areas where stabilization practices are expected to occur, surface waters including wetlands, sinkholes, and careful identification on the site plan of outfall points intended for coverage under the general permit for stormwater discharges from the site. The erosion control plan must meet requirements stated in section 3.5.2 below;

h)  a description of any discharge associated with industrial activity other than construction stormwater that originates on site and the location of that activity and its permit number;

i)  identification of any stream or wetland on or adjacent to the project, a description of any anticipated alteration of these waters and the permit number or the tracking number of the <u>Aquatic Resources Alteration Permit</u> (ARAP) or Section 401 Certification issued for the alteration;

j)  the name of the receiving water(s), and approximate size and location of affected wetland acreage at the site;

k)  if applicable, clearly identify and outline the buffer zones established to protect waters of the state located within the boundaries of the project;

l)  some construction projects, such as residential or commercial subdivisions and/or developments or industrial parks are subdivided. Subdivided lots are sometimes sold to new owners prior to completion of construction. The site-wide developer/owner must describe EPSC measures implemented at those lots. Once the property is sold, the new operator must obtain coverage under this permit;

m)  for projects of more than 50 acres, the construction phases must be described (see subsection 3.5.3.1 below); and

n)  if only a portion of the total acreage of the construction site is to be disturbed, then the protections employed to limit the disturbance must be discussed, i.e., caution fence, stream side buffer zones, etc. Limits of disturbance shall be clearly marked in the SWPPP and areas to be undisturbed clearly marked in the field before construction activities begin.

### 3.5.2. <u>Description of stormwater runoff controls</u>

The SWPPP shall include a description of appropriate erosion prevention and sediment controls and other Best Management Practices (BMPs) that will be implemented at the construction site. The SWPPP must clearly describe each major activity which disturbs soils for major portions of the site (e.g., grubbing, excavation, grading, utilities and infrastructure installation, etc.):

a) appropriate control measures and the general timing for the measures to be implemented during construction activities; and

b) which permittee is responsible for implementation of which controls.

The SWPPP must include erosion prevention and sediment control (EPSC) plans showing the approximate location of each control measure along with a description of the timing during the construction process for implementing each measure (e.g., prior to the start of earth disturbance, as the slopes are altered and after major grading is finished). The different stages of construction (initial/major grading, installation of infrastructure, final contours, etc.) and the erosion preventions and sediment control measures that will be utilized during each stage should be depicted on multiple plan sheets (see paragraphs below). Half sheets are acceptable. One sheet showing all EPSCs that will be used during the life of the multi-phase project implementing different EPSC controls at each stage will not be considered complete.

For site disturbances less than 5 acres, at least two separate EPSC plan sheets shall be developed. At least two stages shall be identified, with associated EPSC measures addressed. The plan stages shall be addressed separately in plan sheets, with each stage reflecting the conditions and EPSC measures necessary to manage stormwater runoff, erosion and sediment during the initial land disturbance (initial grading) and the conditions and EPSC measures necessary to manage stormwater, erosion and sediment at final grading.

For site disturbances more than 5 acres, at least 3 separate EPSC plan sheets shall be developed. Three stages shall be identified. The first plan sheet should reflect the conditions and EPSC measures necessary to manage stormwater runoff, during the initial land disturbance (initial grading). The second plan sheet shall reflect the conditions and the EPSC measures necessary to manage stormwater runoff from interim land disturbance activities. The third plan sheet shall reflect the conditions and EPSC measures necessary to manage stormwater runoff, erosion and sediment at final grading.

The description and implementation of controls shall address the following minimum components, as described in sections 3.5.3; 3.5.4 and 3.5.5 below. Additional controls may be necessary to comply with section 5.3.2 below.

3.5.3. Erosion prevention and sediment controls

3.5.3.1. General criteria and requirements

a) The construction-phase erosion prevention controls shall be designed to eliminate (or minimize if complete elimination is not possible) the dislodging and suspension of soil in water. Sediment controls shall be designed to retain mobilized sediment on site to the maximum extent practicable.

b) The design, inspection and maintenance of Best Management Practices (BMPs) described in SWPPP must be prepared in accordance with good engineering practices and, at a minimum, shall be consistent with the requirements and recommendations contained in the current edition of the Tennessee Erosion and Sediment Control Handbook. In addition, all control measures must be properly selected, installed, and maintained in accordance with the manufacturer's specifications (where applicable). All control measures selected must be able to slow runoff so that rill and gully formation is prevented. When steep slopes and/or fine particle soils are present at the site, additional physical or chemical treatment of stormwater runoff may be required. Proposed physical

Case 1:18-cv-00029    Document 1-1    Filed 04/09/18    Page 65 of 153 PageID #: 96

and/or chemical treatment must be researched and applied according to the manufacturer's guidelines and fully described in the SWPPP. If periodic inspections or other information indicates a control has been used inappropriately, or incorrectly, the permittee must replace or modify the control for relevant site situations.

c) If permanent or temporary vegetation is to be used as a control measure, then the timing of the planting of the vegetation cover must be discussed in the SWPPP. Planning for planting cover vegetation during winter months or dry months should be avoided.

d) If sediment escapes the permitted area, off-site accumulations of sediment that have not reached a stream must be removed at a frequency sufficient to minimize offsite impacts (e.g., fugitive sediment that has escaped the construction site and has collected in a street must be removed so that it is not subsequently washed into storm sewers and streams by the next rain and/or so that it does not pose a safety hazard to users of public streets). Permittees shall not initiate remediation/restoration of a stream without consulting the division first. This permit does not authorize access to private property. Arrangements concerning removal of sediment on adjoining property must be settled by the permittee with the adjoining landowner.

e) Sediment should be removed from sediment traps, silt fences, sedimentation ponds, and other sediment controls as recommended in the <u>Tennessee Erosion and Sediment Control Handbook</u>, and must be removed when design capacity has been reduced by 50%.

f) Litter, construction debris, and construction chemicals exposed to stormwater shall be picked up prior to anticipated storm events or before being carried off of the site by wind (e.g., forecasted by local weather reports), or otherwise prevented from becoming a pollutant source for stormwater discharges (e.g., screening outfalls, daily pick-up, etc.). After use, materials used for erosion prevention and sediment control (such as silt fence) should be removed or otherwise prevented from becoming a pollutant source for stormwater discharges.

g) Erodible material storage areas (including but not limited to overburden and stockpiles of soil etc.) and borrow pits used primarily for the permitted project and which are contiguous to the site are considered a part of the site and shall be identified on the NOI, addressed in the SWPPP and included in the fee calculation. TDOT projects shall be addressed in the <u>Waste and Borrow Manual</u> per the <u>Statewide Stormwater Management Plan (SSWMP)</u>.

h) Pre-construction vegetative ground cover shall not be destroyed, removed or disturbed more than 15 days prior to grading or earth moving unless the area is seeded and/or mulched or other temporary cover is installed.

i) Clearing and grubbing must be held to the minimum necessary for grading and equipment operation. Existing vegetation at the site should be preserved to the maximum extent practicable.

j) Construction must be sequenced to minimize the exposure time of graded or denuded areas.

k) Construction phasing is required on all projects regardless of size as a major practice for minimizing erosion and limiting sedimentation. Construction must be phased to keep the total disturbed area less than 50 acres at any one time. Areas of the completed phase must be stabilized within 14 days (see subsection 3.5.3.2 below). No more than 50 acres of active soil disturbance is allowed at any time during the construction project. This includes off-site borrow or disposal areas that meet the conditions of section 1.2.2 above of this general permit.

The 50 acre limitation does not apply to linear construction projects (such as roadway, pipeline, and other infrastructure construction activities) if the following conditions are met:

- Where no one area of active soil disturbance is greater than 50 acres and the various areas of disturbance have distinct receiving waters; or
- Where contiguous disturbances amount to greater than 50 acres, but no one distinct water is receiving run off from more than 50 disturbed acres; or
- With the department's written concurrence, where more than 50 acres of disturbance is to occur and where one receiving water will receive run-off from more than 50 acres; or
- Where no one area of active soil disturbance is greater than 50 acres and the various areas of disturbance are more than 5 miles apart.

In order for a linear project to take advantage of the 50 acre rule exemption outlined in this paragraph, the contractor shall conduct monthly site assessments as described in section 3.1.2 above until the site is permanently stabilized.

l) Erosion prevention and sediment control measures must be in place and functional before earth moving operations begin, and must be constructed and maintained throughout the construction period. Temporary measures may be removed at the beginning of the workday, but must be replaced at the end of the workday.
m) The following records shall be maintained on or near site: the dates when major grading activities occur; the dates when construction activities temporarily or permanently cease on a portion of the site; the dates when stabilization measures are initiated; inspection records and rainfall records.
n) Off-site vehicle tracking of sediments and the generation of dust shall be minimized. A stabilized construction access (a point of entrance/exit to a construction site) shall be described and implemented, as needed, to reduce the tracking of mud and dirt onto public roads by construction vehicles.
o) Permittees shall maintain a rain gauge and daily rainfall records at the site, or use a reference site for a record of daily amount of precipitation.

## 3.5.3.2. Stabilization practices

The SWPPP shall include a description of interim and permanent stabilization practices, including site-specific scheduling of the implementation of the practices. Site plans should ensure that existing vegetation is preserved where attainable and that disturbed portions of the site are stabilized. Site plans should comply with buffer zone requirements (see sections 4.1.2 and 5.4.2 below), if applicable, in which construction activities, borrow and/or fill are prohibited. Stabilization practices may include: temporary seeding, permanent seeding, mulching, geotextiles, sod stabilization, vegetative buffer strips, protection of trees, preservation of mature vegetation, and other appropriate measures. Use of impervious surfaces for final stabilization in lieu of a permanent vegetative cover should be avoided where practicable. No stabilization, erosion prevention and sediment control measures are to be installed in a stream without obtaining a Section 404 permit and an Aquatic Resources Alteration Permit (ARAP), if such permits are required and appropriate.

Stabilization measures shall be initiated as soon as possible in portions of the site where construction activities have temporarily or permanently ceased. Temporary or permanent soil stabilization at the construction site (or a phase of the project) must be completed no later than 14 days after the construction activity in that portion of the site has temporarily or permanently ceased. In the following situations, temporary stabilization measures are not required:

a) where the initiation of stabilization measures is precluded by snow cover or frozen ground conditions or adverse soggy ground conditions, stabilization measures shall be initiated as soon as practicable; or

b) where construction activity on a portion of the site is temporarily ceased, and earth disturbing activities will be resumed within 14 days.

Steep slopes shall be temporarily stabilized not later than 7 days after construction activity on the slope has temporarily or permanently ceased.

Permanent stabilization with perennial vegetation (using native herbaceous and woody plants where practicable) or other permanently stable, non-eroding surface shall replace any temporary measures as soon as practicable. Unpacked gravel containing fines (silt and clay sized particles) or crusher runs will not be considered a non-eroding surface.

### 3.5.3.3. Structural practices

The SWPPP shall include a description of structural practices to divert flows from exposed soils, store flows or otherwise limit runoff and discharge of pollutants from exposed areas of the site. Such practices may include silt fences, earth dikes, drainage swales, sediment traps, check dams, subsurface drains, pipe slope drains, level spreaders, storm drain inlet protection, rock outlet protection, reinforced soil retaining systems, gabions, and temporary or permanent sediment basins. Structural controls shall not be placed in streams or wetlands except as authorized by a section 404 permit and/or <u>Aquatic Resources Alteration Permit</u> (ARAP).

Erosion prevention and sediment control measures must be prepared in accordance with good engineering practices and the latest edition of the <u>Tennessee Erosion and Sediment Control Handbook</u>. In addition, erosion prevention and sediment controls shall be designed to minimize erosion and maximize sediment removal resulting from a 2-year, 24-hour storm (the design storm -- see part 10 below: "2-year and 5-year design storm depths and intensities"), as a minimum, either from total rainfall in the designated period or the equivalent intensity as specified on the following website http://hdsc.nws.noaa.gov/hdsc/pfds/orb/tn_pfds.html. When clay and other fine particle soils are present at the construction site, chemical treatment may be used to minimize amount of sediment being discharged.

For an on-site outfall which receives drainage from 10 or more acres, a minimum sediment basin volume that will provide treatment for a calculated volume of runoff from a 2 year, 24 hour storm and runoff from each acre drained, or equivalent control measures as specified in the <u>Tennessee Erosion and Sediment Control Handbook</u>, shall be provided until final stabilization of the site. A drainage area of 10 or more acres includes both disturbed and undisturbed portions of the site or areas adjacent to the site, all draining through the common outfall. Where an equivalent control measure is substituted for a sediment retention basin, the equivalency must be justified to the division. Runoff from any undisturbed acreage should be diverted around the disturbed area and the sediment basin. Diverted runoff can be omitted from the volume calculation. Sediment storage expected from the disturbed areas must be included.

All calculations of drainage areas, runoff coefficients and basin volumes must be provided in the SWPPP. The discharge structure from a sediment basin must be designed to retain sediment during the lower flows. Muddy water to be pumped from excavation and work areas must be held in settling basins or filtered or chemically treated prior to its discharge into surface waters. Water must be discharged through a pipe, well-grassed or lined channel or other equivalent means so that the discharge does not cause erosion and sedimentation. Discharged water must not cause an objectionable color contrast with the receiving stream.

3.5.4. <u>Stormwater management</u>

The SWPPP shall include a description of any measures that will be installed during the construction process to control pollutants in stormwater discharges that will occur <u>after</u> construction operations have been completed.

For projects discharging to waters considered impaired by sediment or habitat alteration due to in-channel erosion, the SWPPP shall include a description of measures that will be installed during the construction process to control pollutants and any increase in the volume of stormwater discharges that will occur after construction operations have been completed. For steep slope sites, the SWPPP shall also include a description of measures that will be installed to dissipate the volume and energy of the stormwater runoff to pre-development levels.

This permit only addresses the installation of stormwater management measures, and not the ultimate operation and maintenance of such structures after the construction activities have been completed, the site has undergone final stabilization, and the permit coverage has been terminated. Permittees are only responsible for the installation and maintenance of stormwater management measures prior to final stabilization of the site, and are not responsible for maintenance after stormwater discharges associated with construction activity have been eliminated from the site. All permittees are encouraged to limit the amount of post construction runoff, if not required by local building regulations or local <u>MS4</u> program requirements, in order to minimize in-stream channel erosion in the receiving stream.

Construction stormwater runoff management practices may include: stormwater detention structures (including ponds with a permanent pool); stormwater retention structures; flow attenuation by use of open vegetated swales and natural depressions; infiltration of runoff onsite; and sequential systems (which combine several practices).

Velocity dissipation devices shall be placed at discharge locations and along the length of any outfall channel to provide a non-erosive velocity flow from the structure to the receiving stream so that the natural physical and biological characteristics and functions of the stream are maintained and protected (e.g., there should be no significant changes in the hydrological regime of the receiving water). The SWPPP shall include an explanation of the technical basis used to select the velocity dissipation devices to control pollution where flows exceed pre-development levels. The <u>Tennessee Erosion and Sediment Control Handbook</u> provides measures that can be incorporated into the design or implemented on site to decrease erosive velocities. An <u>Aquatic Resources Alteration Permit</u> (ARAP) may be required if such velocity dissipation devices installed would alter the receiving stream and/or its banks.

### 3.5.5. Other items needing control

a) No solid materials, including building materials, shall be placed in waters of the state, except as authorized by a section 404 permit and/or Aquatic Resources Alteration Permit (ARAP)(see part 9 below).

b) For installation of any waste disposal systems on site, or sanitary sewer or septic system, the SWPPP shall identify these systems and provide for the necessary EPSC controls. Permittees must also comply with applicable state and/or local waste disposal, sanitary sewer or septic system regulations for such systems to the extent these are located within the permitted area.

c) The SWPPP shall include a description of construction and waste materials expected to be stored on-site. The SWPPP shall also include a description of controls used to reduce pollutants from materials stored on site, including storage practices to minimize exposure of the materials to stormwater, and spill prevention and response.

d) A description of stormwater sources from areas other than construction and a description of controls and measures that will be implemented at those sites.

e) A description of measures necessary to prevent "taking" of legally protected state or federal listed threatened or endangered aquatic fauna and/or critical habitat (if applicable). The permittee must describe and implement such measures to maintain eligibility for coverage under this permit.

### 3.5.6. Approved local government sediment and erosion control requirements

Permittees must comply with any additional erosion prevention, sediment controls and stormwater management measures required by a local municipality or permitted MS4 program.

### 3.5.7. Maintenance

The SWPPP shall describe procedures to ensure that vegetation, erosion and sediment control measures, buffer zones, and other protective measures identified in the site plan are kept in good and effective operating condition. Maintenance needs identified in inspections or by other means shall be accomplished before the next storm event, but in no case more than 7 days after the need is identified.

### 3.5.8. Inspections

#### 3.5.8.1. Inspector training and certification

Inspectors performing the required twice weekly inspections must have an active certification by completing the "Fundamentals of Erosion Prevention and Sediment Control Level I" course. A copy of the certification or training record for inspector certification should be kept on site.

#### 3.5.8.2. Schedule of inspections

a) Inspections described in paragraphs b, c and d below, shall be performed at least twice every calendar week. Inspections shall be performed at least 72 hours apart. Where sites or portion(s) of construction sites have been temporarily stabilized, or runoff is unlikely due to winter conditions (e.g., site covered with snow or ice) or due to extreme drought, such inspection only has to be conducted once per month until thawing or precipitation results in runoff or construction activity resumes. Inspection requirements do not apply

Case 1:18-cv-00029   Document 1-1   Filed 04/09/18   Page 70 of 153 PageID #: 101

to definable areas that have been finally stabilized, as described in subpart 3.1 above. Written notification of the intent to change the inspection frequency and the justification for such request must be submitted to the local Environmental Field Office, or the division's Nashville Central Office for projects of the Tennessee Department of Transportation (TDOT) and the Tennessee Valley Authority (TVA). Should the division discover that monthly inspections of the site are not appropriate due to insufficient stabilization measures or otherwise, twice weekly inspections shall resume. The division may inspect the site to confirm or deny the notification to conduct monthly inspections.

b) Qualified personnel, as defined in section 3.5.8.1 above (provided by the permittee or cooperatively by multiple permittees) shall inspect disturbed areas of the construction site that have not been finally stabilized, areas used for storage of materials that are exposed to precipitation, structural control measures, locations where vehicles enter or exit the site, and each outfall.

c) Disturbed areas and areas used for storage of materials that are exposed to precipitation shall be inspected for evidence of, or the potential for, pollutants entering the site's drainage system. Erosion prevention and sediment control measures shall be observed to ensure that they are operating correctly.

d) Outfall points (where discharges leave the site and/or enter waters of the state) shall be inspected to determine whether erosion prevention and sediment control measures are effective in preventing significant impacts to receiving waters. Where discharge locations are inaccessible, nearby downstream locations shall be inspected. Locations where vehicles enter or exit the site shall be inspected for evidence of offsite sediment tracking.

e) Based on the results of the inspection, any inadequate control measures or control measures in disrepair shall be replaced or modified, or repaired as necessary, before the next rain event, but in no case more than 7 days after the need is identified.

f) Based on the results of the inspection, the site description identified in the SWPPP in accordance with section 3.5.1 above and pollution prevention measures identified in the SWPPP in accordance with section 3.5.2 above shall be revised as appropriate, but in no case later than 7 days following the inspection. Such modifications shall provide for timely implementation of any changes to the SWPPP, but in no case later than 14 days following the inspection.

g) All inspections shall be documented on the Construction Stormwater Inspection Certification form provided in Appendix C of this permit for all construction sites. An alternative inspection form may be used as long as the form contents and the inspection certification language are, at a minimum, equivalent to the division's form (Appendix C) and the permittee has obtained a written approval from the division to use the alternative form. Inspection documentation will be maintained on site and made available to the division upon request. Inspection reports must be submitted to the division within 10 days of the request. If the division requests the Construction Stormwater Inspection Certification form to be submitted, the submitted form must contain the printed name and signature of the trained certified inspector and the person who meets the signatory requirements of section 7.7.2 below of this permit.

h) Trained certified inspectors shall complete inspection documentation to the best of their ability. Falsifying inspection records or other documentation or failure to complete inspection documentation shall result in a violation of this permit and any other applicable acts or rules.

i) Subsequent operator(s) (primary permittees) who have obtained coverage under this permit should conduct twice weekly inspections, unless their portion(s) of the site has been temporarily stabilized, or runoff is unlikely due to winter conditions or due to

extreme drought as stated in paragraph a) above. The primary permittee (such as a developer) is no longer required to conduct inspections of portions of the site that are covered by a subsequent primary permittee (such as a home builder).

### 3.5.9. Pollution prevention measures for non-stormwater discharges

Sources of non-stormwater listed in section 1.2.3 above of this permit that are combined with stormwater discharges associated with construction activity must be identified in the SWPPP. The plan shall identify and ensure the implementation of appropriate pollution prevention measures for the non-stormwater component(s) of the discharge. Any non-stormwater must be discharged through stable discharge structures. Estimated volume of the non-stormwater component(s) of the discharge must be included in the design of all impacted control measures.

### 3.5.10. Documentation of permit eligibility related to Total Maximum Daily Loads (TMDL)

The SWPPP must include documentation supporting a determination of permit eligibility with regard to waters that have an approved TMDL for a pollutant of concern, including:

a) identification of whether the discharge is identified, either specifically or generally, in an approved TMDL and any associated wasteload allocations, site-specific requirements, and assumptions identified for the construction stormwater discharge;

b) summaries of consultation with the division on consistency of SWPPP conditions with the approved TMDL, and

c) measures taken to ensure that the discharge of TMDL identified pollutants from the site is consistent with the assumptions and requirements of the approved TMDL, including any specific wasteload allocation that has been established that would apply to the construction stormwater discharge.

## 4. CONSTRUCTION AND DEVELOPMENT EFFLUENT GUIDELINES

## 4.1. Non-Numeric Effluent Limitations

Any point source authorized by this general permit must achieve, at a minimum, the effluent limitations representing the degree of effluent reduction attainable by application of best practicable control technology (BPT) currently available and is described in sections 4.1.1 through 4.1.7 below.

### 4.1.1. Erosion Prevention and Sediment Controls

Design, install and maintain effective erosion prevention and sediment controls to minimize the discharge of pollutants. At a minimum, such controls must be designed, installed and maintained to:

(1) Control stormwater volume and velocity within the site to minimize soil erosion;

(2) Control stormwater discharges, including both peak flow rates and total stormwater volume, to minimize erosion at outlets and to minimize downstream channel and streambank erosion;

(3) Minimize the amount of soil exposed during construction activity;

(4) Minimize the disturbance of steep slopes;

Case 1:18-cv-00029    Document 1-1    Filed 04/09/18    Page 72 of 153 PageID #: 103

(5) Eliminate (or minimize if complete elimination is not possible) sediment discharges from the site. The design, installation and maintenance of erosion prevention and sediment controls must address factors such as the design storm (see sub-section 3.5.3.3 above) and soil characteristics, including the range of soil particle sizes expected to be present on the site;

(6) Provide and maintain natural buffers around surface waters, direct stormwater to vegetated areas to increase sediment removal and maximize stormwater infiltration, unless infeasible (see section 4.1.2 below); and

(7) Minimize soil compaction and, unless infeasible, preserve topsoil.

### 4.1.2. Buffer zone requirements

Buffer zone requirements in this section apply to all streams adjacent to construction sites, with an exception for streams designated as impaired or Exceptional Tennessee waters (see section 5.4.2 below). A 30-foot natural riparian buffer zone adjacent to all streams at the construction site shall be preserved, to the maximum extent practicable, during construction activities at the site. The water quality buffer zone is required to protect waters of the state (e.g., perennial and intermittent streams, rivers, lakes, wetlands) located within or immediately adjacent to the boundaries of the project, as identified using methodology from Standard Operating Procedures for Hydrologic Determinations (see rules to implement a certification program for Qualified Hydrologic Professionals, TN Rules Chapter 0400-40-17). Buffer zones are not primary sediment control measures and should not be relied on as such. Rehabilitation and enhancement of a natural buffer zone is allowed, if necessary, for improvement of its effectiveness of protection of the waters of the state. The buffer zone requirement only applies to new construction sites, as described in section 2.4.2 above.

The riparian buffer zone should be preserved between the top of stream bank and the disturbed construction area. The 30-feet criterion for the width of the buffer zone can be established on an average width basis at a project, as long as the minimum width of the buffer zone is more than 15 feet at any measured location.

Every attempt should be made for construction activities not to take place within the buffer zone. BMPs providing equivalent protection to a receiving stream as a natural riparian zone may be used at a construction site. Such equivalent BMPs shall be designed to be as effective in protecting the receiving stream from effects of stormwater runoff as a natural riparian zone. A justification for use and a design of equivalent BMPs shall be included in the SWPPP. Such equivalent BMPs are expected to be routinely used at construction projects typically located adjacent to surface waters. These projects include, but are not limited to: sewer line construction, roadway construction, utility line or equipment installation, greenway construction, construction of a permanent outfall or a velocity dissipating structure, etc.

This requirement does not apply to any valid Aquatic Resources Alteration Permit (ARAP), or equivalent permits issued by federal authorities. Additional buffer zone requirements may be established by the local MS4 program.

### 4.1.2.1. Buffer zone exemption based on existing uses

Buffer zones as described in section 4.1.2 above shall not be required to portions of the buffer where certain land uses exist and are to remain in place according to the following:

1. A use shall be considered existing if it was present within the buffer zone as of the date of the Notice of Intent for coverage under the CGP. Existing uses shall include, but not be limited to, buildings, parking lots, roadways, utility lines and on-site sanitary sewage systems. Only the portion of the buffer zone that contains the footprint of the existing land use is exempt from buffer zones. Activities necessary to maintain uses are allowed provided that no additional vegetation is removed from the buffer zone.

2. If an area with an existing land use is proposed to be converted to another use or the impervious surfaces located within the buffer area are being removed buffer zone requirements shall apply.

## 4.1.2.2. Pre-Approved Sites

Construction activity at sites that have been pre-approved before February 1, 2010, are exempt from the buffer requirements of section 4.1.2 above. Evidence of pre-approval for highway projects shall be a final right-of-way plan and for other construction projects, the final design drawings with attached dated, written approval by the local, state or federal agency with authority to approve such design drawings for construction.

## 4.1.3.  Soil stabilization

Stabilization of disturbed areas must, at a minimum, be initiated immediately whenever any clearing, grading, excavating or other earth disturbing activities have temporarily or permanently ceased on any portion of the site, and will not resume for a period exceeding 14 calendar days. Soil stabilization (temporary or permanent) of those of disturbed areas must be completed as soon as possible, but not later than 14 days after the construction activity in that portion of the site has temporarily or permanently ceased. In arid, semiarid, and drought-stricken areas where initiating vegetative stabilization measures immediately is infeasible, alternative stabilization measures (such as, but not limited to: properly anchored mulch, soil binders, matting) must be employed.

## 4.1.4.  Dewatering

Discharges from dewatering activities, including discharges from dewatering of trenches and excavations, are prohibited unless managed by appropriate controls. Appropriate controls include, but are not limited to: weir tank, dewatering tank, gravity bag filter, sand media particulate filter, pressurized bag filter, cartridge filter or other control units providing the level of treatment necessary to comply with permit requirements.

Case 1:18-cv-00029   Document 1-1   Filed 04/09/18   Page 74 of 153 PageID #: 105

4.1.5.  Pollution prevention measures

The permittee must design, install, implement, and maintain effective pollution prevention measures to minimize the discharge of pollutants. At a minimum, such measures must be designed, installed, implemented and maintained to:

(1) Minimize the discharge of pollutants from equipment and vehicle washing, wheel wash water, and other wash waters. Wash waters must be treated in a sediment basin or alternative control that provides equivalent or better treatment prior to discharge;

(2) Minimize the exposure of building materials, building products, construction wastes, trash, landscape materials, fertilizers, pesticides, herbicides, detergents, sanitary waste and other materials present on the site to precipitation and to stormwater; and

(3) Minimize the discharge of pollutants from spills and leaks and implement chemical spill and leak prevention and response procedures.

4.1.6.  Prohibited discharges

The following discharges are prohibited:

(1) Wastewater from washout of concrete, unless managed by an appropriate control;
(2) Wastewater from washout and cleanout of stucco, paint, form release oils, curing compounds and other construction materials;
(3) Fuels, oils, or other pollutants used in vehicle and equipment operation and maintenance; and
(4) Soaps or solvents used in vehicle and equipment washing.

4.1.7.  Surface outlets

When discharging from basins and impoundments, utilize outlet structures that only withdraw water from near the surface of the basin or impoundment, unless infeasible.

## 5.  SPECIAL CONDITIONS, MANAGEMENT PRACTICES, AND OTHER NON-NUMERIC LIMITATIONS

### 5.1.  Releases in Excess of Reportable Quantities

The discharge of hazardous substances or oil in the stormwater discharge(s) from a facility shall be prevented or minimized in accordance with the applicable stormwater pollution prevention plan for the facility. This permit does not relieve the permittee of the reporting requirements of 40 CFR 117 and 40 CFR 302. Where a release containing a hazardous substance in an amount equal to or in excess of a reportable quantity established under either 40 CFR 117 or 40 CFR 302 occurs during a 24 hour period:

a)  the permittee is required to notify the National Response Center (NRC) (800-424-8802) and the Tennessee Emergency Management Agency (emergencies: 800-262-3300; non-emergencies: 800-262-3400) in accordance with the requirements of 40 CFR 117 or 40 CFR 302 as soon as he or she has knowledge of the discharge;

b)  the permittee shall submit, within 14 days of knowledge of the release, a written description of: the release (including the type and estimate of the amount of material

Case 1:18-cv-00029   Document 1-1   Filed 04/09/18   Page 75 of 153 PageID #: 106

released), the date that such release occurred, the circumstances leading to the release, what actions were taken to mitigate effects of the release, and steps to be taken to minimize the chance of future occurrences, to the appropriate Environmental Field Office (see subpart 2.8 above); and

c) the SWPPP required under part 3 above of this permit must be updated within 14 days of knowledge of the release: to provide a description of the release, the circumstances leading to the release, and the date of the release. This can be accomplished by including a copy of a written description of the release as described in the paragraph b) above. In addition, the SWPPP must be reviewed to identify measures to prevent the reoccurrence of such releases and to respond to such releases, and the plan must be modified where appropriate.

## 5.2. Spills

This permit does not authorize the discharge of hazardous substances or oil resulting from an on-site spill.

## 5.3. Discharge Compliance with State Water Quality Standards

### 5.3.1. Violation of Water Quality Standards

This permit does not authorize stormwater or other discharges that would result in a violation of a state water quality standard (the TDEC Rules, Chapters 1200-4-3, 1200-4-4). Such discharges constitute a violation of this permit.

Where a discharge is already authorized under this permit and the division determines the discharge to cause or contribute to the violation of applicable state water quality standards, the division will notify the operator of such violation(s). The permittee shall take all necessary actions to ensure future discharges do not cause or contribute to the violation of a water quality standard and shall document these actions in the SWPPP.

### 5.3.2. Discharge quality

a) The construction activity shall be carried out in such a manner that will prevent violations of water quality criteria as stated in the TDEC Rules, Chapter 1200-4-3-.03. This includes but is not limited to the prevention of any discharge that causes a condition in which visible solids, bottom deposits, or turbidity impairs the usefulness of waters of the state for any of the uses designated for that water body by TDEC Rules, Chapter 1200-4-4. Construction activity carried out in the manner required by this permit shall be considered compliance with the TDEC Rules, Chapter 1200-4-3-.03.

b) There shall be no distinctly visible floating scum, oil or other matter contained in the stormwater discharge.

c) The stormwater discharge must not cause an objectionable color contrast in the receiving stream.

d) The stormwater discharge must result in no materials in concentrations sufficient to be hazardous or otherwise detrimental to humans, livestock, wildlife, plant life, or fish and aquatic life in the receiving stream. This provision includes species covered under subpart 1.3 above.

Case 1:18-cv-00029   Document 1-1   Filed 04/09/18   Page 76 of 153 PageID #: 107

## 5.4. Discharges into Impaired or Exceptional Tennessee Waters

5.4.1. Additional SWPPP/BMP Requirements for discharges into impaired or exceptional TN Waters

Discharges that would add loadings of a pollutant that is identified as causing or contributing to an impairment of a water body on the list of impaired waters, or which would cause degradation to waters designated by TDEC as Exceptional Tennessee waters (see subpart 1.3 above) are not authorized by this permit. To be eligible to obtain and maintain coverage under this permit, the operator must satisfy, at a minimum, the following additional requirements for discharges into waters impaired by siltation (or discharges upstream of such waters and because of the proximity to the impaired segment and the nature of the discharge is likely to contribute pollutants of concern in amounts measurable in the impaired segment that may affect the impaired waters) and for discharges to waters identified by TDEC as Exceptional Tennessee waters (or discharges upstream of such waters and because of the proximity to the exceptional segment and the nature of the discharge is likely to contribute pollutants of concern in amounts measurable in the exceptional segment that may affect the Exceptional Tennessee waters):

a) The SWPPP must certify that erosion prevention and sediment controls used at the site are designed to control storm runoff generated by a 5-year, 24-hour storm event (the design storm - see part 10 below: "2-year and 5-year design storm depths and intensities"), as a minimum, either from total rainfall in the designated period or the equivalent intensity as specified on the following website http://hdsc.nws.noaa.gov/hdsc/pfds/orb/tn_pfds.html. When clay and other fine particle soils are found on sites, additional physical or chemical treatment of stormwater runoff may be used.

b) The SWPPP must be prepared by a person who, at a minimum, has completed the department's Level II Design Principles for Erosion Prevention and Sediment Control for Construction Sites course. This requirement goes in effect 24 months following the new permit effective date. A copy of the certification or training record for inspector certification should be included with the SWPPP.

c) The permittee shall perform inspections described in section 3.5.8 above at least twice every calendar week. Inspections shall be performed at least 72 hours apart.

d) The permittee must certify on the form provided in Appendix C of this permit whether or not all planned and designed erosion prevention and sediment controls are installed and in working order. The form must contain the printed name and signature of the inspector and the certification must be executed by a person who meets the signatory requirements of section 7.7.2 below of this permit. The record of inspections must be kept at the construction site with a copy of the SWPPP. For record retention requirements, see part 6 below.

e) In the event the division finds that a discharger is complying with the SWPPP, but contributing to the impairment of receiving stream, then the discharger will be notified by the director in writing that the discharge is no longer eligible for coverage under the general permit. The permittee may update the SWPPP and implement the necessary changes designed to eliminate further impairment of the receiving stream. If the permittee does not implement the SWPPP changes within 7 days of receipt of notification, the permittee will be notified in writing that continued discharges must be covered by an individual permit (see subpart 7.12 below). To obtain the individual permit, the operator must file an individual permit application (EPA Forms 1 and 2F). The project must be stabilized immediately until the SWPPP is updated and the

Case 1:18-cv-00029   Document 1-1   Filed 04/09/18   Page 77 of 153 PageID #: 108

individual permit is issued. Only discharges from earth disturbing activities necessary for stabilization are authorized to continue until the individual permit is issued.

f) For an on-site outfall in a drainage area of a total of 5 or more acres, a minimum temporary (or permanent) sediment basin volume that will provide treatment for a calculated volume of runoff from a 5 year, 24 hour storm and runoff from each acre drained, or equivalent control measures as specified in the Tennessee Erosion and Sediment Control Handbook, shall be provided until final stabilization of the site. A drainage area of 5 or more acres includes both disturbed and undisturbed portions of the site or areas adjacent to the site, all draining through the common outfall. Where an equivalent control measure is substituted for a sediment retention basin, the equivalency must be justified. Runoff from any undisturbed acreage should be diverted around the disturbed area and the sediment basin and, if so, can be omitted from the volume calculation. Sediment storage expected from the disturbed areas must be included and a marker installed signifying a cleanout need.

g) The director may require revisions to the SWPPP necessary to prevent a negative impact to legally protected state or federally listed aquatic fauna, their habitat, or the receiving waters.

## 5.4.2. Buffer zone requirements for discharges into impaired or exceptional TN waters

For sites that contain and/or are adjacent to a receiving stream designated as impaired or Exceptional Tennessee waters a 60-foot natural riparian buffer zone adjacent to the receiving stream shall be preserved, to the maximum extent practicable, during construction activities at the site. The water quality buffer zone is required to protect waters of the state (e.g., perennial and intermittent streams, rivers, lakes, wetlands) located within or immediately adjacent to the boundaries of the project, as identified using methodology from Standard Operating Procedures for Hydrologic Determinations (see rules to implement a certification program for Qualified Hydrologic Professionals , TN Rules Chapter 0400-40-17). Buffer zones are not primary sediment control measures and should not be relied on as such. Rehabilitation and enhancement of a natural buffer zone is allowed, if necessary, for improvement of its effectiveness of protection of the waters of the state. The buffer zone requirement only applies to new construction sites, as described in section 2.4.2 above.

The natural buffer zone should be established between the top of stream bank and the disturbed construction area. The 60-feet criterion for the width of the buffer zone can be established on an average width basis at a project, as long as the minimum width of the buffer zone is more than 30 feet at any measured location.

Every attempt should be made for construction activities not to take place within the buffer zone. BMPs providing equivalent protection to a receiving stream as a natural riparian zone may be used at a construction site. Such equivalent BMPs shall be designed to be as effective in protecting the receiving stream from effects of stormwater runoff as a natural buffer zone. A justification for use and a design of equivalent BMPs shall be included in the SWPPP. Such equivalent BMPs are expected to be routinely used at construction projects typically located adjacent to surface waters. These projects include, but are not limited to: sewer line construction, roadway construction, utility line or equipment installation, greenway construction, construction of a permanent outfall or a velocity dissipating structure, etc.

This requirement does not apply to an area that is being altered under the authorization of a valid Aquatic Resources Alteration Permit (ARAP), or equivalent permits issued by federal

Case 1:18-cv-00029   Document 1-1   Filed 04/09/18   Page 78 of 153 PageID #: 109

authorities. Additional natural buffer zone requirements may be established by the local MS4 program.

5.4.2.1. Buffer zone exemption based on existing uses

Buffer zones as described in section 5.4.2 above shall not be required to portions of the buffer where certain land uses exist and are to remain in place according to the following:

1.  A use shall be considered existing if it was present within the buffer zone as of the date of the Notice of Intent for coverage under the CGP. Existing uses shall include, but not be limited to, buildings, parking lots, roadways, utility lines and on-site sanitary sewage systems. Only the portion of the buffer zone that contains the footprint of the existing land use is exempt from buffer zones. Activities necessary to maintain uses are allowed provided that no additional vegetation is removed from the buffer zone.

2.  If an area with an existing land use is proposed to be converted to another use or the impervious surfaces located within the buffer area are being removed buffer zone requirements shall apply.

5.4.3.  Pre-Approved sites

Construction activity at sites that have been pre-approved before June 16, 2005, are exempt from the design storm requirements of section 5.4.1 a) and e) above and the buffer requirements of section 5.4.2 above. Evidence of pre-approval for highway projects shall be a final right-of-way plan and for other construction projects, the final design drawings with attached dated, written approval by the local, state or federal agency with authority to approve such design drawings for construction.

# 6.   RETENTION, ACCESSIBILITY AND SUBMISSION OF RECORDS

## 6.1.   Documents

The permittee shall retain copies of stormwater pollution prevention plans and all reports required by this permit, and records of all data used to complete the NOI and the NOT to be covered by this permit, for a period of at least three years from the date the notice of termination is submitted. This period may be extended by written request of the director.

## 6.2.   Accessibility and Retention of Records

The permittee shall retain a copy of the SWPPP required by this permit (including a copy of the permit) at the construction site (or other local location accessible to the director and the public) from the date construction commences to the date of termination of permit coverage. Permittees with day-to-day operational control over pollution prevention plan implementation shall have a copy of the SWPPP available at a central location onsite for the use of all operators and those identified as having responsibilities under the plan whenever they are on the construction site. Once coverage is terminated, the permittee shall maintain a copy of all records for a period of three years.

Case 1:18-cv-00029   Document 1-1   Filed 04/09/18   Page 79 of 153 PageID #: 110

6.2.1. Posting information at the construction site

The permittee shall post a notice near the main entrance of the construction site accessible to the public with the following information:

    a) a copy of the NOC with the NPDES permit tracking number for the construction project;
    b) name, company name, E-mail address (if available), telephone number and address of the project site owner/operator or a local contact person;
    c) a brief description of the project; and
    d) the location of the SWPPP (see section 3.3.3 above).

The notice must be maintained in a legible condition. If posting this information near a main entrance is infeasible due to safety concerns, or not accessible to the public, the notice shall be posted in a local public building. If the construction project is a linear construction project (e.g., pipeline, highway, etc.), the notice must be placed in a publicly accessible location near where construction is actively underway and moved as necessary. This permit does not provide the public with any right to trespass on a construction site for any reason, including inspection of a site. This permit does not require that permittees allow members of the public access to a construction site.

The permittee shall also retain following items/information in an appropriate location on-site:

    a) a rain gauge;
    b) a copy of twice weekly inspection reports;
    c) a documentation of quality assurance site assessments, if applicable (see section 3.1.2 above); and
    d) a copy of the site inspector's Fundamentals of Erosion Prevention and Sediment Control Level 1 certification.

## 6.3. Electronic Submission of NOIs, NOTs and Reports

If the division notifies dischargers (directly by mail or E-mail, by public notice, or by making information available on the world wide web) of electronic forms or other report options that become available at a later date (e.g., electronic submission of forms), the operators may take advantage of those options to satisfy the NOI, NOT and other report notification requirements.

## 7. STANDARD PERMIT CONDITIONS

## 7.1. Duty to Comply

7.1.1. Permittee's duty to comply

The permittee must comply with all conditions of this permit. Any permit noncompliance constitutes a violation of the Tennessee Water Quality Control Act (TWQCA) and is grounds for enforcement action; for permit termination, revocation and reissuance, or modification; or for denial of a permit renewal application.

Case 1:18-cv-00029    Document 1-1    Filed 04/09/18    Page 80 of 153 PageID #: 111

7.1.2. Penalties for violations of permit conditions

Pursuant to T.C.A. § 69-3-115 of The Tennessee Water Quality Control Act of 1977, as amended:

a) any person who violates an effluent standard or limitation or a water quality standard established under this part (T.C.A. § 69-3-101, et. seq.); violates the terms or conditions of this permit; fails to complete a filing requirement; fails to allow or perform an entry, inspection, monitoring or reporting requirement; violates a final determination or order of the board, panel or commissioner; or violates any other provision of this part or any rule or regulation promulgated by the board, is subject to a civil penalty of up to ten thousand dollars ($10,000) per day for each day during which the act or omission continues or occurs;

b) any person unlawfully polluting the waters of the state or violating or failing, neglecting, or refusing to comply with any of the provisions of this part (T.C.A. § 69-3-101, et. seq.) commits a Class C misdemeanor. Each day upon which such violation occurs constitutes a separate offense;

c) any person who willfully and knowingly falsifies any records, information, plans, specifications, or other data required by the board or the commissioner, or who willfully and knowingly pollutes the waters of the state, or willfully fails, neglects or refuses to comply with any of the provisions of this part (T.C.A. § 69-3-101, et. seq.) commits a Class E felony and shall be punished by a fine of not more than twenty-five thousand dollars ($25,000) or incarceration, or both.

7.1.3. Civil and criminal liability

Nothing in this permit shall be construed to relieve the discharger from civil or criminal penalties for noncompliance. Notwithstanding this permit, the discharger shall remain liable for any damages sustained by the State of Tennessee, including but not limited to fish kills and losses of aquatic life and/or wildlife, as a result of the discharge to any surface or subsurface waters. Additionally, notwithstanding this permit, it shall be the responsibility of the discharger to conduct stormwater discharge activities in a manner such that public or private nuisances or health hazards will not be created. Furthermore, nothing in this permit shall be construed to preclude the State of Tennessee from any legal action or relieve the discharger from any responsibilities, liabilities, or penalties established pursuant to any applicable state law or the Federal Water Pollution Control Act.

7.1.4. Liability under state law

Nothing in this permit shall be construed to preclude the institution of any legal action or relieve the permittee from any responsibilities, liabilities, or penalties established pursuant to any applicable local, state or federal law.

## 7.2. Continuation of the Expired General Permit

Permittees shall maintain coverage under this general permit until a new general permit is issued. Permittees who choose not to maintain coverage under the expired general permit, or are required to obtain an individual permit, must submit an application (U.S. EPA NPDES Forms 1 and 2F and any other applicable forms) at least 180 days prior to expiration of this general permit.

Case 1:18-cv-00029   Document 1-1   Filed 04/09/18   Page 81 of 153 PageID #: 112

Permittees who are eligible and choose to be covered by the new general permit must submit an NOI by the date specified in that permit. Facilities that have not obtained coverage under this permit by the permit expiration date cannot become authorized to discharge under the continued permit.

Operator(s) of an existing site permitted under the division's 2005 construction general permit shall maintain full compliance with the existing SWPPP. The existing SWPPP should be modified, if necessary, to meet requirements of this new general permit, and the SWPPP changes implemented no later than 12 months following the new permit effective date. The permittee shall make the updated SWPPP available for the division's review upon request.

## 7.3. Need to Halt or Reduce Activity Not a Defense

It shall not be a defense for a permittee in an enforcement action that it would have been necessary to halt or reduce the permitted activity in order to maintain compliance with the conditions of this permit.

## 7.4. Duty to Mitigate

The permittee shall take all reasonable steps to minimize or prevent any discharge in violation of this permit that has a reasonable likelihood of adversely affecting human health or the environment.

## 7.5. Duty to Provide Information

The permittee shall furnish to the division or an authorized representative of the division, within a time specified by the division, any information that the division may request to determine compliance with this permit or other information relevant to the protection of the waters of the state. The permittee shall also furnish to the division, upon request, copies of records required to be kept by this permit.

## 7.6. Other Information

When the permittee becomes aware that he or she failed to submit any relevant facts or submitted incorrect information in the Notice of Intent or in any other report to the director, he or she shall promptly submit such facts or information.

## 7.7. Signatory Requirements

All Notices of Intent (NOIs), stormwater pollution prevention plans (SWPPPs), requests for termination of permit coverage (NOTs), Construction Stormwater Inspection Certifications, Construction Stormwater Monitoring Report forms, reports, certifications or information either submitted to the director or the operator of a large or medium municipal separate storm sewer system and/or any other information either submitted to the division, or that this permit requires be maintained by the permittee, shall be signed as described in sections 7.7.1 and 7.7.2 below and dated.

Case 1:18-cv-00029   Document 1-1   Filed 04/09/18   Page 82 of 153 PageID #: 113

7.7.1.  Signatory requirements for a Notice of Intent (NOI)[3]

NOI shall be signed as follows:

a)  For a corporation, by a responsible corporate officer. For the purpose of this section, a responsible corporate officer means:

(i) a president, secretary, treasurer, or vice-president of the corporation in charge of a principal business function, or any other person who performs similar policy or decision-making functions for the corporation, or

(ii) the manager of one or more manufacturing, production, or operating facilities, provided, the manager is authorized to make management decisions which govern the operation of the regulated site including having the explicit or implicit duty of making major capital investment recommendations, and initiating and directing other comprehensive measures to assure long term environmental compliance with environmental laws and regulations; the manager can ensure that the necessary systems are established or actions taken to gather complete and accurate information for permit application requirements; and where authority to sign documents has been assigned or delegated to the manager in accordance with corporate procedures.

NOTE: The division does not require specific assignments or delegations of authority to responsible corporate officers. The division will presume that these responsible corporate officers have the requisite authority to sign permit applications unless the corporation has notified the director to the contrary. Corporate procedures governing authority to sign permit applications may provide for assignment or delegation to applicable corporate positions rather than to specific individuals.

b)  For a partnership or sole proprietorship, by a general partner or the proprietor, respectively.

c)  For a municipality, state, federal, or other public agency, by either a principal executive officer or ranking elected official. For purposes of this section, a principal executive officer of a Federal agency includes:

(i) the chief executive officer of the agency, or

(ii) a senior executive officer having responsibility for the overall operations of a principal geographic unit of the agency (e.g., Regional Administrators of EPA).

7.7.2.  Signatory requirements for reports and other items

SWPPPs, Construction Stormwater Inspection Certification forms, reports, certifications or other information submittals required by the permit and other information requested by the division, including but not limited to Notice of Violation responses, shall be signed by a person described in section 7.7.1 above, or by a duly authorized representative of that person.

---

[3] As specified in 40 CFR 122.22(a)(1)-(3) [48 FR 14153, Apr. 1, 1983, as amended at 48 FR 39619, Sept. 1, 1983; 49 FR 38047, Sept. 29, 1984; 50 FR 6941, Feb. 19, 1985; 55 FR 48063, Nov. 16, 1990; 65 FR 30907, May 15, 2000]

Case 1:18-cv-00029   Document 1-1   Filed 04/09/18   Page 83 of 153 PageID #: 114

7.7.3. <u>Duly authorized representative</u>

For a purpose of satisfying signatory requirements for reports (see section 7.7.2 above), a person is a duly authorized representative only if:

    a)  the authorization is made in writing by a person described in section 7.7.1 above;

    b)  the authorization specifies either an individual or a position having responsibility for the overall operation of the regulated site or activity such as the position of plant manager, superintendent, position of equivalent responsibility, or an individual or position having overall responsibility for environmental matters for the company; a duly authorized representative may thus be either a named individual or any individual occupying a named position and,

    c)  the written authorization is submitted to the director or an appropriate EFO (see section 2.8 above). The written authorization shall be a written document including the name of the newly authorized person and the contact information (title, mailing address, phone number, fax number and E-mail address) for the authorized person. The written authorization shall be signed by the newly authorized person accepting responsibility and by the person described in section 7.7.1 above delegating the authority.

7.7.4. <u>Changes to authorization</u>

If an authorization under sections 7.7.1 above or 7.7.3 above is no longer accurate because a different individual or position has responsibility as the primary or secondary permittee, but the company name (permittee name) remains the same, a new NOI and SWPPP certification shall be submitted to an appropriate EFO (see section 2.8 above) and signed by the new party who meets signatory authority satisfying the requirements of sections 7.7.1 above or 7.7.3 above . The NOI shall include the new individual's information (title, mailing address, phone number, fax number and E-mail address), the existing tracking number and the project name.

7.7.5. <u>Signatory requirements for primary permittees</u>

Primary permittees required to sign an NOI and SWPPP because they meet the definition of an operator (see subpart 2.2 above) shall sign the following certification statement on the NOI and SWPPP:

> "*I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.*"

7.7.6. <u>Signatory requirements for secondary permittees</u>

Secondary permittees (typically construction contractors) required to sign an NOI and SWPPP because they meet the definition of an operator but who are not primarily responsible for

Case 1:18-cv-00029    Document 1-1    Filed 04/09/18    Page 84 of 153 PageID #: 115

preparing an NOI and SWPPP, shall sign the following certification statement on the NOI and SWPPP:

> *"I certify under penalty of law that I have reviewed this document, any attachments, and the SWPPP referenced above. Based on my inquiry of the construction site owner/developer identified above and/or my inquiry of the person directly responsible for assembling this NOI and SWPPP, I believe the information submitted is accurate. I am aware that this NOI, if approved, makes the above-described construction activity subject to NPDES permit number TNR100000, and that certain of my activities on-site are thereby regulated. I am aware that there are significant penalties, including the possibility of fine and imprisonment for knowing violations, and for failure to comply with these permit requirements."*

## 7.8. Penalties for Falsification of Reports

Knowingly making any false statement on any report or form required by this permit may result in the imposition of criminal penalties as provided for in Section 309 of the Clean Water Act and in T.C.A. §69-3-115 of the Tennessee Water Quality Control Act.

## 7.9. Oil and Hazardous Substance Liability

Nothing in this permit shall be construed to preclude the institution of any legal action or relieve the permittee from any responsibilities, liabilities, or penalties to which the permittee is or may be subject to Section 311 of the Clean Water Act or Section 106 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA).

## 7.10. Property Rights

The issuance of this permit does not convey any property rights of any sort, nor any exclusive privileges, nor does it authorize any injury to private property nor any invasion of personal rights, nor any infringement of federal, state or local laws or regulations. The issuance of this permit does not authorize trespassing or discharges of stormwater or non-stormwater across private property.

## 7.11. Severability

The provisions of this permit are severable, and if any provision of this permit, or the application of any provision of this permit to any circumstance, is held invalid, the application of such provision to other circumstances, and the remainder of this permit shall not be affected thereby.

## 7.12. Requiring an Individual Permit

### 7.12.1. Director can require a site to obtain an individual permit

The director may require any person authorized by this permit to apply for and/or obtain an individual NPDES permit in order to obtain adequate protection of designated uses of a receiving stream. Any interested person may petition the director in writing to take action under this paragraph, but must include in their petition the justification for such an action. Where the

Case 1:18-cv-00029    Document 1-1    Filed 04/09/18    Page 85 of 153 PageID #: 116

director requires a discharger authorized to discharge under this permit to apply for an individual NPDES permit, the director shall notify the discharger in writing that an individual permit application is required. This notification will include a brief statement of the reasons for this decision, an application form, a statement setting a deadline for the discharger to file the application, and a statement that coverage under this general permit shall terminate upon the effective date of an individual NPDES permit or denial of coverage under an individual permit. The notification may require stabilization of the site and suspend coverage under this general permit until the individual permit is issued. Individual permit applications shall be submitted to the appropriate Environmental Field Office of the division as indicated in subpart 2.8 above of this permit. The director may grant additional time to submit the application upon request of the applicant. If a discharger fails to submit in a timely manner an individual NPDES permit application as required by the director under this paragraph, then the applicability of this permit to the discharger will be terminated at the end of the day specified by the director for application submittal.

If the decision to require an individual NPDES permit precedes the issuance of coverage under this general permit, earth disturbing activities cannot begin until the individual permit is issued.

### 7.12.2. Permittee may request individual permit instead of coverage under this general permit

Any discharger authorized by this permit may request to be excluded from the coverage of this permit by applying for an individual permit. Any discharger that knowingly cannot abide by the terms and conditions of this permit must apply for an individual permit. In such cases, the permittee shall submit an individual application in accordance with the requirements of 40 CFR 122.26(c)(1)(ii), with reasons supporting the request, to the appropriate division's Environmental Field Office. The request may be granted by issuance of an individual permit, or alternative general permit, if the reasons cited by the permittee are adequate to support the request.

### 7.12.3. Individual permit terminates general permit

When an individual NPDES permit is issued to a discharger otherwise subject to this permit, or the discharger is authorized to discharge under an alternative NPDES general permit, the applicability of this permit to the discharger is terminated on the effective date of the individual permit or the date of authorization of coverage under the alternative general permit, whichever the case may be. When an individual NPDES permit is denied to an owner or operator otherwise subject to this permit, or the owner or operator is denied for coverage under an alternative NPDES general permit, the applicability of this permit to the individual NPDES permittee is terminated on the date of such denial, unless otherwise specified by the director. Coverage under the Tennessee Multi-Sector General Permit for the Discharge of Stormwater from an Industrial Activity (TMSP) will not be considered as an alternative general permit under this section without being specified by the director.

## 7.13. Other, Non-Stormwater, Program Requirements

No condition of this permit shall release the permittee from any responsibility or requirements under other environmental statutes or regulations.

Case 1:18-cv-00029    Document 1-1    Filed 04/09/18    Page 86 of 153 PageID #: 117

### 7.14. Proper Operation and Maintenance

The permittee shall at all times properly operate and maintain all facilities and systems of treatment and control (and related equipment) which are installed or used by the permittee to achieve compliance with the conditions of this permit and with the requirements of stormwater pollution prevention plans.

Proper operation and maintenance also includes adequate laboratory quality assurance and quality control procedures. Proper operation and maintenance requires the operation of backup or auxiliary facilities or similar systems, installed by a permittee, when determined by the permittee or the division to be necessary to achieve compliance with the conditions of the permit.

### 7.15. Inspection and Entry

The permittee shall allow authorized representatives of the Environmental Protection Agency, the director or an authorized representative of the commissioner of TDEC, or, in the case of a construction site which discharges through a municipal separate storm sewer, an authorized representative of the MS4 receiving the discharge, upon the presentation of credentials and other documents as may be required by law:

  a) to enter upon the permittee's premises where a regulated facility or activity is located or conducted or where records must be kept under the conditions of this permit;
  b) to have access to and copy at reasonable times, any records that must be kept under the conditions of this permit; and
  c) to inspect any facilities or equipment (including monitoring and control equipment).

### 7.16. Permit Actions

This permit may be issued, modified, revoked, reissued or terminated for cause in accordance with this permit and the applicable requirements of T.C.A. § 69-3-108. The filing of a request by the permittee for a permit modification, revocation and reissuance, or termination, or a notification of planned changes or anticipated noncompliance does not stay any permit condition.

8.1.1. Termination of builder and contractor coverage

## 8. REQUIREMENTS FOR TERMINATION OF COVERAGE

## 8.1. Termination of Developer and Builder Coverage

8.1.1. Termination process for primary permittees

Primary permittees wishing to terminate coverage under this permit must submit a completed notice of termination (NOT) form, provided in Appendix B of this permit (or copy thereof). Primary permittees who abandon the site and fail to submit the NOT will be in violation of this permit. Signs notifying the public of the construction activity shall be in place until the NOT form has been submitted. Primary permittees may terminate permit coverage only if the conditions described in items 1, 2 or 3 below occur at the site:

1.  All earth-disturbing activities at the site are completed and, if applicable, construction support activities permitted under section 1.2.2 above, and the following requirements are met:

    (a) For any areas that
    - were disturbed during construction,
    - are not covered over by permanent structures, and
    - over which the permittee had control during the construction activities
    the requirements for final vegetative or non-vegetative stabilization described in sub-section 3.5.3.2 above are met;

    (b) The permittee has removed and properly disposed of all construction materials, waste and waste handling devices, and have removed all equipment and vehicles that were used during construction, unless intended for long-term use following termination of permit coverage;

    (c) The permittee has removed all stormwater controls that were installed and maintained during construction, except those that are intended for long-term use following termination of permit coverage;

    (d) The permittee has removed all potential pollutants and pollutant-generating activities associated with construction, unless needed for long-term use following termination of permit coverage; and

    (e) The permittee must identify who is responsible for ongoing maintenance of any stormwater controls left on the site for long-term use following termination of permit coverage; or

2.  The permittee has transferred control of all areas of the site for which he is responsible (including, but not limited to, infrastructure, common areas, stormwater drainage structures, sediment control basin, etc.) under this permit to another operator, and that operator has submitted an NOI and obtained coverage under this permit; or

3.  The permittee obtains coverage under an individual or alternative general NPDES permit.

8.1.2.  NOT review

The division will review NOTs for completeness and accuracy and, when necessary, investigate the proposed site for which the NOT was submitted. Upon completing the NOT review, the division will:

1)  prepare and transmit a notification that a NOT form was received;
2)  notify the applicant of needed changes to their NOT submittal; or
3)  deny a request for termination of coverage under this general permit.

The division retains the right to deny termination of coverage under this general permit upon receipt of the NOT. If the local Environmental Field Office has information indicating that the permit coverage is not eligible for termination, written notification will be provided that permit

Case 1:18-cv-00029    Document 1-1    Filed 04/09/18    Page 88 of 153 PageID #: 119

coverage has not been terminated. The notification will include a summary of existing deficiencies. When the site meets the termination criteria, the NOT should be re-submitted.

If any permittee files for bankruptcy or the site is foreclosed on by the lender, the permittee should notify the division of the situation so that the division may assess the site to determine if permit coverage should be obtained by any other person or whether other action is needed.

## 8.2.    Termination of Builder and Contractor Coverage

### 8.2.1.    Termination process for secondary permittees

Secondary permittees (builders/contractors) must request termination of coverage under this permit by submitting an NOT when they are no longer an operator at the construction site. Secondary permittees receive coverage under this permit, but are not normally mailed a Notice of Coverage. Consequently, the division may, but is not required to, notify secondary permittees that their notice of termination has been received. If the division has reason to believe that the secondary permittee's NOT should not have been submitted, the division will deny the secondary permittee's NOT in writing, with specific reasons as to why the NOT should not have been submitted.

## 8.3.    NOT certification

The NOT and the following certification must be signed in accordance with subpart 7.7 above (Signatory Requirements) of this permit:

> *"I certify under penalty of law that either: (a) all stormwater discharges associated with construction activity from the portion of the identified facility where I was an operator have ceased or have been eliminated or (b) I am no longer an operator at the construction site. I understand that by submitting this notice of termination, I am no longer authorized to discharge stormwater associated with construction activity under this general permit, and that discharging pollutants in stormwater associated with construction activity to waters of the United States is unlawful under the Clean Water Act where the discharge is not authorized by a NPDES permit. I also understand that the submittal of this notice of termination does not release an operator from liability for any violations of this permit or the Clean Water Act."*

## 8.4.    Where to Submit a Notice of Termination (NOT)?

The NOT shall be submitted to the Environmental Field Office (EFO) which issued the NOC to the primary permittee. A list of counties and the corresponding EFOs is provided in subpart 2.8 above. The appropriate permit tracking number must be clearly printed on the form.

## 9.    Aquatic Resource Alteration Permits (ARAP)

Alterations to channels or waterbodies (stream, wetland and/or other waters of the state) that are contained on, traverse through or are adjacent to the construction site, may require an Aquatic Resources Alteration Permit (ARAP) (http://www.tn.gov/environment/permits/arap.shtml). It is

Case 1:18-cv-00029    Document 1-1    Filed 04/09/18    Page 89 of 153 PageID #: 120

the responsibility of the developer to provide a determination of the water's status[4]. This determination must be conducted using methodology from Standard Operating Procedures for Hydrologic Determinations (see rules to implement a certification program for Qualified Hydrologic Professionals , TN Rules Chapter 0400-40-17). The permittee can make an assumption that streams/wetlands are present at the site in order to expedite the permit process. In some cases, issuance of coverage under the CGP may be delayed or withheld if the appropriate ARAP has not been obtained. At a minimum, any delay in obtaining an ARAP for water body alteration associated with the proposed project must be adequately addressed in the SWPPP prior to issuance of an NOC. Failure to obtain an ARAP prior to any actual alteration may result in enforcement action for the unauthorized alteration.

10.     **DEFINITIONS**

"**2-year and 5-year design storm depths and intensities**" The estimated design rainfall amounts, for any return period interval (i.e., 2-yr, 5-yr, 25-yr, etc,) in terms of either 24-hour depths or intensities for any duration, can be found by accessing the following NOAA National Weather Service Atlas 14 data for Tennessee: http://hdsc.nws.noaa.gov/hdsc/pfds/orb/tn_pfds.html. Other data sources may be acceptable with prior written approval by TDEC Water Pollution Control.

"**Best Management Practices**" ("BMPs") means schedules of activities, prohibitions of practices, maintenance procedures, and other management practices to prevent or reduce the discharge of pollutants to waters of the state. BMPs also include treatment requirements, operating procedures, and practices to control plant site runoff, spillage or leaks, sludge or waste disposal, or drainage from raw material storage.

"**Borrow Pit**" is an excavation from which erodible material (typically soil) is removed to be fill for another site. There is no processing or separation of erodible material conducted at the site. Given the nature of activity and pollutants present at such excavation, a borrow pit is considered a construction activity for the purpose of this permit.

"**Buffer Zone**" is a strip of dense undisturbed perennial native vegetation, either original or re-established, that borders streams and rivers, ponds and lakes, wetlands, and seeps. Buffer zones are established for the purposes of slowing water runoff, enhancing water infiltration, and minimizing the risk of any potential nutrients or pollutants from leaving the upland area and reaching surface waters. Buffer zones are most effective when stormwater runoff is flowing into and through the buffer zone as shallow sheet flow, rather than in concentrated form such as in channels, gullies, or wet weather conveyances. Therefore, it is critical that the design of any development include management practices, to the maximum extent practical, that will result in stormwater runoff flowing into and through the buffer zone as shallow sheet flow. Buffer zones are established for the primary purpose of protecting water quality and maintaining a healthy aquatic ecosystem in receiving waters.

"**Clearing**" in the definition of discharges associated with construction activity, typically refers to removal of vegetation and disturbance of soil prior to grading or excavation in anticipation of construction activities. Clearing may also refer to wide area land disturbance in anticipation of

---

[4] The EPA considers inventorying a site's natural features is a technique called fingerprinting. More info can be found in EPA's document - EPA's Developing Your SWPPP -- A Guide for Construction Sites (EPA-833-R-06-004 May 2007)

Case 1:18-cv-00029    Document 1-1    Filed 04/09/18    Page 90 of 153 PageID #: 121

non-construction activities; for instance, clearing forested land in order to convert forestland to pasture for wildlife management purposes. Clearing, grading and excavation do not refer to clearing of vegetation along existing or new roadways, highways, dams or power lines for sight distance or other maintenance and/or safety concerns, or cold planing, milling, and/or removal of concrete and/or bituminous asphalt roadway pavement surfaces. The clearing of land for agricultural purposes is exempt from federal stormwater NPDES permitting in accordance with Section 401(1)(1) of the 1987 Water Quality Act and state stormwater NPDES permitting in accordance with the Tennessee Water Quality Control Act of 1977 (T.C.A. 69-3-101 et seq.).

**"Commencement of construction"** The initial disturbance of soils associated with clearing, grading, or excavating activities or other construction activities.

**"Common plan of development or sale"** is broadly defined as any announcement or documentation (including a sign, public notice or hearing, sales pitch, advertisement, drawing, permit application, zoning request, computer design, etc.) or physical demarcation (including boundary signs, lot stakes, surveyor markings, etc.) indicating construction activities may occur on a specific plot. A common plan of development or sale identifies a situation in which multiple areas of disturbance are occurring on contiguous areas. This applies because the activities may take place at different times, on different schedules, by different operators.

**"Control measure"** As used in this permit, refers to any Best Management Practice (BMP) or other method used to prevent or reduce the discharge of pollutants to waters of the state.

**"CWA"** means the Clean Water Act of 1977 or the Federal Water Pollution Control Act (33 U.S.C. 1251, et seq.)

**"Department"** means the Department of Environment and Conservation.

**"Director"** means the director, or authorized representative, of the Division of Water Pollution Control of the State of Tennessee, Department of Environment and Conservation.

**"Discharge of stormwater associated with construction activity"** As used in this permit, refers to stormwater point source discharges from areas where soil disturbing activities (e.g., clearing, grading, excavation, etc.), or construction materials or equipment storage or maintenance (e.g., earth fill piles, fueling, waste material etc.) are located.

**"Division"** means the Division of Water Pollution Control of the State of Tennessee, Department of Environment and Conservation.

**"Final Stabilization"** means that all soil disturbing activities at the site have been completed and one of the three following criteria is met:

a. A uniform (e.g., evenly distributed, without large bare areas) perennial vegetative cover with a uniform density of at least 70 percent of the (preferably) native vegetative cover for the area has been established on all unpaved areas and areas not covered by permanent structures, and all slopes and channels have been permanently stabilized against erosion, or

Case 1:18-cv-00029    Document 1-1    Filed 04/09/18    Page 91 of 153 PageID #: 122

    b. Equivalent permanent stabilization measures (such as the use of riprap; permanent geotextiles, hardened surface materials including concrete, asphalt, gabion baskets, or Reno mattresses) have been employed, or

    c. For construction projects on land used for agricultural or silvicultural purposes, final stabilization may be accomplished by returning the disturbed land to its preconstruction agricultural or silvicultural use.

"**Exceptional Tennessee waters**" are surface waters of the State of Tennessee that satisfy characteristics of exceptional Tennessee waters as listed Chapter 1200-4-3-.06 of the official compilation - Rules and Regulations of the State of Tennessee. Characteristics include waters designated by the Water Quality Control Board as Outstanding National Resource Waters (ONRW); waters that provide habitat for ecologically significant populations of certain aquatic or semi-aquatic plants or animals; waters that provide specialized recreational opportunities; waters that possess outstanding scenic or geologic values; or waters where existing conditions are better than water quality standards.

"**Impaired waters**" (unavailable conditions waters) means any segment of surface waters that has been identified by the division as failing to support one or more classified uses. For the purpose of this permit, pollutants of concern include, but are not limited to: siltation (silt/sediment) and habitat alterations. Based on the most recent assessment information available to staff, the division will notify applicants and permittees if their discharge is into, or is affecting, impaired waters. Resources to be used in making this determination include biennial compilations of impaired waters, databases of assessment information, updated GIS coverages (http://tnmap.tn.gov/wpc/), and the results of recent field surveys. GIS coverages of the streams and lakes not meeting water quality standards, plus the biennial list of impaired waters, can be found at http://tn.gov/environment/wpc.

"**Improved sinkhole**" is a natural surface depression that has been altered in order to direct fluids into the hole opening. Improved sinkhole is a type of injection well regulated under the Underground Injection Control (UIC) program. Underground injection constitutes an intentional disposal of waste waters in natural depressions, open fractures, and crevices (such as those commonly associated with weathering of limestone).

"**Inspector**" An inspector is a person that has successfully completed (has a valid certification from) the "Fundamentals of Erosion Prevention and Sediment Control Level I" course or equivalent course. An inspector performs and documents the required inspections, paying particular attention to time-sensitive permit requirements such as stabilization and maintenance activities. An inspector may also have the following responsibilities:
    a) oversee the requirements of other construction-related permits, such as Aquatic Resources Alteration Permit (ARAP) or Corps of Engineers permit for construction activities in or around waters of the state;
    b) update field SWPPPs;
    c) conduct pre-construction inspection to verify that undisturbed areas have been properly marked and initial measures have been installed; and
    d) inform the permit holder of activities that may be necessary to gain or remain in compliance with the CGP and other environmental permits.

Case 1:18-cv-00029  Document 1-1  Filed 04/09/18  Page 92 of 153 PageID #: 123

**"Linear Project"** – is a land disturbing activity as conducted by an underground/overhead utility or highway department, including but not limited to any cable line or wire for the transmission of electrical energy; any conveyance pipeline for transportation of gaseous or liquid substance; any cable line or wire for communications; or any other energy resource transmission ROW or utility infrastructure, e.g., roads and highways. Activities include the construction and installation of these utilities within a corridor. Linear project activities also include the construction of access roads, staging areas, and borrow/spoil sites associated with the linear project. Land disturbance specific to the development of a residential and/or commercial subdivision or high-rise structures is not considered a linear project.

**"Monthly"** refers to calendar months.

**"Municipal Separate Storm Sewer System"** or **"MS4"** is defined at 40 CFR §122.26(b)(8) to mean a conveyance or system of conveyances (including roads with drainage systems, municipal streets, catch basins, curbs, gutters, ditches, manmade channels, or storm drains):
1. Owned and operated by a state, city, town, borough, county, parish, district, association, or other public body (created by or pursuant to state law) having jurisdiction over disposal of sewage, industrial wastes, stormwater, or other wastes, including special districts under state law such as a sewer district, flood control district or drainage district, or similar entity, or an Indian tribe or an authorized Indian tribal organization, or a designated and approved management agency under section 208 of the CWA that discharges to waters of the United States;
2. Designed or used for collecting or conveying stormwater;
3. Which is not a combined sewer; and
4. Which is not part of a Publicly Owned Treatment Works (POTW) as defined at 40 CFR §122.2.

**"NOI"** means notice of intent to be covered by this permit (see part 2 above of this permit.)

**"NOT"** means notice of termination (see part 8 above of this permit).

**"Operator"** for the purpose of this permit and in the context of stormwater associated with construction activity, means any person associated with a construction project that meets either of the following two criteria:

a) This person has operational or design control over construction plans and specifications, including the ability to make modifications to those plans and specifications. This person is typically the owner or developer of the project or a portion of the project, and is considered the primary permittee; or

b) This person has day-to-day operational control of those activities at a project which are necessary to ensure compliance with a SWPPP for the site or other permit conditions. This person is typically a contractor or a commercial builder who is hired by the primary permittee, and is considered a secondary permittee.

It is anticipated that at different phases of a construction project, different types of parties may satisfy the definition of "operator."

Case 1:18-cv-00029    Document 1-1    Filed 04/09/18    Page 93 of 153 PageID #: 124

**"Point source"** means any discernible, confined, and discrete conveyance, including but not limited to, any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, landfill leachate collection system, vessel or other floating craft from which pollutants are or may be discharged. This term does not include introduction of pollutants from non point-source agricultural and silvicultural activities, including stormwater runoff from orchards, cultivated crops, pastures, range lands, and forest lands or return flows from irrigated agriculture or agricultural stormwater runoff.

**"Qualifying State, Tribal, or local erosion and sediment control program"** is one that includes, as defined in 40 CFR 122.44(s):

    (i) Requirements for construction site operators to implement appropriate erosion and sediment control best management practices;

    (ii) Requirements for construction site operators to control waste such as discarded building materials, concrete truck washout, chemicals, litter, and sanitary waste at the construction site that may cause adverse impacts to water quality;

    (iii) Requirements for construction site operators to develop and implement a stormwater pollution prevention plan. (A stormwater pollution prevention plan includes site descriptions, descriptions of appropriate control measures, copies of approved State, Tribal or local requirements, maintenance procedures, inspection procedures, and identification of non-stormwater discharges); and

    (iv) Requirements to submit a site plan for review that incorporates consideration of potential water quality impacts.

**"Quality Assurance Site Assessment"** means documented site inspection to verify the functionality and performance of the SWPPP and for determining if construction, operation and maintenance accurately comply with permit requirements, as presented in the narrative, engineering specifications; maps, plans and drawings; and details for erosion prevention, sediment control and stormwater management.

**"Registered Engineer"** and **"Registered Landscape Architect"** An engineer or landscape architect certified and registered by the State Board of Architectural and Engineer Examiners pursuant to Section 62-202, Tennessee Code Annotated, to practice in Tennessee.

**"Runoff coefficient"** means the fraction of total rainfall that will appear at the conveyance as runoff. Runoff coefficient is also defined as the ratio of the amount of water that is NOT absorbed by the surface to the total amount of water that falls during a rainstorm.

**"Sediment"** means solid material, both inorganic (mineral) and organic, that is in suspension, is being transported, or has been moved from the site of origin by wind, water, gravity, or ice as a product of erosion.

**"Sediment basin"** A temporary basin consisting of an embankment constructed across a wet weather conveyance, or an excavation that creates a basin or by a combination of both. A sediment basin typically consists of a forebay cell, dam, impoundment, permanent pool, primary spillway, secondary or emergency spillway, and surface dewatering device. The size and shape of the basin depends on the location, size of drainage area, incoming runoff volume and peak flow, soil type and particle size, land cover, and receiving stream classification (i.e., impaired, HQ, or unimpaired).

"**Sedimentation**" means the action or process of forming or depositing sediment.

"**Significant contributor of pollutants to waters of the state**" means any discharge containing pollutants that are reasonably expected to cause or contribute to an impairment of receiving stream water quality or designated uses.

"**Soil**" means the unconsolidated mineral and organic material on the immediate surface of the earth that serves as a natural medium for the growth of plants.

"**Steep Slope**" A natural or created slope of 35% grade or greater. Designers of sites with steep slopes must pay attention to stormwater management in the SWPPP to engineer runoff non-erosively around or over a steep slope. In addition, site managers should focus on erosion prevention on the slope(s) and stabilize the slope(s) as soon as practicable to prevent slope failure and/or sediment discharges from the project.

"**Stormwater**" means rainfall runoff, snow melt runoff, and surface runoff and drainage.

"**Stormwater associated with industrial activity**" is defined at 40 CFR 122.26(b)(14) and incorporated here by reference. Most relevant to this permit is 40 CFR 122.26(b)(14)(x), which relates to construction activity including clearing, grading, filling and excavation activities (including borrow pits containing erodible material). Disturbance of soil for the purpose of crop production is exempted from permit requirements, but stormwater discharges from agriculture-related activities which involve construction of structures (e.g., barn construction, road construction, pond construction, etc.) are considered associated with industrial activity. Maintenance performed to maintain the original line and grade, hydraulic capacity, or original purpose of the facility, e.g. re-clearing, minor excavation performed around an existing structure necessary for maintenance or repair, and repaving of an existing road, is not considered a construction activity for the purpose of this permit.

"**Stormwater discharge-related activities**" include: activities which cause, contribute to, or result in point source stormwater pollutant discharges, including but not limited to: excavation, site development, grading and other surface disturbance activities; and measures to control stormwater including the siting, construction and operation of best management practices (BMPs) to control, reduce or prevent stormwater pollution.

"**Stormwater Pollution Prevention Plan**"(SWPPP): A written plan required by this permit that includes site map(s), an identification of construction/contractor activities that could cause pollutants in the stormwater, and a description of measures or practices to control these pollutants. It must be prepared and approved before construction begins. In order to effectively reduce erosion and sedimentation impacts, Best Management Practices (BMPs) must be designed, installed, and maintained during land disturbing activities. The SWPPP should be prepared in accordance with the Tennessee Erosion and Sediment Control Handbook. The handbook is designed to provide information to planners, developers, engineers, and contractors on the proper selection, installation, and maintenance of BMPs. The handbook is intended for use during the design and construction of projects that require erosion and sediment controls to protect waters of the state. It also aids in the development of SWPPPs and other reports, plans, or specifications required when participating in Tennessee's water quality regulations.

Case 1:18-cv-00029   Document 1-1   Filed 04/09/18   Page 95 of 153 PageID #: 126

"**Take**" of an endangered species means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect, or attempt to engage in any such conduct.

"**Temporary stabilization**" is achieved when vegetation and/or a non-erodible surface have been established on the area of disturbance and construction activity has temporarily ceased. Under certain conditions, temporary stabilization is required when construction activities temporarily cease. However, if future construction activity is planned, permit coverage continues.

"**Total maximum daily load**" (TMDL) The sum of the individual wasteload allocations for point sources and load allocations for nonpoint sources and natural background (40 CFR 130.2(I)). TMDL is a study that: quantifies the amount of a pollutant in a stream, identifies the sources of the pollutant, and recommends regulatory or other actions that may need to be taken in order for the stream to cease being polluted. Some of the actions that might be taken are:

1.) Re-allocation of limits on the sources of pollutants documented as impacting streams. It might be necessary to lower the amount of pollutants being discharged under NPDES permits or to require the installation of other control measures, if necessary, to ensure that water quality standards will be met.
2.) For sources over which the division does not have regulatory authority, such as ordinary agricultural or forestry activities, provide information and technical assistance to other state and federal agencies that work directly with these groups to install appropriate Best Management Practices (BMPs).

Even for impacted streams, TMDL development is not considered appropriate for all bodies of water: if enforcement has already been taken and a compliance schedule has been developed; or if best management practices have already been installed for non-regulated activities, the TMDL is considered not applicable. In cases involving pollution sources in other states, the recommendation may be that another state or EPA perform the TMDL . TMDLs can also be described by the following equation:

TMDL = sum of non point sources (LA)+ sum of point sources (WLA)+ margin of safety

A list of completed TMDLs that have been approved by EPA cab found at our web site: http://tn.gov/environment/wpc/tmdl/approved.shtml

"**Turbidity**" is the cloudiness or haziness of a fluid caused by individual particles (suspended solids) that are generally invisible to the naked eye, similar to smoke in air.

"**Waters**" or "**waters of the state**" means any and all water, public or private, on or beneath the surface of the ground, which are contained within, flow through, or border upon Tennessee or any portion thereof except those bodies of water confined to and retained within the limits of private property in single ownership which do not combine or effect a junction with natural surface or underground waters.

"**Waste site**" is an area where material from a construction site is disposed of. When the material is erodible, such as soil, the site must be treated as a construction site.

"**Wet weather conveyances**" are man-made or natural watercourses, including natural watercourses that have been modified by channelization that flow only in direct response to

Case 1:18-cv-00029   Document 1-1   Filed 04/09/18   Page 96 of 153 PageID #: 127

precipitation runoff in their immediate locality; whose channels are at all times above the ground water table; that are not suitable for drinking water supplies; and in which hydrological and biological analyses indicate that, under normal weather conditions, due to naturally occurring ephemeral or low flow there is not sufficient water to support fish or multiple populations of obligate lotic aquatic organisms whose life cycle includes an aquatic phage of at least two months. (Rules and Regulations of the State of Tennessee, Chapter 1200-4-3-.04(3)).

## 11.  LIST OF ACRONYMS

| | |
|---|---|
| ARAP | Aquatic Resource Alteration Permit |
| BMP | Best Management Practice |
| CERCLA | Comprehensive Environmental Response, Compensation and Liability Act |
| CGP | Construction General Permit |
| CWA | Clean Water Act |
| EFO | Environmental Field Office |
| EPA | (U.S.) Environmental Protection Agency |
| EPSC | Erosion Prevention and Sediment Control |
| MS4 | Municipal Separate Storm Sewer System |
| NOC | Notice of Coverage |
| NOI | Notice of Intent |
| NOT | Notice of Termination |
| NPDES | National Pollutant Discharge Elimination System |
| ONRW | Outstanding National Resource Waters |
| POTW | Publicly Owned Treatment Works |
| SWPPP | Stormwater Pollution Prevention Plan |
| TDEC | Tennessee Department of Environment and Conservation |
| TDOT | Tennessee Department of Transportation |
| TMDL | Total Maximum Daily Load |
| TMSP | Tennessee Multi-Sector General Permit for the Discharge of Stormwater from an Industrial Activity |
| TVA | Tennessee Valley Authority |
| TWQCA | Tennessee Water Quality Control Act |
| UIC | Underground Injection Control |
| USGS | United States Geological Survey |

(End of body of permit; appendices follow.)

**APPENDIX A – Notice of Intent (NOI) Form**
(next page)

Case 1:18-cv-00029    Document 1-1    Filed 04/09/18    Page 98 of 153 PageID #: 129



**TENNESSEE DEPARTMENT OF ENVIRONMENT AND CONSERVATION**
Division of Water Pollution Control
6ᵗʰ Floor Annex, L&C Tower, 401 Church Street, Nashville, Tennessee 37243
1-888-891-8332 (TDEC)

**Notice of Intent (NOI) for General NPDES Permit for Stormwater Discharges from Construction Activities (TNR100000)**

| Site or Project Name: | | NPDES Tracking Number: TNR |
|---|---|---|
| Street Address or Location: | | Construction Start Date: |
| Site Description: | | Estimated End Date: |
| | | Latitude (dd,dddd): |
| | | Longitude (-dd,dddd): |
| County(ies): | MS4 Jurisdiction: | Acres Disturbed: |
| | | Total Acres: |

Does a topographic map show dotted or solid blue lines ☐ and/or wetlands ☐ on or adjacent to the construction site?
If wetlands are located on-site and may be impacted, attach wetlands delineation report.
If an Aquatic Resource Alteration Permit has been obtained for this site, what is the permit number?     ARAP Number:

Receiving waters:

| Attach the SWPPP with the NOI | ☐ SWPPP Attached | Attach a site location map | ☐ Map Attached |
|---|---|---|---|

**Name of Site Owner or Developer (Site-Wide Permittee):** (person, company, or legal entity that has operational or design control over construction plans and specifications)

| Site Owner or Developer Contact Name: (individual responsible for site) | | Title or Position: (the party who signs the certification below): | | |
|---|---|---|---|---|
| Mailing Address: | | City: | State: | Zip: |
| Phone: ( ) | Fax: ( ) | E-mail: | | |

| Optional Contact: | | Title or Position: | | |
|---|---|---|---|---|
| Mailing Address: | | City: | State: | Zip: |
| Phone: ( ) | Fax: ( ) | E-mail: | | |

**Owner or Developer Certification:** (must be signed by president, vice-president or equivalent, or ranking elected official) (Primary Permittee)

I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

| Owner or Developer Name: (print or type) | Signature: | Date: |
|---|---|---|

**Contractor(s) Certification:** (must be signed by president, vice-president or equivalent, or ranking elected official) (Secondary Permittee)

I certify under penalty of law that I have reviewed this document, any attachments, and the SWPPP referenced above. Based on my inquiry of the construction site owner/developer identified above and/or my inquiry of the person directly responsible for assembling this NOI and SWPPP, I believe the information submitted is accurate. I am aware that this NOI, if approved, makes the above-described construction activity subject to NPDES permit number TNR100000, and that certain of my activities on-site are thereby regulated. I am aware that there are significant penalties, including the possibility of fine and imprisonment for knowing violations, and for failure to comply with these permit requirements.

| Primary contractor name and address: (print or type) | Signature: | Date: |
|---|---|---|
| Other contractor name and address: (print or type) | Signature: | Date: |
| Other contractor name and address: (print or type) | Signature: | Date: |

**OFFICIAL STATE USE ONLY**

| Received Date: | Reviewer: | Field Office: | Permit Number TNR | Exceptional TN Water: |
|---|---|---|---|---|
| Fee(s): | T & E Aquatic Flora and Fauna: | | Impaired Receiving Stream: | Notice of Coverage Date: |

CN-0940 (Rev. 4-11)                    (Instructions on reverse)                    RDAs 2399 and 2400

**APPENDIX A**

Case 1:18-cv-00029     Document 1-1     Filed 04/09/18     Page 99 of 153 PageID #: 130

# CONSTRUCTION ACTIVITY – STORMWATER DISCHARGES
## NOTICE OF INTENT (NOI) - INSTRUCTIONS
### Notice of Intent (NOI) for General NPDES Permit for Stormwater Discharges from Construction Activities (TNR100000)

Purpose of this form  A completed notice of intent (NOI) must be submitted to obtain coverage under the Tennessee General NPDES Permit for Discharges of Stormwater Associated with Construction Activity (permit). **Requesting coverage under this permit means that an applicant has obtained and examined a copy of this permit, and thereby acknowledges applicant's claim of ability to be in compliance with permit terms and conditions.** This permit is required for stormwater discharge(s) from construction activities including clearing, grading, filling and excavating (including borrow pits) of one or more acres of land. This form should be submitted at least 30 days prior to the commencement of land disturbing activities, or no later than 48 hours prior to when a new operator assumes operational control over site specifications or commences work at the site.

Permit fee (see table below) must accompany the NOI and is based on total acreage to be disturbed by an entire project, including any associated construction support activities (e.g. equipment staging yards, material storage areas, excavated material disposal areas, borrow or waste sites). There is no fee for sites less than 1 acre.

| Acres Disturbed | = or > 150 acres | = or > 50 < 150 acres | = or > 5 < 50 acres | = or > 1 < 5 acres |
|---|---|---|---|---|
| Fee | $7,500 | $4,000 | $1,000 | $250 |

Who must submit the NOI form?  Per Section 2 of the permit, all site operators must submit an NOI form. "Operator" for the purpose of this permit and in the context of stormwater associated with construction activity means any person associated with a construction project who meets either or both of the following two criteria: (1) The person has operational or design control over construction plans and specifications, including the ability to make modifications to those plans and specifications. This person is typically the owner or developer of the project or a portion of the project (e.g. subsequent builder), or the person that is the current land owner of the construction site. This person is considered the primary permittee; or (2) The person has day-to-day operational control of those activities at a project which are necessary to ensure compliance with a SWPPP for the site or other permit conditions. This person is typically a contractor or a commercial builder who is hired by the primary permittee, and is considered a secondary permittee.

Owners, developers and all contractors that meet the definition of the operator in subsection 2.2 of the permit shall apply for permit coverage on the same NOI, insofar as possible. After permit coverage has been granted to the primary permittee, any subsequent NOI submittals must include the site's previously assigned permit tracking number and the project name. The comprehensive site-specific SWPPP shall be prepared in accordance with the requirements of part 3 of the permit and must be submitted with the NOI unless the NOI being submitted is to only add a contractor (secondary permittee) to an existing coverage.

Notice of Coverage  The division will review the NOI for completeness and accuracy and prepare a notice of coverage (NOC). Stormwater discharge from the construction site is authorized on the effective date of the NOC.

Complete the form  Type or print clearly, using ink and not markers or pencil. Answer each item or enter "NA," for not applicable, if a particular item does not fit the circumstances or characteristics of your construction site or activity. If you need additional space, attach a separate piece of paper to the NOI form. **The NOI will be considered incomplete without a permit fee, a map, and the SWPPP.**

Describe and locate the project  Use the legal or official name of the construction site. If a construction site lacks street name or route number, give the most accurate geographic information available to describe the location (reference to adjacent highways, roads and structures; e.g. intersection of state highways 70 and 100). Latitude and longitude (expressed in decimal degrees) of the center of the site can be located on USGS quadrangle maps. The quadrangle maps can be obtained at the USGS World Wide Web site: http://www.usgs.gov/; latitude and longitude information can be found at numerous other web sites. Attach a copy of a portion of a 7.5 minute quad map, showing location of site, with boundaries at least one mile outside the site boundaries. Provide estimated starting date of clearing activities and completion date of the project, and an estimate of the number of acres of the site on which soil will be disturbed, including borrow areas, fill areas, stockpiles and the total acres. For linear projects, give location at each end of the construction area.

Give name of the receiving waters  Trace the route of stormwater runoff from the construction site and determine the name of the river(s), stream(s), creek(s), wetland(s), lake(s) or any other water course(s) into which the stormwater runoff drains. Note that the receiving water course may or may not be located on the construction site. If the first water body receiving construction site runoff is unnamed ("unnamed tributary"), determine the name of the water body that the unnamed tributary enters.

ARAP permit may be required  **If your work will disturb or cause alterations of a stream or wetland, you must obtain an appropriate Aquatic Resource Alteration Permit (ARAP).** If you have a question about the ARAP program or permits, contact your local Environmental Field Office (EFO).

Submitting the form and obtaining more information  Note that this form must be signed by the company President, Vice-President, or a ranking elected official in the case of a municipality, for details see subpart 2.5. For more information, contact your local EFO at the toll-free number 1-888-891-8332 (TDEC). Submit the completed NOI form (keep a copy for your records) to the appropriate EFO for the county(ies) where the construction activity is located, addressed to Attention: **Stormwater NOI Processing.**

| EFO | Street Address | Zip Code | EFO | Street Address | Zip Code |
|---|---|---|---|---|---|
| Memphis | 8383 Wolf Lake Drive, Bartlett | 38133-4119 | Cookeville | 1221 South Willow Ave. | 38506 |
| Jackson | 1625 Hollywood Drive | 38305-4316 | Chattanooga | 540 McCallie Avenue STE 550 | 37402-2013 |
| Nashville | 711 R S Gass Boulevard | 37243 | Knoxville | 3711 Middlebrook Pike | 37921 |
| Columbia | 1421 Hampshire Pike | 38401 | Johnson City | 2305 Silverdale Road | 37601 |

**APPENDIX A**

Case 1:18-cv-00029    Document 1-1    Filed 04/09/18    Page 100 of 153 PageID #: 131

**APPENDIX B -- Notice of Termination (NOT) Form**
(next page)



**TENNESSEE DEPARTMENT OF ENVIRONMENT AND CONSERVATION (TDEC)**
Division of Water Pollution Control (WPC)
6th Floor Annex, L&C Tower, 401 Church Street, Nashville, Tennessee 37243
1-888-891-TDEC (8332)
**Notice of Termination (NOT) for General NPDES Permit for Stormwater Discharges from Construction Activities (CGP)**

This form is required to be submitted when requesting termination of coverage from the CGP. The purpose of this form is to notify the TDEC that either all stormwater discharges associated with construction activity from the portion of the identified facility where you, as an operator, have ceased or have been eliminated; or you are no longer an operator at the construction site. Submission of this form shall in no way relieve the permittee of permit obligations required prior to submission of this form. Please submit this form to the local WPC Environmental Field Office (EFO) address (see table below). For more information, contact your local EFO at the toll-free number 1-888-891-8332 (TDEC).

**Type or print clearly, using ink and not markers or pencil.**

| Site or Project Name: | NPDES Tracking Number: TNR |
|---|---|
| Street Address or Location: | County(ies): |

| Name of Permittee Requesting Termination of Coverage: | | | |
|---|---|---|---|
| Permittee Contact Name : | Title or Position: | | |
| Mailing Address: | City: | State: | Zip: |
| Phone: ( ) | E-mail: | | |

**Check the reason(s) for termination of permit coverage:**

| | |
|---|---|
| ☐ | Stormwater discharge associated with construction activity is no longer occurring and the permitted area has a uniform 70% permanent vegetative cover OR has equivalent measures such as rip rap or geotextiles, in areas not covered with impervious surfaces. |
| ☐ | You are no longer the operator at the construction site (i.e., termination of site-wide, primary or secondary permittee coverage). |

**Certification and Signature: (must be signed by president, vice-president or equivalent ranking elected official)**

I certify under penalty of law that either: (a) all stormwater discharges associated with construction activity from the portion of the identified facility where I was an operator have ceased or have been eliminated or (b) I am no longer an operator at the construction site. I understand that by submitting this notice of termination, I am no longer authorized to discharge stormwater associated with construction activity under this general permit, and that discharging pollutants in stormwater associated with construction activity to waters of the United States is unlawful under the Clean Water Act where the discharge is not authorized by a NPDES permit. I also understand that the submittal of this notice of termination does not release an operator from liability for any violations of this permit or the Clean Water Act.

For the purposes of this certification, elimination of stormwater discharges associated with construction activity means that all disturbed soils at the portion of the construction site where the operator had control have been finally stabilized, the temporary erosion and sediment control measures have been removed, and/or the site or portions of the site have obtained permit coverage by subsequent operators or that all stormwater discharges associated with construction activities from the identified site that are authorized by a NPDES general permit have otherwise been eliminated from the portion of the construction site where the operator had control.

| Permittee name (print or type): | Signature: | Date: |
|---|---|---|
| | | |

| EFO | Street Address | Zip Code | EFO | Street Address | Zip Code |
|---|---|---|---|---|---|
| Memphis | 8383 Wolf Lake Drive, Bartlett, TN | 38133 | Cookeville | 1221 South Willow Ave. | 38506 |
| Jackson | 1625 Hollywood Drive | 38305 | Chattanooga | 540 McCallie Avenue STE 550 | 37402 |
| Nashville | 711 R S Gass Boulevard | 37243 | Knoxville | 3711 Middlebrook Pike | 37921 |
| Columbia | 1421 Hampshire Pike | 38401 | Johnson City | 2305 Silverdale Road | 37601 |

CN-1175 (Rev. 4-11)                                                                 RDAs 2399 and 2400

**APPENDIX B**

Case 1:18-cv-00029    Document 1-1    Filed 04/09/18    Page 102 of 153 PageID #: 133

**APPENDIX C – Twice-Weekly Inspection Report Form**
(next page)



# CGP Inspection Worksheet for Twice-Weekly Inspections of Erosion Prevention and Sediment Controls

| Site or Project Name: | | NPDES Tracking Number: TNR |
|---|---|---|
| Primary Permittee Name: | | Date of Inspection: |
| Current approximate disturbed acreage: | Has daily rainfall been documented? ☐ Yes ☐ No | Name of Inspector: |
| Current weather/site conditions: | | Inspector's TNEPSC Certification Number: |

**Please check the box if the following items are on-site:**

☐ Notice of Coverage (NOC)   ☐ Stormwater Pollution Prevention Plan (SWPPP)   ☐ Twice weekly inspection documentation

☐ Site contact information   ☐ Rain Gage   ☐ Off-site Reference Rain Gage Location: _____

**Best Management Practices (BMPs):**

| | Are the Erosion Prevention and Sediment Controls (EPSCs) functioning correctly in the following locations: | | |
|---|---|---|---|
| 1. | Disturbed areas/material storage areas | ☐ Yes | ☐ No |
| 2. | Outfall points (or nearest accessible downstream point if an outfall is inaccessible) | ☐ Yes | ☐ No |
| 3. | Construction ingress/egress points | ☐ Yes | ☐ No |

If the answer is "No" for any of the above, please describe the problem and corrective actions to be taken. Otherwise, describe any pertinent observations:

| | | | |
|---|---|---|---|
| 4. | Are (EPSCs) installed and maintained in the field per SWPPP? If "No", describe below. | ☐ Yes | ☐ No |
| 5. | Have site discharges caused an objectionable color contrast in the receiving stream (Permit section 5.3.2)? If "Yes", describe below the measures implemented to eliminate contrast. | ☐ Yes | ☐ No |
| 6. | Have discharges from dewatering activities been managed by appropriate controls per Section 4.1.4 of the Permit? If "No", describe below the measures to be implemented to achieve compliance. | ☐ Yes | ☐ No |
| 7. | If construction activity at any location on-site has temporarily/permanently ceased, was the area stabilized within 14 days per Section 3.5.3.2? If, "No", describe below each location and measures taken to stabilize the area(s). | ☐ Yes | ☐ No |
| 8. | Are non-stormwater discharges (per Section 1.2.3) and housekeeping measures such as storing chemicals, construction related debris litter, oils, fuels, building products, truck wash (per Section 3.5.3.1 (f) and (g)) being properly managed? If "No", describe below the measures to be implemented to achieve compliance. | ☐ Yes | ☐ No |
| 9. | If a concrete washout facility is located on site, is it clearly identified on the project and maintained? If "No", describe below the measures to be implemented to achieve compliance.   ☐ N/A | ☐ Yes | ☐ No |
| 10. | Have all previous deficiencies been addressed? If not, describe the remaining deficiencies. ☐ Check if deficiencies/corrective measures have been reported on a previous form. | ☐ Yes | ☐ No |

| **Certification and Signature** (must be signed by the certified inspector and the permittee per Sections 3.5.8.2 (g) and 7.7.2 of the CGP) | | |
|---|---|---|

I certify under penalty of law that this report and all attachments are, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

| Inspector Name and Title (print or type): | Signature: | Date: |
|---|---|---|
| Permittee Name and Title (print or type): | Signature: | Date: |

Case 1:18-cv-00029    Document 1-1    Filed 04/09/18    Page 104 of 153 PageID #: 135

# CGP Inspection Worksheet for Twice-Weekly Inspections of Erosion Prevention and Sediment Controls

## Purpose of this form/ Instructions

An inspection, as described in section 3.5.8.2.of the General Permit for Stormwater Discharges from Construction Activities ("Permit"), shall be performed at least twice every calendar week and documented on this form. Inspections shall be performed at least 72 hours apart. Where sites or portion(s) of construction sites have been temporarily stabilized, or runoff is unlikely due to winter conditions (e.g., site covered with snow or ice), such inspection only has to be conducted once per month until thawing results in runoff or construction activity resumes.

Inspectors performing the required twice weekly inspections must have an active certification by completing the "Fundamentals of Erosion Prevention and Sediment Control Level I" course. (http://www.tnepsc.org/). A copy of the certification or training record for inspector certification should be kept on site.

Qualified personnel, as defined in section 3.5.8.1 of the Permit (provided by the permittee or cooperatively by multiple permittees) shall inspect disturbed areas of the construction site that have not been finally stabilized, areas used for storage of materials that are exposed to precipitation, structural control measures, locations where vehicles enter or exit the site, and each outfall.

Disturbed areas and areas used for storage of materials that are exposed to precipitation shall be inspected for evidence of, or the potential for, pollutants entering the site's drainage system. Erosion prevention and sediment control measures shall be observed to ensure that they are operating correctly.

Outfall points (where discharges leave the site and/or enter waters of the state) shall be inspected to determine whether erosion prevention and sediment control measures are effective in preventing significant impacts to receiving waters. Where discharge locations are inaccessible, nearby downstream locations shall be inspected. Locations where vehicles enter or exit the site shall be inspected for evidence of offsite sediment tracking.

Based on the results of the inspection, any inadequate control measures or control measures in disrepair shall be replaced or modified, or repaired as necessary, before the next rain event if possible, but in no case more than 7 days after the need is identified.

Based on the results of the inspection, the site description identified in the SWPPP in accordance with section 3.5.1 of the Permit and pollution prevention measures identified in the SWPPP in accordance with section 3.5.2 of the Permit, shall be revised as appropriate, but in no case later than 7 days following the inspection. Such modifications shall provide for timely implementation of any changes to the SWPPP, but in no case later than 14 days following the inspection.

All inspections shall be documented on this Construction Stormwater Inspection Certification form. Alternative inspection forms may be used as long as the form contents and the inspection certification language are, at a minimum, equivalent to the division's form and the permittee has obtained a written approval from the division to use the alternative form. Inspection documentation will be maintained on site and made available to the division upon request. Inspection reports must be submitted to the division within 10 days of the request. If the division requests the Construction Stormwater Inspection Certification form to be submitted, the submitted form must contain the printed name and signature of the trained certified inspector and the person who meets the signatory requirements of section 7.7.2 of the Permit.

Trained certified inspectors shall complete inspection documentation to the best of their ability. Falsifying inspection records or other documentation or failure to complete inspection documentation shall result in a violation of this permit and any other applicable acts or rules.

Case 1:18-cv-00029    Document 1-1    Filed 04/09/18    Page 105 of 153 PageID #: 136

(This page intentionally left blank)

**APPENDIX 5**

**NOI/NOT**



**TENNESSEE DEPARTMENT OF ENVIRONMENT AND CONSERVATION (TDEC)**
Division of Water Pollution Control (WPC)
6th Floor Annex, L&C Tower, 401 Church Street, Nashville, Tennessee 37243
1-888-891-TDEC (8332)
**Notice of Termination (NOT) for General NPDES Permit for Stormwater Discharges from Construction Activities (CGP)**

This form is required to be submitted when requesting termination of coverage from the CGP. The purpose of this form is to notify the TDEC that either all stormwater discharges associated with construction activity from the portion of the identified facility where you, as an operator, have ceased or have been eliminated; or you are no longer an operator at the construction site. Submission of this form shall in no way relieve the permittee of permit obligations required prior to submission of this form. Please submit this form to the local WPC Environmental Field Office (EFO) address (see table below). For more information, contact your local EFO at the toll-free number 1-888-891-8332 (TDEC).

**Type or print clearly, using ink and not markers or pencil.**

| Site or Project Name: | NPDES Tracking Number: TNR |
|---|---|
| Street Address or Location: | County(ies): |

| Name of Permittee Requesting Termination of Coverage: | | | |
|---|---|---|---|
| Permittee Contact Name: | Title or Position: | | |
| Mailing Address: | City: | State: | Zip: |
| Phone: ( ) | E-mail: | | |

**Check the reason(s) for termination of permit coverage:**

☐ Stormwater discharge associated with construction activity is no longer occurring and the permitted area has a uniform 70% permanent vegetative cover OR has equivalent measures such as rip rap or geotextiles, in areas not covered with impervious surfaces.

☐ You are no longer the operator at the construction site (i.e., termination of site-wide, primary or secondary permittee coverage).

**Certification and Signature: (must be signed by president, vice-president or equivalent ranking elected official)**

I certify under penalty of law that either: (a) all stormwater discharges associated with construction activity from the portion of the identified facility where I was an operator have ceased or have been eliminated or (b) I am no longer an operator at the construction site. I understand that by submitting this notice of termination, I am no longer authorized to discharge stormwater associated with construction activity under this general permit, and that discharging pollutants in stormwater associated with construction activity to waters of the United States is unlawful under the Clean Water Act where the discharge is not authorized by a NPDES permit. I also understand that the submittal of this notice of termination does not release an operator from liability for any violations of this permit or the Clean Water Act.

For the purposes of this certification, elimination of stormwater discharges associated with construction activity means that all disturbed soils at the portion of the construction site where the operator had control have been finally stabilized, the temporary erosion and sediment control measures have been removed, and/or the site or portions of the site have obtained permit coverage by subsequent operators or that all stormwater discharges associated with construction activities from the identified site that are authorized by a NPDES general permit have otherwise been eliminated from the portion of the construction site where the operator had control.

| Permittee name (print or type): | Signature: | Date: |
|---|---|---|

| EFO | Street Address | Zip Code | EFO | Street Address | Zip Code |
|---|---|---|---|---|---|
| Memphis | 8383 Wolf Lake Drive, Bartlett, TN | 38133 | Cookeville | 1221 South Willow Ave. | 38506 |
| Jackson | 1625 Hollywood Drive | 38305 | Chattanooga | 540 McCallie Avenue STE 550 | 37402 |
| Nashville | 711 R S Gass Boulevard | 37243 | Knoxville | 3711 Middlebrook Pike | 37921 |
| Columbia | 1421 Hampshire Pike | 38401 | Johnson City | 2305 Silverdale Road | 37601 |

CN-1175 (Rev. 4-11)                                                                 RDAs 2399 and 2400

# EXHIBIT 4

# AERIAL PHOTOGRAPHS OF SEDIMENT BASIN FOR WASTE RELOCATION AREA



Aerial Photograph of ACC Landfill – 10/25/2014



Aerial Photograph of ACC Landfill – 11/25/2014



Aerial Photograph of ACC Landfill – 12/26/2014



Aerial Photograph of ACC Landfill – 1/25/2015



Aerial Photograph of ACC Landfill – 2/25/2015



Aerial Photograph of ACC Landfill – 7/25/2017

# EXHIBIT 5

# TVA MPLT1 WEATHER STATION PRECIPITATION DATA

| Tennessee Valley Authority - River Scheduling | | | | | |
|---|---|---|---|---|---|
| Daily Precipitation for August, 2017 (inches) | | | | | |
| | | | | | |
| Gage ID - Location (Operator) | 8/1-Tue | 8/2-Wed | 8/3-Thu | 8/4-Fri | 8/5-Sat |
| MPLT1 - Mount Pleasant, TN () | 0.00 | 0.00(E) | 0.00 | 0.00 | 0.00 |
| (E) - Denotes estimated data.  Data may be estimated due to factors affecting the accuracy or availability | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| 8/6-Sun | 8/7-Mon | 8/8-Tue | 8/9-Wed | 8/10-Thu | 8/11-Fri | 8/12-Sat | 8/13-Sun |
| 0.06 | 1.22 | 0.00 | 0.00 | 0.00 | 0.91 | 0.00 | 0.00 |
| of actual gage measurements. | | | | | | | |

| | 8/14-Mon | 8/15-Tue | 8/16-Wed | 8/17-Thu | 8/18-Fri | 8/19-Sat | 8/20-Sun | 8/21-Mon |
|---|---|---|---|---|---|---|---|---|
| | 0.88 | 0.22 | 0.01 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 |

| | 8/22-Tue | 8/23-Wed | 8/24-Thu | 8/25-Fri | 8/26-Sat | 8/27-Sun | 8/28-Mon | 8/29-Tue |
|---|---|---|---|---|---|---|---|---|
| | 0.39 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | | | | | | | |

| | | |
|---|---|---|
| | | |
| | | |
| 8/30-Wed | 8/31-Thu | Monthly Total |
| 0.13 | 3.28 | 7.13 |
| | | |

| Tennessee Valley Authority - River Scheduling | | | | | |
|---|---|---|---|---|---|
| Daily Precipitation for September, 2017 (inches) | | | | | |
| | | | | | |
| Gage ID - Location (Operator) | 9/1-Fri | 9/2-Sat | 9/3-Sun | 9/4-Mon | 9/5-Tue |
| MPLT1 - Mount Pleasant, TN () | 0.58 | 0.00 | 0.00 | 0.00 | 0.03 |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| 9/6-Wed | 9/7-Thu | 9/8-Fri | 9/9-Sat | 9/10-Sun | Monthly Total |
| 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.61 |

# EXHIBIT 6

## NATIONAL WEATHER SERVICE POINT
## PRECIPITATION FREQUENCY ESTIMATES



**NOAA Atlas 14, Volume 2, Version 3**
Location name: **Mount Pleasant, Tennessee,**
**USA***
Latitude: 35.4931°, Longitude: -87.1786°
Elevation: 745.01 ft**
* source: ESRI Maps
** source: USGS



### POINT PRECIPITATION FREQUENCY ESTIMATES

G.M. Bonnin, D. Martin, B. Lin, T. Parzybok, M.Yekta, and D. Riley

NOAA, National Weather Service, Silver Spring, Maryland

PF_tabular | PF_graphical | Maps_&_aerials

### PF tabular

| Duration | \multicolumn{10}{c}{PDS-based point precipitation frequency estimates with 90% confidence intervals (in inches)[1]} |
|---|---|

| Duration | \multicolumn{10}{c}{Average recurrence interval (years)} |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 5 | 10 | 25 | 50 | 100 | 200 | 500 | 1000 |
| 5-min | 0.411 (0.378-0.450) | 0.485 (0.447-0.532) | 0.568 (0.522-0.622) | 0.637 (0.583-0.696) | 0.730 (0.664-0.798) | 0.804 (0.726-0.877) | 0.880 (0.789-0.961) | 0.980 (0.853-1.05) | 1.07 (0.936-1.17) | 1.16 (1.00-1.27) |
| 10-min | 0.656 (0.604-0.719) | 0.776 (0.714-0.851) | 0.910 (0.835-0.997) | 1.02 (0.933-1.11) | 1.16 (1.06-1.27) | 1.28 (1.16-1.40) | 1.40 (1.25-1.53) | 1.52 (1.35-1.66) | 1.69 (1.48-1.85) | 1.82 (1.58-1.99) |
| 15-min | 0.820 (0.755-0.899) | 0.976 (0.898-1.07) | 1.15 (1.06-1.26) | 1.29 (1.18-1.41) | 1.48 (1.34-1.61) | 1.62 (1.46-1.77) | 1.77 (1.59-1.93) | 1.92 (1.71-2.09) | 2.13 (1.86-2.32) | 2.29 (1.98-2.50) |
| 30-min | 1.12 (1.03-1.23) | 1.35 (1.24-1.48) | 1.64 (1.50-1.79) | 1.87 (1.71-2.04) | 2.19 (1.99-2.39) | 2.44 (2.21-2.66) | 2.71 (2.43-2.96) | 2.99 (2.66-3.26) | 3.38 (2.97-3.70) | 3.70 (3.21-4.05) |
| 60-min | 1.40 (1.29-1.54) | 1.69 (1.56-1.85) | 2.10 (1.93-2.30) | 2.43 (2.23-2.66) | 2.91 (2.65-3.18) | 3.31 (2.99-3.61) | 3.73 (3.35-4.07) | 4.19 (3.73-4.57) | 4.85 (4.25-5.31) | 5.40 (4.68-5.91) |
| 2-hr | 1.62 (1.48-1.78) | 1.94 (1.78-2.13) | 2.40 (2.20-2.64) | 2.79 (2.54-3.07) | 3.35 (3.03-3.67) | 3.82 (3.43-4.18) | 4.33 (3.85-4.73) | 4.87 (4.30-5.33) | 5.67 (4.93-6.22) | 6.35 (5.45-6.97) |
| 3-hr | 1.75 (1.61-1.93) | 2.10 (1.93-2.31) | 2.59 (2.38-2.84) | 3.01 (2.75-3.29) | 3.60 (3.26-3.93) | 4.09 (3.69-4.48) | 4.62 (4.13-5.05) | 5.20 (4.61-5.68) | 6.03 (5.27-6.60) | 6.73 (5.81-7.37) |
| 6-hr | 2.19 (2.01-2.40) | 2.61 (2.39-2.86) | 3.18 (2.92-3.49) | 3.67 (3.36-4.02) | 4.37 (3.96-4.77) | 4.95 (4.47-5.40) | 5.57 (4.99-6.08) | 6.24 (5.54-6.81) | 7.20 (6.32-7.87) | 7.99 (6.93-8.76) |
| 12-hr | 2.66 (2.44-2.91) | 3.17 (2.91-3.48) | 3.86 (3.54-4.23) | 4.44 (4.06-4.86) | 5.25 (4.77-5.75) | 5.93 (5.36-6.48) | 6.65 (5.96-7.26) | 7.41 (6.60-8.10) | 8.49 (7.48-9.29) | 9.37 (8.17-10.3) |
| 24-hr | 3.27 (3.03-3.54) | 3.91 (3.63-4.24) | 4.76 (4.42-5.16) | 5.44 (5.03-5.88) | 6.36 (5.87-6.87) | 7.10 (6.53-7.66) | 7.85 (7.20-8.47) | 8.62 (7.88-9.30) | 9.68 (8.79-10.4) | 10.5 (9.49-11.3) |
| 2-day | 3.88 (3.59-4.21) | 4.64 (4.29-5.04) | 5.65 (5.22-6.14) | 6.45 (5.95-7.01) | 7.55 (6.94-8.18) | 8.42 (7.73-9.11) | 9.31 (8.51-10.1) | 10.2 (9.31-11.1) | 11.5 (10.4-12.4) | 12.4 (11.2-13.5) |
| 3-day | 4.14 (3.85-4.47) | 4.95 (4.60-5.35) | 6.01 (5.58-6.50) | 6.84 (6.34-7.38) | 7.95 (7.35-8.57) | 8.82 (8.13-9.51) | 9.69 (8.91-10.4) | 10.6 (9.69-11.4) | 11.8 (10.7-12.7) | 12.7 (11.5-13.7) |
| 4-day | 4.41 (4.11-4.73) | 5.26 (4.91-5.66) | 6.38 (5.94-6.85) | 7.23 (6.73-7.76) | 8.35 (7.75-8.96) | 9.22 (8.54-9.90) | 10.1 (9.32-10.8) | 10.9 (10.1-11.8) | 12.1 (11.1-13.0) | 12.9 (11.8-14.0) |
| 7-day | 5.19 (4.87-5.53) | 6.19 (5.81-6.59) | 7.43 (6.97-7.92) | 8.37 (7.85-8.91) | 9.60 (8.99-10.2) | 10.5 (9.86-11.2) | 11.5 (10.7-12.2) | 12.4 (11.5-13.2) | 13.6 (12.6-14.5) | 14.5 (13.3-15.4) |
| 10-day | 5.90 (5.54-6.27) | 7.00 (6.59-7.44) | 8.33 (7.84-8.85) | 9.35 (8.80-9.93) | 10.7 (10.0-11.3) | 11.7 (11.0-12.4) | 12.7 (11.9-13.5) | 13.7 (12.8-14.5) | 15.0 (13.9-15.9) | 16.0 (14.8-17.0) |
| 20-day | 8.10 (7.66-8.55) | 9.56 (9.05-10.1) | 11.1 (10.5-11.8) | 12.3 (11.6-13.0) | 13.7 (12.9-14.5) | 14.7 (13.9-15.6) | 15.7 (14.8-16.6) | 16.6 (15.6-17.6) | 17.8 (16.7-18.8) | 18.6 (17.4-19.6) |
| 30-day | 9.98 (9.47-10.5) | 11.7 (11.1-12.3) | 13.5 (12.8-14.2) | 14.7 (13.9-15.5) | 16.2 (15.4-17.1) | 17.3 (16.4-18.2) | 18.3 (17.3-19.3) | 19.3 (18.2-20.3) | 20.4 (19.2-21.5) | 21.2 (19.9-22.4) |
| 45-day | 12.5 (11.9-13.2) | 14.7 (14.0-15.4) | 16.7 (15.9-17.5) | 18.1 (17.2-19.0) | 19.9 (18.9-20.9) | 21.2 (20.1-22.2) | 22.3 (21.1-23.4) | 23.4 (22.1-24.5) | 24.6 (23.3-25.9) | 25.5 (24.1-26.8) |
| 60-day | 15.0 (14.3-15.8) | 17.6 (16.7-18.5) | 19.9 (18.9-20.9) | 21.6 (20.5-22.7) | 23.8 (22.4-24.8) | 25.0 (23.7-26.3) | 26.2 (24.8-27.6) | 27.4 (25.9-28.8) | 28.7 (27.1-30.3) | 29.6 (28.0-31.3) |

[1] Precipitation frequency (PF) estimates in this table are based on frequency analysis of partial duration series (PDS).

Numbers in parenthesis are PF estimates at lower and upper bounds of the 90% confidence interval. The probability that precipitation frequency estimates (for a given duration and average recurrence interval) will be greater than the upper bound (or less than the lower bound) is 5%. Estimates at upper bounds are not checked against probable maximum precipitation (PMP) estimates and may be higher than currently valid PMP values.
Please refer to NOAA Atlas 14 document for more information.

Back to Top

# PF graphical



PDS-based depth-duration-frequency (DDF) curves
Latitude: 35.4931°, Longitude: -87.1786°



NOAA Atlas 14, Volume 2, Version 3          Created (GMT): Mon Sep 11 16:10:25 2017

Back to Top

## Maps & aerials

### Small scale terrain



### Large scale terrain



### Large scale map



**Large scale aerial**



Back to Top

US Department of Commerce
National Oceanic and Atmospheric Administration
National Weather Service
National Water Center
1325 East West Highway
Silver Spring, MD 20910
Questions?: HDSC.Questions@noaa.gov

Disclaimer

# EXHIBIT 7

## GROUND LEVEL PHOTOGRAPHS FROM 9/1/2017



Confluence of unnamed tributary with Sugar Creek – 9/1/2017



Stormwater runoff from ACC in unnamed tributary entering SLLI property – 9/1/2017



Arrow Lake Dam Spillway – 9/1/2017



Sugar Creek just after the Arrow Lake Dam spillway – 9/1/2017

# EXHIBIT 8

## PHOTOGRAPHS OF SAMPLES COLLECTED 9/1/2017



Samples collected (L to R) from Arrow Lake spillway, Sugar Creek just upstream of SLLI property and unnamed tributary to Sugar Creek – 9/1/2017

# EXHIBIT 9

## 8/25/2017 AERIAL PHOTOGRAPHS



Aerial Photograph of ACC Landfill – 8/25/2017



# EXHIBIT 10

## 3/24/2017 AERIAL PHOTOGRAPHS OF WASTE RELOCATION AREA



Cattle grazing on Waste Relocation Area – 3/24/2017



Waste Relocation Area and Sediment Basin – 3/24/2017

# EXHIBIT 11

# GROUND LEVEL AND AERIAL PHOTOGRAPHS OF VARIOUS STORM EVENTS



Confluence of unnamed tributary and Sugar Creek – 2/10/2013



Sediment on bottom of Unnamed Tributary to Sugar Creek at ACC Discharge – 3/04/2013



Discharge from ACC onto SLLI Property – 3/11/2013



Arrow Lake with Sediment on far side – 3/11/2013



Sediment laden water in Arrow Lake – 3/18/2013



Sediment laden water separated from clean water in Arrow Lake – 3/18/2013



Stormwater overflowing sediment pond emergency spillway on ACC property – 4/11/2013



Discharge from north culvert from ACC into woods leading directly into Arrow Lake – 4/11/2013



Sediment laden water in Arrow Lake – 4/11/2013



Sediment free water discharging from Arrow Lake – 4/11/2013



Stormwater overflowing sediment pond emergency spillway on ACC property – 7/14/2013



Sediment laden water in Arrow Lake – 7/14/2013



Stormwater overflowing sediment pond emergency spillway on ACC property – 7/21/2013



Aerial photograph of sediment in Arrow Lake – 2/21/2014



Sediment laden water in Arrow Lake – 3/3/2014



Samples from ACC discharge in unnamed tributary on SLLI property – 3/3/2014



Stormwater Discharge exiting ACC – 6/9/2014



Stormwater in unnamed tributary to Sugar Creek entering SLLI property – 6/9/2014

T



ACC discharge in the unnamed tributary entering Sugar Creek – 12/24/2015



ACC Landfill and Waste Relocation Area as of 12/29/2015 with no vegetation



Unnamed tributary entering SLLI's property – 2/01/2016



Unnamed tributary entering SLLI property – 3/1/2017



Stormwater runoff from ACC on left at Arrow Mines Road – 3/1/2017



Stormwater overflowing emergency spillway of ACC sediment basin – 7/6/2017



Unnamed tributary entering SLLI Property – 7/6/2017



Stormwater from ACC in roadside ditch on Arrow Mines Road – 7/6/2017



Discharge form south culvert under Arrow Mines Road onto SLLI property – 7/6/2017



Discharge to north culvert under Arrow Mines Road that goes directly to Arrow Lake – 7/6/2017



Sediment laden water in Arrow Lake – 7/6/2017



Sediment laden water in Arrow Lake – 7/6/2017

0109541.0583837   4851-3688-3024v1