IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

STARLINK LOGISTICS INC.,                    )
                                            )
    Plaintiff,                          )        NO. 1:18-cv-00029
                                            )
v.                                          )        JUDGE RICHARDSON
                                            )
ACC, LLC and SMELTER SERVICE                )
CORP.,                                      )
                                            )
    Defendants.                         )

## MEMORANDUM OPINION AND ORDER

Pending before the Court is "Defendant Smelter Service Corporation's Motion for Summary Judgment" (Doc. No. 104, "Motion"), which is supported by a memorandum in support thereof. Plaintiff filed a response in opposition to the Motion (Doc. No. 111, "Opposition"), to which Defendant Smelter Service Corp. ("SSC") filed a reply (Doc. No. 124, "Reply").

## FACTUAL AND PROCEDURAL HISTORY

This case—at least when considered in tandem with the earlier-filed and related case, M.D. Tenn. Case No. 1:12-cv-00011 ("Prior Case")[1]—has a somewhat complicated procedural history. For present purposes, it suffices to provide the following description of the two cases' procedural history, preceded by three paragraphs of undisputed facts to put that history in context.

---

[1] In some instances, citation to the record in the Prior Case is appropriate. Herein, where the identification of a "Doc. No." (document number) is preceded by "Prior Case," unsurprisingly the citation is to the docket in the Prior Case. Otherwise, such a citation (including, notably, all citations to Doc. No. 119) is to the docket in the instant case.

Plaintiff and ACC, LLC f/k/a Associated Commodities Corporation ("ACC"), are neighboring landowners in Maury County, Tennessee. ACC was created to establish a landfill on its property (the "Landfill") dedicated solely to receiving waste from SSC's operations. (Prior Case, Doc. No. 266 at ¶ 1). ACC constructed and operated the Landfill pursuant to a "registration" or "permit" issued on July 1, 1981 by the Tennessee Department of Public Health, the predecessor to the Tennessee Department of Environment and Conservation ("TDEC"). (*Id.* at ¶ 2; Prior Case, Doc. No. 271 at ¶ 8). ACC operated the Landfill between August 1981 and September 1, 1993. (Prior Case, Doc. No. 266 at ¶ 3; Doc. No. 119 at ¶ 17). During that time, the only waste disposed of in the Landfill consisted of byproducts from SSC's aluminum recycling operations at its secondary aluminum smelting plant—specifically, byproducts known as aluminum "slag" (also called "salt cake") and "baghouse dust." (Prior Case, Doc. No. 266 at ¶¶ 5–7; Doc. No. 119 at ¶¶ 14–15). TDEC accepted the closure of the Landfill in 1996. (Prior Case, Doc. No. 271 at ¶ 9; Doc. No. 119 at ¶ 19).

Plaintiff owns a 1,485-acre tract of land located at 786 Arrow Lake Road in Mount Pleasant, Tennessee, which is directly adjacent to, and downstream from, ACC's property. (Prior Case, Doc. No. 266 at ¶ 9; Doc. No. 119 at ¶¶ 1, 12). A stream, known as Sugar Creek, is impounded to form Arrow Lake on Plaintiff's property. (Doc. No. 119 at ¶ 2).

Soon after ACC began disposing of SSC's salt cake and baghouse dust, waste in the Landfill came into contact with groundwater. (Prior Case, Doc. No. 266 at ¶ 11.) As groundwater infiltrated the waste, it formed something known as "leachate"—essentially, a substance consisting of dissolved chloride salts, ammonia and metals that have leached out of the waste and into the

water. (*Id.* at ¶ 12).[2] Plaintiff's claims against ACC in this case are all based on leachate and sediment emanating from the Landfill and entering Sugar Creek and Arrow Lake.

After very lengthy Tennessee state administrative and court proceedings,[3] which involved *inter alia* not only attempts by ACC and the TDEC to remediate the problems at the Landfill but also Plaintiff's intervention in chancery court proceedings to prevent court approval of a consent order between Plaintiff and TDEC, Plaintiff filed a complaint on January 19, 2012, to initiate the Prior Case. (Prior Case, Doc. No. 1). That complaint named only ACC as a defendant, and it asserted ten claims (each styled as a "Claim for Relief"). The first six were based on federal environmental laws,[4] and the last four were based on Tennessee common law. More specifically, the complaint asserted claims: under the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251–1389 (the first and second claims); under the Resource Conservation and Recovery Act of 1976 ("RCRA), 42 U.S.C. §§ 6901–6992k (the third, fourth and fifth claims); under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601-

---

[2] Tennessee Solid Waste Regulations define leachate as "a liquid that has passed through or emerged from solid waste and contains soluble, suspended, or miscible materials removed from such waste." Tenn. Comp. R. & Regs. 0400-11-01-.02(2). *See also Hudson River Fishermen's Ass'n v. Westchester Cnty.*, 686 F. Supp 1044, 1046 n.2 (S.D.N.Y. 1988) ("As used in the context of a landfill, leachate refers to that substance which is created when, over a period of time, compression of the solid waste, and other refuse contained within the landfill, forces liquid from the refuse. Leachate can also be produced when storm water seeps into the landfill and mixes with the refuse. The resultant liquid, or leachate, takes on the properties of certain constituents of the refuse. Leachate typically is very concentrated, high in metal and organic constituents.").

[3] These proceedings need not be detailed here, but they are detailed in Prior Case, Doc. No. 283, at 4-5, which, in part, quotes *StarLink Logistics Inc. v. ACC, LLC*, 494 S.W.3d 659, 662–63 (Tenn. 2016).

[4] All of Plaintiff's claims brought, in the instant action and in the Prior Case, under federal environmental laws were brought under so-called "citizens'-suit" provisions, which authorize "interstitial" enforcement by private citizens, but only when the government has been properly offered the chance to bring its own enforcement action and has not done so. *See Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 60–61 (1987). The nature and requirements of such citizens'-suit provisions proved significant in the Court's resolution of the Prior Case, (Prior Case, Doc. No. 283), but they are not material here, so the Court will forego any discussion of them herein.

9628 (the sixth claim); for private nuisance (the seventh claim); for negligence (the eighth claim); for trespass (the ninth claim), and for punitive damages (the tenth claim).[5] (*Id.* at 9–18).

On January 9, 2013, Plaintiff filed an amended complaint in the Prior Case, this one naming both ACC and SSC as defendants. (Prior Case, Doc. No. 61). The amended complaint asserted a claim against ACC in each of its ten claims but expressly mentioned SSC only in the Sixth claim, which as indicated above sought cost recovery under CERCLA. Nevertheless, it appears that Plaintiff asserts each of the ten claims against SSC as well as ACC, as Defendants explain in a case management order in the Prior Case:

> SSC was brought into this lawsuit by way of an amended complaint in which the plaintiff alleged that, SSC has exercised complete dominion over ACC and used ACC as an instrument through which SSC disposed of the aluminum smelting wastes without complying with state and federal laws, resulting in harm to SLLI. (Document 61 at 9.) The plaintiff has asserted that all of its allegations against ACC apply with equal force to SSC.

(Prior Case, Doc No. 129 at 6).[6] But to say that Plaintiff asserts that all of its allegations against ACC "apply with equal force" to SSC is not to say that Plaintiff asserts that SSC is *directly* liable just as it asserts that ACC is directly liable. And here, Plaintiff gives no indication that any claim against SSC, other than the CERCLA claim, is being pursued under a direct-liability theory. To the contrary, in that same case management order, Plaintiff's theory of the case, which spans a page and a half, says nothing at all about SSC except that the waste in the Landfill came from

---

[5] "Punitive damages" is a kind of remedy, and not a claim in the sense of being a cause of action or theory of liability. But, like many plaintiffs before it, Plaintiff styled it as a claim. For this reason, and because punitive damages are a remedy associated with tort liability, the Court treats the request for punitive damages like the other torts claims asserted by Plaintiff under state law.

[6] Consistent with the notion that Plaintiff brought each of the ten claims against SSC as well as ACC, but did so based only on an assertion of derivative liability, Plaintiff repeatedly prayed in the amended complaint that the Court "hold SSC jointly and severally liable for" various requested judgments and orders that Plaintiff primarily asked the Court to enter "against ACC." (Prior Case, Doc. No. 61 at 20-21).

SSC's operations and that "SSC and ACC are related companies"; it certainly says nothing about SSC's own actions that would make it directly liable. *Id.* at 3-4.

Beyond adding SSC as a defendant and asserting the liability of SSC (as well as ACC) on each of Plaintiff's ten claims, the amended complaint did not vary substantively from the original complaint.

On November 30, 2012, ACC filed a motion to stay the Prior Case in its entirety. On January 17, 2013, for reasons the Court need not discuss herein, the Court (per District Judge Aleta A. Trauger)[7] granted in part and denied in part that motion. Specifically, the Court stayed the CWA claims (the first and second claims) and RCRA claims (the third, fourth and fifth claims), but declined to stay the CERCLA claim and the state-law claims. (Prior Case, Doc. No. 65).

Accordingly, the parties thereafter proceeded with discovery on the CERCLA claim and the state-law claims, while the CWA claims and RCRA claims ultimately remained stayed until March 10, 2021.[8] Meanwhile, both before and after the January 17, 2013 entry of the stay order, there were numerous additional developments in administrative and state-court proceedings,[9] but none that are material for present purposes.

On April 9, 2018, Plaintiff initiated the instant action against ACC and T & K Construction, LLC (but not SSC),[10] asserting 25 separate claims under the CWA as well as state-law claims for nuisance and negligence. (Doc. No. 1). On August 30, 2019 (while the CWA and RCRA claims

---

[7] The Prior Case was thereafter transferred to the Honorable Waverly D. Crenshaw. Then, on October 22, 2018, both it and the instant action were transferred to the undersigned district judge.

[8] Those claims were ultimately dismissed by the Court on November 23, 2022. (Prior Case, Doc. No. 283).

[9] These proceedings need not be detailed here, but they are detailed in Prior Case, Doc. No. 283, at 6-15.

[10] Plaintiff voluntarily dismissed with prejudice all claims against T & K Construction, LLC on October 31, 2019. (Doc. No. 78).

in the Prior Case remained stayed), the Court severed the CERCLA and state-law claims—which, as noted above, had not been stayed— from the Prior Case and consolidated them with the claims pending in the instant action. (Prior Case, Doc. No. 225 at 1).

Thus, the claims pending against SSC in this case are those originally set forth in the sixth through tenth claims in the amended complaint in the Prior Case. To reiterate, the sixth claim is for cost recovery under CERCLA, and the seventh through tenth claims all are claims brought under Tennessee state tort law.

Relevant to the discussion below, each of these claims potentially can be pursued by a plaintiff under either a direct-liability theory or a derivative-liability theory,[11] as each party correctly notes. (*E.g.,* Doc. No. 111 at 19; Doc. No. 124 at 114). Plaintiff pursues its CERCLA cost-recovery claim under both theories, but as discussed below Plaintiff appears to assert its state-law claims only under a derivative-liability theory.

## THE INSTANT MOTION FOR SUMMARY JUDGMENT

SSC originally sought, via the Motion, summary judgment as to all of Plaintiff's claims against SSC in their entirety. (Doc. No. 104 at 1 ("Pursuant to Fed. R. Civ. P. 56, ACC Smelter Service Corporation ("SSC") moves for summary judgment on all claims asserted by Plaintiff.")); (Doc. No. 105 at 17 ("SSC is entitled to judgment as a matter of law on all claims asserted against it.")). In its Reply, however, SSC changed course somewhat, conceding that summary judgment

---

[11] The term "vicarious liability" seems to be widely considered synonymous with "derivative liability." *See, e.g., Dominguez v. City of Scottsdale*, 587 F. Supp. 3d 914, 937 (D. Ariz. 2022) (citing *Chaney Bldg. Co. v. City of Tucson*, 148 Ariz. 571, 716 P.2d 28, 30-31 (1986)); *Nippa v. Botsford Gen. Hosp.*, 257 Mich. App. 387, 402 n. 12, 668 N.W.2d 628, 637 n.12 (2003). Likewise, "derivative liability" is considered "indirect liability," *see, e.g. Basic Mgmt. Inc. v. United States*, 569 F. Supp. 2d 1106, 1117 (D. Nev. 2008) (noting the distinction under CERCLA between "between direct operator liability and indirect derivative liability"), and so sometimes courts use "indirect liability" where "derivative liability" could have been used. Each party herein primarily uses the term "derivative liability," and so the Court herein consistently does likewise, except when quoting case law that uses one of the other terms. in a footnote towards the end of this opinion.

was inappropriate as to Plaintiff's claim against it under CERCLA to the extent based on a direct-liability theory, (Doc. No. 124 at 14), thus leaving the Motion to assert the propriety of summary judgment only with respect to Plaintiff's claims (both under CERCLA and state law) to the extent based on a derivative-liability theory.

In short, the question is the extent to which, with respect to the sole federal (CERCLA) claim and all of the state law claims, SSC is entitled to summary judgment on Plaintiff's derivative liability theory. The Court perceives that, at times, the parties' briefings seem to suggest that the derivative-liability theory is at issue only with respect to the pending CERCLA claim. But because several state-law claims also remain pending, and because liability on those state-law claims can be based (and here appears to be based solely) on a derivative liability theory, the question of whether summary judgment should be granted as to a derivative-liability theory is applicable to all pending claims against SSC, and not just the CERCLA claim.

<u>SUMMARY JUDGMENT STANDARDS</u>

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. *See id.* at 248. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine[.]'" *Id.*

A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Reeves v. Swift Transp. Co.*, 446 F.3d 637, 640 (6th Cir. 2006) (citing *Anderson*, 477 U.S. at 248), *abrogated on other grounds by Young v. Utd. Parcel Serv.*, 575 U.S. 206 (2015). A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Harris v. Klare*, 902 F.3d 630, 634–35 (6th Cir. 2018). The party bringing the summary judgment motion has the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627-28 (6th Cir. 2018) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Alternatively, the moving party may meet its initial burden by otherwise "show[ing]"—even without citing materials of record—that the nonmovant "cannot produce admissible evidence to support a material fact (for example, the existence of an element of a nonmovant plaintiff's claim)." Fed R. Civ. P. 56(c)(1)(B).

If the summary judgment movant meets its initial burden, then in response the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Pittman*, 901 F.3d at 628.[12] Importantly, "[s]ummary judgment for a defendant [that has met its initial burden as the movant] is appropriate when the plaintiff 'fails to make a showing sufficient to establish the existence of an element essential to [her] case, and on which [she] will bear the burden of proof at trial.'" *Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 805–06 (1999) (quoting *Celotex,* 477 U.S. at 322).

Any party asserting that a fact cannot be or genuinely is disputed—i.e., any party seeking summary judgment and any party opposing summary judgment, respectively—can support the

---

[12] Courts (appropriately) at times refer interchangeably to a party being able to raise a genuine issue as to a fact and a reasonable jury being able to find in the party's favor on that fact, and this Court does likewise.

assertion either by: (a) citing to materials in the record, including, but not limited to, depositions, documents, affidavits, or declarations, Fed. R. Civ. P. 56(c)(1)(A), or (b) "showing" (i) that the adverse party cannot produce admissible evidence to raise a genuine dispute as to that fact or (ii) that contrary to the claim of the adverse party, the materials cited by the adverse party do not actually establish the absence or presence (as the case may be) of a genuine dispute as to that fact.

In reviewing a motion for summary judgment, this court must view the evidence in the light most favorable to the non-moving party. *Tlapanco v. Elges*, 969 F.3d 638, 647 (6th Cir. 2020) (quoting *Anderson*, 477 U.S. at 248). Likewise, the court should view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and weighing of evidence are improper. *Hostettler v. College of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). As noted above, where there is a genuine dispute as to any material fact, summary judgment is not appropriate. *Id*. The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id*. The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient to survive summary judgment; rather, there must be evidence upon which the jury could reasonably find for the non-moving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

<u>APPLICABLE SUBSTANTIVE LEGAL PRINCIPLES</u>

I.    <u>Derivative liability under CERCLA can be based only on piercing the corporate veil in accordance with applicable state law.</u>

Under CERCLA, "any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances" shall be liable costs of removal or remedial action and damages for lost

property. 42 U.S.C. § 9607(a)(3). Where a corporate parent and its subsidiary are each involved in the operation of such a facility, if "the corporate parent . . . .  actively participated in, and exercised control over, the operations of the facility itself [it] may be held directly liable in its own right as an operator of the facility." *United States v. Bestfoods*, 524 U.S. 51, 55 (1998). As noted above, SSC no longer seeks summary judgment as to Plaintiff's theory that SSC, the (current) corporate parent of ACC, may be held *directly* liable under CERCLA as an operator of the facility. Instead, it seeks summary judgment only as to Plaintiff's theory that SSC is *derivatively* liable under CERCLA—*i.e.*, Plaintiff's theory that SSC has liability to Plaintiff derived from ACC's liability, based on SSC's active participation and control over *ACC* (as opposed to active participation and control over the *facility* specifically).

The Supreme Court has provided specific guidance on this area of the law, phrasing the question as "whether a parent corporation that actively participated in, and exercised control over, the operations of a subsidiary may, without more, be held liable [under CERCLA] as an operator of a polluting facility owned or operated by the subsidiary." *Id.* To that question, the Supreme Court "answer[ed] no, unless the corporate veil may be pierced." *Id.*  In other words, a parent corporation cannot be derivatively liable—liable based *on its relationship with a subsidiary* that is itself subject to liability under CERCLA—unless the subsidiary's corporate veil can be pierced to reach the parent corporation. As the Sixth Circuit has put it more recently, "[a] corporate parent may be held indirectly liable under CERCLA only if the corporate veil separating parent and subsidiary may be pierced under the corporate law of the relevant state." *Duke Energy Fla., LLC v. FirstEnergy Corp.*, 731 F. App'x 385, 386 (6th Cir. 2018). That is to say, "'[c]ontrol of the subsidiary, if extensive enough, gives rise to indirect liability under piercing doctrine. . .' '[W]hen (but only when) the corporate veil may be pierced, may a parent corporate be charged with

derivative CERCLA liability for its subsidiary's actions.'" *Id.* at 390 (quoting *Bestfoods*, 524 U.S. at 68) (internal citations omitted).

II.     <u>Under the law of the applicable state, Tennessee, the veil of an LLC can be pierced to reach the LLC's parent corporation, but only if so doing is warranted upon application of the so-called *Continental Bankers* test.</u>

As noted above, applicable state law governs whether a subsidiary's corporate veil can be pierced to render its parent corporation liable for the cost recovery under CERCLA for which the subsidiary is primarily liable. In the instant case, it is undisputed (and indisputable) that the Tennessee law is applicable to this question. Likewise, it is indisputable that Tennessee law governs the extent to which a subsidiary's corporate veil can be pierced to render its parent corporation liable on torts under Tennessee law for which the subsidiary is primarily liable. So it is appropriate to set forth the basics of Tennessee law concerning the piercing of the corporate veil of a company.

"Despite the inapplicability of the remedy's name, the 'corporate veil' of a Tennessee limited liability company may also be pierced, utilizing the same standards [that are applied to corporations]."[13] *Edmunds v. Delta Partners, L.L.C.*, 403 S.W.3d 812, 829 (Tenn. Ct. App. 2012) (quoting *In re Steffner,* 479 B.R. 746, 755 (Bkrtcy.E.D.Tenn.2012) (quoting *Starnes Family Office, LLC v. McCullar,* 765 F.Supp.2d 1036, 1049 (W.D.Tenn.2011))). In other words, "[t]he doctrine of piercing the corporate veil applies equally to cases in which a party seeks to pierce the veil of a limited liability company . . . ." *Id.* at 828. This principle is relevant here because it appears undisputed that for part of the time implicated by the Motion, ACC operated as

---

[13]As indicated in *Starnes Family Office*, a limited liability company, not being a corporation, would not have a "corporate" veil. But for ease and consistency of reference, the court will use the term "corporate veil" to refer to the so-called "veil" of a limited liability company.

a limited liability company rather than a corporation.[14] (Doc. No. 105 at 11) ("ACC operated as a corporation from 1979 until January 1, 2009, when it converted from a corporation to a limited liability company."); (Doc. No. 1 at 1, 2) (referring to ACC as "ACC, LLC," then noting that it was *formerly* known as Associated Commodities Corporation).

The question then becomes what the standards are under Tennessee law to pierce an entity's (a corporation's or a limited liability company's) corporate veil to reach—*i.e.,* impose derivative liability on—a parent corporation. For reasons indicated below, this specific question is meaningfully different from the question of what the standards are to pierce the corporate veil to reach an individual member (*i.e.*, a natural person who is a part owner or sole owner) of the limited liability company ("LLC").

"The general rule is that corporate entities will be recognized as separate and distinct from their stockholders and that to disregard the corporate entities requires, in the case of parent and subsidiary, more than a showing that they have similar corporate names and locations and the exercise of dominion through common officers and directors." *Cont'l Bankers Life Ins. Co. of the South v. Bank of Alamo* ["*Continental Bankers*"], 578 S.W.2d 625, 631 (1979). As for what is sufficient (and necessary) to pierce the corporate veil of a subsidiary:

> When a subsidiary corporation is used as a mere instrumentality of a parent corporation, [the Tennessee] Supreme Court has held that the corporate veil of the subsidiary may be pierced to reach the parent if three elements are present:
>
> (1) The parent corporation, at the time of the transaction complained of, exercises complete dominion over its subsidiary, not only of finances, but of policy and business practice in respect to the transaction under attack, so that the corporate entity, as to that transaction, had no separate mind, will or existence of its own.

---

[14] Notably, the complaint in this action alleged (using the present tense) that ACC is a Tennessee *corporation*, (Doc. No. 1 at 2), despite referring to ACC as "ACC, LLC." (Doc. No. 1 at 1). ACC's answer asserts that ACC actually (currently) is a Tennessee *limited liability company*, (Doc. No. 55 at 4-5), and the Court perceives this fact to be undisputed. The confusion appears to be, as noted elsewhere herein, that ACC was converted to an LLC from a corporation on January 1, 2009.

(2) Such control must have been used to commit fraud or wrong, to perpetuate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of third parties' rights.

(3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Pamperin v. Streamline Mfg., Inc.*, 276 S.W.3d 428, 437–38 (Tenn. Ct. App. 2008) (quoting *Cont'l Bankers*, 578 S.W.2d at 632). Manifestly, in *Continental Bankers,* the Tennessee Supreme Court prescribed three *prerequisites* (requirements) for piercing the corporate veil of a parent company's subsidiary. By contrast, the Tennessee Supreme Court has stated that "Tennessee's courts have consistently used the *factors* identified in *FDIC v. Allen,* 584 F. Supp. 386, 397 (E.D.Tenn.1984) to determine whether a corporation's separate legal identity should be ignored." *CAO Holdings, Inc. v. Trost*, 333 S.W.3d 73, 88 n.13 (Tenn. 2010) (emphasis added). As for what those factors are:

> Factors to be considered in determining whether to disregard the corporate veil include not only whether the entity has been used to work a fraud or injustice in contravention of public policy, but also: (1) whether there was a failure to collect paid in capital; (2) whether the corporation was grossly undercapitalized; (3) the nonissuance of stock certificates; (4) the sole ownership of stock by one individual; (5) the use of the same office or business location; (6) the employment of the same employees or attorneys; (7) the use of the corporation as an instrumentality or business conduit for an individual or another corporation; (8) the diversion of corporate assets by or to a stockholder or other entity to the detriment of creditors, or the manipulation of assets and liabilities in another; (9) the use of the corporation as a subterfuge in illegal transactions; (10) the formation and use of the corporation to transfer to it the existing liability of another person or entity; and (11) the failure to maintain arms length relationships among related entities.

*Id.* at 88 n.13 (Tenn. 2010) (quoting *Allen*, 584 F. Supp. at 397). "The Tennessee Supreme Court, like other courts, [has] referred to this multi-part inquiry as 'the *Allen* factors.'" *Hatfield v. Allenbrooke Nursing & Rehab. Ctr., LLC*, No. W201700957COAR3CV, 2018 WL 3740565, at *38 (Tenn. Ct. App. Aug. 6, 2018) (quoting *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 216

(Tenn. 2012)). "Thus, the multi-factor test articulated in *Rogers* [*i.e.*, the *Allen* factors] is largely distinct from the test articulated in *Continental Bankers*." *Id.* There is a difference between factors (which are circumstances to be *balanced*) and prerequisites (which are requirements that must be *satisfied*). *See Memphis A. Phillip Randolph Inst. v. Hargett*, 478 F. Supp. 3d 699, 703 (M.D. Tenn. 2020) (quoting *Michael v. Futhey*, No. 08-3922, 2009 WL 4981688, at *17 (6th Cir. Dec. 22, 2009) (quoting *Six Clinic Holding Corp., II v. Cafcomp Sys.*, 119 F.3d 393, 400 (6th Cir. 1997))). And "[t]he distinction between factors and prerequisites is one with a difference." *BlueDane, LLC v. Bandura Cyber, Inc.*, No. 3:20-CV-00553, 2021 WL 2869154, at *4 (M.D. Tenn. July 7, 2021). That is true in the current context as in other contexts; unlike the (mandatory) prerequisites set forth in *Continental Bankers*, "[n]o single [*Allen*] factor among those listed is conclusive, nor is it required that all of these factors support piercing the corporate veil; typically, courts will rely on a combination of the factors in deciding the issue." *Rogers*, 367 S.W.3d at 215.

So the question here is which test is applicable—*Continental Banker*'s multi-prerequisite test or *Allen*'s multi-factor test? The same question was implicated in *Hatfield*. There, the court noted:

> As evidenced by the Tennessee Supreme Court's continued citation of the Continental Bankers test in *Gordon* [*v. Greenview Hosp., Inc.*, 300 S.W.3d 635, 653 (Tenn. 2009)], . . . the Tennessee Supreme Court has never expressly held that the *Continental Bankers* test is no longer good law. This situation has left this Court to opine that the *Continental Bankers* test remains viable when piercing the corporate veil as between a parent and subsidiary, while the *Allen* factors are the proper consideration when seeking to hold a shareholder personally liable.

*Hatfield*, 2018 WL 3740565 at *38 (citing *Christenberry Trucking & Farm, Inc.*, No. E2015-00266-COA-R3-CV, 2015 WL 6122872, at *4 (Tenn. Ct. App. Oct. 19, 2015), *Edmunds*, 403 S.W.3d at 830 (citing *Tennessee Racquetball Inv'rs, Ltd. v. Bell*, 709 S.W.2d 617, 624 (Tenn. Ct. App. 1986) (holding that the *Continental Bankers* test was not applicable to shareholder liability)),

and *Schlater v. Haynie,* 833 S.W.2d 919, 925 (Tenn. Ct. App. 1991)). Thus, as this Court has noted, "Tennessee appellate courts have held that the *Continental Bankers* test applies to efforts to pierce the veil between parent and subsidiary corporations, while the *Allen* factors are considered when seeking to hold a shareholder personally liable." *Layne Christensen Co. v. City of Franklin, Tenn.*, 449 F. Supp. 3d 748, 760–61 (M.D. Tenn. 2020) (citing *Hatfield* and *Schlater*). And as the Sixth Circuit has noted in addressing a veil-piercing issue (albeit one distinct from the particular issue herein),"[t]hough the Tennessee Supreme Court has not squarely addressed the issue, when 'an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, that is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.'" *Church Joint Venture, L.P. v. Blasingame*, 947 F.3d 925, 932 (6th Cir. 2020) (quoting *West v. AT&T*, 311 U.S. 223, 237 (1940)). And as this Court has stated, "[t]here is no persuasive data that leads the Court to conclude that the Tennessee Supreme Court would apply the *Allen* factors to veil piercing between a parent and a subsidiary." *Layne Christensen Co*., 449 F. Supp. 3d at 761.

Defendant argues that based on *Hatfield* and *Layne Christensen*, the Court should apply the *Continental Bankers* test to determine whether to pierce ACC's corporate veil to reach SSC. (Doc. No. 105 at 11). Plaintiff does not disagree with that, and neither does the Court; indeed, the Court agrees with *Hatfield* and *Layne Christenson Co.* that *Continental Bankers* governs attempts to pierce a subsidiary's corporate veil (like ACC's) to reach a corporate parent (like SSC). In fact, *Pamperin v. Streamline Mfg., Inc.*, 276 S.W.3d 428 (Tenn. Ct. App. 2008), cited by Plaintiff, additionally supports this conclusion:

> [O]ur Supreme Court has held that *the corporate veil of the subsidiary may be pierced to reach the parent if three elements are present*:

> (1) The parent corporation, at the time of the transaction complained of, exercises complete dominion over its subsidiary, not only of finances, but of policy and business practice in respect to the transaction under attack, so that the corporate entity, as to that transaction, had no separate mind, will or existence of its own.
>
> (2) Such control must have been used to commit fraud or wrong, to perpetuate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of third parties' rights.
>
> (3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.
>
> *Continental Bankers Life Ins. Co. of the South v. Bank of Alamo*, 578 S.W.2d 625, 632 (Tenn.1979).

*Id.* at 437-38 (emphasis added). So *Pamperin* stands squarely for the proposition that the *Continental Bankers* test is applicable to determine whether the corporate veil of the subsidiary may be pierced to reach the parent.

Rather than disputing that in this case the *Continental Bankers* test should be applied, Plaintiff asserts that "both the *Continental Bankers* Test and *Allen* Factors must be considered." (Doc. No. 111 at 24). This is an odd argument to make, because its acceptance by the Court would serve only to make it harder for Plaintiff to prevail. If, as Plaintiff states, the *Continental Bankers* test is to be "considered," that can reasonably mean only that the test *must be satisfied* in full (just as Defendants argue); the Court fails to see how a test that by its very nature requires *satisfaction* of multiple *elements*—rather than *consideration* of multiple *factors*—can be deemed "considered" by a court unless the court requires each of its elements to be satisfied.

Under Plaintiff's approach, incongruously it would be insufficient for Plaintiff—which bears the burden of doing what it takes to establish the appropriateness of piercing the corporate

veil[15]—merely to satisfy the *Continental Banker*'s test. Instead, Plaintiff perversely—though presumably unwittingly—is advocating for an approach that requires more of Plaintiff than the approach advocated by Defendants.[16] That is, under Defendants' approach, Plaintiff need only satisfy the *Continental Bankers* test, while under Plaintiff's approach, Plaintiff needs *both* to satisfy the *Continental Bankers* test *and* to convince the Court that the *Allen* factors collectively cut in Plaintiff's favor.[17] But for present purposes, the Court will assume *arguendo* (contrary to

---

[15] "Ordinarily, a shareholder of a corporation is not personally liable for the acts of the corporation." *Rogers*, 367 S.W.3d at 214. "The party seeking to pierce the corporate veil has the burden of presenting facts demonstrating that it is entitled to relief." *Id.* And "in all events, the equities must substantially favor the party requesting relief, and the presumption of the corporation's separate identity should be set aside only with great caution and not precipitately." *Id.*

[16] In fairness to Plaintiff, what SSC does here is likewise odd. Rather than agree that both *Continental Bankers* and the *Allen* factors are applicable—which, as noted herein, would serve to *increase* Plaintiff's burden—SSC is insistent that "this Court must apply *only* the Continental Bankers test." (Doc. No. 124 at 6). The Court understands why SSC advocates for use of the *Continental Bankers* test, but it would have behooved Defendant to agree with Plaintiff that the *Allen* factors also are applicable, such that Plaintiff should *additionally* have to prevail under a balancing of the *Allen* factors.

[17] This would not be the only context in which the applicable test(s) required the party seeking relief both to satisfy one or more prerequisites and to show that the balancing of multiple factors goes in its favor. The standard for temporary restraining orders and preliminary injunctions is another such context, as the undersigned previously has explained:

> Generally speaking, "district courts weigh the strength of the four factors against one another," in what is commonly described as a "balancing test." *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 326 (6th Cir. 2019). However, the inquiry is not a pure balancing test because the second factor—irreparable injury absent the injunction—must be present in order for the Court to issue the requested preliminary injunction. *Id.* at 326–27 (6th Cir. 2019) ("[E]ven the strongest showing on the other three factors cannot 'eliminate the irreparable harm requirement.' That factor is indispensable: If the plaintiff isn't facing imminent and irreparable injury, there's no need to grant relief now as opposed to at the end of the lawsuit.") (quoting *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982)). Thus, "although the extent of an injury may be balanced against other factors, the existence of an irreparable injury is mandatory." *Id.* at 327.

> "Furthermore, the first factor in many cases is not far from effectively being a prerequisite, inasmuch as 'a finding that there is simply no likelihood of success on the merits is usually fatal.'" *Carter v. Tenn. Dep't of Child.'s Servs.*, No. 22-cv-00247, 2022 WL 1144134, at *2 (M.D. Tenn. Apr. 18, 2022) (brackets omitted) (quoting *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000)); *see Daunt*, 956 F.3d at 421

Plaintiff's position but actually to Plaintiff's benefit) that Plaintiff need *only* satisfy the *Continental Banker's* test.[18]

So the question is whether SSC has met its burden of showing the lack of a genuine issue of material fact as to the existence of one or more of *Continental Banker*'s requirements (elements) for piercing ACC's corporate veil. As suggested above, because Plaintiff bears the burden of establishing (all of) these elements, that question devolves to whether SSC has shown that, with respect to at least one requirement, Plaintiff lacks evidence sufficient for a jury to find the existence of such requirement(s).[19]

---

("Our cases warn that a court must not issue a preliminary injunction where the movant presents no likelihood of merits success.") (brackets omitted) (quoting *La.-Pac. Corp. v. James Hardie Bldg. Prods., Inc.*, 928 F.3d 514, 517 (6th Cir. 2019)).

*Doe #11 v. Lee*, —F. Supp. 3d—, 2022 WL 2181800, at *7 (M.D. Tenn. June 16, 2022). The Sixth Circuit has made clear that the test indeed involves *both* a prerequisite and a multi-factor balancing test. See *Sumner Cty. Sch.*, 942 F.3d at 326–27 ("Thus, although the *extent* of an injury may be balanced against other factors, the *existence* of an irreparable injury is mandatory.") As indicated above, as the party bearing the burden to establish the appropriateness of piercing the corporate veil, Plaintiff *should* prefer to be able to meet that burden by showing the existence of all applicable prerequisites, without having also to prevail under a balancing test. But as noted above, for whatever reason (and perhaps without realizing it), Plaintiff here has invited the Court to require it to do both—an invitation the Court has declined *arguendo*.

[18] What the Court is assuming here actually strikes the Court as the correct result in any event. *Rogers* and *CAO Holdings, Inc.* appear to be the two most recent Tennessee Supreme Court cases that apply the *Allen* factors, and each concerns piercing the corporate veil to hold individual shareholders liable. But the instant case is not about piercing the corporate veil for that purpose. Instead, it is about piercing the corporate veil to reach a parent corporation—a situation that is governed by the *Continental Bankers* test to the exclusion of the *Allen* factors, according to both *Hatfield* and *Layne Christensen* (each of which the Court finds persuasive).

[19] Notably, under Tennessee law, the question of whether to pierce the corporate veil is treated as one of fact for the jury (assuming a jury rather than a bench trial and also that the question is not resolved on motion for summary judgment), rather than one for the court. *See, e.g., Dog House Invs., LLC v. Teal Properties, Inc.*, 448 S.W.3d 905, 918 (Tenn. Ct. App. 2014) (quoting *Electric Power Bd. of Chattanooga v. St. Joseph Valley Structural Steel Corp.*, 691 S.W.2d 522, 526 (Tenn. 1985)); *Smith v. Music City Homes, LLC*, No. 3:12-CV-0681, 2013 WL 12100999, at *2 (M.D. Tenn. Dec. 17, 2013).

Crucially, as Plaintiff correctly points out, (Doc. No. 111 at 24 n.106), Defendant cannot meet such burden by merely asserting baldly that Plaintiff lacks evidence and essentially challenging Plaintiff to come forward with its evidence of such element(s). Instead, as the summary-judgment movant, SSC must meet its initial burden of showing preliminarily the absence of such evidence—a showing that is necessary for it to shift the burden to Plaintiff to come forward with its evidence.

## ANALYSIS

SSC asserts that regarding that as to whether to pierce ACC's corporate veil to reach SSC,

> [the] analysis must be split into two distinct periods of time because of the relationship or lack thereof between SSC and ACC during two different periods of time. ACC operated as a corporation from 1979 until January 1, 2009, when it converted from a corporation to a limited liability company. See filing information for ACC, LLC, which is attached to the Declaration of Nicholas A. Lastra as collective Exhibit B. SSC held no ownership interest in ACC when it was a corporation from 1979 until January 1, 2009. See ACC's Certificate Book, which is attached to the Declaration of Nicholas A. Lastra as collective Exhibit C.

> On January 2, 2009, SSC obtained for the first time a controlling share of ACC, LLC, when its sole member, i.e., Jim Barrier, assigned the whole of his membership interest in ACC, LLC to SSC for valuable consideration. See Articles of Organization for ACC, LLC, which is attached to the Declaration of Nicholas A. Lastra as collective Exhibit D. Accordingly, the court must separately analyze the periods of time from 1979 until January 1, 2009, and from January 2, 2009 until the present date.

(Doc. No. 105 at 11). The Court accepts the facts recited here by SSC, which the Court finds entirely supported by the record, including documents filed and cited both by SSC[20] and by Plaintiff, and not genuinely in dispute.[21] This means, most pertinently, that there is no genuine

---

[20] (Doc. No. 106 at ¶ 3) (citing Doc. No. 108 and attachments thereto).

[21] (Doc. No. 114 at ¶ 3 (citing numerous documents filed by Plaintiff)). Notably, Plaintiff cites all of these documents purportedly to support its disputing of SSC's asserted fact(s) that "SSC had no parent-subsidiary

dispute that prior to January 2, 2009, SSC had no ownership interest in ACC and therefore had no parent-subsidiary relationship with ACC.

Additionally, the Court agrees that it is useful and appropriate to analyze the period through January 1, 2009 separately from the period after January 1, 2009. The reason is that as written, the *Continental Bankers* test can be satisfied only if: (i) *during the existence of a parent-subsidiary relationship*; (ii) there occurred a transaction;[22] (iii) over which the parent, to the exclusion of the subsidiary, exercised plenary control; and (iv) that was used to commit fraud, or some other wrong, or a violation of a third-parties rights, or a violation of some other legal duty (collectively referred to below as "wrongful conduct"). With respect to the first of these four requirements, in the present case the analysis is plainly different in the earlier period than it is in the latter period, and it follows easily that the analysis should be bifurcated between the two periods. The Court will proceed accordingly.

---

relationship with ACC prior to January 2, 2009, as SSC held no ownership or controlling interest in ACC." In fact, none of these cited documents help at all to dispute the asserted facts. To the contrary, if anything they squarely support the asserted fact(s) (which are obviously undisputed anyway) that prior to January 2, 2009 SSC lacked a parent-subsidiary relationship with ACC inasmuch as SSC held no ownership or controlling interest in ACC. The Court gathers that Plaintiff actually cited these documents not to cast doubt on these facts, but rather for a different purpose, namely to show that prior to January 2, 2009, ACC (i) had a substantial relationship with SSC, and (ii) was solely owned by one of the owners of ACC, Jim Barrier— all with the goal of supporting the notion that for some reason SSC was derivatively liable despite the lack of a parent-subsidiary relationship prior to January 2, 2009. But whatever the value of these cited documents in supporting such a notion (which the Court ultimately finds to be unsupported, as discussed below), they are of no value in disputing the actually undisputed specific fact(s) referenced here—*i.e.*, that SSC had no parent-subsidiary relationship with ACC prior to January 2, 2009, as SSC held no ownership or controlling interest in ACC.

[22] The Court construes the term "transaction" broadly, to Plaintiff's benefit, to refer not merely to business dealings but also to a broad range of other kinds of activities, including all of the alleged conduct at and regarding the Landfill of which Plaintiff complains here. Such a reading clearly seems reasonable and appropriate, and Defendant has done nothing to persuade the Court otherwise, as would have behooved it to do as the movant had it desired a narrower construction.

In doing so, the Court keeps in mind three points. First, as suggested above, it appears that *Continental Bankers* assesses liability against the parent company, if at all, based on when the *wrongful conduct* occurred, not on when the *harm* was incurred or the injury was sustained by the plaintiff. This is relevant here because it means that the Court below has divided the overall inquiry into two questions, namely whether SSC has shown that a matter of law based on the undisputed facts: (i) it cannot be held liable under a veil-piercing theory for any wrongful conduct of ACC that occurred before January 2, 2009; and (ii) it cannot can be held liable under a veil-piercing theory for any wrongful conduct of ACC that occurred after January 2, 2009.[23] The Court should not, and does not, entertain the possibility that SSC can be liable for *harms or injury* to Plaintiff first arising *after* January 2, 2009 based on *wrongful conduct* that occurred *before* January 2, 2009.

Second, Plaintiff can get only so far with its assertion that "[t]here are facts in the record to show that SSC had 'complete dominion' over Associated, which later became ACC, and of which SSC is now the sole member, with respect to finances, policy, and business practices in order to satisfy the *Continental Bankers* test." (Doc. No. 111 at 26). Even if this assertion is true, it does Plaintiff no good unless SSC was the *parent* of ACC during the time periods in question. *Continental Bankers* requires, in order to pierce the corporate veil to reach a company, that the corporation have been the parent company of the relevant company whose corporate veil the plaintiff seeks to pierce. This makes perfect sense because *Continental Bankers* prescribes the requirements for *piercing the corporate veil* of one corporation (or LLC) to reach another corporation (which is one particular way, but not the only possible way, of imposing derivative liability on a corporation), and piercing the corporate veil would not serve to reach the latter

---

[23] As explained below, based on facts not in genuine dispute: (i) the answer to the former question is "yes" essentially because undisputedly SSC did not stand behind ACC's corporate veil prior to January 2, 2009: and (ii) the answer to the latter question is "no" essentially because SSC has not met its burden of showing that ACC engaged in wrongful conduct at the Landfill on or after January 2, 2009.

corporation unless it actually stands behind the corporate veil of the former corporation—*i.e.*, actually is the parent of the company whose corporate veil the plaintiff seeks to pierce.

Third, although Plaintiff makes much of the principle that whether to pierce the corporate veil is "ordinarily" a question of fact for the jury rather than a question to be resolved on motion for summary judgment, (Doc. No. 111 at 23, 29), this principle on closer inspection proves to be insignificant. This is because it does not really add anything to what the Court has already indicated above: a question of fact is not to be resolved on motion for summary judgment (rather than at trial by the jury) unless the summary-judgment movant meets its burden of demonstrating that the question is not genuinely in dispute.[24] In other words, as is already very well established, generally ("ordinarily") a question of fact is for the jury—that is, for the jury unless the summary-judgment movant meets its burden to take the issue away from the jury.

I.    <u>Based on undisputed facts, Plaintiff cannot satisfy all of C*ontinental Bankers'* requirements to impose derivative liability on SSC for allegedly tortious actions or statutory violations preceding January 2, 2009, because SSC and ACC had no parent-subsidiary relationship during that time.</u>

As indicated above, there is no genuine dispute that SSC and ACC had no parent-subsidiary relationship prior to January 2, 2009. This makes it impossible as a matter of law for Plaintiff to satisfy *Continental Bankers'* requirement with respect to wrongful conduct preceding that date, because *a parent-subsidiary* relationship—and not merely *any* close or controlling relationship— is a prerequisite to piercing the corporate veil (imposing derivative liability on the parent) under *Continental Bankers*. Accordingly, SSC is entitled to summary judgment on Plaintiff's piercing-

---

[24] The Court notes additionally that the Court generally would not need, at the summary judgment stage, to decide whether a question of fact is genuinely in dispute unless the question is one of *material* fact. The question of fact at issue here—*i.e.*, whether to pierce the corporate veil—obviously is material to the overarching issue on SSC's (now partial) motion, *i.e.*, whether SSC should be granted summary judgment on Plaintiff's claim of derivative liability.

the-corporate-veil theory with respect to the period pre-dating January 2, 2009, *i.e.,* Plaintiff's claim against SSC asserting liability for wrongful conduct of ACC pre-dating January 2, 2009 based on a piercing-the-corporate veil theory.[25]

II.   <u>SSC has failed to meet its initial burden as the summary-judgment movant to show preliminarily that Plaintiff could not satisfy *Continental Bankers'* requirements to impose derivative liability on SSC for tortious actions or statutory violations allegedly post-dating January 2, 2009.</u>

The next question is whether SSC has met its burden to show that as a matter of law, ACC's corporate veil cannot be pierced to reach SSC with respect to wrongful conduct that occurred on or after January 2, 2009, the date on which SSC became ACC's corporate parent.

SSC's primary argument here is that Plaintiff does not allege (complain about) any wrongful conduct occurring during this later period. SSC argues that "[Plaintiff] complains that ACC improperly operated its [L]andfill from 1981 until 1993, which resulted in harm to [Plaintiff]. As a matter of law, [Plaintiff] cannot establish the first or second elements of the Continental Bankers test because SSC was not the parent corporation 'at the time of the transaction complained of.'" (Doc. No 124 at 10). SSC implies that Plaintiff is complaining only about alleged wrongful conduct occurring through 1993. But to support this implication, SSC cites nothing from Plaintiff's amended complaint in the Prior Case (from which the claims against SSC were transferred to this case), Plaintiff's Opposition to the instant Motion, or from anywhere else. And as noted below, the Court in fact rejects this unsupported implication, finding that Plaintiff in fact does complain about alleged wrongful conduct stretching far past 1993 and indeed past January 1, 2009. And the Court cannot find on the instant record that no wrongful conduct occurred after January 1, 2009.

_____

[25] The Court realizes that Plaintiff has not necessarily or expressly couched its piercing-the-corporate-veil theory in terms of when the wrongful conduct occurred (as opposed to when Plaintiff sustained injury). But under *Continental Bankers*, that is how the theory should be couched, and so that is how the Court treats Plaintiff's theory.

It is true that the record in this case does show that ACC's operations undisputedly ceased in 1993 and the Landfill was closed in 1996. Specifically, the record in this case reflects that it is undisputed that ACC "commenced ACC Landfill operations in or around August 1981, until operations ceased on September 1, 1993."[26] The record in this case also reflects that it is undisputed that "[t]he Tennessee Department of Public Health approved the closure of the [L]andfill in 1993" and that "ACC submitted its certificate of closure to the TDEC on July 18, 1995[, and] TDEC's issued acceptance of closure was on April 8, 1996."[27]

Defendant asserts essentially that once ACC ceased operations at the Landfill and the Landfill closed, ACC could not have taken any actions at the Landfill, and in particular could not have taken actions at the Landfill that could have amounted to wrongful conduct. (Doc. No. 124 at 10 ("As a matter of law, SLLI cannot establish the first or second elements of the Continental Bankers test [for the period after ACC ceased operations at the Landfill] because SSC was **not** the parent corporation 'at the time of the transaction complained of.'")) But Defendant so asserts in

_____

[26] The quoted fact was asserted by ACC (not SSC) in its statement of material facts in support of its own motion for summary judgment. (Doc. No. 102 at ¶ 17). Notably, ACC purported to support this statement by a citation only to a page in its brief (Doc. No. 13-1) in support of its previously filed motion to dismiss Doc. No. 13. Such a citation is patently inadequate to support the assertion that the fact is not genuinely in dispute, especially considering that the page in question did not in turn cite to anything in the record. (Plaintiff justifiably calls out ACC for making this kind of citation, albeit in connection with a different assertion of fact. (Doc. No. 119 at ¶ 18)). ACC would be prudent to do better in the future in this regard. Nevertheless Plaintiff responded that this fact was undisputed, and although Plaintiff included the caveat that the fact was undisputed only for purposes of ACC's motion for summary judgment, does not change the reality that this fact is not in genuine dispute for purposes of the instant Motion, especially considering that Plaintiff's own complaint alleges that "[t]he ACC Landfill received industrial waste from 1981 to 1993." (Doc. No. 1 at ¶ 24) and that Plaintiff's Opposition asserts likewise (Doc. No. 111 at 8) and also asserts that "SSC finally stopped disposing its waste at the Landfill in 1993." (*Id.* at 10).

[27] These quoted facts likewise were asserted by ACC in its statement of material facts in support of its own motion for summary judgment. (Doc. No. 102 at ¶ 18, 19). At least with respect to the first of these quoted facts, ACC again failed to provide a proper supporting citation. But Plaintiff nevertheless responded that each of these facts was undisputed, and although Plaintiff again included the caveat that the fact was undisputed only for purposes of ACC's motion for summary judgment, the Court has no trouble concluding this fact is not in genuine dispute for purposes of the instant Motion.

an entirely conclusory fashion. And contrary to this assertion, in the amended complaint Plaintiff actually seems to base the CERCLA claim as well as the state-law claims in part on allegations of continuing violations of duties owed to Plaintiff—alleged violations post-dating January 2, 2009 and indeed continuing through the time of the January 9, 2013 filing of the amended complaint (in the Prior Case). True, the alleged continuing violations appear to be more in the nature of non-feasance ("negligence," "omissions" amounting to private nuisance, and so forth), but they nevertheless appear (especially absent any contrary demonstration by SSC) to qualify as "transactions" of which Plaintiff complains and as alleged "violation[s] of a statutory or other positive legal duty," thereby potentially subjecting SSC to derivative liability under *Continental Bankers*. So it is not necessarily true that merely because the Landfill closed long prior to SSC becoming ACC's parent corporation, "SSC was not the parent corporation 'at the time of the transaction complained of.'" Indeed, based on the allegations of the claims at issue, it appears to be untrue, and SSC has done nothing to show otherwise—*i.e.*, nothing to show that Plaintiff, in the CERCLA and state-law counts, complains of no "transactions" occurring during the period after SSC became ACC's parent corporation. So SSC's argument fails on this point.

Moreover, SSC has not otherwise met its initial burden as the summary-judgment movant to show the lack of a genuine issue of material fact as to whether Plaintiff could satisfy all requirements of *Continental Bankers* for imposing derivative liability on SSC based on wrongful conduct occurring after January 2, 2009. Indeed, SSC makes no effort to do so, either in its briefing or in its statement of undisputed facts in support of the Motion (Doc. No. 104). SSC is to be commended for being very targeted and concise in what it put into in its statement of undisputed facts, the brevity of which is refreshing in light of the overly long and unfocused statements of undisputed facts this Court often sees. But SSC cannot reasonably be deemed to have shown the

absence of a genuine issue of material fact regarding Plaintiff's ability to satisfy every element of *Continental Bankers* for the period after January 1, 2009, given that (i) Plaintiff clearly claims that these factual issues are in in genuine dispute, and (ii) SSC does not in its statement of undisputed facts make or support any contrary assertion or refer in any way whatsoever to the issue of whether Plaintiff could adduce evidence sufficient to satisfy each element of *Continental Bankers*.

SSC's strategy is, instead, to claim that it had no obligation as the summary-judgment movant to make an initial showing that Plaintiff could not satisfy each element of *Continental Bankers*, because SSC supposedly "is under no obligation to prove the negative in order to shift the burden of proof on summary judgment." (Doc. No. 124 at 10). The Court does not necessarily disagree with the quoted statement precisely as it is worded; SSC may not have an obligation to "prove" any "negative."[28] But what it does have, as noted above is an initial burden to either identify portions of the record that demonstrate (preliminarily, and subject to a contrary showing by Plaintiff) the absence of a genuine dispute over material facts, or otherwise "show" preliminarily that Plaintiff cannot produce admissible evidence to support a material fact (for example, the existence of an element of *Continental Bankers*)." SSC has not even attempted to do so with respect to the elements of Plaintiff's veil-piercing claim under *Continental Bankers* regarding wrongful conduct occurring on or after January 2, 2009. Thus, because SSC never shifted the burden to Plaintiff on this point, SSC must be denied summary judgment on this point.

SSC's effort to obtain summary judgment in this regard by doing nothing to shift the burden to Plaintiff, and claiming that Plaintiff nevertheless must provide proof to satisfy the elements of *Continental Bankers*, (Doc. No. 124 at 10), reflects a misunderstanding of how summary-judgment procedure works, and thus the Court rejects it. Accordingly, Plaintiff's veil-piercing claim against

---

[28] The undersigned believes that it would be more accurate to say that SSC must make a "preliminary showing" of the "absence" of something, namely, the absence of evidence to support one or more elements of *Continental Bankers*.

SSC will survive with respect to alleged wrongful conduct that occurred on or after January 2, 2009 (but, as indicated above, not with respect to wrongful conduct that occurred before January 2, 2009).

III.  Plaintiff's underdeveloped argument for imposing derivative liability on SSC, despite its lack of a parent subsidiary-relationship at the pertinent times as required for veil-piercing under *Continental Bankers*, is insufficient for Plaintiff to avoid summary judgment as to derivative-liability theories.

Plaintiff makes rather vague overtures suggesting an additional basis—beyond *Continental Bankers* (or *Allen*, which, as noted above, actually does not even apply to attempts to impose derivative liability on a corporation as opposed to a natural person)—for imposing derivative liability on SSC based on its relationship with ACC. As just indicated, Plaintiff need not rely on this theory to survive summary judgment on its claim of derivative liability for the period post-dating January 1, 2009, because the claim survives under the veil-piercing theory of *Continental Bankers*. But because perhaps Plaintiff would desire to have an alternative basis available at trial with respect to this period, and because the claim for derivative liability for the prior period does not survive as a veil-piercing claim under *Continental Bankers*, the Court will address whether the derivative-liability claim survives on some basis or theory other than *Continental Bankers*.

Specifically, Plaintiff refers to various circumstances that it suggests support derivative liability irrespective of whether SSC was the parent of ACC during the pertinent time period(s) as required for veil-piercing under *Continental Bankers*. For example, Plaintiff relies on the purported fact that SSC "acquired all of Barrier's liability with respect to ACC when it purchased all of Barrier's membership interest in ACC on January 2, 2009." (Doc. No. 111 at 24). The Court disregards this statement as written because the Court does not even know what is meant by Barrier's liability—liability to Plaintiff, which is clearly the liability Plaintiff has in mind—"with respect to ACC"; the Court is unsure of how exactly an LLC member is deemed to have "liability

with respect to" the debts of the LLC. Most likely, Plaintiff means that Barrier (as the 100 percent owner of ACC) as a practical matter bore (albeit indirectly) all of ACC's liability. Even if true, this proposition does Plaintiff no good because Plaintiff fails to explain why it would matter for present purposes that on January 2, 2009, SSC is properly deemed to have taken on all of Barrier's (indirect) liability for the debts of ACC. Plaintiff neither makes a cogent argument for why, nor refers to any potentially cognizable theory (such a "reverse piercing")[29] under which SSC could be derivatively liable based on its assumption of Barrier's liability for ACC's debts as of January 2, 2009.[30]

Instead, Plaintiff merely states, in wholly conclusory fashion and without citation to any legal authority whatsoever, that "even though ACC may not have been a corporation with a parent-subsidiary relationship to SSC until 2009, SSC is nevertheless liable for ACC's actions because it acquired all of Barrier's and ACC's liabilities when it paid Barrier $155,133.00 for 100% of his membership interest in ACC." (Doc. No. 111 at 24). Plaintiff recites other alleged facts for a similar purpose, *i.e.*, to show that even absent a parent-subsidiary relationship with ACC, SSC is derivatively liable because of the close relationship between SSC and ACC as well as SSC's involvement in and alleged domination of ACC's affairs. (Doc. No. 111 at 26-29). But again, Plaintiff identifies no cognizable legal theory for why such SSC-ACC intertwinement support a

---

[29] Because Plaintiff does not invoke, let alone support via argument or citation to legal authorities, a reverse-piercing theory, the Court does not consider such theory. However, SSC did address the theory; in effect SSC set up the theory for Plaintiff (which Plaintiff did not do for itself), and then attempted to knock the theory down. The Court is of the initial impression is that SSC was successful in this regard, in that it persuasively explains why a reverse-piercing theory is inapplicable here. But as noted, the Court need not ultimately opine on the applicability of the theory, because it simply was not raised.

[30] Perhaps SSC could be *directly* liable to Plaintiff to some extent based on its supposed assumption of Barrier's liability for ACC's debts. The Court finds this possibility far-fetched, but it need not ponder the matter any further because the question here is only whether SSC could potentially be found *derivatively* liable to Plaintiff.

kind of derivative liability other than veil-piercing; still less does Plaintiff support such a theory with argument and citation to legal authority.[31] Conceivably, such a theory could be cognizable and could be factually supported, but Plaintiff does not come close to establishing that this is the case.[32]

This kind of cursory argument, lacking any analysis or support is, insufficient to survive summary judgment. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones.") So Plaintiff's apparent invocation of a theory of derivative liability separate from veil-piercing is insufficient for Plaintiff to avoid liability on its theory that SSC somehow is derivatively liable for the actions of ACC.

There is an alternative reason why Plaintiff's CERCLA claim in particular cannot survive based on some theory of derivative liability other than veil piercing. Specifically, as discussed above, a parent corporation cannot be derivatively liable under CERCLA "unless the corporate veil may be pierced." *Bestfoods*, 524 U.S. at 55.

---

[31] Plaintiff's argument might reasonably be seen as suggesting that SSC is liable based not only under a veil-piercing theory or some other theory of derivative liability, but also under an alter ego theory. "As an initial matter, claims of 'alter ego' and 'veil piercing' are not exactly the same," even though "[t]he analysis and effects" [of the two] are similar. *Church Joint Venture*, 947 F.3d at 930 (decided under Tennessee law). "A veil piercing claim seeks to hold a second party liable for another's debt, while an alter ego claim asserts that the two parties should be treated as the same party, so the liability is direct, not vicarious." *Id.* Plaintiff does not expressly assert an alter ego theory, as opposed to one or more theories of *derivative liability*, which is what Plaintiff does assert. (Doc. No. 111 at 22). For this reason, and also because in this case (as in *Church Joint Venture)* there does not appear to be a consequential distinction between alter-ego and derivative liability theory in any event, the Court does not herein address the viability of a theory that SSC is liable because (supposedly) ACC is its alter ego.

[32] The Court notes that it does not believe that Defendant had an initial burden to show the absence of a genuine issue as to the (lack of) validity of a theory of derivative liability other than veil-piercing. The initial burden of this sort that Defendant bears as the summary judgment movant surely is not broad enough to apply to unidentified theories that remain obscure even after completion of briefing on the summary judgment motion.

For all of these reasons, Plaintiff may not proceed at trial under a theory of derivative liability other than veil-piercing.

<u>CONCLUSION</u>

In summary, the Motion (Doc. No. 104) is **GRANTED IN PART AND DENIED IN PART**, as set forth in the following two paragraphs.

As indicated above, Plaintiff's CERCLA claim survives the Motion, and thus will proceed to trial, to the extent that such claim is based on a direct-liability theory. As also indicated above, the Court perceives that Plaintiff premised SSC's liability on the state law claims solely upon a derivative-liability theory, and thus the state-law claims will not proceed to trial on a direct-liability theory.

And for the reasons set forth above, with respect to Plaintiff's state-law claims and Plaintiff's CERCLA claim to the extent it is based on a derivative liability theory: (1) the Motion is GRANTED as to the period preceding January 2, 2009, meaning that Plaintiff cannot seek at trial to hold SSC derivatively liable based on ACC's wrongful conduct that occurred prior to January 2, 2009; and (2) the Motion is DENIED as to the period beginning January 2, 2009, meaning that Plaintiff can seek at trial to hold SSC derivatively liable based on ACC's wrongful conduct that occurred on or after January 2, 2009.

IT IS SO ORDERED.

*Eli Richardson*
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE