IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

| | | |
|---|---|---|
| STARLINK LOGISTICS INC., | ) | |
| | ) | |
| Plaintiff, | ) | NO. 1:18-cv-00029 |
| | ) | |
| v. | ) | JUDGE RICHARDSON |
| | ) | |
| ACC, LLC and SMELTER SERVICE | ) | |
| CORP., | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION

Pending before the Court is Defendant ACC, LLC's motion for summary judgment (Doc.

No. 100, "Motion"), which is supported by a memorandum in support thereof (Doc. No. 101,

"Memorandum in Support"). Plaintiff filed a response in opposition to the Motion (Doc. No. 116,

"Response"), to which Defendant ACC, LLC ("ACC") filed a reply (Doc. No. 125, "Reply").

FACTUAL AND PROCEDURAL HISTORY

This case—particularly when considered together with the earlier-filed and related case,

M.D. Tenn. Case No. 1:12-cv-00011 ("Prior Case")[1]—has a somewhat complicated procedural

history. For present purposes, it suffices to provide the following description of the two cases'

procedural history, preceded by three paragraphs of undisputed facts to put that history in context.

Plaintiff and ACC are neighboring landowners in Maury County, Tennessee. ACC was

created to establish on its property a landfill (the "Landfill") dedicated solely to receiving waste

from the operations of Defendant Smelter Service Corporation ("SSC") (Prior Case, Doc. No. 266

---

[1] Herein, where the identification of a "Doc. No." (document number) is preceded by "Prior Case,"
unsurprisingly the citation is to the docket in the Prior Case. Otherwise, such a citation (including, notably,
all citations to Doc. No. 119) is to the docket in the instant case.

at ¶ 1). ACC constructed and operated the Landfill pursuant to a "registration" or "permit" issued on July 1, 1981 by the Tennessee Department of Public Health, the predecessor to the Tennessee Department of Environment and Conservation ("TDEC"). (*Id.* at ¶ 2; Prior Case, Doc. No. 271 at ¶ 8). ACC operated the Landfill between August 1981 and September 1, 1993. (Prior Case, Doc. No. 266 at ¶ 3; Doc. No. 119 at ¶ 17). During that time, the only waste disposed of in the Landfill consisted of byproducts from SSC's aluminum recycling operations at its secondary aluminum smelting plant—specifically, byproducts known as aluminum "slag" (also called "salt cake") and "baghouse dust." (Prior Case, Doc. No. 266 at ¶¶ 5–7; Doc. No. 119 at ¶¶ 14–15). TDEC accepted the closure of the Landfill in 1996. (Prior Case, Doc. No. 271 at ¶ 9; Doc. No. 119 at ¶ 19).

Plaintiff owns an approximately 1,485-acre tract of land located at 786 Arrow Lake Road in Mount Pleasant, Tennessee ("Plaintiff's Property), which is directly adjacent to, and downstream from, ACC's property. (Prior Case, Doc. No. 266 at ¶ 9; Doc. No. 119 at ¶¶ 1, 12). A stream, known as Sugar Creek, is impounded to form Arrow Lake on Plaintiff's Property. (Doc. No. 119 at ¶ 2).

Soon after ACC began disposing of SSC's salt cake and baghouse dust, waste in the Landfill came into contact with groundwater. (Prior Case, Doc. No. 266 at ¶ 11.) As groundwater infiltrated the waste, it formed something known as "leachate"—essentially, a substance consisting of dissolved chloride salts, ammonia and metals that have leached out of the waste and into the water. (*Id.* at ¶ 12).[2] Plaintiff's claims against ACC in this case are all based on leachate and sediment emanating from the Landfill and entering Sugar Creek and Arrow Lake.

---

[2] Tennessee Solid Waste Regulations define leachate as "a liquid that has passed through or emerged from solid waste and contains soluble, suspended, or miscible materials removed from such waste." Tenn. Comp. R. & Regs. 0400-11-01-.02(2). *See also Hudson River Fishermen's Ass'n v. Westchester Cnty.*, 686 F. Supp 1044, 1046 n.2 (S.D.N.Y. 1988) ("As used in the context of a landfill, leachate refers to that substance which is created when, over a period of time, compression of the solid waste, and other refuse contained

Very lengthy Tennessee state administrative and court proceedings ensued,[3] involving *inter alia* not only attempts by ACC and the TDEC to remediate the problems at the Landfill but also Plaintiff's intervention in chancery court proceedings to prevent court approval of a consent order between Plaintiff and TDEC. Additionally, Plaintiff's Property was accepted into the State of Tennessee's Voluntary Oversight and Assistance Program ("VOAP"). (Doc. 119 at ¶ 31). VOAP is a statutorily created program for the voluntary cleanup of brownfield projects.[4] Tenn. Code Ann. § 68-212-224(a)(1). Under the VOAP, TDEC was authorized to enter into voluntary agreements or consent orders, for the investigation and/or remediation of a site that was the subject of a brownfield project, with a party (like Plaintiff)[5] who had not generated, transported or released contamination that is to be addressed at the property. *Id.* TDEC and Plaintiff entered into just such an agreement with respect to Plaintiff's Property (Doc. No. 13-2, "VOAP agreement") on December 15, 2009.[6]

On January 19, 2012, Plaintiff filed a complaint to initiate the Prior Case. (Prior Case, Doc. No. 1). That complaint named only ACC as a defendant, and it asserted ten claims (each styled as

---

within the landfill, forces liquid from the refuse. Leachate can also be produced when storm water seeps into the landfill and mixes with the refuse. The resultant liquid, or leachate, takes on the properties of certain constituents of the refuse. Leachate typically is very concentrated, high in metal and organic constituents.").

[3] These proceedings need not be detailed here, but they are detailed in Prior Case, Doc. No. 283, at 4-5, which, in part, quotes *StarLink Logistics Inc. v. ACC, LLC*, 494 S.W.3d 659, 662–63 (Tenn. 2016).

[4] "'Brownfield project' means the screening, investigation, monitoring, control and/or remediation of any abandoned, idled, under-utilized, or other property whose re-use, growth, enhancement or redevelopment is complicated by real or perceived adverse environmental conditions. Brownfield projects may address sites contaminated by hazardous substances, solid waste, or any other pollutant[.]" Tenn. Code. Ann. § 68-212-202(a)(1).

[5] In the VOAP agreement, Plaintiff certified that it was such a party (*i.e.*, a party not culpable with respect to the pollution to be addressed via the VOAP agreement. (Doc. No. 13-2 at 2, 24).

[6] Pertinent terms of the VOAP agreement are discussed below.

a "Claim for Relief"). The first six were based on federal environmental laws,[7] and the last four were based on Tennessee common law. More specifically, the complaint asserted claims: under the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251–1389 (the first and second claims); under the Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. §§ 6901–6992k (the third, fourth, and fifth claims); under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601-9628 (the sixth claim); for private nuisance (the seventh claim); for negligence (the eighth claim); for trespass (the ninth claim), and for punitive damages (the tenth claim).[8] (*Id.* at 9–18).

On January 9, 2013, Plaintiff filed an amended complaint in the Prior Case, this one naming both ACC and SSC as defendants. (Prior Case, Doc. No. 61). The amended complaint asserted a claim against ACC in each of its ten claims but expressly mentioned SSC only in the sixth claim, which, as indicated above, sought cost recovery under CERCLA. Nevertheless, as this Court explained in a prior memorandum opinion and order in this case (Doc. No. 139), whereby it granted in part SSC's motion for (partial) summary judgment (Doc. No. 104), it appears that Plaintiff asserts each of the ten claims not only against ACC but also against SSC.[9] (Doc. No. 139 at 4).

---

[7] All of Plaintiff's claims brought, in the instant action and in the Prior Case, under federal environmental laws were brought under so-called "citizens'-suit" provisions. A Citizens'-suit provisions is a statutory authorization "interstitial" enforcement of the law by private citizens, but only when the government has been properly offered the chance to bring its own enforcement action and has not done so. *See Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 60–61 (1987). The nature and requirements of such citizens'-suit provisions proved significant in the Court's resolution of the Prior Case, (Prior Case, Doc. No. 283), but they are not material here, so the Court will forego any discussion of them herein.

[8] "Punitive damages" is a kind of remedy, and not a claim in the sense of being a cause of action or theory of liability. But, like many plaintiffs before it, Plaintiff styled it as a claim. For this reason, and because punitive damages are a remedy associated with tort liability, the Court treats the request for punitive damages like the other torts claims asserted by Plaintiff under state law.

[9] As the Court explained, as to SSC, Plaintiff appears to assert only a theory of derivative liability—that SSC's liability is derivative of ACC's liability—on all of Plaintiff's claims, with the exception of the

Beyond adding SSC as a defendant and asserting the liability of SSC (as well as ACC) on each of Plaintiff's ten claims, the amended complaint did not vary substantively from the original complaint.

On November 30, 2012, ACC filed a motion to stay the Prior Case in its entirety. On January 17, 2013, for reasons the Court need not discuss herein, the Court (per District Judge Aleta A. Trauger)[10] granted in part and denied in part that motion. Specifically, the Court stayed the CWA claims (the first and second claims) and RCRA claims (the third, fourth, and fifth claims), but declined to stay the CERCLA claim and the state-law claims. (Prior Case, Doc. No. 65).

Accordingly, the parties thereafter proceeded with discovery on the CERCLA claim and the state-law claims, while the CWA claims and RCRA claims ultimately remained stayed until March 10, 2021.[11] Meanwhile, both before and after the January 17, 2013 entry of the stay order, there were numerous additional developments in administrative and state-court proceedings,[12] but none that are material for present purposes.

On April 9, 2018, Plaintiff initiated the instant action against ACC and T & K Construction, LLC (but not SSC).[13] Therein, Plaintiff asserted 25 separate claims under the CWA—each one based on a separate alleged violation of both a Construction General Permit (CGP) issued by TDEC to ACC in 2011 and a successive CGP issued by TDEC to ACC in 2016— as well as state-

---

CERCLA claim (as to which Plaintiff asserts both derivative liability and direct liability). (Doc. No. 139 at 4 & n.6).

[10] The Prior Case was thereafter transferred to the Honorable Waverly D. Crenshaw. Then, on October 22, 2018, both it and the instant action were transferred to the undersigned district judge.

[11] Those claims were ultimately dismissed by the Court on November 23, 2022. (Prior Case, Doc. No. 283).

[12] These proceedings need not be detailed here, but they are detailed in Prior Case, Doc. No. 283 at 6-15.

[13] The Court dismissed with prejudice all claims against T & K Construction, LLC on October 31, 2019, (Doc. No. 80), pursuant to what amounted to a joint motion to dismiss T & K Construction pursuant to Rule 21 of the Federal Rules of Civil Procedure (Doc. No. 80).

law claims for nuisance and negligence. (Doc. No. 1). On August 30, 2019 (while the CWA and RCRA claims in the Prior Case remained stayed), the Court severed the CERCLA and state-law claims—which, as noted above, had not been stayed— from the Prior Case and consolidated them with the claims pending in the instant action. (Prior Case, Doc. No. 225 at 1).

Thus, the claims pending against ACC in this case are: (i) the 25 CWA claims asserted in the complaint in this case; (ii) the state-law claims for nuisance and negligence asserted in the complaint in this case; and (iii) the claims originally set forth in the sixth through tenth claims in the amended complaint in the Prior Case, namely a claim for cost recovery under CERCLA and various state-law claims.

As for SSC, it sought summary judgment as to all of Plaintiff's claims, except for Plaintiff's CERCLA claim to the extent that it was based on a theory of direct liability rather than derivative liability. On December 15, 2022, the Court granted in part and denied in part SSC's motion, ruling: (i) that (as was undisputed) Plaintiff's CERCLA claim could proceed to trial against ACC on a direct-liability theory; and (ii) Plaintiff's other claims could proceed to trial on a derivative-liability theory as to (and only as to) the period beginning January 2, 2009, meaning that Plaintiff can seek at trial to hold SSC derivatively liable based on ACC's alleged wrongful conduct that occurred on or after January 2, 2009. (Doc. No. 139).

THE INSTANT MOTION FOR SUMMARY JUDGMENT

In the Motion, ACC makes several arguments in support of its contention that it should be granted summary judgment as to all of Plaintiff's claims. Regarding Plaintiff's CWA claims, ACC argues that they fail for a number of alternative procedural and jurisdictional reasons, namely that they: (i) fall outside this Court's subject-matter jurisdiction because they constitute an attempt to enforce laws and regulations not covered by the CWA; (ii) constitute an impermissible collateral

attack on a CGP; (iii) are thwarted by the so-called "permit shield" protections of the CWA; (iv) are barred by the statute of limitations; (v) are moot; and (vi) fall outside this Court's subject-matter jurisdiction because Plaintiff lacks standing to assert them under Article III of the U.S. Constitution (Doc. No. 101 at 6-22). Plaintiff alternatively claims that the various CWA claims are all subject to summary judgment even if assessed on the merits. (*Id.* at 22-36).

Regarding Plaintiff's CERCLA cost-recovery claim, ACC asserts that Plaintiff lacks standing to assert it because Plaintiff has not incurred any response costs for which recovery could be had. (*Id.* at 36-40).

Regarding Plaintiff's state-law causes of action originally pled in the Prior Case (for nuisance, negligence, and trespass),[14] ACC contends that each is barred by the applicable statute of limitations. (*Id.* at 40-47). As for Plaintiff's claims for nuisance and negligence (both as pled in the Prior Case and as pled in the complaint in the instant case), Plaintiff contends that there is no genuine dispute that one element of each is lacking. And finally, as to Plaintiff's claims for trespass and for punitive damages, ACC asserts that there is no genuine dispute that (i) ACC did not act with the intent required for a valid claim of trespass; and (ii) ACC did not act with recklessness as is required, according to ACC,[15] for an award of punitive damages. *Id.* at 47-50.

<u>DISCUSSION</u>

1.    <u>The Court will not grant summary judgment to ACC as to Plaintiff's CWA claims based on an alleged lack of subject-matter jurisdiction over those claims.</u>

ACC is not the first litigant to challenge subject-matter jurisdiction via a motion for summary judgment under Rule 56. *See, e.g., Rivet v. State Farm Mut. Auto. Ins. Co.*, No. 04-CV-

---

[14] The Court here uses the phrase "cause of action" purposefully, inasmuch as the amended complaint in the Prior Case contained another (fourth) state-law "claim" that, as noted above, is a requested *remedy* rather than a cause of action.

[15] As noted below, actually three mental states other than recklessness also can support an award of punitive damages.

72333-DT, 2005 WL 8161993, at *1 (E.D. Mich. Dec. 22, 2005) (involving motions by counter-defendants styled as motions "to dismiss for lack of subject matter jurisdiction pursuant to Rule 56") But this approach is procedurally improper because a challenge to subject-matter should be brought under Rule 12(b)(1). As its very name implies, summary *judgment* constitutes a decision on the merits, at least for the vital purposes of claim preclusion (res judicata) and issue preclusion (collateral estoppel). *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 910 (6th Cir. 2001) ("Finally, summary judgment is recognized as a final judgment for the purpose of issue preclusion"); *In re Moon*, 116 B.R. 75, 77 (Bankr. E.D. Mich. 1990) ("It is well-settled that a federal court's summary judgment issued under F.R. Civ. P. 56 results in both claim preclusion (res judicata) and issue preclusion (collateral estoppel)").

Accordingly, it is clear that ACC's challenge to subject-matter jurisdiction should have been brought under Rule 12(b)(1), not Rule 56. *See Chicago Joe's Tea Room, LLC v. Vill. of Broadview*, 894 F.3d 807, 814 (7th Cir. 2018) (stating, where the defendant sought summary judgment based on the alleged mootness of the plaintiff's claims, "[b]ecause mootness is a jurisdictional issue, not a merits issue, [the defendant] should have raised its jurisdictional arguments as a motion under Rule 12(b)(1), not Rule 56."); *Winslow v. Walters*, 815 F.2d 1114, 1116 (7th Cir. 1987) ("Seeking summary judgment on a jurisdictional issue, therefore, is the equivalent of asking a court to hold that because it has no jurisdiction the plaintiff has lost on the merits. This is a nonsequitur."), citing *Exchange Nat'l Bank v. Touche Ross*, 544 F.2d 1126, 1130–31 (2d Cir. 1976).

Far from being merely formalistic, this distinction has real consequences. In particular, if the movant is correct that the court lacks subject-matter jurisdiction, then the Court lacks power to enter summary (or any other kind of) judgment in the defendant's favor; instead, all it can do is

*dismiss* the suit (without prejudice). And the res judicata effect of such a dismissal is very different from the res judicata effect afforded a summary judgment. *Chicago Joe's Tea Room,* 894 F.3d at 814 (7th Cir. 2018) ("The distinction [between summary judgment and dismissal for lack of subject-matter jurisdiction] matters because the *res judicata* effect of a dismissal for lack of jurisdiction is limited to the jurisdictional issue.").

The Court realizes that it could consider treating this improper Rule 56 motion as a Rule 12(b)(1) motion, as did, for example, the court in *Ortiz ex rel. Ortiz v. United States*, No. CIV F03-6541 AWISMS, 2007 WL 404899, at *13 (E.D. Cal. Feb. 2, 2007). If it did so, it would make the most sense to treat the motion as one raising a so-called "factual attack," rather than a so-called "facial attack," on subject-matter jurisdiction;[16] this is because ACC's challenge to subject-matter jurisdiction, being supported as would a summary-judgment motion (under the false premise that this properly is a summary-judgment motion), relies on assertions of fact rather than merely the alleged inadequacy of the allegations in Plaintiff's Complaint. But *Ortiz* itself suggests a reason

---

[16] Rule 12(b)(1) "provides for the dismissal of an action for lack of subject matter jurisdiction." *Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014). "Subject matter jurisdiction is always a threshold determination." *Am. Telecom Co. v. Republic of Lebanon*, 501 F.3d 534, 537 (6th Cir. 2007). And the party invoking federal jurisdiction has the burden to prove that jurisdiction. *Global Technology, Inc. v. Yubei (XinXiang) Power Steering Sys. Co.*, 807 F.3d 806, 810 (6th Cir. 2015); *Golden v. Gorno Bros.*, 410 F.3d 879, 881 (6th Cir. 2005).

There are two types of motions to dismiss for lack of subject-matter jurisdiction: facial and factual attacks. *Gentek Bldg. Products, Inc. v. Sherman-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). A facial attack questions merely the sufficiency of the pleading. When reviewing a facial attack, a district court takes the allegations in the complaint as true. *Id.* If those allegations establish federally-cognizable claims, jurisdiction exists. *Id.* A factual attack instead raises a factual controversy concerning whether subject-matter jurisdiction exists. *Id.*

Where there is a factual attack on the subject-matter jurisdiction of the court under Fed. R. Civ. P. 12(b)(1), no presumptive truthfulness applies to the complaint's allegations; instead, the court must weigh the conflicting evidence to arrive at the factual predicate that subject-matter jurisdiction does or does not exist. *Gentek Bldg. Products, Inc.*, 491 F.3d at 330. "[T]he district court has considerable discretion in devising procedures for resolving questions going to subject matter jurisdiction[.]" *Ohio Nat. Life Ins. Co. v. United States*, 922 F.2d 320, 327 (6th Cir. 1990).

why the Court appropriately might decline to do so: "Because Rule 12(b)(1) and not Rule 56 set the framework for resolution of the motion, the mere presence of a factual dispute between the parties on a jurisdictional issue will not cause the denial of Defendant's motion."[17] *Id.* In other words, the framework for resolving a factual attack under Rule 12(b)(1) is different from the framework for resolving a motion for summary judgment; so even though both involve the Court looking at the alleged facts (and the evidence that supposedly shows them), an argument for summary judgment is simply different. So the Court declines to treat ACC's argument, presented incorrectly under Rule 56, as one cognizable under Rule 12(b)(1).

Even absent a cognizable motion, the Court would have the duty to dismiss these claims *sua sponte* for lack of subject-matter jurisdiction if it concluded itself that it lacked subject-matter jurisdiction. *See* Fed. R. Civ. P. 12(h)(3). And if the Court so concluded based on the information contained in this part of the Motion (even though it was incorrectly packaged as one under Rule 56), it would dismiss the claims. But the Court does not conclude from the information in the Motion that it lacks subject-matter jurisdiction. The Court is far from convinced by ACC's argument on this point. And the Court finds Plaintiff's response persuasive—as does ACC, apparently, inasmuch as their fifteen-page Reply does not even mention the challenge to subject-

---

[17] This is because the Court, in resolving a motion raising a factual attack on subject-matter jurisdiction, is empowered to decide for itself what the underlying relevant facts actually are and then decide the motion accordingly. *See, e.g.*, *Ohio Nat. Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990) ("When facts presented to the district court give rise to a factual controversy, the district court must therefore weigh the conflicting evidence to arrive at the factual predicate that subject matter jurisdiction exists or does not exist. In reviewing these [factual attacks], a trial court has wide discretion to allow affidavits, documents and even a limited evidentiary hearing to resolve disputed jurisdictional facts."); *Woodward Stuckart, LLC v. United States*, 973 F. Supp. 2d 1210, 1216 (D. Or. 2013) ("When analyzing a factual attack, the Court may consider affidavits or other evidence and resolve disputes where necessary." (citing *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004)), *aff'd*, 650 F. App'x 380 (9th Cir. 2016). The Court thus is *not* relegated to deciding merely (as it does on a motion for summary judgment) merely whether a dispute exists as to what the relevant facts are such that the motion should be denied based on such factual dispute.

matter jurisdiction. For this reason, the Motion is denied insofar as it seeks to dispose of this case due to a purported lack of subject-matter jurisdiction.

     2.    <u>ACC is entitled to summary judgment on all of Plaintiff's CWA claims under the concurrent remedy doctrine.</u>

As noted above, each of Plaintiff's 25 CWA claims is based on an alleged violation of the 2011 CGP and 2016 CGP. In its Memorandum in Support, ACC asserts that 28 U.S.C. § 2462 is the statute of limitations applicable to these claims because it provides that generally "an action, suit or proceeding for enforcement of any civil fine, penalty . . . shall not be entertained unless commenced within five years from the date when the claim first accrued" and that its (general) rule applies to claims under the CWA (Doc. No. 101 at 16-17) (quoting 28 U.S.C. § 2462). ACC then asserts that Plaintiff's CWA claims were brought after the expiration of the five-year limitations period specified in that statute.[18]

---

[18] The undersigned will highlight a few important points regarding the terminology used herein, by reference to something he wrote years ago:

> On the subject of limitations, courts often use language loosely, interchanging various terms for one another. For maximum clarity, terms must be defined so that important concepts are distinguishable from one another, then used consistently in accordance with those definitions. Herein, legal authorities will be paraphrased in terms of the following definitions to convey the concepts expressed therein, regardless of the terms used (or misused) by the authority being cited.

> As used herein, a "statute of limitations" refers to a legislative enactment, or codification thereof, that sets forth a limitations period.... A "limitations period" refers to the length of time-the specific number of days, months, or years-in which a given claim can be commenced, as set forth in a statute of limitations. "Limitations" [refers] to the legal doctrine whereby a plaintiff is barred from bringing a claim based upon the lapse of the applicable limitations period.

Eli J. Richardson, *Eliminating the Limitations of Limitations Law*, 29 Ariz. St. L.J. 1015, 1017–19 (1997). When using his own words, the undersigned intends to stick generally to this terminology, with the caveat that the case law and briefing of the parties he quotes may not do so and thus may be less precise or looser in their terminology.

As ACC correctly summarizes in its Reply, "[i]n its Response, [Plaintiff] admits that [Plaintiff]'s CWA claims are barred by the five-year statute limitations [sic] for civil penalties but asserts that because it sought nine specific prayers for relief the statute of limitations does not apply to its remaining eight (8) requests for relief." (Doc. No. 125 at 2). Here, ACC is referring to the fact that in the complaint in this case, the Prayer for Relief listed nine requests for relief (labeled "a" through "i"), and that only one of them (item "e") sought civil penalties. (Doc. No. 1 at 30). ACC then asserts that "the concurrent remedy doctrine operates to bar" Plaintiff's eight remaining requests for relief. (*Id.*).

The Court pauses to break down these eight other requests for relief (items "a" through "d" and "f" through "h" of the Prayer for Relief). Four of them (items "a" through "d") seek declaratory or injunctive relief related to the CWA, one (item "h") seeks an award to Plaintiff of its costs of litigation (including reasonable attorney and expert witness fees) as purportedly authorized by Section 505(d) of the CWA (33 U.S.C. § 1365(d)), two (items "f" and "g") are based solely on Plaintiff's state-law claims, and one (item "i," which requests "such other and further relief as the Court deems just and proper") is the classic catchall request that is so generic and unspecific that it does not actually amount to a request for relief at all.[19] The upshot is that Plaintiff makes—in addition to its request for civil penalties that it admits is time-barred—a request for declaratory[20]

_____

[19] The Court does not mean to indicate here that inclusion of such a catchall request is somehow inappropriate or of no potential value in defeating a claim that the plaintiff waived its right to request thereafter some additional specific relief. Rather, the Court's point is only that it does not itself count as a request for relief for purposes of the present analysis.

[20] It is not entirely clear whether declaratory relief is properly viewed as equitable in nature, or instead neither legal nor equitable in nature. There is a good authority, including from both the Supreme Court and the Sixth Circuit, to support each of these opposite views. *See In re Murray Energy Holdings Co.*, 634 B.R. 951, 978 (Bankr. S.D. Ohio 2021). To the extent that declaratory relief is not properly viewed as equitable in nature, the Court perceives of no reason why that would make\the request for declaratory relief a better candidate to survive the concurrent-remedy doctrine.

and injunctive relief as well as litigation costs that can be awarded only to a "prevailing or substantially prevailing party." 33 U.S.C. § 1365(d).

As a panel of the Fifth Circuit noted a few years ago, in a case involving the Clean Air Act, when explaining the nature and then-current state of the concurrent-remedies doctrine:

> The Supreme Court has long recognized that "when the jurisdiction of the federal court is concurrent with that of law, or the suit is brought in aid of a legal right, equity will withhold its remedy if the legal right is barred by the local statute of limitations." For the reasons we have explained, § 2462 clearly bars the legal claims here. The question is whether the government's equitable claims are also barred.
>
> At the outset of our analysis, we should make clear that, in the case of private litigants, the concurrent-remedies doctrine appears to be alive, well, and strong. For example, here, the concurrent-remedies doctrine may properly be invoked against Sierra Club, a private party acting on its own behalf. Indeed, to allow equitable claims to proceed where the legal claims are time barred is counter-intuitive to general legal thought and reasoning. So we make clear, we address a very narrow set of circumstances: the sovereign acting in its sovereign capacity when it has not legislatively conceded, in any explicit terms, that a time bar may be applied to its equitable claims. It is that set of narrow circumstances that informs the following discussion.

*United States v. Luminant Generation Co., L.L.C.*, 905 F.3d 874, 885–86 (5th Cir. 2018) (citations omitted).[21] The Court accepts the Fifth Circuit's evaluation of the prevailing status of the concurrent-remedies doctrine, and its own research has revealed nothing indicating that such evaluation has been undermined by the relatively short passage of time since 2018 or anything in Sixth Circuit case law. And the instant case (in which the plaintiff is a private party rather than the United States Government) does not involve the above-specified narrow set of circumstances in

---

[21] The Court perceives that this panel opinion arguably was essentially (though not expressly) vacated when the Fifth Circuit granted rehearing *en banc*. *United States v. Luminant Generation Co., L.L.C.*, 929 F.3d 316 (5th Cir. 2019). But the Fifth Circuit's electronic docket indicates that the appeal was dismissed soon thereafter, and so nothing in the panel opinion was ever addressed (let alone) reversed on the merits by the *en banc* court. Of course, this (Fifth Circuit) panel opinion would not be binding in this Court in any event, and it is cited herein for its persuasive value—which has not been undercut in any way by its subsequent history.

which equitable remedies might be permitted to proceed even though "concurrent" legal claims are time-barred.

The term "concurrent" in this context has a meaning that actually goes beyond mere chronological connotations (contemporaneousness) and instead encompasses topical (factual) connotations. "[C]ourts agree 'civil penalties and equitable relief . . . are concurrent [where] "an action at law or equity could be brought on the same facts."'" *Id.* at 886 (quoting *Tennessee Valley Auth.*, 502 F.3d at 1327 (*quoting United States v. Telluride Co.*, 146 F.3d 1241, 1248 n.12 (10th Cir. 1998) )). There is no question that Plaintiff not only "could," but in this case *did*, bring a claim that simultaneously sought both legal relief (civil penalties) and equitable relief based on the same facts. Plaintiff's requests for equitable relief—and the request for declaratory relief, to the extent that it is not considered "equitable" in nature—are therefore barred under the concurrent- remedies doctrine.

The Court recognizes that a limited number of cases in the past have viewed the concurrent-remedies doctrine in a manner more favorable to a plaintiff whose claim for civil penalties is time-barred. In *Nat'l Parks & Conservation Ass'n, Inc. v. Tennessee Valley Auth.*, 502 F.3d 1316 (11th Cir. 2007), the Eleventh Circuit rejected the reliance of the plaintiffs (private conservation organizations) on two such cases:

> By its plain language, the statute of limitations set forth in 28 U.S.C. § 2462 applies only to claims for legal relief; it does not apply to equitable remedies. *United States v. Banks,* 115 F.3d 916, 919 (11th Cir. 1997). Nonetheless, where a party's legal remedies are time-barred, that party's concurrent equitable claims generally are barred under the concurrent remedy doctrine. *Cope v. Anderson,* 331 U.S. 461, 464, 67 S. Ct. 1340, 91 L. Ed. 1602 (1947); *see also Gilbert v. City of Cambridge,* 932 F.2d 51, 57 (1st Cir. 1991) (stating that "it is settled . . . that where legal and equitable claims coexist, equitable remedies will be withheld if an applicable statute of limitations bars the concurrent legal remedy"); *United Transp. Union v. Fla. E. Coast Ry. Co.,* 586 F.2d 520, 523–24 (5th Cir. 1978) (holding that, where both legal and equitable relief are sought, the statute of limitations bars both).

[The plaintiffs] rely on *Banks* and *United States v. Cinergy Corp.,* 397 F.Supp.2d 1025, 1032 (S.D. Ind. 2005), in arguing that the concurrent remedy doctrine does not bar their claims. *Banks* carved out an exception to the concurrent remedy doctrine so that statutes of limitations cannot operate to bar "claims brought by the federal government in its sovereign capacity" as enforcer of environmental regulations. 115 F.3d at 919 (government sought injunction against party discharging dredged or fill materials on wetlands in violation of Clean Water Act). [Plaintiffs] argue that this exception should be extended to them because they are acting as "private attorneys general" to enforce environmental regulations for the public benefit, *see Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n,* 453 U.S. 1, 16–17, 101 S. Ct. 2615, 69 L. Ed.2d 435 (1981). There is no authority, however, for expanding the governmental exception to preclude application of the concurrent remedy doctrine in the instant suit, which was filed by private parties where the government has declined to act. The statute provides that plaintiffs in a citizen suit are acting "on [their] own behalf," 42 U.S.C. § 7604(a); though they may be acting as private attorneys general, they do not represent the public at large in the same way the government does when it brings suit to enforce the statute. *See Conservation Law Found. of New England, Inc. v. Browner,* 840 F. Supp. 171, 175 (D. Mass.1993) (citing legislative history of citizen suit provision).

Alternatively, [the plaintiffs] argue that the doctrine is inapplicable because their legal and equitable claims do not seek "concurrent" remedies, urging us to adopt the reasoning articulated by the Indiana district court in *Cinergy.* In *Cinergy,* the court held that the concurrent remedy doctrine did not bar a citizen suit seeking injunctive relief that was paired with a time-barred claim for civil penalties. The court held that the separate claims were not concurrent because the remedies had "different goals and effects." 397 F.Supp.2d at 1032 (identifying the goal of civil penalties as deterrence because fine is paid to the government, while the goal of equitable relief is "to stop threats to the environment"). We are not aware of other authority for this novel distinction and are not persuaded that it is a meaningful one. We conclude that the civil penalties and equitable relief sought in this case are concurrent because "an action at law or equity could be brought on the same facts." *United States v. Telluride Co.,* 146 F.3d 1241, 1248 n. 12 (10th Cir.1998) (internal quotations and citations omitted).

*Id.* at 1326–27. The Court finds this analysis persuasive and not undercut in any way by any subsequent legal authority.

All remedies that Plaintiff seeks here are concurrent. Thus, all of its CWA claims are barred in their entirety—and with respect to all requested relief—based on the expiration of the limitations period applicable to the claim for civil penalties combined with the application of the concurrent-

remedies doctrine. Accordingly, ACC is entitled to summary judgment on all 25 of Plaintiff's

CWA claims.

3.    ACC is entitled to summary judgment on Plaintiff's CERCLA cost-recovery claim.

In *Hobart Corp. v. Waste Mgmt. of Ohio, Inc.*, 758 F.3d 757, 761 (6th Cir. 2014), the Sixth

Circuit provided what it called a "CERCLA [p]rimer." Not wishing to recreate the metaphorical

wheel unnecessarily, the Court sets forth the primer below, with the preliminary observation that

Plaintiff is, with respect to Plaintiff's Property, a Potentially Responsible Party:[22]

> "Congress enacted CERCLA in 1980 to 'promote the timely cleanup of
> hazardous waste sites' and to ensure that the costs of such cleanup efforts were
> borne by those responsible for the contamination.'" *CTS Corp. v. Waldburger,* 573
> U.S. ——, 134 S. Ct. 2175, 2180, 189 L.Ed.2d 62 (2014) (quoting *Burlington N. &
> Santa Fe R. Co. v. United States,* 556 U.S. 599, 602, 129 S. Ct. 1870, 173 L.Ed.2d
> 812 (2009)). To that end, CERCLA imposes liability upon four types of parties:
>
> (1) the owner and operator of a vessel or a facility,
>
> (2) any person who at the time of disposal of any hazardous
> substance owned or operated any facility at which such hazardous
> substances were disposed of,
>
> (3) any person who by contract, agreement, or otherwise arranged
> for disposal or treatment, or arranged with a transporter for transport
> for disposal or treatment, of hazardous substances . . . at any facility
> . . ., and
>
> (4) any person who accepts or accepted any hazardous substances
> for transport to disposal or treatment facilities, incineration vessels

---

[22] Asserting that it is uncontroverted that Plaintiff is a Potentially Responsible Party with respect to
Plaintiff's Property, Defendant cites Doc. No. 13-2 at 14 (Page ID # 249). (Doc. No. 101 at 37 n. 94). This
citation is regrettably inapt; nothing on the cited page supports the assertion.

  The Supreme Court has described what "potentially responsible parties" means for purposes of CERCLA:
a  "part[y] that may be held accountable for hazardous waste in particular circumstances." *Atl.  Richfield
Co. v. Christian*, 140 S. Ct. 1335, 1353 (2020). This clearly appears to apply to Plaintiff, which has admitted
(in the VOAP agreement) that it "may occupy the status of a 'liable party' pursuant to the definition of that
term contained in T.C.A. § 68-212-202(4)." (Doc. No. 13-2 at 12). It is easy to see that a party that "may"
occupy the status of a "liable party" within the meaning of that Tennessee statute is a party that is
"potentially responsible" for hazardous waste in the applicable circumstances concerning Plaintiff's
Property.

or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance . . . .

CERCLA § 107(a)(1)-(4); 42 U.S.C. § 9607(a)(1)-(4).

The statute also creates a complicated network of cost-shifting provisions, which apply depending upon who pays what and why. If the federal government identifies a contaminated site, it has several options. The government may clean up the site itself under CERCLA § 104, 42 U.S.C. § 9604; the government may compel a "Potentially Responsible Party" ("PRP") to clean up the site through an action under CERCLA § 106, 42 U.S.C. § 9606; or the government may enter into an agreement with a PRP under CERCLA § 122, 42 U.S.C. § 9622, that requires the PRP to clean up the site. *See Cooper Indus., Inc. v. Aviall Servs., Inc.,* 543 U.S. 157, 161, 125 S. Ct. 577, 160 L. Ed.2d 548 (2004); *RSR Corp. v. Commercial Metals Co.,* 496 F.3d 552, 554–55 (6th Cir.2007). If the government removes the waste and remediates the site, it may recover its response costs from PRPs under § 107(a)(4); if a private party actually incurs response costs rehabilitating the site, it may partially recover those response costs under § 107(a)(4)(B).[1] *United States v. Atl. Research Corp.,* 551 U.S. 128, 131, 127 S. Ct. 2331, 168 L.Ed.2d 28 (2007). In turn, any party sued under §§ 106 or 107, by the government or a private party, may seek contribution[2] from other PRPs under § 113(f)(1), so that the recovery costs can be distributed in an equitable fashion. *Cooper Indus.,* 543 U.S. at 165–66, 125 S. Ct. 577.

Another option for the government is to clean up the site itself and enter into a settlement agreement with PRPs to cover the government's response costs. *See* § 122(a), (g), (h). In this scenario, "[a] person who has resolved its liability to the United States ... for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any [PRP] who is not a party to [the] settlement." § 113(f)(3)(B). In exchange for resolving its liability, the settling PRP "shall not be liable for claims for contribution regarding matters addressed in the settlement." § 113(f)(2).

While there are multiple avenues for the government and PRPs to apportion the costs of contamination and clean up, CERCLA contains several specific statutes of limitations as to the timing of lawsuits. Cost-recovery actions under § 107(a)(4) must be brought within three years "after completion of the removal action" or "for a remedial action, within [six] years after initiation of physical on-site construction." § 113(g)(2). Actions for contribution under § 113(f), however, must be filed within three years of "(A) the date of judgment in any action under [CERCLA] for recovery of such costs or damages, or (B) the date of an administrative order under [§ 122(g) ] (relating to de minimis settlements) or [§ 122(h) ] (relating to cost recovery settlements) or entry of a judicially approved

settlement with respect to such costs or damages." § 113(g)(3); *see also RSR Corp.,* 496 F.3d at 556–58 (discussing limitations periods).

*Hobart Corp. v. Waste Mgmt. of Ohio, Inc.,* 758 F.3d 757, 761–63 (6th Cir. 2014).

The end of this discussion reflects the apparent reality that the much longer limitations period for a cost-recovery action sometimes prompts plaintiffs to characterize (whether accurately or inaccurately) their CERCLA claims as ones for cost recovery (under § 107 of CERCLA) rather than contribution (under § 113 of CERCLA). But this is only one of multiple incentives for a plaintiff has to couch a CERCLA claim as one for cost recovery. *See Georgia-Pac. Consumer Prod. LP v. NCR Corp.*, 32 F.4th 534, 541 (6th Cir. 2022) (noting that because Section 107 "'likely provides a broader avenue for recovery, and has a longer limitations period than § 113(f), it provides a more attractive option for PRPs." (quoting *Hobart*, 758 F.3d at 767)). For whatever reason(s), Plaintiff here brought a cost-recovery claim (and only a cost-recovery claim).[23]

Near the outset of its attack on Plaintiff's cost-recovery claim,[24] ACC observes that a cost-recovery claim requires the plaintiff to have actually incurred response costs that are "necessary" and "consistent with the National Contingency Plan[.]" (Doc. No. 101 at 37). This observation appears to be a correct statement of the law, and Plaintiff does not dispute it. ACC argues that it is

---

[23] Plaintiff correctly notes that a cost-recovery claim and a contribution claim are "mutually exclusive remedies." (Doc. No. 116 at 36). *See also Hobart Corp. v. Waste Mgmt. of Ohio, Inc.*, 758 F.3d 757, 768 (6th Cir. 2014). The does not necessarily mean that the second claim could not at least be pled in the alternative, but Plaintiff does not plead a contribution claim at all (in the alternative or otherwise).

Notably, as suggested in *Georgia-Pac. Consumer Prod.*, a PRP such as Plaintiff, like any private party, can bring a cost-recovery action. *United States v. Atl. Research Corp.*, 551 U.S. 128, 136 (noting that § 107 "authorizes cost-recovery actions by any private party, including PRPs").

[24] The undersigned realizes that no one is perfect. But in high-stakes litigation like the present one, counsel must take more care than was demonstrated near the middle of page 38, and near the top of page 39, of its Memorandum in Support. In (at least) each of these two places, there appears to have been some incomplete or simply erroneous cutting and pasting that left part of one sentence in the middle of another sentence in which it did not belong. A similar problem is reflected five lines from the bottom of page 15 of the Reply. This of course reflects sloppiness and tends to obscure the author's intended meaning. The Court urges an extra measure of proofreading.

entitled to judgment as a matter of law on the CERCLA claim because Plaintiff incurred no such costs. (Doc. No. 101 at 39). The Court will set aside this argument.

ACC argues alternatively that a PRP (like Plaintiff) that has "entered settlement" may bring against other PRPs only a contribution claim, and not a cost-recovery claim. (*Id.* at 38). To support this argument, ACC cites *Hobart Corp. v. Waste Mgmt. of Ohio, Inc.*, 758 F.3d 757, 767 (6th Cir. 2014). ACC here again regrettably appears to have been off in its citation (by a page), but *Hobart Corp.* does indeed hold something very close to what ACC claims it holds: "a PRP [that] has entered into an administrative settlement with the government, thereby having met a statutory trigger for filing a contribution action, can bring only a § 113(f)(3)(B) action for contribution— not a § 107(a)(4)(B) cost-recovery action." *Id.* at 768.[25] The Sixth Circuit is not alone in so holding, as the Third Circuit has noted:

> 1. *The price of contribution-claim immunity.* A polluter who settles its CERCLA liability with the federal government or a state government enjoys immunity under § 9613(f)(2) from contribution claims. In *Agere Systems*, we held that if a polluter is immune from contribution claims, it cannot bring cost-recovery claims. *Agere Sys., Inc. v. Advanced Envtl. Tech. Corp.*, 602 F.3d 204, 229 (3d Cir. 2010). Instead, it can bring only contribution claims. *Id.*
>
> Six other circuits have reached this issue. All agree. *See Whittaker Corp. v. United States*, 825 F.3d 1002, 1007 & n.4 (9th Cir. 2016); *Hobart Corp. v. Waste Mgmt. of Ohio, Inc.*, 758 F.3d 757, 768 (6th Cir. 2014); *Bernstein v. Bankert*, 733 F.3d 190, 202 (7th Cir. 2013); *Solutia, Inc. v. McWane, Inc.*, 672 F.3d 1230, 1236– 37 (11th Cir. 2012) (per curiam); *Morrison Enters. v. Dravo Corp.*, 638 F.3d 594, 603 (8th Cir. 2011); *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 127–28 (2d Cir. 2010).

*Cranbury Brick Yard, LLC v. United States*, 943 F.3d 701, 705 (3d Cir. 2019)

---

[25] ACC briefly offers a rationale for this rule, namely its value in preventing a windfall for a PRP that has entered into a settlement that shields it from contribution counterclaims from other PRPs. (Doc. No. 38). The rationale was more thoroughly discussed *Cranbury Brick Yard,* which explained how "the rule helps apportion cleanup costs equitably by keeping polluters from using their immunity as both sword and shield." 943 F.3d 705–06. The Court agrees that the rule well may serve this laudable goal. Ultimately, however, the Court will concern itself with determining whether to apply this rule, and not with discussing the precise rationale and opining as to its merits.

Notably, however, whereas ACC used the term "settlement," *Hobart Corp.* used the term "administrative settlement." This is a distinction with a difference because *Hobart Corp.* applies here only if the VOAP is an "administrative settlement," and the term "administrative settlement" is a particular statutory term subject to a particular construction based on its wording and Sixth Circuit case law defining it. *See Hobart*, 758 F.3d at 768. Thus defined, an "administrative settlement" is one in which the settlement agreement "'resolve[s] [the PRP's] liability to the United States or a State for some or all of a response action or for some or all of the costs of such action [hereinafter, "response costs"]. . . .'" *Id.* (*citing* § 113(f)(3)(B) and *ITT Indus., Inc. v. BorgWarner, Inc.,* 506 F.3d 452, 459 (6th Cir.2007)). So the question is whether the VOAP agreement is such an agreement. And ACC provides no real help in this regard, since, as noted, it failed to concern itself with the precise kind of "settlement" that would preclude a cost-recovery action. But it did manage to sufficiently raise the issue for the Court to decide—which the Court will do on its own.

To determine whether an agreement resolves a PRP's liability, the court looks to the specific terms of the agreement. *Id.* at 770. In so doing, it applies state contract law, appropriately starting with the state's cardinal rule of contract construction as well as other basic principles. I*d.* at 768.[26]

_____

[26] Tennessee law strikes the undersigned as very typical with respect to such foundational principles of contract law:

> "Under Tennessee law . . . the 'cardinal rule [for interpreting contracts] . . . is to ascertain the intention of the parties and to give effect to that intention, consistent with legal principles.' " *Frizzell Constr. Co. v. Gatlinburg, L.L.C.*, 9 S.W.3d 79, 85 (Tenn. 1999) (second and third alteration in original) (quoting *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975)). "In addition, a contract's provisions must be interpreted in the context of the entire contract, 'viewed from beginning to end and all its terms must pass in review, for one clause may modify, limit or illustrate another.' " *D&E Constr. Co. v. Robert J. Denley Co.*, 38 S.W.3d 513, 519 (Tenn. 2001) (quoting *Frizzell Constr. Co.*, 9 S.W.3d at 85).

*Cates v. Crystal Clear Techs., LLC*, 874 F.3d 530, 541 (6th Cir. 2017).

The question of whether the VOAP agreement is properly said to have "resolved Plaintiff's liability" to the State of Tennessee for some or all response costs is not quite as simple as it might initially seem. This is especially true in the Sixth Circuit, where applicable opinions are not easy to reconcile as to the question of whether a settlement agreement resolves the liability of the party in question to the federal government or state government. As the Ninth Circuit has noted;

> [In *ITT*], [the Sixth Circuit] found no resolution of liability where (i) EPA reserved its right to bring legal action for failure to comply with the agreement or for past, present, or future response costs; and (ii) the agreement expressly stated that the PRP did not concede liability. *Id.* at 459–60. And more recently, in *Florida Power* [*Corp. v. FirstEnergy Corp.*, 810 F.3d 996 (6th Cir. 2015)], the Sixth Circuit found no resolution where (i) EPA reserved its right to bring a CERCLA enforcement action for violations of the agreement; (ii) the agreement expressly stated that the PRP "shall have resolved [its] liability to EPA" only "[f]ollowing satisfaction of the requirements of this Consent Order"; (iii) the agreement provided that "participation of [the PRP] in this Order shall not be considered an admission of liability"; and (iv) the agreement was not titled an "administrative settlement." 810 F.3d at 1004.

> By contrast, in *Hobart* . . ., the Sixth Circuit held that a PRP had resolved its liability where the agreement (i) stated that, "for purposes of Section 113(f)(3)(B) . . . [the PRPs] have, as of the Effective Date, resolved their liability to the United States"; (ii) immunized the settling parties from contribution actions as of the Effective Date; (iii) included the title, "Administrative Settlement Agreement"; and (iv) contained a covenant prohibiting EPA from suing under CERCLA "[i]n consideration of the actions that will be performed and the payments that will be made by [the PRPs] under the terms of th[e] Settlement Agreement." Id. at 768–69 (emphasis added and omitted). Yet, as pointed out by the dissent in *Florida Power*, the agreement in *Hobart* also included a broad reservation of rights, specifying that "nothing herein shall prevent U.S. EPA ... from taking other legal or equitable action as it deems appropriate or necessary." *Florida Power*, 810 F.3d at 1016 (Suhrheinrich, J., dissenting) (internal quotation marks omitted). Similar provisions precluded a finding that the parties had resolved their liability in *ITT* and *Florida Power*, thus creating what appears to be an inconsistent approach within the Sixth Circuit.

> Further complicating the law in the Sixth Circuit is an earlier case, *RSR*, in which the court held that the PRP's promise of future performance "resolved [its] liability to the United States" because RSR "agree[d] to assume *all* liability (vis-à-vis the United States) for future remedial actions." 496 F.3d at 558 (emphasis in original). But, as noted again by the dissent in *Florida Power*, the agreement at issue in *RSR* also included a covenant not to sue *conditioned* on a Certification of

Completion of Remediation Action issued by EPA. *Florida Power*, 810 F.3d at 1012 (Suhrheinrich, J., dissenting); *see id.* (contemplating that the covenant might "not take effect until the remedial action was complete"). The *RSR* court indicated that a promise of future performance in an agreement suffices to constitute resolution of liability. *See* 496 F.3d at 558.

*Asarco LLC v. Atl. Richfield Co.*, 866 F.3d 1108, 1123–24 (9th Cir. 2017). The Court sees the Ninth Circuit's point about the tension between the cases, except insofar as the Ninth Circuit here suggests that *ITT* and *Florida Power* found that a broad governmental reservation of rights *by itself* precluded a finding that the parties had resolved their liability in those cases. The Court has a healthy respect for the nuances in the analysis that exist due to some tension between some Sixth Circuit cases. Nevertheless, the Court concludes that "[g]iven the similarities with *Hobart*, this case is *relatively* straightforward." *LWD PRP Grp. v. Alcan Corp* [*LWD*], 600 F. App'x 357, 362 (6th Cir. 2015) (emphasis added).

As noted in *LWD*, *Hobart* relied on four different factors (or circumstances, to be more precise) in finding that the agreement there was an administrative settlement:[27]

> First, the *Hobart* parties included language in their agreement that stated their intent that the agreement be an administrative settlement: "The Parties agree that this Settlement Agreement constitutes an administrative settlement for purposes of *Section 113(f)(3)(B)* of CERCLA . . . pursuant to which [Appellants] have, as of the Effective Date, *resolved their liability* to the United States for the Work, and Future Response Costs." . . . .

> Second, the *Hobart* Agreement provided that its settling parties were "entitled, as of the Effective Date, to protection from contribution actions or claims as provided by Sections 113(f)(2) and 122(h)(4) of CERCLA." As we explained, "[f]or this paragraph to have any meaning and Appellants to receive any protection from contribution actions, the [*Hobart* Agreement] must be an administrative agreement under § 113(f)." . . . .

> Third, we noted in *Hobart* that "the parties titled the [*Hobart* Agreement] an "*Administrative Settlement Agreement* and Order on Consent." "In doing so,"

---

[27] *LWD*'s list of the four factors is framed differently from *Asarco*'s list of four factors. Finding *LWD*'s framing accurate and especially helpful, the Court opts to use it.

we observed, "the parties precisely matched the statutory language in § 113(f)(3)(B)." . . . .

> And fourth, the *Hobart* agreement contained a covenant from the EPA " not to sue or take administrative action against [Appellants] pursuant to Sections 106 and 107(a) of CERCLA . . . for the Work and Future Response Costs."

*LWD*, 600 F. App'x at 362–63 (internal quotation marks within internal quotation marks omitted).

Where (as here) two major factors indicate very strongly that the PRP had an "administration settlement," it is relatively straightforward to conclude that in fact it did.

As for the first factor, very similar (in all material respects) to the language in *Hobart*, the language in the VOAP agreement states in Section VIII that the VOAP agreement "constitutes an approved administrative settlement pursuant to 42 U.S.C. § 9613(f) and resolves [Plaintiff's] liability, if any whatsoever, to the State of Tennessee as of the date of [the VOAP agreement] under the Comprehensive Response, Compensation and Liability Act ("CERCLA") and its amendments, 42 U.S.C. § 9601 *et seq*." (Doc. No. 13-2 at 12). By contrast, in *Florida Power*, the agreements did "*not* provide that the plaintiff has 'resolved its liability to the [governmental agency] as of the effective date of the agreement,' but rather state[d], '[f]ollowing satisfaction of the requirements of this Consent Order, [the plaintiff] shall have resolved [its] liability to the EPA . . . ." *Fla. Power*, 810 F.3d at 1004. "The phrase [used in the agreements in *Florida Power*] is better interpreted as conditioning the resolution of plaintiff's liability on plaintiff's performance."[28]

---

[28] The Court concedes that there is certainly language in the VOAP agreement that might suggest that resolution of Plaintiff's liability actually was conditioned on Plaintiff's performance under the agreement. In particular, in multiple places, the VOAP agreement speaks in terms of extinguishment of the liability of Plaintiff if it complies with (does what it is supposed to do under) the VOAP agreement. For instance, the VOAP agreement provides that Plaintiff's "implementation of the actions agreed upon in this Agreement will constitute satisfaction of the apportioned liability of [Plaintiff]" under applicable environmental statutes for specified contamination. (Doc. No. 13-2 at 12). And the VOAP also raises the possibility of potentially liability for certain contamination that is expressly excluded from the scope of the liability protection offered by the VOAP agreement. (Doc. No. 13-2 at 12-13). This certainly tends to muddy the waters somewhat as to whether the VOAP agreement effected an administrative settlement. The Court

*Id.* The same simply cannot be said of the phrase used in VOAP agreement, and to read that phrase otherwise would be to do precisely what *Florida Power* impliedly frowned upon: "compromise the meaning of the parties' chosen language." *Id.*

Moreover, the VOAP agreement expressly used the term "administrative settlement," and indeed identified it as an administrative settlement specifically for purposes of CERCLA liability. By contrast, in *Florida Power*, "'administrative settlement' [was] a phrase that is not found anywhere" in either of the agreements purportedly effectuating an administrative settlement. *Fla.* Id. at 1005.

As for the second factor, like the agreement in *Hobart*, the VOAP agreement provided protection from contribution actions under CERCLA. In particular, it provided that Plaintiff "shall not be liable to third parties for contribution regarding matters addressed in" the VOAP agreement,

---

deems it fair to say that the VOAP agreement was poorly drafted in this regard, as it failed to clearly reconcile these provisions with the provision of the VOAP agreement stating that it "resolves [Plaintiff's] liability, if any whatsoever, to the State of Tennessee as of the date of [the VOAP agreement] under CERCLA."

What, then, is the Court to do? It focuses on the most applicable provision of the VOAP agreement—which, unlike the provision in *Florida Power*—unequivocally and explicitly provided that the signer's (here, Plaintiff's) liability under CERCLA *was resolved* as of the date of the agreement, and not merely *potentially to be resolved* if Plaintiff ended up doing in the future what it was supposed to do. *Florida Power* itself suggested that the situation in *Florida Power* was distinguishable from cases like the present, in which the agreement did *not* "explicitly condition the resolution of liability on performance" of the agreement. *Florida Power*, 810 F.3d at 1004.

The Court's focus herein on what *was* stated explicitly—that Plaintiff's liability under CERCLA was resolved via the VOAP agreement—is supported by the fact that the VOAP agreement seems meticulous about avoiding any language framed so as to suggest that the "resol[ution]" announced in Section VIII of the VOAP agreement potentially could be treated later as somehow either being undone or never achieved in the first place. For example, although the VOAP agreement declares that "achievement of [listed] performance goals is a requirement of [the VOAP]," (Doc. No. 13-2 at 15), the VOAP agreement nowhere indicates that a consequence of non-achievement is the vitiation or non-attainment of the resolution touted in Section VIII. Nor is there any indication in the VOAP agreement that such non-achievement, or any other failure to perform under the VOAP agreement, would be grounds for terminating the VOAP agreement as a whole; in fact, such failure is conspicuously omitted from the recitation of TDEC's grounds for termination set forth in Section XVI(D). (Doc. No. 13-2 at 23). Ultimately, one gets the impression that the parties did not want to be too explicit about what would happen in the event that Plaintiff did not do what it was supposed to do under the VOAP agreement, and in any event absolutely did not want to say that in this event resolution unambiguously announced in Section VIII would not be recognized.

which included liability under CERCLA. (Doc. No. 13-2 at 14). True, this provision was qualified by the proviso that it applied to third parties who were given by Plaintiff actual or constructive notice of the VOAP agreement and given an "opportunity to comment upon" (whatever that means) the VOAP agreement. *Id.* But the Court does not perceive that this changes the fact that this factor cuts in favor of the VOAP agreement being an administrative settlement.

As for the third factor, the title of the VOAP agreement does not use the term "Administrative Settlement" as did the agreement in *Hobart*. But this strikes the Court as rather unimportant, given the above-quoted content from the VOAP agreement that makes very clear in express terms that the parties intended it to be an administrative settlement.

As for the fourth factor, unlike in *Hobart,* the Court does not see where the VOAP agreement contains any express covenant by TDEC not to sue or take administrative action pursuant to CERCLA. But the Court notes something of related if not equal effect. Specifically, as suggested at the end of a footnote above, the VOAP agreement—though making vague references to the possibility of Plaintiff having liability for certain things under certain circumstances—seem meticulous in omitting any clear reference to the possibility that Plaintiff could be sued or subject to administrative action. For example, in Section XVI ("Reservation of Rights), the VOAP agreement reserves to TDEC various rights, and conspicuously absent from them is the right to sue or take administrative action against Plaintiff. Tellingly, TDEC therein reserves the right to "assess responsible parties *other than* [Plaintiff] for liability for civil penalties or damages incurred by the State, including [claims that the State] may have under Section 107 of CERCLA . . . ." (Doc. No. 13-2 at 22) (emphasis added). This does not amount to a covenant not to sue Plaintiff under CERCLA, but it does seem to reflect a lack of intention to sue Plaintiff under CERCLA, and thus counts for something under the fourth factor.

In summary, the first two factors, which the Court deems the most important, very strongly suggest that Plaintiff obtained an "administrative settlement" via the VOAP agreement. The latter two factors do not cut in Plaintiff's favor, but they do not go far in tilting the balance in the other direction. Overall, the Court concludes without great difficulty that the VOAP agreement resolved Plaintiff's liability under CERCLA and thus constitutes (or, perhaps to put it more accurately, effects) an "administrative settlement."[29] And as a result, Plaintiff cannot maintain a cost recovery claim under CERCLA. Accordingly, ACC is entitled to summary judgment on this claim.

4. <u>ACC is entitled, based on limitations, to summary judgment with respect to Plaintiff's negligence claim and nuisance claim originally asserted in the amended complaint in the Prior Case. Otherwise, ACC is not entitled to summary judgment on any of Plaintiff's state-law claims, because with respect to each such claim it failed to meet its initial burden as the summary judgment movant.</u>[30]

_____

[29] Nothing in *ITT* convinces the Court otherwise. As noted above, the Sixth Circuit there found no resolution of liability, and thus no administrative settlement, based primarily on two key factors.

The first was that the environmental agency (there, the EPA) reserved its right to bring legal action against the plaintiff for failure to comply with the agreement or for past, present, or future response costs. 506 F.3d at 459-60. By contrast, as noted above, here no such provision was included in the "Reservation of Rights" section of the VOAP agreement, and the remainder of the VOAP agreement is simply unclear (perhaps intentionally, as noted above) as to the extent to which TDEC reserved the right to bring legal action for failure to comply with the VOAP agreement or for past, present, or future response costs; it is especially unclear that TDEC ever could do any of these things under CERCLA in particular.

The second was that the plaintiff expressly did not concede liability. *Id.* at 460. That is not true of Plaintiff here, who instead admitted in the VOAP agreement that it "may occupy the status of a 'liable party' . . . ." (Doc. No. 13-2 at 12).

[30] In its analysis of Plaintiff's state-law claims, the Court keeps in mind the following in determining the substance of applicable state law:

In diversity cases such as this, we apply state law in accordance with the controlling decisions of the state supreme court. *See Prestige Cas. Co.,* 99 F.3d at 1348 (applying Michigan law). If the state supreme court has not yet addressed the issue presented, we must predict how the court would rule by looking to all the available data. *See id.* "Relevant data include decisions of the state appellate courts, and those decisions should not be disregarded unless we are presented with persuasive data that the Michigan Supreme Court would decide otherwise." *Kingsley Assoc. v. Moll PlastiCrafters, Inc.,* 65 F.3d 498, 507 (6th Cir.1995).

*Allstate Ins. Co. v. Thrifty Rent-A-Car Sys., Inc.*, 249 F.3d 450, 454 (6th Cir. 2001). These principles are especially important here, where the parties rely heavily on (unreported) intermediate Tennessee appellate decisions.

a. *Negligence claims*

As Plaintiff accurately notes, it "has asserted two claims of negligence against ACC for breaching its duty to carry out (1) landfilling activities and landfill post-closure activities in [the Prior Case], and (2) construction activities in [the captioned action]." (Doc. No. 116 at 45). The Court generally will refer to these as the "first negligence claim" and "second negligence claim," respectively.

ACC argues that the first negligence claim is barred by the applicable statute of limitations. According to ACC, the applicable statute of limitations for this claim is Tenn. Code. Ann. § 28-3-105, (Doc. Nos 101 at 46), and Plaintiff does not disagree. ACC's assertion is sound, given that this claim is one "for injuries to . . . real property," Tenn. Code. Ann. § 28-3-105(1), and thus plainly appears to be covered by that statute. The statute prescribes a three-year limitations period that runs "from the accruing of the cause of action." Tenn. Code. Ann. § 28-3-105. Tennessee generally follows the so-called discovery rule (generally a plaintiff-friendly rule) for determining the time of "accrual" (or "accruing") of a claim. And it appears that the discovery rule applies to the determination of the time of "the accruing" of a claim that is covered by Tenn. Code. Ann. § 28-3-105. *See Hulan v. Coffee Cnty. Bank*, No. M201800358COAR3CV, 2019 WL 354870, at *3 (Tenn. Ct. App. Jan. 28, 2019). ¹

"Under the current discovery rule, a cause of action accrues and the statute of limitations begins to run not only when the plaintiff has actual knowledge of a claim, but also when the plaintiff has actual knowledge of "facts sufficient to put a reasonable person on notice that he or she has suffered an injury as a result of wrongful conduct." *Redwing v. Cath. Bishop for Diocese of Memphis*, 363 S.W.3d 436, 459 (Tenn. 2012) (internal quotation marks and brackets omitted). The phrasing of *Redwing* suggests that there are two different times from which the limitation

period runs under the discovery rule (*i.e.*, two different times of accrual). However, it is more precise to say that there is one time of accrual (one juncture from which the limitations period runs), which is the earlier of two times: (a) when the plaintiff has actual knowledge of a claim; or (b) when the plaintiff has actual knowledge of facts sufficient to put a reasonable person on notice that he or she has suffered an injury as a result of wrongful conduct.

ACC asserts that there is no genuine dispute that Plaintiff's first negligence claim accrued at least three years prior to its filing date (January 19, 2012). ACC points to indications in the record that Plaintiff conducted a site assessment in 2006, an investigation in 2007, and a risk assessment in 2008, all with respect to Plaintiff's Property, and thereafter entered into the VOAP agreement with TDEC. (Doc. No. 101 at 46-47). And as ACC notes:

> The TDEC agreement relied upon the preceding Risk Assessments that states that "an area of distressed vegetation is located upstream of Arrow Lake where water with high chloride concentrations enters the Site from the adjacent Associated Commodities Company landfill site. Elevated chloride concentrations exist in Arrow Lake as a result of this water entering the site." There is no legitimate question – [Plaintiff] knew of the contamination for which ACC is alleged to be responsible no later than 2006.

(*Id.* at 47). The Court agrees. And from this it follows that, more than three years prior to filing of the Prior Case in January 2012, Plaintiff both had actual knowledge of either a claim or facts sufficient to put a reasonable person on notice that it suffered an injury as a result of wrongful conduct.

Plaintiff claims that ACC nevertheless has not shown that the limitations period expired prior to its filing the first negligence claim, because ACC has failed "to demonstrate there is no genuine issue of material fact as to when its negligent behavior ceased." (Doc. No. 116 at 45). But Plaintiff does not cite any authority for the proposition that the limitations analysis turns at all upon when the alleged negligent behavior ceased; to the contrary, the applicable test for the date of

accrual is in no way pegged to when the negligent behavior ceased. And because, as noted above, the accrual date preceded the filing of the Prior Case by more than 3 years, the first negligence claim is time-barred under the applicable statute of limitations.

As to the second negligence claim, as noted above it is based upon "construction activities." More specifically, it is based on ACC's "engage[ment] in episodic construction activities at the . . . Landfill since 2011 and at the Waste Relocation Area since 2012."[31] (Doc. No. 1 ¶ 44). Defendant does not assert that this claim is time-barred. Instead, in its Memorandum in Support, ACC argues the following (and only the following) in seeking summary judgment as to this claim:

> As a matter of law, ACC's landfilling activity cannot be considered either a nuisance or negligence because ACC constructed and operated the landfill, the source of the discharges, in accordance with applicable laws. As a rule, "whatever is authorized by statute within the scope of legislative powers is lawful, and, therefore, cannot be a nuisance." Railroad v. Bingham, 87 Tenn. 522, 535-36, 11 S.W. 705, 708-09 (1889). Likewise, it is undisputed that ACC has been engaged in the operation of its landfill and the remediation of the site pursuant to permit of the Tennessee Department of Environment and Conservation. SLLI has not produced any evidence that demonstrates how ACC's conduct has fallen below the permit requirements nor has it presented any evidence that ACC owes a duty greater than that imposed by the State. As a result, SLLI's claims for negligence and nuisance from both 2012 and 2018 complaints should be dismissed as a matter of law because SLLI cannot prove based upon the undisputed facts that ACC breached a duty or acted unreasonably.

(Doc. No. 100).[32] In substance, ACC argues in conclusory fashion that it cannot be liable for negligence for construction activities because (according to ACC) they were conducted "in

---

[31] The Complaint in this action describes the "Waste Relocation Area is part of the Landfill, *i.e.*, an area within the Landfill "where industrial waste that had been buried in the Landfill was relocated between 2012 and 2016." (Doc. No. 1 ¶ 15).

[32] The argument quoted here is made also in support of summary judgment on (i) the first negligence claim, (ii) the nuisance claim set forth in the Prior Case, and (iii) the nuisance claim set forth in the instant action. As noted elsewhere herein, the Court is granting summary judgment as to each of the first of these three claims based on limitations, and so the Court need not address the quoted argument with respect to those claims. As to the third of these claims, the Court addresses the quoted argument below. Significantly, the quoted argument is the sole argument made in support of summary judgment as to the negligence claim and the nuisance claim set forth in the instant action; notably ACC does not address either of these claims in its Reply.

accordance with applicable laws" inasmuch as they supposedly were "authorized by statute" within the meaning of the sole case cited here (which happens to be 134 years old), and because (again according to ACC) Plaintiff has not shown how ACC breached the standard of care.

To this, Plaintiff responds (with respect to both negligence claims, although here the Court is concerned only with the second negligence claim):

> Rather than point to evidence in the record to show that [Plaintiff] cannot prove one or more elements of negligence, ACC argues that the negligence claims . . . fail because ACC complied with "applicable laws." These surface-level arguments fail to demonstrate that [Plaintiff]'s negligence claims fail as a matter of law.

> ACC also argues that both negligence claims . . . fail as a matter of law because ACC's landfilling activity was done "in accordance with applicable laws." However, ACC has not provided evidence as to what these "applicable laws" are or how it complied with them. . . . As for [the negligence claim in the instant action], [Plaintiff's] expert Dr. George McMahon opined that ACC failed to meet the standard of care in its construction stormwater management practices given it was dealing with a construction project that would span many years and involve toxic industrial wastes and highly erodible soils. Accordingly, ACC's request for summary judgment on ACC's negligence claims must be denied.

(Doc. No. 116 at 46). Here, Plaintiff has it right. As discussed above, as the summary-judgment movant, ACC bears the burden of establishing at least preliminarily (generally via citation to materials of record, although this is not absolutely required, as discussed above) the absence of a genuine issue of material fact as to the second negligence claim. But beyond making mere conclusory assertions (without citation to anything of record or any law that is actually helpful here), ACC does nothing to establish presumptively either that (i) there is at least one element of negligence that Plaintiff cannot establish, or (ii) it has an affirmative defense that Plaintiff cannot defeat. Accordingly, the Motion fails with respect to the claim of negligence asserted in this action.

b. *Nuisance*

As Plaintiff accurately explains, Plaintiff "alleges two claims of nuisance—in [the Prior Case] for harm suffered from ACC's acts and omissions 'with respect to its closed Landfill' and in [the instant case] 'with respect to discharges of sediment from ACC's property' from its construction activities that commenced in late 2012." (Doc. No. 116 at 40). The Court generally will refer to these as the "first nuisance claim" and "second nuisance claim," respectively.

ACC argues that the first nuisance claim is barred by the applicable statute of limitations. What the Court said above about negligence is likewise applicable to nuisance. ACC asserts that the applicable statute of limitations for this claim is Tenn. Code. Ann. § 28-3-105, (Doc. Nos 101 at 46), Plaintiff does not disagree, and the assertion is sound because this claim is one "for injuries to . . . real property," Tenn. Code. Ann. § 28-3-105(1), and thus covered by that statute. As noted, the statute prescribes a three-year limitations period that runs "from the accruing of the cause of action." Tenn. Code. Ann. § 28-3-105. And under Tennessee's here-applicable discovery rule, as discussed above that means earlier of: (a) when the plaintiff has actual knowledge of a claim; or (b) when the plaintiff has actual knowledge of facts sufficient to put a reasonable person on notice that he or she has suffered an injury as a result of wrongful conduct.

ACC asserts that ACC assets Plaintiff's first nuisance claim accrued at least three years prior to its filing date (January 19, 2012): Specifically, ACC argues that "[t]his cause of action first accrued when the landfill was closed in 1995, as, at that time, the owner of the SLLI's property had all the information necessary to detect and evaluate the physical damage to its property." The Court agrees that the record reflects that by that time—and at the very least well over three years before January 2012, given the information cited by ACC at Doc. No. 101 at 46-47— Plaintiff both had actual knowledge of a nuisance claim and, alternatively, had actual knowledge of facts

sufficient to put a reasonable person on notice that it suffered an injury as a result of wrongful conduct.

Plaintiff does not actually dispute this. That is to say, Plaintiff does not contest that under the usual "discovery" accrual rules, the limitations period would have expired. Instead, Plaintiff responds that the limitations period nevertheless did not expire here, because although the limitations period for a nuisance claim generally is three years, that is not the case if "the nuisance is temporary and continuous in nature, in which case the statute of limitations will not bar a recovery even where the nuisance has existed longer than three years." (Doc. No. 116 at 43 (citing Tenn. Code Ann. § 28-3-105 and *Kind v. Johnson City*, 478 S.W.2d 63 (Tenn. Ct. App. 1970)). ACC does not contest the validity of this proposition. But it does dispute Plaintiff's contention that the nuisance at issue is "temporary and continuous,"[33] rather than permanent. "The distinction is critical because the two categories require . . . different standards for determining when the statute of limitations begins to run." *KMI Grp., Inc. v. Wade Acres, LLC*, No. W201800301COAR3CV, 2019 WL 1504034, at *4 (Tenn. Ct. App. Apr. 5, 2019).

Articulating the distinction, Plaintiff writes:

> Under Tennessee law, a permanent nuisance is "presumed to continue indefinitely, and is at once productive of all the damage which can ever result from it." *Caldwell*, 391 S.W.2d at 9. A temporary nuisance, on the other hand, is one that can be "corrected by the expenditure of labor or money." Id. at 11. Where the nuisance is temporary, "the damages to plaintiff's property are recurrent and may be recovered from time to time until the nuisance is abated." *Id.*

(Doc. No. 116 at 43) (quoting *Caldwell v. Knox Concrete Products, Inc*., 391 S.W.2d 5, 9 (Tenn. Ct. App. 1964)). This description is consistent with the most recent discussion the Court can find from a Tennessee appellate court regarding these definitions:

---

[33] Tennessee Courts often refer to the second kind of nuisance as a "temporary nuisance." The Court herein will do likewise even though such a term omits the special and relevant connotation provided by the word "continuous"—a connotation that the Court keeps in mind despite the terminology it is using here

There are two types of nuisance: temporary and permanent. A temporary nuisance is one that "can be corrected by the expenditure of labor or money" and the damages to the property "are recurrent and may be recovered from time to time until the nuisance is abated." *Pate v. City of Martin*, 614 S.W.2d 46, 48 (Tenn. 1981); see also *Clabo v. Great Am. Resorts, Inc.*, 121 S.W.3d 668, 671 (Tenn. Ct. App. 2003). "A permanent nuisance is one that is 'presumed to continue indefinitely, and is at once productive of all the damage which can ever result from it . . . .'" *Clabo*, 121 S.W.3d at 671 (quoting *Caldwell v. Knox Concrete Prods.*, Inc., 391 S.W.2d 5, 11 (Tenn. 1964)).

*Whitford v. Vill. Groomer & Animal Inn, Inc.*, No. M202000946COAR3CV, 2021 WL 4240989, at *3 (Tenn. Ct. App. Sept. 17, 2021).

But there is a different line of cases that actually dictates a very different analysis into whether a nuisance is "permanent" or "temporary." As ACC explains, with adequate accuracy, this second line of cases:

> To supplement these definitions, the Tennessee Supreme Court has also stated that if the operation that allegedly caused the nuisances is "done with due care considering the use thereof, and it is not contemplated that any change in operation will be made, the damage is permanent." *Butcher v. Jefferson City Cabinet Co.*, 59 Tenn. App. 59, 437 S.W.2d 256, 259 (Tenn. 1968)(citations omitted). This analysis hinges on whether the operations on Defendant's property are reasonable and lawful as well as the permanence of the damage. "If the damages resulting from the nuisance are due to the fact that the defendant is "negligently operating its property so as to unnecessarily create the damage" and it is within the defendant's power to operate in a non-negligent manner, then the nuisance is temporary. *Robertson v. Cincinnati, New Orleans & Texas Pacific Ry. Co.*, 207 Tenn. 272, 339 S.W.2d 6, 8 (Tenn.1960). If, on the other hand, "the operation is done with due care considering the use thereof, and it is not contemplated that any change in operation will be made, the damage is permanent, and the proper measure of damage is the injury to the fee." *Butcher v. Jefferson City Cabinet Co.*, 59 Tenn. App. 59, 437 S.W.2d 256, 259 (Tenn.Ct.App.1968) (emphasis in original). *Russell v. Howard*, No. M2005-02956-COA-R3CV, 2007 WL 432987, at *6 (Tenn. Ct. App. Feb. 8, 2007).

(Doc. No. 101 at 43). To put it bluntly, these two lines of cases are irreconcilable.[34] The two lines of cases tell the court to focus on—and indeed make dispositive—an inquiry into very different

---

[34] In one case, the Tennessee Court of Appeals noted, with good reason, that the definitions reflected in the first line of cases "are not entirely satisfactory." *KMI Grp., Inc. v. Wade Acres, LLC*, No.

things. To put the problem concisely, the second line of cases tells the court to focus on the extent to which the defendant acted in an inexcusably negligent manner, and the first line of cases tells the court to focus on entirely other things. Accordingly, the Court feels compelled to choose between the two lines of cases rather than, as ACC suggests, treating the second line of cases as "supplement[ing]" the first line—an inaccurate characterization inasmuch as the second line diverges completely from, rather than merely "supplements," the first line. That is to say, the Court cannot purport to apply both lines, but rather must pick one and rely on it to the exclusion of the other.

The Court concludes that Plaintiff (and *Whitford*) have accurately set forth Tennessee law as the Tennessee Supreme Court would view it as of today, and so the Court will follow that line of cases.[35] This is in part because the second line of cases is based on the Tennessee Supreme Court's 1960 opinion in *Robertson*, and (as far as the Court has been able to determine) *Robertson* has never been cited by the Tennessee Supreme Court.[36] Additionally, the Court does not see where the Tennessee Supreme Court has relied on the principles of *Robertson* since *Robertson* was decided. And although the first line of cases is not without its problems (as noted and a footnote

---

W201800301COAR3CV, 2019 WL 1504034, at *4 (Tenn. Ct. App. Apr. 5, 2019). The problem with such definitions is that "with enough money and labor, nearly anything is possible" and that "a permanent improvement to property may, in conjunction with the forces of nature, cause harm only periodically." *Id.* (internal quotation marks omitted). *KMI* opined that in a prior case, the Tennessee Court of Appeals had fixed the problem by invoking the second line of cases "to find more precise definitions." (*Id.* (citing *Clabo v. Great American Resorts, Inc.*, 121 S.W.3d 668, 671 (Tenn. Ct. App. 2003)). The Court respectfully disagrees with the characterization of the second (and older, as *KMI* noted) as providing a "more precise" definition than the first line of cases; vis-à-vis the first line of cases, the second line of cases in fact sets forth very different definitions focused on entirely different considerations. Notably, although the Court herein does not follow *Clabo* on this issue, it does below follow *Clabo* on another issue as to which the Court finds *Clabo*'s opinion sound and not in tension with other Tennessee case law.

[35] Ironically, ACC probably fares better under the first line of cases than under the second line of cases, inasmuch as ACC has not necessarily satisfied the Court that its conduct at the Landfill was such as to render any nuisance "permanent" under the second line of cases.

[36] *Robertson* has been cited a number of times by federal courts and the Tennessee Court of Appeals.

herein that cites *KMI Group*), the second line of cases has its own major problems, considering

what a nuisance actually *is* under Tennessee law.

> As Defendant correctly notes:
>
>> Tennessee courts have defined a private nuisance as "anything which annoys or disturbs the free use of one's property, or which renders its ordinary use or physical occupation uncomfortable . . . [and] extends to everything that endangers life or health, gives offense to the senses, violates the laws of decency, or obstructs the reasonable and comfortable use of property." *Pate v. City of Martin,* 614 S.W.2d 46, 47 (Tenn. 1981). Depending on the surroundings, activities that constitute a nuisance in one context may not constitute a nuisance in another. Whether a particular activity or use of property amounts to an unreasonable invasion of another's legally protectable interests depends on the circumstances of each case, such as the character of the surroundings, the nature, utility, and social value of the use, and the nature and extent of the harm involved. *Id.*

(Doc. No. 101 at 42) (quoting *Lane v. W.J. Curry & Sons*, 92 S.W.3d 355, 364–65 (Tenn. 2002)).[37]

Significantly, "[w]hether a particular activity or use of property is a nuisance is measured by its

effect on a "normal person," *Shore v. Maple Lane Farms, LLC*, 411 S.W.3d 405, 416 (Tenn. 2013),

rather than by the extent to which the defendant is blameworthy as to its activities on (or use of)

the defendant's own property. So what makes the defendant's activities on its own land a nuisance

is its effect on—its capacity to annoy or disturb—a (nearby) landowner, and obviously a nearby

landowner's degree of annoyance or disturbance does not turn on the extent to which it later turns

out that the defendant conducted its activities in an inexcusably negligent manner. And the Court

---

[37] This language from *Lane*, not to mention many other Tennessee cases and indeed *Plaintiff's amended complaint in the Prior Case* absolutely suggests that it is the defendant's conduct that is (or "constitutes") the nuisance, *i.e.*, that the nuisance is the defendant's conduct rather than the harm suffered by the plaintiff. To the extent that *Lane* suggested otherwise when stating that "nuisance does not describe a defendant's conduct, but a type of harm suffered by the plaintiff," the Court is constrained to disregard the suggestion (i) for the reasons just mentioned, and also because it seems incongruous to define the thing that supports a cause of action to recover damages for the plaintiff's harm as *the plaintiff's harm itself.*

    Although the Court hesitates to rely heavily on unreported intermediate state appellate decisions, the Court notes that the discussion in *Clabo* cited by ACC (Doc. No. 125 at 14) supports the notion that the nuisance is the activity on the defendant's property, not the harm to the plaintiff that results from such activity.

likewise does not see why the classification of the nuisance—the classification of the capacity to annoy or disturb the nearby landowner—as being temporary or permanent should turn on the extent to which the nearby landowner ultimately determines the defendant conducted its activities in an inexcusably negligent manner; such capacity does not become more or less permanent based on the extent to which it later turns out the defendant conducted its activities in an inexcusably negligent manner.

And as noted above, in considering whether something is a nuisance, the court is to consider various factors, only *some* of which (and even then only in some cases) turn at all on whether the defendant has conducted activities on the defendant's own property in an inexcusably negligent manner. In other words, the factors for determining whether to characterize something as a nuisance or largely unrelated to the circumstances that the second line of cases tells the court to look at exclusively in deciding whether a nuisance is permanent or temporary. To the Court, it follows that whether a nuisance is temporary likewise is largely unrelated to the circumstances that the second line of cases tells the court to look at exclusively in deciding whether a nuisance is permanent or temporary.

For all of its flaws, the first line of cases is appropriately focused on factors bearing directly on the extent to which something is properly characterized as a nuisance, *i.e.*, properly characterized as having the capacity to annoy or disturb nearby landowners. And these factors are geared more specifically to whether something has the capacity to annoy or disturb permanently as opposed to just temporarily. For all of these reasons, the Court finds the first line of cases more sound than the second line of cases. And absent any reason to believe that the Tennessee Supreme Court today would not embrace the sounder line of cases, the Court concludes that it would do so,

rather than following a line of cases embracing a principle that Tennessee Supreme Court has not invoked for more than sixty years.

To reiterate, under the first line of cases, "[w]here an activity or business operation creating the nuisance is of such a character that it will be presumed to continue indefinitely, and is at once productive of all the damage which can ever result from it, the nuisance is permanent, and the statute of limitations begins to run against the plaintiff's cause of action from the time of the complete creation of the nuisance." *Caldwell v. Knox Concrete Prod., Inc.*, 54 Tenn. App. 393, 406, 391 S.W.2d 5, 11 (1964).[38] As noted above, the activity allegedly constituting the nuisance, according to the amended complaint in the Prior Case, was "the acts and omissions of ACC with respect to its closed Landfill"; Plaintiff asserted that these "acts and omissions constitute an actionable nuisance . . . ." (Prior Case, Doc. No. 61 at 18). But in substance, such alleged acts and omissions really amount solely to ACC having on its Landfill "buried wastes," which is contacted by "surface and ground waters" that "pick[ ] up contaminants from the wastes, and then discharge from the toe of the landfill as surface and subsurface leachate containing elevated levels of pollutants . . . .." (*Id.* at 7). True, the amended complaint does insinuate that ACC is engaging in malfeasance or nonfeasance with respect to the buried wastes at the Landfill, but the amended complaint is clear that it is *the presence of waste at the Landfill*— and not any particular "activities" of ACC at the Landfill post-closure—that is what is "annoying and disturbing" Plaintiff as a neighboring landowner. In the Court's view, the presence of waste at the Landfill—the applicable nuisance—is indeed of "such a character that it will be presumed to continue indefinitely." And

---

[38] For this proposition, *Caldwell* oddly cited *Robertson* (which was decided four years before *Caldwell*). Although incongruous and not directly relevant to how the Tennessee Supreme Court would decide today, this citation of *Robertson* by the Tennessee Court of Appeals may be telling; it may reflect that *Robertson's* tenure as strong support for the second line of cases was short-lived—although the Court realizes that *Robertson* has since been cited periodically as support for the second line of cases.

the presence of the waste also is "at once productive of all the damage which can ever result from it" because once all of the waste was present in the Landfill (as it was at the time of the Landfill's closure in 1995), it was able to produce all of the damage (to Plaintiff's Property in particular) that ever could result from it; any remedial removal of waste could *diminish* such damage, but once in place, the waste was in position to do all the damage it could do without the need for ACC or another else to do anything else whatsoever to increase the damage.

In short, the nuisance underlying the nuisance claim alleged originally in the Prior Case was permanent. Accordingly, the general accrual rules apply normally—without any exception being made on the grounds that the nuisance actually was temporary—and this claim is time-barred.

The second nuisance claim is another matter, because there the alleged nuisance is something entirely different: ACC's construction activities (which allegedly began around 2011). This difference would make the limitations argument substantially more difficult for ACC, and ACC does not even make the argument. Instead, with respect to this claim, the Motion makes the argument quoted above in connection with the discussion of Plaintiff's second negligence claim. But this argument suffers from the same kind of flaw that doomed ACC's argument with respect to Plaintiff's second negligence claims. Namely, it does not establish preliminarily (whether by citation to materials of record or otherwise) either that Plaintiff will be unable to establish that ACC's construction activities constituted a nuisance under Tennessee law or that Plaintiff would be unable to defeat a particular affirmative defense. Instead, ACC relies on mere conclusory assertions—and the misguided belief that Plaintiff has from the get-go a burden of showing evidence in support of its claim, when in fact Plaintiff bears no such burden unless and until ACC

as the summary-judgment movant meets its initial burden. Because ACC never shifted such burden to Plaintiff, the Motion fails with respect to the second claim.

      c.  *Trespass*

In the amended complaint in the in the Prior Case (but not the instant action), Plaintiff asserted a claim for trespass. According to Defendant:

> Under Tennessee common law, the essential elements of a claim for trespass are: (1) an intentional entry or holdover [on the land of the plaintiff], (2) by the defendant or a thing;[39] (3) without consent or legal right. *Twenty Holdings, LLC v. Land S. TN, LLC*, No. M2018-01903-COA-R3-CV, 2019 Tenn. App. LEXIS 438, at *23-28 (Ct. App. Sep. 5, 2019)(citing Trespass, Plaintiff's Proof Prima Facie Case § 14:24).

(Doc. No. 101 at 49). The citation here is to an unreported intermediate Tennessee appellate decision, which cites to no Tennessee authority. But Plaintiff does not dispute that these are the elements, and for present purposes the Court accepts that they are.

Plaintiff's trespass claim is stated in pertinent part as follows:

> The acts and omissions of ACC constituted, and continue today to constitute, an ongoing and unlawful trespass, because they interfere with [Plaintiff]'s exclusive possession and legitimate uses of its property, and are causing partial destruction of, and continuing damage to, [Plaintiff]'s property . . . . . . .
>
> ACC's acts and omissions that created, and continue to create today, its unlawful trespass, were intentional, deliberate, wanton, oppressive, and accompanied by gross negligence and heedless disregard for [Plaintiff]'s rights as a property owner. The destruction of and ongoing damage to [Plaintiff]'s property occurred under egregious circumstances because, among other things, ACC's discharge of toxic pollutants to [Plaintiff]'s property was . . . longstanding and . . . significant . . . .

(Prior Case, Doc. No. 61 at 19). Plaintiff is unclear as to what it contends constitutes the trespassing. For one thing, Plaintiff does not indicate *what* "acts and omissions of ACC

---

[39] In context, it is clear that the "thing" mentioned here is something (besides the defendant itself) that has entered the plaintiff's land as the result of some action of the plaintiff; otherwise, it would make no sense for the defendant to be liable for the entry or holdover of the "thing."

constituted" the alleged ongoing trespass. Moreover, Plaintiff then equivocates, saying not that acts and omissions of ACC *constituted* the trespass, but rather that ACC's acts and omissions *"created"* the trespass—leaving the Court to wonder what was that ACC's acts and omissions "created" that was in turn the trespass. In other words, if ACC's acts and omissions caused the trespass, what was the act thus caused that in turn constituted the trespass? ACC does not say. Unsurprisingly, Plaintiff does not allege that any agent of ACC entered upon its land or placed anything (*i.e.*, any waste) upon its land. And so the Court surmises that Plaintiff's theory is that some (unspecified) acts or omissions of ACC caused discharge of pollutants onto Plaintiff's Property, and that this discharge constituted the "intentional entry" of a "thing" sufficient to support a claim of trespass under Tennessee law.[40]

ACC contends that this claim is barred by limitations for the same reason that the first negligence claim is by barred by limitations: (i) Tenn. Code Ann. § 28-3-105 is the applicable statute of limitation and provides a three-year limitations period; and (ii) the three-year period expired, under the discovery rule, more than three years prior to the filing of the Prior Case. (Doc. No. 101 at 45-47).

In response, Plaintiff does not directly challenge either of these points. Instead, Plaintiff argues that the normal limitations analysis on which ACC relies is simply inapplicable because it has alleged a "continuing trespass." So the initial question is whether, in the case of a "continuing" trespass, the Court should eschew the normal rule that the limitations period expires three years after the accrual date *as determined by the discovery rule*.

---

[40] ACC apparently construed the trespass claim the same way, although ACC was less explicit than the Court in articulating the basis for that construction. (Doc. No. 101 at 48-49). Notably, Defendant has not challenged the claim for being too indefinite, and so the Court considers the claim as thus construed, rather than dismissing the claim for being too indefinite.

Although there appears to be little Tennessee law on point, the one case the Court was able to find holds that there is a dichotomy between temporary or continuing trespass and permanent trespass for purposes of limitations, including at the summary judgment stage. As noted in

> Appellants do not dispute that [in the particular case at hand] any trespass claim must constitute a temporary or continuing trespass to survive summary judgment on the statute of limitations. As explained by a secondary source on this issue,
>
>> Ordinarily, only one recovery may be had for damages resulting from a permanent and unabatable ... trespass, but where a . . . trespass is abatable and is temporary or recurring in nature, or is what is called a continuing . . . trespass, each occurrence, recurrence, or continuance gives rise to a new cause of action and successive actions may be maintained for the damages accruing from time to time. Under the continuing tort doctrine, where a tort involves a continuing or repeated injury, the limitations period does not begin to run until the date of the last injury or the date the tortious acts cease.

*Ray v. Neff*, No. M2016-02217-COA-R3-CV, 2018 WL 3493158, *8 (Tenn. Ct. App. July 20, 2018) (quoting 14 A.L.R.7th Art. 8 (2016)). The Court accepts that the Tennessee Supreme Court would view this the same way, *i.e.*, that a continuing-trespass theory upends the normal limitations analysis by rendering inapplicable the discovery rule of accrual—and instead making the three-year limitations period beginning running on the date of the last injury or the date the tortious acts cease.

This renders viable Plaintiff's argument here, which is that: (i) Plaintiff has alleged a continuing trespass; (ii) the key to the limitations analysis for a continuing trespass is not when the trespassing began but rather when the trespassing stopped; and (iii) ACC has not shown that the trespassing has stopped at all, let alone stopped more than three years prior to the filing of the Prior Case. The third point here is irrelevant and the entire argument fails, it should be noted, *unless* ACC has the burden of showing that the limitations period expired even under a continuing-

trespass theory. The question is whether ACC shoulders this burden merely because Plaintiff has pleaded such theory; conceivably, a defendant-movant does not bear the initial burden of showing that the plaintiff fails to survive a limitations defense under a plaintiff-friendly theory of the limitations analysis that the plaintiff has not shown is actually (rather than merely allegedly) applicable. So the Court must decide, as the court in *Ray* did not, whether the summary-judgment movant bears the initial burden of showing preliminarily that it prevails under a continuing-trespass theory, merely because the non-movant asserted the theory in its complaint.

"[T]he party asserting statute of limitations as an affirmative defense has the burden of demonstrating that the statute has run." *Griffin v. Rogers*, 308 F.3d 647, 653 (6th Cir. 2002). This applies in the specific context of summary judgment. *See Campbell v. Grand Trunk W. R. Co.*, 238 F.3d 772, 775 (6th Cir. 2001) (stating, when reviewing a district court's grant of summary judgment on limitations grounds, that "[b]ecause the statute of limitations is an affirmative defense, the burden is on the defendant to show that the statute of limitations has run."). So "[w]hen a party seeks judgment as a matter of law on a statute of limitations, the Court must decide two questions: '(1) whether the statute of limitations has run and (2) whether there exists a genuine issue of material fact as to when the plaintiff's cause of action accrued.'" *Waste Servs. of Decatur, LLC v. Decatur Cnty., Tennessee*, 367 F. Supp. 3d 792, 810 (W.D. Tenn. 2019) (quoting *Henry v. Norfolk S. Ry. Co.*, 605 F. App'x 508, 510 (6th Cir. 2015) (quoting *Campbell v. Grand Trunk W. R.R. Co.*, 238 F.3d 772, 775 (6th Cir. 2001))). This phrasing is awkward, because obviously a court cannot answer the first question until it has the answer to the second question; whether a limitations period has expired depends inextricably upon when the claim accrued. The Court gathers that the questions essentially can (and should be reversed, to read: "(1) whether there exists a genuine issue of material fact as to when the plaintiff's cause of action accrued; and if not, (2) whether the statute

of limitations has run in light of the [now determined] date of accrual." The Court will proceed accordingly.

ACC's argument fails at the first of these questions. To show the absence of a genuine issue of material fact as to when Plaintiff's trespass claim accrued for limitations purposes, it was incumbent upon ACC to show the absence of a genuine issue as to the viability of a continuing trespass theory. In other words, ACC does bear the burden of showing that the continuing violations theory is inapplicable here, because otherwise it cannot show the lack of a genuine issue of material fact as to when the trespass claim accrued—since the question would remain as to whether the accrual date was set by the generally applicable discovery rule or by the special rule applicable if the continuing trespass theory is viable. Without nailing down that the continuing trespass theory was not viable, ACC cannot even show which of the test tests of accrual is applicable here and thus cannot meet its burden of showing the absence of a genuine issue of material fact as to the first question. Still less can ACC show the absence of a genuine issue as to the subsequent second question, which turns largely on the first question. In short, Defendant's limitations argument fails because it has not shown (preliminarily) that the continuing-trespass theory is not viable or that the limitations period expired even under a continuing trespass theory.

ACC makes two other arguments regarding the claim of trespass. The argument is premised on the notion that "[i]t is undisputed that ACC's landfilling activities that allegedly caused the discharge to [Plaintiff's Property] were contained on ACC's property." (Doc. No. 101 at 50). ACC's purported showing that this is "undisputed" is a solely citation to paragraph 6 of the amended complaint in the Prior Case, (id.), which actually does not stand plainly for the proposition that all (as opposed to some or even most) of ACC's relevant activities were contained on ACC's property. This showing is less than overwhelming and, with more planning by ACC,

conceivably could have been made much more effectively. But such citation is at least a step in the right direction, and one familiar with the case as a whole comes away with the distinction impression that there is no reason to believe that ACC ever did anything on Plaintiff's Property. Moreover, in its response, Plaintiff does not dispute the proposition. So the Court accepts the proposition as undisputed

From this proposition, ACC argues (albeit not as clearly as it might have) in essence that the trespass claim fails for inability to establish either its first or second element because there was no entry (or "holdover," a concept that seems irrelevant here)—whether intentional or intentional—by either ACC or a "thing" attributable to it. This is a colorable argument, and one that is very sound with respect to *ACC itself*. But ACC fails to adequately support this argument with respect to a "thing" attributable to ACC. Specifically, it fails to explain—as opposed to merely asserting conclusorily in the most terse of fashions, with a dash of hyperbole thrown in—why the discharge from the Landfill onto Plaintiff's Property cannot qualify under the law as a "thing" entering Plaintiff's Property that could satisfy the second element of a trespass claim. Still less does ACC cite any legal authority for the proposition that such discharge could not qualify as such a "thing." So this seemingly promising argument fails as inadequately support by the summary-judgment movant.

That leaves ACC's final argument, one that ACC does not distinguish from its second argument as clearly as the Court does herein. This argument is to the effect that ACC did not act with the requisite intent to commit trespass. ACC argues that the requisite intent is the intent to be on Plaintiff's land, or, more specifically in this case, intent to place something onto Plaintiff's property. (Doc. No. 101 at 49). For this proposition, ACC cites *Twenty Holdings, LLC v. Land S. TN, LLC*, No. M201801903COAR3CV, 2019 WL 4200970 (Tenn. Ct. App. Sept. 5, 2019).

Consistent with ACC's representation, *Twenty Holdings* states that "[i]n the context of a trespass, 'intent' refers to intent to be on the land" rather than intent to trespass (*i.e.*, intent to be on someone else's land without permission to do so). *Id.*, at *8 *Twenty Holdings*, which the Court assumes *arguendo* accurately states Tennessee law in this regard, goes on to say, "While a trespass clearly occurs when the actor knowingly and without authority enters the land of another, the requisite intention is to enter upon the particular land in question, irrespective of whether the actor knows or should know that he or she is not entitled to enter." *Id.* It follows, according to ACC, that it cannot be liable for trespass because it did not intend to enter (or, as relevant here, to have the discharge of pollutants from the Landfill enter onto Plaintiff's Property).

According to Plaintiff, the argument fails because the requisite intent actually is the intent "to do the act that results in the trespass." For this proposition, Plaintiff cites *City of Townsend v. Damico*, No. E2013-01778-COA-R3CV, 2014 WL 2194453, at *4 (Tenn. Ct. App. May 27, 2014), which the Court will assume *arguendo* accurately reflects Tennessee law. This case does state that "'it is required that there be an intent to do the act that results in the trespass.'" *Id.* (quoting 75 AM. JUR.2d Trespass § 5 (2014)). But this statement does not suggest that the *only* required intent is the intent to do the act that results in the trespass, and there is no conflict between saying both this this intent is required *and* that the intent to enter (or cause some "thing" to enter) upon the plaintiff's land is required. To give effect to both *City of Townsend* and *Twenty Holdings*, which the Court believes is warranted, the Court must accept that both kinds of intent are required for a trespass claim. And the Court does so without much consternation; the Court finds it unexceptional that tort liability would require both an intent to do an act that causes a result, and an intent to cause a result (here meaning an intent to cause a discharge that enters upon Plaintiff's land, irrespective of any intent specifically to *trespass* by so doing).

In short, the Court accepts ACC's view that a trespass claim requires an intent to cause the discharge from its property to enter onto Plaintiff's land. Crucially, however, the notion of "intent" in this context is, according to the very case cited by ACC, broader that ACC acknowledges. Specifically, in discussing what "intent" means in the specific context of trespass, *Twenty Holdings* noted that "[i]t is not necessary that one act for the purpose of entering; it is enough that the actor knows that the conduct will result in such an entry, inevitably or to a substantial certainty." *Twenty Holdings*, 2019 WL 4200970, at *8. *Accord Barrios v. Simpkins*, No. M202101347COAR3CV, 2022 WL 16846642, at *12 (Tenn. Ct. App. Nov. 10, 2022) (quoting this language from *Twenty Holdings*) In other words, *specific intent* to have a "thing" enter onto the plaintiff's property is not actually required; it is enough that the defendant *knew* to a substantial certainty that such entry would occur.

ACC concedes that it took the "intentional act [of] disposing of waste into the [landfill] on its own property." (Doc. No. 101 at 49). The questions here are (i) whether the entry of the discharge onto Plaintiff's Property is properly deemed to have resulted from such intentional act, and (ii) whether Defendant "intended" such discharge to enter Plaintiff's Property. ACC expressly bypasses the first question, effectively assumes arguendo that the answer to the first question, and seeks to prevail solely under the second question. (Doc. No. 101 at 49) ("The migration of discharge onto [Plaintiff]'s property, whether caused by ACC['s] . . . actions *on ACC's property*, were not intentionally placed on SLLI's property"). To prevail as the summary-judgment movant, however, ACC must begin by preliminarily showing the absence of a genuine issue of material fact as to whether ACC intended the discharge to enter Plaintiff's Property. ACC does nothing to make this showing beyond asserting in conclusory fashion that it had no such intent. In particular, ACC does nothing to show that a reasonable jury could not find that ACC "kn[ew] that its disposal

of waste in the Landfill w[ould] result in such an entry [discharge from the waste], inevitably or to a substantial certainty." For all the record reveals, ACC possibly could have lacked specific intent for the discharge to enter, and yet was *substantially certain* that such entry would occur— in which case it would be deemed to have the required "intent." Having failed to eliminate that possibility at least preliminarily (subject of course to Plaintiff's right to respond as the non-movant), ACC has failed to meet its burden on this claim, and it will be denied summary judgment on this claim.

### d. *Punitive Damages*

Plaintiff also asserted, in the Amended Complaint in the Prior case, a claim for punitive damages premised solely on ACC's alleged trespass. (Prior Case, Doc. No. 61 at ¶ 63). ACC seeks summary judgment on this claim. In so doing, ACC argues the following (and only the following):

> [I]n its 2012 complaint, SLLI asserted a claim for punitive damages based upon the alleged trespass by ACC. If this claim were not made moot by the dismissal of the claim for trespass based upon the statute of limitations or the merits, the claim for punitive damages should be dismissed because ACC's conduct complied with direction of [TDEC]. Such compliance inherently negates the recklessness required for an award of punitive damages.

(Doc. No. 101 at 50). In its Response, Plaintiff counters with:

> ACC argues that SLLI's punitive damages claim must be dismissed because SLLI's trespass claim must be dismissed and because ACC complied with direction from TDEC, which "inherently negates the recklessness required for an award of punitive damages." As detailed above, ACC has not met its burden to demonstrate that SLLI's trespass claim fails as a matter of law, so SLLI's punitive damages claim is not "made moot." In addition, ACC provides no law to support its assertion that compliance with direction from TDEC—or any other state agency —shields it from punitive damages. It also provides no citations to the record to demonstrate what direction TDEC gave it or how it complied with that direction.213 Instead, ACC yet again asks this Court and SLLI to simply take its word and dismiss SLLI's claims. For these reasons, ACC has failed to show why SLLI's claims for trespass and punitive damages fail as a matter of law.

(Doc. No. 116 at 48). Correctly noting that a party conceivably can act intentionally, fraudulently, or maliciously even if it has not acted recklessly, Plaintiff further notes:

> ACC also ignores that punitive damages can be awarded if a defendant has acted either intentionally, fraudulently, maliciously, or recklessly. *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn. 1992). Therefore, even if ACC could show that its compliance with TDEC meant that its actions were not reckless, it has not demonstrated that its actions were not intentional, fraudulent, or malicious.

(Doc. No. 116 at 48 n. 212).

Plaintiff's argument here is spot on, and the Court embraces it fully. As noted above, the trespass claim survives the Motion, and so the punitive damages claim does not fail at this juncture on the grounds that the trespass claim fails. And however strong ACC's argument might have been had ACC adequately supported it, the argument is toothless because ACC has failed to support it. That is, it has made no preliminary showing that, as it asserts in wholly conclusory fashion, its conduct complied with direction of TDEC—let alone that for this (or indeed any other reason) a reasonable jury could not find that ACC acted either intentionally, fraudulently, maliciously or recklessly in committing the trespass alleged by Plaintiff.

<u>CONCLUSION</u>

For the reasons set forth above, the Motion (Doc. No. 100) will be GRANTED IN PART AND DENIED IN PART. Specifically, ACC will be (a) granted summary judgment on Plaintiff's 25 claims under the Clean Water Act (asserted in the complaint in this case), on Plaintiff's CERCLA cost-recovery claim (originally asserted in the Prior Case), and on the negligence claim and nuisance claim originally asserted in the Prior Case; but (b) denied summary judgment as to all other claims, *i.e.*, all state-law claims asserted either in this case or in the amended complaint in the Prior Case except for the above-referenced negligence claim and nuisance claim.

An appropriate order will be entered.

_Eli Richardson_

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE